## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| CHRIS MCGEE, MD PA, APRIL E. LOPEZ, FNP-BC, LLC DBA LOPEZ FAMILY CLINIC, BRIAN G. LODER, DPM, PLC DBA DETROIT FOOT AND ANKLE, HEALTHCARE HOUSECALLS LLC, AND INDY WOUND CENTER FOR LIMB PRESERVATION & RECONSTRUCTION DBA INDY WOUND CENTER, individually and on behalf of all others similarly situated <br><br> *Plaintiffs*, <br><br> *v.* <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, <br><br> DR. MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES <br><br> CENTERS FOR MEDICARE & MEDICAID SERVICES <br><br> *Defendants.* | Civil Action No. _____ |

## <u>CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiffs Chris McGee, MD PA, April E. Lopez, FNP-BC, LLC, dba Lopez Family Clinic, Brian Loder, DPM, PLC, dba Detroit Foot and Ankle, Healthcare Housecalls LLC, and Indy Wound Center for Limb Preservation & Reconstruction dba Indy Wound Center ("Plaintiffs"), on behalf of themselves and all others similarly situated, hereby bring this complaint against the United States Department of Health and Human Services ("HHS"), the

Centers for Medicare & Medicaid Services ("CMS"), Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services (the "Secretary"), and Dr. Mehmet Oz, in his official capacity as Administrator of CMS (the "Administrator" and, together with HHS, CMS, and the Secretary, "Defendants" or the "Agency"), alleging as follows:

## NATURE OF THE ACTION

1.     This case concerns an illegal and coordinated scheme by the Defendants to eradicate an industry that has helped hundreds of thousands of Americans suffering from chronic, non-healing wounds, that, if left untreated, can lead to amputation and death. Defendants have targeted the skin substitute industry for termination through their scheme despite the overwhelming evidence that these products improve patient outcomes, reduce healthcare costs, and save limbs and lives. Due to their efficacy, Plaintiffs and other providers for many years have used skin substitutes to treat chronic wounds that failed to respond to conventional medical treatments, prescribing activities directly in line with well-established and long-standing guidelines under Medicare. Plaintiffs' uses of skin substitute products are fully consistent with industry norms, historical use of these products, and even Medicare coverage standards. But now their use is being second-guessed and denied payment as part of Defendants' systematic campaign to shut down the industry using whatever means necessary.

2.     The clawbacks at issue in this case—audits that seek to recoup reimbursements for skin substitute products claiming their use was somehow "experimental" or "investigational"— are an on-going effort in this long-running campaign. Defendants also took this war to another front when they previously attempted and failed on two separate occasions to promulgate local coverage determinations through a public notice and comment process that would have changed Medicare's coverage standard for future services. As part of this latest effort, CMS officials

estimated in private communications that the new local coverage determinations, if in place during a previous 12-month coverage period, would have saved approximately $1.17 billion from that year alone. *See* Exhibits 1 and 2. While coverage determinations are required to be based on "medical necessity," not cost considerations, Defendants' financially driven motivations were abundantly clear before the President intervened to stop the new local coverage determinations and directed CMS instead to prioritize patient well-being. Despite those failed efforts, Defendants remain focused on squeezing massive financial savings from the skin substitute industry, now under the guise of "audits" that seek to second-guess the well-established scientific and medical consensus about these products. Indeed, Defendants have continued to assault the industry through a coordinated, nationwide campaign to reopen previously paid claims and retroactively clawback money for services they already approved and paid for. Moreover, at the same time that Defendants have implemented these clawbacks, they also targeted the industry with new initiatives that went into effect on January 1, 2026, that dramatically lower reimbursement amounts for skin substitute products and also impose prior authorization requirements in certain areas under CMS's so-called Wasteful and Inappropriate Service Reduction (WISeR) pilot program. These new regulatory efforts are only compounding the harms being experienced by Plaintiffs and the patients they serve who have come to rely on skin substitutes to meet their urgent health needs.

3.        Defendants' resort to systematic clawbacks to accomplish what they tried and failed to do through other channels is patently unlawful. Defendants are ignoring policies that remain on the books and that require coverage of skin substitutes in the very patient settings in which Defendants are now denying coverage. Defendants have failed to provide any reasoned justification for why they have forsaken those long-standing policies or how products that have been used for years with widespread scientific and medical consensus are now "experimental" and

"investigational." This new regulatory approach and the faulty process that precipitated it directly contravene foundational requirements of the Medicare statute and the Administrative Procedure Act.

4.    Pointedly, the clawbacks at issue here are not based on faulty medical documentation or other similar shortcomings with the providers' diligence. Indeed, in most instances, Defendants' own contractors have acknowledged that providers adequately demonstrated medical necessity for the care dispensed. Instead, Defendants' agents have manufactured a pretextual rationale that skin substitute products somehow became "experimental" and "investigational" after it paid claims for years and years on these items. The consequences of these clawbacks are bleak: providers are being driven out of business, patients are losing access to care, and funds that rightfully belong to providers are being unlawfully seized. This lawsuit seeks to uphold the rule of law and stop this illegal Clawback Policy.

5.    Plaintiff Dr. Chris McGee is a board-certified physician and director of a wound-care clinic, Cutting Edge Wound Solutions. Plaintiff April E. Lopez is a board-certified Family Nurse Practitioner ("FNP-BC"). Plaintiff Dr. Brian Loder is a board-certified podiatrist and foot and ankle surgeon. Dr. Joseph Lalia is a board-certified physician who directs a medical clinic, Plaintiff Healthcare Housecalls LLC. Drs. Neal Patel and Thomas Zumbaugh are board-certified podiatrists who co-own a wound-care clinic, Plaintiff Indy Wound Center. As part of their respective practices, Plaintiffs provide critical wound care services to Medicare beneficiaries. Chronic wounds are particularly prevalent and severe among elderly individuals who suffer from diabetes and related conditions. Indeed, wounds among elderly patients with diabetes often manifest as diabetic foot ulcers and venous leg ulcers. These wounds are debilitating and, if not successfully treated, can lead to limb amputations and potentially even death. In fact, patients with

chronic, open wounds and amputations have a five-year survival rate comparable to that of some of the most aggressive cancers. *See* Gary Rothenberg, *What Diabetic Foot Ulcers and Cancer Have in Common — And Why It Matters*, Podimetrics (Apr. 11, 2025), https://podimetrics.com/what-diabetic-foot-ulcers-and-cancer-have-in-common-and-why-it-matters/ (citing David G. Armstrong et al., *Five Year Mortality and Direct Costs of Care for People with Diabetic Foot Complications Are Comparable to Cancer*, 13 J. Foot & Ankle Rsch. 1 (2020), *available at* https://tinyurl.com/yxdyhmbc).

A.    **Medicare's Longstanding Coverage of Skin Substitutes**

6.    For decades, wound care experts, including Plaintiffs, have successfully treated chronic wounds using products known as "skin substitutes." These products, regulated by the Food and Drug Administration ("FDA"), are derived from minimally processed human amniotic tissue and have had a significant beneficial impact on patient care. Skin substitutes have been a major factor in improving wound-closure rates, reducing the comorbidities that accompany chronic wounds, and achieving overall better health outcomes. For decades, skin substitutes have been widely used by healthcare providers across a broad range of settings including hospitals, physicians' offices, residences, and nursing homes. Both physicians and patients have come to rely upon the availability and use of skin substitutes to treat chronic wounds.

7.    Due to CMS's recognition of the efficacy of these products and the important benefits they provide, the Medicare program for decades has reimbursed wound care providers for their use of skin substitute products to treat chronic, non-healing wounds. The government hires Medicare Administrative Contractors ("MACs") to process and review requests for reimbursement from healthcare providers on a regional basis. Until recently, the MACs in every region of the country paid for the use of skin substitute products when used to treat Medicare beneficiaries. In fact, three of the seven MACs adopted detailed, binding written policies that remain in effect today

and outline the medical necessity rationale for providing broad-based coverage of skin substitutes in treating chronic, non-healing wounds, specifically diabetic foot ulcers and venous leg ulcers.

8.    Some MACs codified their broad-based coverage of skin substitute products through Local Coverage Determinations ("LCDs"), which are written policies or determinations that a product or service is medically reasonable and necessary. 42 U.S.C. § 1395ff(f)(2)(B). These LCDs provided clear notice to practitioners and patients that Medicare would cover the use of skin substitute products because of their healing properties. Four MACs—CGS Administrators, First Coast Service Options, Novitas, and Palmetto—adopted such LCDs. They made these determinations after reviewing the clinical evidence and literature and concluding that it was sufficient to establish that skin substitutes healed chronic wounds faster and at a higher rate than standard wound care treatments. *See* L36690, Wound Application of Cellular and/or Tissue Based Products (CTPs), Lower Extremities (2016) (the "CGS 2016 LCD") (attached as Exhibit 3); L36377, Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities (2015) (the "First Coast 2015 LCD") (attached as Exhibit 4); L35041, Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds (2015) (the "Novitas 2015 LCD") (attached as Exhibit 5) (collectively, the "2015–2016 LCDs"); *see also* L36466, Application of Skin Substitutes (2016) (retired in 2019) (the "Palmetto 2016 LCD") (attached as Exhibit 6). The four MACs' policy of pre-authorizing coverage and payment alleviated any financial stress that would result from uncertainty of coverage and allowed providers and patients to focus on achieving the best health outcomes.

9.    The use of skin substitutes to treat refractory diabetic foot ulcers and venous leg ulcers was so medically accepted that even MACs without a formal LCD routinely covered skin substitutes for chronic, non-healing wounds. Indeed, CMS's own data underscores that MACs in

all jurisdictions provided comprehensive coverage. From 2015 to 2023, all seven MACs—including the three that did not publish a skin substitute LCD—paid over 1.3 million skin substitute claims worth nearly $14 billion in total reimbursements, providing critical wound care treatment to hundreds of thousands of Medicare beneficiaries suffering from chronic, non-healing wounds. For Medicare claims limited to the application of skin substitutes to diabetic foot ulcers and venous leg ulcers—wounds that, if left untreated, can lead to amputation and death—the seven MACs paid more than 340,000 claims across all jurisdictions, representing countless patients whose limbs and lives were saved by these treatments. The MACs rarely rejected payment, in fact, paying these claims between 86.6% to 94.2% of the time. To illustrate how uniformly all MACs covered skin substitutes, the three MACs that have maintained formal LCDs throughout the entire time period—CGS, First Coast, and Novitas—were responsible for only 120,180 claims limited to the application of diabetic foot ulcers and venous leg ulcers, which represents approximately only 35% of these types of claims paid nationwide; the remaining 65% came from MACs operating without any formal LCD. This general practice by all MACs, whether by LCD or on a case-by-case basis, of covering skin substitutes to treat chronic, non-healing wounds is referred to herein as Medicare's "Skin Substitute Coverage Policy."

10.    Consistent with Medicare's Skin Substitute Coverage Policy, Plaintiffs have relied for years upon skin substitute products—including Zenith, carePATCH, Impax, Amnio-Maxx, BioLab Membrane Wrap, and Amnio Quad-Core—to treat patients suffering from diabetic foot ulcers and venous leg ulcers. The Medicare program has historically covered these products, recognizing that their innate properties stimulate and promote wound healing. *See, e.g.*, Exhibit 5, Novitas 2015 LCD (recognizing skin substitutes' ability "to stimulate or facilitate healing or promote epithelization" in chronic wounds that do not respond to conventional treatment); Exhibit

3, CGS 2016 LCD (same). Based on this well-settled policy and a history of predictable and reliable reimbursements for these products, Plaintiffs continued to provide them where medically appropriate, with the reasonable expectation that Medicare would continue to cover these treatments for eligible beneficiaries. Both Plaintiffs and their patients have come to rely on Medicare's past coverage of the Products and reasonably expect these Products to remain available under Medicare Part B, particularly given the absence of any publicly announced change in policy.

11.     Given this long history of coverage, Plaintiffs and those similarly situated could not reasonably have been expected to know that the Medicare program would abruptly stop covering these products. Plaintiffs lacked any prior written or verbal notice that these products would not be covered; in fact, under the Skin Substitute Coverage Policy, these products were routinely and regularly covered. No general Medicare notice to the medical community of Medicare payment denial was issued by CMS or the MACs regarding these products. Plaintiffs and other similarly situated providers' provision of these products was consistent with acceptable standards of practice in the local medical community. There was no written notification from a utilization review committee that these products would not be covered. Plaintiffs did not issue a written notice of the likelihood of Medicare payment denial for the products to any beneficiaries. Plaintiffs and other similarly situated providers exercised reasonable care in billing for, and accepting, Medicare payment for the products by making full disclosure of material facts and on the basis of the information available to them, including, but not limited to, Medicare instructions and regulations. Accordingly, providers had a reasonable basis for assuming that the payments they received were correct.

12.     Yet, in a complete and unexplained reversal, Defendants and their agents have abruptly abandoned Medicare's long-standing Skin Substitute Coverage Policy. They have slowed

reimbursements to wound care providers for many skin substitute products—including Zenith, carePATCH, Impax, Amnio-Maxx, BioLab Membrane Wrap, and Amnio Quad-Core—and are pursuing a campaign to recoup past Medicare payments from providers who appropriately used these products. The MACs' reasoning for this reversal is confusing, has varied over time, and is ultimately arbitrary and capricious. In many instances, they attempt to justify these clawbacks of Medicare payments by claiming—contrary to Medicare's Skin Substitute Coverage Policy and the binding 2015–2016 LCDs—that skin substitute products are now somehow "experimental" and "investigational" and, therefore, *not* medically reasonable and necessary. The MACs implemented this retroactive change in coverage policy in violation of notice and comment requirements. Moreover, they have not provided any reasoned explanation or cited any evidence to justify this reversal.

13.    Defendants are being assisted in their unlawful clawback campaign by an army of Medicare contractors that follow the same playbook: audit wound care providers, make adverse findings, and turn these providers over to the MACs to claw back money for services that were appropriately provided to patients. This army includes Recovery Audit Contractors ("RACs") and Unified Program Integrity Contractors ("UPICs"), who audit paid Medicare claims and are incentivized to do so aggressively. RACs, for example, are authorized to search for "overpayments" and are paid a percentage of what they recover for the Medicare program. UPICs are ostensibly charged with detecting evidence of fraud and abuse, and they are supposed to audit claims to look for suspicious billing patterns that are then referred to law enforcement. CMS evaluates UPICs, in part, on their ability to recover money for the Medicare program. MACs, RACs, and UPICs are all required by CMS to work together and coordinate their audit activities. *See e.g.*, CMS, Medicare Program Integrity Manual ("MPIM") § 9.2.5 (2019) (requiring among

other things MACs and UPICs to develop a "Joint Operating Agreement" with RACs). In this way, the RACs and UPICs have joined in on the MACs' unexplained departure from Medicare's Skin Substitute Coverage Policy and conducted hundreds of audits in which they have found that the use of amniotic skin substitute products in wound care is now "investigational" or "experimental."

14.     Upon information and belief, since as early as April 2022, Defendants' agents—the MACs, RACs and UPICs—have embarked to change the Medicare Skin Substitute Coverage Policy retroactively (and illegally) by reopening and denying previously paid Medicare claims and issuing repayment demands to wound care providers totaling many millions of dollars. Ignoring the fact that they had earlier found sufficient clinical evidence to cover skin substitutes en masse as medically reasonable and necessary treatments for chronic wounds, CMS's agents now somehow claim that any particular skin substitute product is "investigational" unless a healthcare provider can cite to a multitude of peer-reviewed scientific literature that specifically addresses the effectiveness of the particular skin substitute product used in treatment. This product-by-product evidence requirement is a façade. It has never been required by either FDA or CMS through two decades of reimbursing thousands of skin substitute claims, is not a stated requirement in any rule, and it has caught providers and the industry completely off guard. There is no rational basis for imposing this requirement because all amniotic skin substitute products share the same inherent qualities: they are donated human tissue that is minimally processed and marketed to be used in a way that is consistent with that tissue's biological purpose. 42 U.S.C. § 264 *et seq*.; 21 C.F.R. § 1271 *et seq*. This unlawful, retroactive recoupment program in which Defendants' agents now claim, without any factual basis, that skin substitute products are "investigational" or "experimental" is referred to herein as the "Clawback Policy."

**B.** **The Clawback Policy Is Applied to Unlawfully Deny Reimbursement to Plaintiffs for Their Use of Skin Substitutes**

15.    Plaintiffs and similarly situated providers have been caught squarely in the crosshairs of the Clawback Policy. For example, Novitas, the MAC that administers Ms. Lopez's claims, routinely covered Zenith and carePATCH to treat chronic wounds before 2023, consistent with its own Novitas 2015 LCD. But subsequently, and pursuant to the Clawback Policy, Novitas retroactively audited and then denied Ms. Lopez's claims for Zenith and carePATCH—claims that Novitas had previously paid—ultimately claiming the use of Zenith and carePATCH was purportedly "experimental" or "investigational." Echoing the same verbiage about these products being "experimental" or "investigational" used in many other audits and payment recoupments and that can be extended to any provider that seeks reimbursement for skin substitutes makes plain this coordinated effort by CMS and its agents to retroactively and unlawfully change Medicare's Skin Substitute Coverage Policy. Indeed, Novitas has never provided a cogent explanation as to how Zenith and carePATCH suddenly became experimental and investigational after Novitas had covered this product for years pursuant to its own 2015 LCD, which remains in effect. Novitas certainly has never provided any new data or clinical evidence to back up this claim.

16.    Dr. McGee's experience was very similar to Ms. Lopez's. Novitas initially covered his use of skin substitutes to treat his patients, but it then went back and retroactively denied them. Dr. McGee's claims were then denied at every level of appeal because the MACs and other adjudicators found that the skin substitute he used, Amnio Quad-Core, is purportedly "investigational and experimental."

17.    Dr. Loder was similarly a target of the Clawback Policy. The reviewing MAC, Wisconsin Physicians' Services, initially paid claims Dr. Loder submitted for his use of Impax to treat chronic wounds, as it had routinely done for the prior decade (despite not having an LCD for

the product). The UPIC, however, recently reopened and retroactively denied coverage for Dr. Loder's uses of Impax, claiming this skin substitute was not "medically reasonable and necessary." Exhibit 7 at 1 (ALJ Decisions on Dr. Loder's treatment of P.B.). The QIC then affirmed the UPIC's determination that Dr. Loder's use of Impax "was experimental and investigational, and therefore not medically reasonable and necessary." *Id.* Plaintiff appealed these denials to an Administrative Law Judge ("ALJ"), who affirmed and found that Dr. Loder had not proved "that Dual Layer Impax Membrane is safe, effective, non-experimental, non-investigational, and clinically appropriate for the treatment of the beneficiary's non-pressure chronic ulcer wounds, and therefore the products and services provided were not reasonable and necessary." *Id.* At no point did the UPIC, QIC, or ALJ address the weight and import of Medicare's Skin Substitute Coverage Policy that previously provided reimbursement and coverage of Impax to treat chronic wounds. Nor did any of these administrative proceedings identify any new evidence, new data or any other information to justify this new Clawback Policy.

18.    Healthcare Housecalls LLC was victimized by this policy, too. The MAC, First Coast, claimed overpayment on the basis that Healthcare Housecalls' use of Amnio-Maxx was non-homologous. However, the QIC through its review found that the use *was* homologous, but still denied coverage, claiming that use of Amnio-Maxx was purportedly experimental. The ALJ then reverted back to First Coast's reasoning, holding that the use of Amnio-Maxx was non-homologous because wound healing is not a basic function of an amniotic tissue donor, so Healthcare Housecalls' use of it was merely experimental and investigational. The MAC, QIC and ALJ all failed to address Medicare's Skin Substitute Coverage Policy that previously provided reimbursement and coverage of Impax to treat chronic wounds. Nor did any of these administrative proceedings identify any new evidence, new data or any other information to justify application of

the new Clawback Policy to deny coverage for Healthcare Housecalls' use of the skin substitute products, as informed by its medical judgment and expertise.

19.    Indy Wound Center's use of skin substitutes suffered the same fate, even though it used skin substitutes to treat a patient with a wound so severe that she required hospitalization. Despite the fact that Medicare had reimbursed the use of skin substitutes for a decade and Indy Wound Center submitted numerous studies showing their efficacy, the ALJ still upheld an overpayment determination because Indy Wound Center supposedly failed to show that the skin substitute it elected to use, BioLab Membrane Wrap, was "not experimental." The ALJ then held Indy Wound Center liable for the overpayment despite it having no way of knowing that CMS would cease reimbursing skin substitutes like it had for years prior.

20.    These are not isolated examples, but rather, on information and belief, part of an overarching policy by MACs, RACs, and UPICs reopening claims and recouping Medicare reimbursement for skin substitute products that have been *routinely* covered for years. As providers like Dr. McGee, Ms. Lopez, Dr. Loder, Healthcare Housecalls, and Indy Wound Center challenge the MACs' denials through the administrative review process, the skin substitute products are inevitably labeled by Defendants as "experimental" and "investigational," and, therefore, not medically reasonable and necessary. *See, e.g.*, Compl. ¶ 5, *Koonce v. Kennedy*, No. 5:25-cv-00360 (N.D. Ala. Mar. 7, 2025) (MAC claiming that the wound care provider "failed to provide authoritative evidence to support a finding that Impax was 'safe and effective, not experimental or investigational, and appropriate for the beneficiary's condition,'" even though the MAC approved seven of ten treatments for the beneficiary at issue); Compl. ¶ 1 & Ex. A at 14, *Riegelhaupt v. Becerra*, No. 1:24-cv-07606 (N.D. Ill. Aug. 22, 2024) (MAC explaining that it was "ultimately unable to ascertain whether . . . EpiFix, PuraPly AM, and DermACELL products are safe and

effective, and not experimental or investigational."). In many of these cases, the skin substitute product in question is explicitly covered by a MAC LCD. *See, e.g.*, CMS Medicare Coverage Database, Billing and Coding: Wound Application of Cellular and/or Tissue Based Products (CTPs), Lower Extremities, art. ID A56696 (revised Sep. 4, 2025), https://tinyurl.com/2u6pyv8z.

### C.    The Clawback Policy Is Arbitrary and Unlawful

21.    The aggregate amount of Medicare reimbursement spent on skin substitutes for wound care treatment has grown significantly over the past decade. There are many factors that are responsible for this growth. Among them include the growing recognition among wound care providers that skin substitutes are an effective treatment as demonstrated by the improved outcomes of their patients. In addition, during the COVID-19 pandemic, the Medicare program relaxed the rules that allow beneficiaries to receive wound care treatment—and skin substitutes— in their place of residence. Naturally, as access and the use of skin substitutes increased, so did Medicare's spending on these products.

22.    CMS's agents seem to believe that the increase in Medicare spending on skin substitutes is being driven by certain fraudulent behavior resulting in unnecessary use of skin substitutes. But rather than narrowly focusing their resources to detect, deter, and bring to justice those responsible for unnecessary utilization or fraud, CMS's agents have responded by throwing the baby out with the bathwater. They have sought to apply a new policy retroactively to limit coverage for nearly all skin substitute products. These efforts have been made without prior notice or opportunity for public comment and are overbroad and harmful to beneficiaries who need skin substitutes. CMS's agents have attempted (and, as discussed below, failed) twice to proactively change Medicare coverage policy through new LCDs that would have eliminated coverage for all but a handful of skin substitutes, thus severely limiting access to these life-saving products.

Frustrated by these failed attempts, CMS's agents have aggressively and unlawfully implemented the Clawback Policy.

23.     Under governing law, MACs are compelled to follow their own LCDs, and if they wish to change their coverage policies in an LCD, they can do so only prospectively and only by following a prescribed, public-comment process. *See* 42 U.S.C. § 1395y(l)(5)(D); 42 C.F.R. § 400.202(3); *Azar v. Allina Health Servs.*, 587 U.S. 566, 568 (2019) (finding that changes in Medicare payment methodology require notice and comment rulemaking when they affect substantive payment standards). The MACs have flagrantly disregarded this requirement.

24.     CGS, First Coast, and Novitas attempted to adopt new LCDs in 2023 that would have eliminated all but a handful of skin substitutes from coverage. To do that, the MACs had to first explain their departure from their current policies (i.e., the 2015–2016 LCDs) that cover all amniotic skin substitutes as reasonable and necessary. Tellingly, the 2023 LCDs cited no new data or updated clinical evidence, nor did they explain why the prior LCDs were wrong. In fact, the 2023 LCDs included an extensive and detailed analysis of clinical literature that *supported* the conclusion that skin substitutes as a class are effective in healing chronic wounds. Yet, contrary to that evidence, the MACs initially proposed that only a tiny subset of skin substitutes should be covered in an unlawful effort to lower Medicare spending. However, due to these shortcomings and other glaring legal deficiencies, CGS, First Coast, and Novitas rescinded the 2023 LCDs and issued recission notices which expressly left in place the 2015–2016 LCDs covering all skin substitute products. *See, e.g.*, CMS Medicare Coverage Database, Local Coverage Determination: Application of Skin Substitute Grafts for Treatment of DFU and VLU of Lower Extremities, LCD ID L36377 document note (Sep. 29, 2023) ("Skin Substitute Grafts/Cellular and/or Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Leg Ulcers (L36377/A57680) will

not become effective on 10/01/2023."), *available as an archive in* WayBackMachine, https://web.archive.org/web/20240330230253/https://www.cms.gov/medicare-coverage-database /view/lcd.aspx?lcdId=36377&ver=7 (archived Mar. 30, 2024). Indeed, several of the skin substitute products at issue here— Zenith (code Q4253), carePATCH (code Q4236), Impax (code Q4262), Amnio-Maxx (code Q4239)—are expressly identified as covered products under CGS's LCD. *See* CMS Medicare Coverage Database, Billing and Coding: Wound Application of Cellular and/or Tissue Based Products (CTPs), Lower Extremities, art. ID A56696 (revised Sep. 4, 2025), https://tinyurl.com/bdbbkwn3.

25.    Undeterred, the MACs tried a second time to adopt LCDs that sought to eliminate Medicare coverage for almost all amniotic skin substitute products. This effort also failed. In May 2024, all seven MACs proposed identical LCDs that would have denied Medicare coverage of skin substitutes as "experimental" and "investigational" unless each product was supported by new, clinical evidence of that particular product's effectiveness. Exhibit 8 (collection of proposed LCDs for all seven MACs (2024)). Numerous industry stakeholders objected to the new LCDs as unfounded and warned that they would create a shortage of products that would lead to severe and negative health outcomes for patients with venous leg ulcers and diabetic foot ulcers. All seven MACs ignored those comments and finalized their LCDs on November 14, 2024, shortly after the Presidential election. However, shortly before these new LCDs were to take effect, the new Administration suspended their implementation until January 1, 2026, citing the obvious need for Medicare beneficiaries to have continued access to skin substitute products. *See* Image posted by Donald J. Trump (@realDonald Trump), Truth Soc. (Mar. 2, 2025), https://tinyurl.com/dbvytshw (stating that the 187,286 Americans "would lose their [lives] from lack of product supply."). After a full year of review under the current Administration, on December 24, 2025, CMS permanently

withdrew and rescinded all of the MACs' proposed LCDs that were scheduled to take effect on January 1, 2026. CMS, Fact Sheet: *Final Local Coverage Determinations (LCDs) for Certain Skin Substitutes Withdrawn* (Dec. 24, 2025), https://tinyurl.com/54zjkvks. Nonetheless, even though Defendants have forsaken any prospective policy to limit coverage for skin substitute products, and the fact that the 2015–2016 LCDs remain in effect, their agents continue to apply on a retrospective basis the Clawback Policy targeting past claims and recouping Medicare reimbursement for skin substitute products, asserting that they are "experimental" and "investigational."

26.     Through these actions, CMS's agents—the MACs, RACs, UPICs and others—are continuing to ignore the Administration's clear directive to leave unchanged Medicare's Skin Substitute Coverage Policy. They continue to reopen past claims and recoup Medicare reimbursement for skin substitute products pursuant to their Clawback Policy, asserting incorrectly that skin substitutes remain "experimental" and "investigational." Despite repeated requests from industry stakeholders, Defendants have not directed CMS's agents to abandon the Clawback Policy and discontinue recovering funds on the factually unsupported and legally deficient grounds that skin substitutes are experimental or investigational.

27.     If anything, their agents have doubled down in their efforts to apply the unlawful Clawback Policy. Incredibly, the ALJ that denied Ms. Lopez's appeal specifically referenced and relied on Novitas' 2026 LCD *which never went into effect*. And, the ALJ who denied Dr. McGee's recent appeals looked to the 2026 Novitas LCD to guide his decision, as well, even though these decisions were not rendered until February 20, 2026, two months after *CMS announced it was withdrawing that LCD*.

28.     The Clawback Policy will cause Plaintiffs and other class members to experience irreparable financial damages and interfere with their ability to continue using skin substitute products to successfully treat patients with diabetic foot ulcers and venous leg ulcers. When Plaintiffs and other class members treated their patients with these products in the past, they had a reasonable expectation that they would be reimbursed by the Medicare program based on the express language of the 2015–2016 LCDs, and as confirmed by the MACs' approval of their past claims for reimbursement. The Clawback Policy upsets their reasonable expectations for payment, and it likewise upsets the interests of all Medicare beneficiaries who rely upon access to skin substitute products as effective treatments for their chronic wounds.

29.     On behalf of themselves and all those similarly situated—i.e., wound care providers who have had, and will have, Medicare claims recouped pursuant to the Clawback Policy— Plaintiffs respectfully request this Court declare the Clawback Policy unlawful, permanently enjoin Defendants from applying it, and direct Defendants to apply the operative 2015–2016 LCDs and other related coverage policies when reviewing claims for skin substitute products.

## PARTIES

30.     Plaintiffs are wound care providers enrolled in the Medicare Program who furnish healthcare services to Medicare beneficiaries, including patients who have been diagnosed with diabetes and suffer from chronic wounds in the form of diabetic foot ulcers and venous leg ulcers that do not respond to conventional treatment methods. These refractory wounds require special treatment, and Plaintiffs have for several years used skin substitute products to successfully treat and control their patients' chronic wounds.

31.     Plaintiff Dr. Chris McGee MD PA is a board-certified physician and a resident of Texas (NPI: 1790006252). Dr. McGee has used skin substitute products—particularly Amnio Quad-Core—to successfully treat patients.

18

32.     Plaintiff April Lopez is a board-certified wound care specialist and a resident of Texas (NPI: 1194151910). Ms. Lopez has used Zenith and carePATCH, two skin substitute products derived from a single-layer amniotic allograft and a dual layer amniotic allograft, respectively, to successfully treat her patients.

33.     Plaintiff Dr. Brian Loder, DPM is a board-certified podiatrist and foot and ankle surgeon and a resident of Michigan (NPI: 1508004920). Dr. Loder has used Impax, a skin substitute product derived from a dual-layer amniotic allograft, to successfully treat his patients.

34.     Plaintiff Healthcare Housecalls LLC is medical clinic located in Florida directed by Dr. Joseph Lalia, DO (NPI: 1316780679). Dr. Lalia has used Amnio-Maxx, a skin substitute derived from a dual-layer amniotic allograft, to successfully treat patients.

35.     Plaintiff Indy Wound Center is a medical clinic located in Indiana co-owned by Drs. Neal Patel and Thomas Zumbaugh (NPI: 1326763491). Their clinic has used the skin substitute BioLab Membrane Wrap to successfully treat patients.

36.     As further described herein, Plaintiffs seek to represent the following class:

> All healthcare providers enrolled in Medicare who, in April 2022 or later, provided a skin substitute product derived from donated human amniotic tissue that are not regulated as devices or biologicals in conjunction with the treatment of a chronic wound and whose Part B reimbursement payment for such product has been subjected to a post-payment audit that resulted in a determination that the payment should be recouped on the basis that such products are not reasonable and necessary when used to treat a chronic wound because they are experimental and investigational, i.e., the Clawback Policy, with such claims for reimbursement having been presented to the Secretary.

37.    Defendant Department of Health & Human Services ("HHS") is an executive department in the United States government headquartered at 200 Independence Avenue SW, Washington, DC 20201.

38.    Defendant Centers for Medicare & Medicaid Services ("CMS") is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program and is located at 7500 Security Boulevard, Baltimore, Maryland 21244. CMS administers the Medicare program by contracting with private entities such as MACs, RACs and UPICs whose duties are described herein. In addition to MACs, RACs and UPICs, CMS also contracts with an entity known as the Administrative QIC ("AdQIC"), which is responsible for monitoring the application of Medicare payment and coverage policies in individual cases as they make their way through the Medicare administrative review process. The MACs, RACS, UPICs and AdQIC have initiated and are pursuing the illegal Clawback Policy. They are agents of CMS, and CMS ultimately controls their actions.

39.    Defendant Robert F. Kennedy, Jr., sued in his official capacity only, is the Secretary of Health and Human Services. The Secretary has ultimate responsibility for the administration of the Medicare program. His official address is 200 Independence Avenue SW, Washington, DC 20201.

40.    Defendant Dr. Mehmet Oz, sued in his official capacity only, is the Administrator of CMS. The Administrator is responsible for administering the Medicare program. His official address is 7500 Security Boulevard, Baltimore, Maryland 21244.

## JURISDICTION AND VENUE

41.    This Court has jurisdiction under 42 U.S.C. §§ 1395ff(b)(1)(A) and 405(g), which empowers federal courts to exercise subject-matter jurisdiction over a challenge to a final payment determination under Medicare. In addition, this Court has jurisdiction under 28 U.S.C. § 1331

because this action arises under and involves the interpretation and application of the laws of the United States, including the Medicare statute and the Administrative Procedure Act.

42.    As required by 42 U.S.C. §§ 1395ff(b)(1)(A) and 405(g), Plaintiffs have fully presented to the Secretary their claims challenging the Clawback Policy. Plaintiffs have each received unfavorable ALJ decisions regarding the dates of service at issue.

43.    Plaintiff Lopez has exhausted all administrative proceedings under 42 C.F.R. § 405.1132(a)(1), as she submitted a letter to the Medicare Appeals Council requesting escalation to federal court, as specifically provided for in the regulations. As for the other named Plaintiffs, who have all received denials from ALJs, any further administrative appeals would be futile given the broad application of the Clawback Policy by the Medicare Appeals Council to deny payment and would only exacerbate the substantial harm that the Clawback Policy has imposed upon these providers.

44.    As further alleged herein, the Court may exercise jurisdiction over the claims of the members of the proposed Class because those claims for reimbursement have been presented to the Secretary and it is appropriate to excuse the exhaustion of further administrative proceedings by members of the Class.

45.    This case concerns Defendants' application of the Clawback Policy to recoup millions of dollars in Medicare funding, which exceeds the required threshold of $1,960. *See* 42 U.S.C. § 1395ff(b)(1)(E); 42 C.F.R. § 405.1006(c); 90 Fed. Reg. 55869, 55870–71 (Dec. 4, 2025).

46.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Plaintiff Dr. Chris McGee resides in this judicial district.

## GENERAL ALLEGATIONS

**I.    Diabetic Foot Ulcers and Venous Leg Ulcers are Commonly Treated with Skin Substitutes**

47.    Plaintiffs and similarly situated class members are wound care providers who are financially impacted by the unlawful Clawback Policy. They are also motivated to bring this action because of the devastating impact the Clawback Policy is having on their patients—Medicare beneficiaries who are suffering from unhealed diabetic foot ulcers and venous leg ulcers.

48.    Diabetic foot ulcers are a severe complication of diabetes, particularly in the aged population. They form because of pressure or repetitive irritation to the skin tissue, which breaks down and exposes tissue layers underneath. These wounds are notoriously difficult to heal due to consistently high blood sugar levels in diabetic patients. High blood sugar levels often lead to poor blood circulation, nerve problems, and a weakened immune system—all of which can impede healing, sometimes indefinitely. Refractory (i.e., treatment resistant) diabetic foot ulcers are a major health crisis in the diabetic elderly population. Diabetic foot ulcers are the leading cause of hospitalization and limb amputations in the diabetic community. Despite advances in medical care, diabetic foot ulcers still account for a large proportion of hospitalizations and healthcare costs related to diabetes. For example, in the United States in 2017, one-third of the $237 billion spent to treat diabetes was for diabetic foot ulcers. Jean-Baptiste Julla et al., *Incidence of Death and Amputation in Patients with a First Diabetic Foot Ulcer: Results from the CODIA Cohort*, 51 Diabetes & Metabolism 1, 1 (2025), *available at* https://tinyurl.com/457pk5ks. That is more than the direct costs associated with cancer in the U.S. in 2015. *Id.* Diabetic foot ulcers "appear to be more than just a marker of poor health. They are independent risk factors associated with premature death." Armstrong, 13 J. Foot & Ankle Rsch. at 2 (emphasis omitted).

49.     The same is true for venous leg ulcers. Like diabetic foot ulcers, venous leg ulcers are sores that are very slow to heal, and they are usually caused by impaired blood circulation in the veins of the leg. And like diabetic foot ulcers, they are difficult to treat and heal through conventional wound treatment methods. In addition to increased amputation risks, venous leg ulcers negatively impact patients' quality of life. They are painful, they generate a strong and unpleasant odor, and they cause decreased mobility, all of which can lead to social isolation. *See* Nicole M. Vecin & Robert S. Kirsner, *Skin Substitutes as Treatment for Chronic Wounds: Current and Future Directions,* 10 Frontiers in Med. 1, 1 (2023), *available at* https://tinyurl.com/y8497x97; Trientje B. Santema, Paul P.C. Pyck, & Dirk T. Ubbink, *Skin Grafting and Tissue Replacement for Treating Foot Ulcers in People with Diabetes*, 2 Cochrane Database Systematic Revs. 1 (2016), *available at* https://tinyurl.com/2t98z5kc. In this way, the Clawback Policy is adding to the epidemic of isolation among the elderly which itself has adverse health consequences.

50.     The first line of attack against a diabetic foot ulcer or venous leg ulcer is to treat it with standard, conventional care. Skin substitutes are reserved for those cases in which the conventional standard of care fails, and the wound becomes treatment resistant. The conventional standard of care regimen for these wounds includes routine wound assessment and monitoring, infection control, debridement, and the application of conventional dressings that maintain a moist wound environment. Unfortunately, even with standard care and moisture-retaining wound dressings, many diabetic foot ulcers and venous leg ulcers become chronic and do not heal, leading to the need for additional wound therapy to avoid amputations and other serious consequences of unhealed wounds, which may even lead to death.

51.     Fortunately, skin substitutes offer much-needed relief, and it has now become standard medical practice to treat chronic diabetic foot ulcers and venous leg ulcers with skin

substitutes. While conventional dressings cover wounds to prevent infection and maintain a moist

environment, skin substitutes do that and more. Defendants' own agents published LCDs that

acknowledge that skin substitutes are "inert biological products . . . which may provide protein or

growth factors proposed *to stimulate or facilitate healing or promotion of epithelization*." Exhibit

3 at 4, CGS 2016 LCD (emphasis added); Exhibit 5 at 7, Novitas 2015 LCD (same). In CGS's and

Novitas' words:

> The addition of Skin Substitutes or Cellular or Tissue Based Products (CTPs) to
> certain wounds may afford a healing advantage over dressings and conservative
> treatments when these options appear insufficient to affect complete healing.

Exhibit 5 at 6, Novitas 2015 LCD; *see* Exhibit 3 at 3, CGS 2016 LCD. It is precisely because of

this "healing advantage" that *all* MACs for many years covered skin substitutes under the Skin

Substitute Coverage Policy prior to developing and applying the illegal Clawback Policy.

## II.     The FDA Primarily Regulates Amniotic Skin Substitutes Using Its Authority Under Section 361 of the Public Health Services Act

52.     The term "skin substitutes" is sometimes used to refer to a broad range of products

that have different origins. For example, "skin substitute" can refer to an autologous skin graft,

bioengineered skin or even xenografts of a non-human origin. The FDA has authority to regulate

some of these products under the Food Drug and Cosmetic Act ("FDCA") and Section 351 of the

Public Health Service Act ("PHSA") as devices or biologicals. In general, when a manufacturer

wishes to bring a device or biological to market, it must assure the FDA the product is not only

safe, but effective, which requires the manufacturer to provide clinically significant evidence to

support its intended use (i.e., that the product works as claimed under real world conditions).

Devices can reach the market through the following clearance processes depending on the risks

they present: they may be approved as a new device by the FDA via a premarket application

("PMA") as a Class III device (highest risk); they may be granted *de novo* clearance as a Class I

or Class II device as a novel but low risk device; or they can be cleared by the FDA through the 510(k) process as a product that is "substantially equivalent" to another Class I or Class II device already on the market. The FDA reviews premarket applications of biologicals under rules authorized by Section 351 of the PHSA.

53.     This case involves a specific and large sub-category of skin substitutes derived from donated human amniotic tissue after birth that are *not* regulated as devices or biologicals and, therefore, are *not* subject to the device and biological clearance processes described above. Because they are comprised of human cells and tissue, the FDA classifies them as "human cell and tissue-based products" or HCT/Ps. The MACs in their LCDs interchangeably use the term HCT/Ps or CTPs (cell and tissue products) to refer to the same class of skin substitutes of human amniotic tissue origin. The FDA regulates HCT/Ps solely under Section 361 of the PHSA and has adopted regulations at 21 C.F.R. Part 1271 that govern when HCT/Ps can be brought to market. Because HCT/Ps are human cells and tissue that are donated by one person for clinical use on another, the primary purpose of this regulatory framework is to ensure these products remain essentially unchanged and are marketed to perform their original function. In lay terms, the manufacturer is not required to prove the human tissue product works as claimed but rather must show that it has not been changed and maintains its original biological function.

54.     To achieve this purpose, the regulations at 21 C.F.R. Part 1271 set forth four basic requirements that HCT/Ps must meet in order to be marketed. First, the product must not be more than "minimally manipulated" during the manufacturer's processing. "Minimal manipulation" means that any processing must not alter the original relevant characteristics of the cells or tissues. *Id.* § 1271.3(f). Second, the manufacturer must market the HCT/P for its "homologous use" only. "Homologous use" means the HCT/P must "perform[] *the same basic function or functions* in the

recipient as in the donor." *Id*. § 1271.3(c) (emphasis added). Third, the cells or tissues of the HCT/P must not be combined with the cells or tissues of another article. *Id*. § 1271.10(a)(3). Fourth, the HCT/P must be intended for localized treatment of the recipient and does not have a "systemic effect." *Id*. § 1271.10(a)(4).

55.     The FDA has determined that the "homologous use" of a donated amniotic membrane HCT/P includes, among other things, the use of the tissue as a "barrier" or protective "covering." FDA, Guidance for Industry: Regulatory Considerations for Human Cells, Tissues, and Cellular and Tissue-Based Products: Minimal Manipulation and Homologous Use 17–19 (July 2020), *available at* https://tinyurl.com/3s83v4ya (Section IV, question 3) ("FDA Homologous Use Guidance"). This homologous use includes use as a barrier or covering for wounds, particularly wounds that are resistant to conventional treatment. Section 361 of the PHSA only authorizes the FDA to regulate the marketing of an HCT/P; therefore Part 1271 limits manufacturers from *marketing* HCT/Ps for anything other than their homologous use. But the FDA does not regulate how physicians and other clinicians may *prescribe* FDA reviewed and approved products, including HCT/Ps. 21 U.S.C. § 396. Therefore, wound care providers are free to use HCT/Ps to treat their patients with diabetic foot ulcers and venous leg ulcers if they believe they have a "healing effect" (even if that is not the HCT/P's "homologous use"), and the Medicare program is permitted to cover them as medically reasonable and necessary to treat diabetic foot ulcers and venous leg ulcers (as all the MACs did under the Skin Substitute Coverage Policy).

56.     Unlike the review processes for devices and biologicals, the requirements of Part 1271 do *not* require an HCT/P processor to demonstrate the clinical safety or effectiveness of their products. They may be marketed so long as they meet the four criteria specified above. This is because an HCT/P that has not been altered is assumed to be safe and effective to be used according

to its natural function, whether or not used in its native location. FDA Homologous Use Guidance at 17 (because HCT/Ps' "[b]asic functions are well understood; it should not be necessary to perform laboratory, pre-clinical, or clinical studies to demonstrate a basic function or functions for the purpose of applying the HCT/P regulatory framework."). Unlike the device and biological pathway, randomized clinical trials ("RCTs") are not required to bring an HCT/P to market. There is simply no need to prove that an unaltered, unchanged piece of human tissue is "effective" for its basic biological function.

57.    For similar reasons, there is no mandatory "premarket" approval of HCT/Ps by the FDA. But the FDA has established a voluntary process for an HCT/P manufacturer to solicit the agency's views as to whether its product meets the requirements under Part 1271. Under this process, the FDA's Tissue Reference Group ("TRG") will review materials provided by the manufacturer and issue a TRG recommendation (also referred to as a "TRG Letter") as to whether and how the criteria in 21 C.F.R. § 1271.10(a) apply to the manufacturer's HCT/P for a given indication. *See Tissue Reference Group*, FDA.gov, https://tinyurl.com/28dcvmed (current as of January 11, 2023). For several years the FDA TRG Group has reviewed numerous voluntary submissions by HCT/P manufacturers and issued numerous TRG letters concluding that their products meet the requirements of Part 1271, including that these products are being marketed for their "homologous use."

58.    As set forth more fully below, the Medicare program has relied upon the FDA's TRG review process to cover HCT/Ps that receive a TRG letter as "medically reasonably and necessary" for their intended use as a protective cover or barrier for refractory wounds, including diabetic foot ulcers and venous leg ulcers. Wound care providers, like Plaintiffs, use these FDA reviewed products to treat their patients who suffer from diabetic foot ulcers and venous leg ulcers.

27

### III.     The MACs Cover HCT/P Skin Substitutes That Receive TRG Approval

59.     Medicare is the federal health insurance program for the elderly and disabled and is divided into separate "Parts" depending on the benefit. Part B, which is relevant to the claims here, covers physician services that are not provided in an inpatient setting. Physician services include items and supplies that are provided as part of a physician office visit or procedure. Skin substitute products are considered physician supplies under current regulations (they were considered biological products until January 1, 2026) and, when provided in conjunction with a physician's treatment of chronic wounds, have been covered for many years under Part B.

60.     The Medicare program is administered largely by MACs which operate in separate jurisdictions across the country. The Medicare statute prohibits MACs from making payment for any item or service that is not "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). CMS has never outlined in notice and comment the standards it applies when determining whether an item is medically "reasonable and necessary." It has, however, given instructions to the MACs concluding that an item or service is "reasonable and necessary" if it is medically appropriate (including its duration and frequency), safe and effective, and not experimental or investigational. *See, e.g.*, MPIM § 13.5.4. Similarly, CMS has never articulated in rulemaking the standards a MAC must apply to determine whether an item or service is "medically appropriate," nor has it specified what level of clinical data or scientific evidence is necessary to establish that an item or service is "medically necessary" versus "investigational." Instead, CMS has given the MACs some level of flexibility to review scientific evidence to reach their own determination whether an item or service is reasonable and necessary. *Compare* MPIM § 3.6.2.2 *with* MPIM §§ 13.5.3–13.5.4 (establishing no guidelines or criteria as to the level or type of evidence necessary to establish medical necessity).

61.     MACs may apply the "reasonable and necessary" standard on a case-by-case basis, rendering a determination at the time a claim is submitted. The Medicare statute also empowers MACs to adopt LCDs which are advanced pronouncements regarding whether, and under what indications, a specific item or service is considered reasonable and necessary. LCDs are broad-based and apply to all claims submitted within the MAC's region. 42 U.S.C. § 1395ff(f)(2)(B). MACs adopt LCDs so that providers and beneficiaries can make treatment decisions knowing that the item or service will be covered. By law, each MAC is bound to follow its own LCDs, therefore eliminating any uncertainty about whether a treatment subject to an LCD will be covered by Medicare.

## IV.     Medicare LCD Coverage of Skin Substitutes

### A.     The 2015–2016 LCDs

62.     Four of the MACs adopted LCDs in 2015 and 2016 to inform practitioners in advance that they would reimburse them for certain skin substitute products. *See* Exhibit 3, CGS 2016 LCD; Exhibit 4, First Coast 2015 LCD; Exhibit 5, Novitas 2015 LCD; Exhibit 6, 2016 Palmetto LCD. The 2015–2016 LCDs generally cover a wide range of skin substitute products as medically necessary when used to treat chronic wounds. This includes bioengineered skin substitutes or cellular or tissue-based products ("CTPs"), including 361 HCT/Ps.

63.     Although FDA requirements prohibit manufacturers of 361 HCT/Ps from marketing their use as a wound "treatment," CGS, First Coast, and Novitas permitted treating physicians to use such products in their treatment protocols—i.e., to help heal a wound—so long as they were also being used for their "homologous use" as a wound cover.

64.     Over the years, CGS, First Coast and Novitas applied their respective LCDs to reimburse hundreds of wound care providers in treating thousands of Medicare beneficiaries with

amniotic tissue membrane CTPs. From 2015–2024, CGS, First Coast, and Novitas collectively paid 522,480 claims totaling over $6 billion in reimbursements.

65.     MACs that did not adopt an express LCD of this kind also employed a general practice of covering 361 HCT/Ps to treat chronic, non-healing wounds. Indeed, from 2015 to 2024, the three MACs without express LCDs on Medicare coverage for skin substitutes and Palmetto (the MAC that retired its LCD in 2019) processed over 778,000 claims with paid skin substitute lines, disbursing approximately $7.9 billion in total payments for these treatments. After a decade of consistently being reimbursed, providers in these jurisdictions have come to rely on skin substitutes being covered, as well.

**B.    The MACs' Efforts to Revise the 2015–2016 LCDs**

66.     The MACs have tried and failed multiple times to revise the 2015–2016 LCDs to limit coverage for amniotic skin substitute products. The first attempt began in April 2022, when CGS, First Coast, and Novitas each released draft proposed LCDs that would have dramatically narrowed Medicare coverage for skin substitutes to a limited range of products—marking the starting point of the Clawback Policy. The 2022 proposed LCDs specified, "[u]se of skin substitute grafts must meet the medically reasonable and necessary threshold for coverage and these devices must be used in accordance with their approved [FDA] intended use" Exhibit 9 at 3, 28, 51 (collection of proposed LCDs (2022)); *see also* Exhibit 10 at 3, 70 (finalized and later rescinded LCDs (2023)) ("To meet the medically reasonable and necessary threshold for coverage, the skin substitute graft/CTP must be FDA approve for use as an ulcer treatment and not as a wound covering"). The finalized LCDs redefined a "skin substitute graft" solely as a product that generates a "sheet scaffolding for skin growth." *See, e.g.*, Exhibit 10 at 3. The term was further limited to grafts that are intended to remain on the recipient and grow in place or have the recipient's cells grow into the implanted graft material. This much narrower definition arguably

excludes products used as wound covers and captures only one of the mechanisms identified in the current LCDs as the means by which skin substitutes "afford a healing advantage." The MACs adopted this definition precisely to exclude Section 361-compliant CTPs applied as wound barriers or covers—a limitation carried forward in the 2024 Proposed LCDs (described *infra*). These LCDs also required manufacturers to obtain and provide evidence that their products create "scaffolding for skin growth." But this created an impossible Catch-22: if a product were demonstrated to generate skin scaffolding, the FDA would almost certainly conclude that this constitutes manipulation, disqualifying it from Section 361 compliance and requiring a different modality of FDA compliance altogether.

67.    The first attempt failed in 2023 because it was legally defective. CGS, First Coast, and Novitas each issued a new LCD on August 3, 2023, to replace the 2015 LCD. Originally, the 2023 LCDs were scheduled to take effect on October 1, 2023. However, the MACs rescinded the 2023 LCDs on September 28, 2023, before they ever went into effect. Exhibit 10. More recently, MACs issued new LCDs that were set to take effect January 1, 2026 (the "2026 LCDs"), but those LCDs were withdrawn before they ever went into effect. The 2026 LCDs were the product of a closely coordinated effort by all seven of the MACs to simultaneously issue nearly identical LCDs to set the standard for coverage throughout the United States. Exhibit 11 (sample of 2026 LCDs). Neither the LCDs that were rescinded in 2023 nor the 2026 LCDs imposed retroactive coverage standards that would apply to *past* claims submitted by Plaintiffs. Nor do any of these coverage standards apply to past paid claims the MACs have reopened, reviewed, and denied as "experimental and investigational" as part of their audit activity. Rather, those coverage determinations, such as those at issue in this litigation, are directly controlled by the 2015–2016 LCDs or the Skin Substitute Coverage Policy, which remains in full effect.

68.     The final version of the 2023 LCDs, contrary to notice and comment requirements, contained a new definition of "skin substitute," which was not articulated when the 2023 LCDs were initially proposed. This new definition significantly narrowed the number of products that would have been covered by excluding virtually all amniotic tissue skin substitutes. This new definition would have enabled the MACs to deny coverage of amniotic tissue skin substitutes as "experimental and investigational."

69.     Although the 2023 LCDs never took effect, as early as April 2022, the MACs improperly began to deploy the "experimental and investigational" rationale in their audits of claims for past services. This practice contravened the MACs' public announcement that the 2015–2016 LCDs would continue to control coverage determinations: "Skin Substitute Grafts/Cellular and/or Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Leg Ulcers (L35041/A54117) will not become effective on 10/01/2023. . . . In the meantime, current coverage has not changed and you are viewing the existing policy in effect." CMS Medicare Coverage Database, Local Coverage Determination: Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds, LCD ID L35041 document note (Sep. 29, 2023), *available as an archive in* WayBackMachine, https://web.archive.org/web/20231001144212/ https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=35041 (archived Oct. 1, 2023).

70.     On November 14, 2024, the MACs finalized new LCDs (i.e., the 2026 LCDs) that intended to deny coverage for virtually all amniotic tissue products used to cover and treat chronic wounds for services performed on or after February 12, 2025. However, shortly before these LCDs were to take effect, the current Administration suspended their implementation until January 1, 2026, citing the need for Medicare beneficiaries to have continued access to skin substitute

products. *See* Image posted by Donald J. Trump (@realDonald Trump), Truth Soc. (Mar. 2, 2025), https://tinyurl.com/dbvytshw (stating "President Trump's Message to 2 Million Diabetic Patients on Medicare[:] 'Help is on the way!'"); *id.* (stating "[if] allowed to stand, the number of limb-saving products would go from 221 to 17. [This] policy would not only kill innovation but lead to more ER visits, more amputations, more mortality."); *see also* Press Release, CMS Statement on Local Coverage Determination for Certain Skin Substitute Grafts (Apr. 11, 2025), https://tinyurl.com/3kw943rf. Then, on December 24, 2025, CMS withdrew all of the MACs' proposed LCDs that were scheduled to take effect on January 1, 2026. CMS, Fact Sheet: *Final Local Coverage Determinations (LCDs) for Certain Skin Substitutes Withdrawn* (Dec. 24, 2025), https://tinyurl.com/54zjkvks.

71.    The 2026 LCDs largely mirrored the failed 2023 LCDs and sought to significantly narrow coverage for skin substitutes by denying coverage for amniotic tissue products that do not heal by means of generating a "skin scaffolding" and which are not surgically attached to the patient. The 2026 LCDs would have denied coverage for virtually all amniotic tissue products, including the products that Plaintiffs routinely use to treat chronic diabetic foot ulcers and venous leg ulcers. Notably, the 2026 LCDs would have only applied on a prospective basis (i.e., for services performed on January 1, 2026, or later), and even then, the policy was never implemented into law.

72.    Nevertheless, and without any legal basis, Defendants and their agents have implemented the Clawback Policy that mirrors their failed previous attempts to promulgate new LCDs and which imposes new coverage standards on a retroactive basis. This new policy departs significantly from the still-in-effect 2015–2016 LCDs and broader Skin Substitute Coverage Policy, i.e., the Medicare program's historical practice of covering most forms of skin substitutes.

V.    **The Medicare Appeals Process**

73.    A Medicare provider that is dissatisfied with the MAC's initial determination of a claim may pursue the administrative appeals process set forth in 42 U.S.C. § 1395ff and 42 C.F.R. § 405 Subpart I.

74.    A redetermination is the first level of appeal after the initial determination. In conducting a redetermination, the MAC reviews the evidence and findings upon which the initial determination was based, as well as any additional evidence the parties submit or the MAC obtains on its own. 42 C.F.R. § 405.948.

75.    Providers who disagree with the MAC's redetermination decision may then request a reconsideration by a QIC. In conducting this reconsideration, the QIC reviews the evidence and findings before the MAC and any additional evidence the parties submit or that the QIC obtains on its own. If the initial determination involves a finding on whether an item or service is reasonable and necessary for the diagnosis or treatment of illness or injury, a QIC's reconsideration must be informed by a panel review of physicians or other appropriate health care professionals. In addition, the QIC's decision must be based on clinical experience, the patient's medical records, and medical, technical, and scientific evidence of record to the extent applicable. *See* 42 C.F.R. § 405.968(a)(1).

76.    Providers who disagree with the QIC's reconsideration decision may then request a hearing with the Office of Medicare Hearings and Appeals, which is typically conducted by an ALJ. Following that hearing, if the ALJ issues a favorable decision for the provider, the AdQIC may make a referral to the Medicare Appeals Council ("Council"), recommending that it review the ALJ decision on its own motion. 42 C.F.R. § 405.1100. As pertinent here, the AdQIC appears to be consistently referring favorable ALJ decisions regarding the use of skin substitutes to the Council. The Council, in applying the Clawback Policy on a retroactive basis, then rules against

34

the provider, often on the grounds that the use of the skin substitute product is experimental and investigational

77.     Providers who are dissatisfied with the ALJ's decision may appeal the ALJ's decision to the Council. 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1100(a), 405.1102(a)(1). However, given the Council's repeated application of the Clawback Policy to rule against providers, those appeals are an exercise in futility here.

78.     A provider may file an action in federal district court within sixty calendar days after it receives notice of an adverse Council decision or after it receives the Council's notice that the Council is not able to issue a decision within the adjudication period. 42 C.F.R. §§ 405.1136, 405.1132; *see also* 42 U.S.C. §§ 405(g), 1395ff(b).

## FACTUAL AND PROCEDURAL BACKGROUND

**Dr. Chris McGee MD PA**

79.     Dr. McGee is a physician who treats Medicare beneficiaries, including patients who suffer from chronic wounds in the form of diabetic foot ulcers and venous leg ulcers that do not respond to conventional treatment methods. Consistent with Medicare's Skin Substitute Coverage Policy, Dr. McGee has provided wound care services to many Medicare beneficiaries over the years.

*Services Involving Amnio Quad-Core Provided to Beneficiaries*

Beneficiary T.E.

80.     In February 2024, T.E. was suffering from a diabetic foot ulcer on his left heal measuring 5.1 x 7.0 x 0.1 centimeters. This wound had been present for over three months and failed to respond to over 30 days of conservative care treatments, including debridement, barrier creams, diabetic management, nutritional counseling, and regular cleaning and dressing changes.

81.     Dr. McGee determined, based on his medical judgment and years of experience, that the application of skin substitutes was medically reasonable and necessary to treat T.E.'s wounds. He first applied multiple different types of skin substitutes on three dates of service in February and March that are not at issue here.

82.     On April 3, 2024, Dr. McGee elected to use Amnio Quad-Core to treat T.E.'s still-extant wound. At this time, the wound measured 3.0 x 7.0 x 0.1 centimeters. Dr. McGee used 16 total units of Amnio Quad-Core. This date of service and treatment is at issue here.

Beneficiary N.N.

83.     In March 2024, N.N. was suffering from a venous leg ulcer on his left leg measuring 2.5 x 6.0 x 0.1 centimeters and multiple venous leg ulcers on his right leg, the largest measuring 9.0 x 18.0 x 0.4 centimeters. Each wound had been present for over three months (the right-leg wound for over six) and was unresponsive to over 30 days of conservative treatment, including surgical debridement, compression, lymphedema pump, and standard dressings and cleaning.

84.     Dr. McGee determined, based on his medical judgment and years of experience, that the application of skin substitutes was medically reasonable and necessary to treat N.N.'s wounds. He first applied a different type of skin substitute, and that treatment is not at issue here.

85.     On April 4, 2024, Dr. McGee elected to use Amnio Quad-Core to treat N.N.'s wounds. He treated all three of N.N.'s wounds with Amnio Quad-Core, using 180 total units of product. This date of service and treatment is at issue here.

Beneficiary D.S.

86.     In April 2024, D.S. was suffering from several ulcers on her legs and feet, the largest of which measured 2.5 x 4.0 x 0.1 centimeters. Each wound had been present for over six months, and had not responded to conservative treatment for over 30 days, including compression,

36

off-loading, proper nutrition, diabetes management, debridement, protective ointment, polymem foam, and weekly cleaning and dressing changes.

87.    Dr. McGee determined, based on his medical judgment and years of experience, that the application of skin substitutes was medically reasonable and necessary to treat D.S.'s wounds. He elected to use Amnio Quad-Core to treat D.S.

88.    Dr. McGee treated D.S. with Amnio Quad-Core on multiple dates, including April 10, April 17, May 22, and May 29, 2024.

*Administrative Procedural History*

89.    Dr. McGee billed Medicare for all of these Amnio Quad-Core treatments. Medicare initially covered these treatments without issue.

90.    However, the UPIC (Qlarant) determined that overpayments occurred. Dr. McGee requested redetermination by the MAC (Novitas), which Novitas denied. Despite Dr. McGee's detailed record keeping, Novitas denied his claims because his records purportedly "did not adequately show measurements or detail of the initial wound or provide baseline data prior to initiation of the skin substitutes." Exhibit 12 (collection of Novitas decisions). The denial letter also said that Dr. McGee's records "did not show at least four weeks of beneficiary compliant specific wound treatment interventions that had failed prior to the placement of skin substitute," despite Dr. McGee's records specifically detailing this. *Id.*

91.    Dr. McGee requested reconsideration from the QIC, C2C. But C2C denied reconsideration, finding that Amnio Quad-Core "is experimental and investigational as denoted by the Q code status nomenclature."

92.    On October 30, 2025, Dr. McGee requested an ALJ hearing. The ALJ held a telephonic hearing on January 7, 2026.

93.     On February 20, 2026, the ALJ rendered seven unfavorable decisions regarding Dr. McGee's treatment of these three beneficiaries. Exhibit 13 (collection of ALJ decisions). Each decision's reasoning is identical; they differ only in the beneficiary and treatment details. Notably, the ALJ specifically found that Dr. McGee "[met] LCD guidelines for general skin substitute treatment of diabetic or venous leg ulcers." *Id.* at 12. He also noted that the beneficiaries wounds were all "unresponsive to appropriate, conservative wound care for at least 30 days," plainly disputing Novitas' initial denial rationale. *Id.* Nonetheless, it found that Amnio Quad-Core was "investigational or experimental" because none of the literature supplied by Dr. McGee mentioned Amnio Quad-Core specifically and because Amnio Quad-Core was not used homologously, *id.* at 11, 13 (rejecting the still effective 2015–2016 LCDs' premise that all HCT/Ps are similar in that they are for homologous use and need to be minimally manipulated). For support, the ALJ inexplicably cited the 2026 Novitas LCD even though CMS had announced its withdrawal two months before these decisions came down. *See id.* at 5. Finally, the ALJ held that Dr. McGee was liable for the overpayment because he "knew or should have known" that Medicare would not cover his use of Amnio Quad-Core. *Id.* at 8.

94.     The ALJ denied Dr. McGee's claims even though the peer-reviewed articles that he cited and the weight of the medical records and witness testimony overwhelmingly supported use of Amnio Quad-Core as appropriate treatments for the wounds affecting his patients. The ALJ also failed to explain why the ALJ departed from the still-in-effect 2015 Novitas LCD, which has provided Medicare Part B coverage of Amnio Quad-Core for the last decade. In effect, the ALJ effectively applied the 2023 LCDs and 2026 LCDs—which explicitly excluded Amnio Quad-Core from Medicare coverage—even though neither of these LCDs ever took effect; the ALJ even acknowledged that CMS had *already withdrawn* the 2026 LCD at the time of his decisions. *Id.* at

5 n.1. By ignoring the 2015 LCD and the Agency's long-standing practice of reimbursing skin substitutes, in favor of applying its newly fashioned Clawback Policy on a retroactive basis, the Agency acted in violation of the *Accardi* principle. *See, e.g.*, *De Borba Oliveira v. U.S. Att'y Gen.*, No. 23-14019, 2025 WL 40541, at *3 (11th Cir. Jan. 7, 2025) (per curiam) (applying *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)) (administrative agencies must adhere to their own legislative and procedural rules). Finally, the ALJ's holding that Dr. McGee should have known that the skin substitutes she used would not be covered by Medicare is nonsensical, as Medicare had been reimbursing skin substitutes for years prior without issue pursuant to the still-effective 2015–2016 LCDs, so there was no reason for Dr. McGee to believe that it would suddenly reverse course and demand repayment for treatments it had already reimbursed.

95.     Notably, Dr. McGee received several *favorable* decisions from a different ALJ for his treatment of one of the same beneficiaries (N.N.), with the same product, in the same manner. On January 26, 2026, that ALJ held that Dr. McGee's use of Amnio Quad-Core on N.N. was covered by Medicare.

96.     Dr. McGee plans to file an appeal from the ALJ's unfavorable decision to the Council, but that proceeding is an exercise in futility given the broad application of the Clawback Policy by the Council in similar circumstances to deny payment. Moreover, further delays before Dr. McGee could seek relief in court would exacerbate the substantial harm that the Clawback Policy has already imposed upon him and that threatens his ability to continue serving his patients.

**Ms. April Lopez, CWS, MSN, APRN, ACNPC-AG, FNP-BC**

97.     April Lopez is a wound-care specialist who treats Medicare beneficiaries, including patients who suffer from chronic wounds in the form of diabetic foot ulcers and venous leg ulcers that do not respond to conventional treatment methods.

*Services Involving Zenith and carePATCH Provided to Beneficiaries*

98.     Since at least 2022, Ms. Lopez has provided wound care services to Medicare beneficiaries. In each case, Ms. Lopez first uses traditional wound therapy treatments for at least thirty days on her patients, including wet-to-dry coverings, hydrogel, triple antibiotic ointment, betadine and dry gauze, and wound cleaner. However, for many patients, these treatments alone are inadequate to address their underlying wounds.

Beneficiary L.G.

99.     In 2022, L.G. was suffering from six distinct diabetic foot ulcers and venous leg ulcers on his legs and feet. In particular, the wound on L.G.'s right leg was 42 x 17 centimeters, and it caused L.G. to experience throbbing pain.

100.     For over thirty days, Ms. Lopez treated L.G.'s wounds with traditional therapy treatments; however, these treatments had no demonstrable impact on L.G.'s wounds. To the contrary, one of the wounds kept growing in size and had a significant amount of discharge.

101.     Following these events, Ms. Lopez determined, based on her medical judgment and years of experience, that the application of a skin substitute was medically reasonable and necessary to treat L.G.'s wounds. Ms. Lopez elected to use Zenith for this treatment.

102.      Ms. Lopez applied eleven separate treatments of Zenith to L.G., on November 11, 2022, November 15, 2022, November 25, 2022, November 29, 2022, December 9, 2022, December 14, 2022, December 20, 2022, December 22, 2022, January 2, 2023, January 13, 2023, and January 31, 2023—using up to 300 total units for each round of treatment.

Beneficiary M. Ma.

103.     In 2022, M. Ma. was suffering from diabetic foot ulcers and venous leg ulcers on his right hip, right buttock, right heel, and right foot. In particular, the wound on M. Ma.'s right hip was a stage 4 pressure ulcer 2.5 centimeters in length with serious discharge.

104.     For over thirty days, Ms. Lopez treated M. Ma.'s wounds with traditional therapy treatments; however, these treatments had no demonstrable impact on M. Ma.'s wounds.

105.     Following these events, Ms. Lopez determined, based on her medical judgment and years of experience, that the application of a skin substitute was medically reasonable and necessary to treat M. Ma.'s wounds. Ms. Lopez elected to use Zenith for this treatment.

106.     Ms. Lopez treated M. Ma with Zenith one time on November 16, 2022. The treatment used 124 total units.

Beneficiary M. Me.

107.     In 2022, M. Me. was suffering from diabetic foot ulcers and venous leg ulcers in her sacral region, on her left hip, and on both feet. In particular, the wound in her sacral region was a stage 4 pressure ulcer, 3.2 x 3.2 x 2 centimeters in length. This wound caused M. Me. to experience sharp pain.

108.     For over thirty days, Ms. Lopez treated M. Me.'s wounds with traditional therapy treatments; however, these treatments had no demonstrable impact on M. Me.'s wounds.

109.     Following these events, Ms. Lopez determined, based on her medical judgment and years of experience, that the application of a skin substitute was medically reasonable and necessary to treat M. Me.'s wounds. Ms. Lopez elected to use Zenith for this treatment.

110.     Ms. Lopez treated M. Me. with Zenith one time on October 11, 2022. The treatment used 80 total units.

Beneficiary A.P.

111.    In 2023, A.P. was suffering from multiple venous leg ulcers on his right hip. In particular, he suffered from a stage 3 pressure ulcer on his right hip that was 15 x 9 centimeters in length. This wound caused A.P. to experience sharp pain.

112.    For over thirty days, Ms. Lopez treated A.P.'s wounds with traditional therapy treatments; however, these treatments had no demonstrable impact on A.P.'s wounds.

113.    Following these events, Ms. Lopez determined, based on her medical judgment and years of experience, that the application of a skin substitute was medically reasonable and necessary to treat A.P.'s wounds.

114.    Ms. Lopez treated A.P. with skin substitute treatments on February 9, 2023, and April 21, 2023. She elected to use Zenith for the first treatment and carePATCH for the second treatment. These treatments used 116 and 74 units of product, respectively.

Beneficiary R.R.

115.    In 2023, R.R. was suffering from ten total diabetic foot ulcers and venous leg ulcers on his legs and feet. In particular, one ulcer in R.R.'s right leg was 3 x 2.5 centimeters in length and caused R.R. to experience throbbing pain.

116.    For over thirty days, Ms. Lopez treated R.R.'s wounds with traditional therapy treatments; however, these treatments had no demonstrable impact on R.R.'s wounds.

117.    Following these events, Ms. Lopez determined, based on her medical judgment and years of experience, that the application of a skin substitute was medically reasonable and necessary to treat R.R.'s wounds. Ms. Lopez elected to use carePATCH for this treatment.

118.    Ms. Lopez treated R.R. with carePATCH two times, on March 7, 2023, and April 19, 2023. These treatments used 128 and 136 units of product, respectively.

Beneficiary G.V.

119.    In 2022, G.V. was suffering from a diabetic foot ulcer in his right foot that measured 13 x 11 centimeters in length. It caused G.V. to experience sharp pain.

120.    For over thirty days, Ms. Lopez treated G.V.'s wounds with traditional therapy treatments; however, these treatments had no demonstrable impact on G.V.'s wounds.

121.    Following these events, Ms. Lopez determined, based on her medical judgment and years of experience, that the application of a skin substitute was medically reasonable and necessary to treat G.V.'s wounds. Ms. Lopez elected to use Zenith for this treatment.

122.    Ms. Lopez treated G.V. with Zenith one time on October 11, 2022. The treatment used 80 total units.

Beneficiary C.W.

123.    In 2023, C.W. was suffering from multiple diabetic foot ulcers and venous leg ulcers on his legs and feet. In particular, he had a non-pressure ulcer on his left leg that measured 23.5 x 14 centimeters in length, which had been present since March 2020. This wound caused C.W. to experience sharp pain.

124.    For over thirty days, Ms. Lopez treated C.W.'s wounds with traditional therapy treatments; however, these treatments had no demonstrable impact on C.W.'s wounds.

125.    Following these events, Ms. Lopez determined, based on her medical judgment and years of experience, that the application of a skin substitute was medically reasonable and necessary to treat C.W.'s wounds. Ms. Lopez elected to use carePATCH for this treatment.

126.    Ms. Lopez treated C.W. with carePATCH once, on March 23, 2023. This treatment used 140 units of the product.

*Administrative Procedural History*

127.    Ms. Lopez billed Medicare for the Zenith and carePATCH treatments described above. CMS initially covered all of the treatments without issue.

128.    On October 26, 2023, Qlarant Integrity Solutions, LLC ("Qlarant"), the UPIC with purview over these claims, requested that Ms. Lopez submit documentation in support of services rendered for the treatments discussed above. Ms. Lopez fully complied with Qlarant's requests and supplied the requested documentation in support of the claims. Exhibit 14 (Qlarant letter).

129.    On January 30, 2024, Qlarant notified Ms. Lopez that its post-payment review resulted in denial of payment for all of the claims in question. Exhibit 15 (Qlarant decision).

130.    Novitas—the MAC with jurisdiction for Part B services rendered to beneficiaries in Texas—subsequently sent a letter to Lopez dated February 26, 2024, alleging an overpayment of $1,503,871.89. Exhibit 16 (Novitas Letter). Ms. Lopez timely sought redetermination of the alleged overpayment assessed by Novitas.

131.    Novitas issued a series of unfavorable redetermination decisions. These letters began by stating that "Medicare does not cover the service at issue in your appeal." The letters further stated that Ms. Lopez failed to provide adequate documentation to support her use of skin-substitute products. Exhibit 17 (collection of Novitas decisions).

132.    Ms. Lopez then timely sought reconsideration before C2C Innovative Solutions, Inc. ("C2C"), the QIC.

133.    C2C subsequently issued an unfavorable reconsideration decision dated September 13, 2024. C2C claimed, notwithstanding the substantial documentation provided by Lopez, that she had not provided adequate support for the services rendered. Specifically, C2C determined that "amniotic allografts services are not reasonable and necessary for payment" and that the

"submitted documentation did not adequately support the services rendered." C2C faulted Ms. Lopez for not addressing management of underlying conditions or describing why the beneficiaries' wounds were not healing. C2C made this determination despite the clear evidence in the record that the treating primary care physicians were managing the beneficiaries' underlying conditions, had tried conservative wound care measures for at least thirty days, and that the wounds were not responding to those treatments. Moreover, the concerns were also unfounded because the Novitas 2015 LCD does not require providers to document their musings about why wounds are not healing and because Ms. Lopez furnished medical documentation to support that conservative treatments had been tried and failed. Exhibit 18 (C2C decision).

134.    On November 11, 2024, Ms. Lopez filed a request for an ALJ hearing.

135.    The ALJ conducted a telephonic hearing on February 25, 2025. Ms. Lopez again reiterated her case, consistent with Medicare's Skin Substitute Coverage Policy and the 2015–2016 LCDs, that the use of Zenith and carePATCH to treat the patient wounds in question was reasonable and necessary, in that it was medically appropriate, safe and effective, and not experimental or investigational. C2C was informed of the hearing but elected not to participate.

136.    On March 18, 2025, the ALJ issued a decision affirming the claim of overpayment. Exhibit 19 (ALJ decision). The ALJ held that "[Ms. Lopez] has demonstrated that the application of the Zenith Amniotic Membrane and/or carePATCH as a cover to wounds refractory to conservative measures was experimental and investigational and was not supported by peer-reviewed human trials demonstrating its medical efficacy for chronic, non-healing wounds." *Id.* at 1. The ALJ reasoned that every skin-substitute product is unique and must be evaluated individually for safety and effectiveness, even though that is squarely at odds with the applicable 2015-2016 LCDs. *Id.* at 6–7. For support, the ALJ inexplicably cited the 2026 LCDs that were not

operative at the time and, indeed, never went into effect, and further quoted extensively from the

MAC's response to public comments from the failed promulgation of new LCDs concerning

whether skin substitute products are medically reasonable and necessary. *See id.* at 7. Laying bare

this new Clawback Policy, which mirrors the failed 2023 LCDs and 2026 LCDs, the ALJ went on

to reject the premise behind the 2015–2016 LCDs that "all HCT/Ps are similar in that they are for

homologous use and need to be minimally manipulated," and on that basis, found "there is simply

a lack of medical literature to support coverage of these two products." *Id.* at 7–8. Finally, the ALJ

held that Ms. Lopez was liable for the overpayment because she "knew or should have known that

the services were not medically reasonable and necessary." *Id.* at 8.

137.    The ALJ denied Ms. Lopez's claims even though the peer-reviewed articles that

she cited and the weight of the medical records and witness testimony overwhelmingly supported

use of Zenith and carePATCH as appropriate treatments for the wounds affecting her patients. The

ALJ also failed to explain why the ALJ departed from the still-in-effect 2015 Novitas LCD, which

has provided Medicare Part B coverage of Zenith and carePATCH for the last decade. In effect,

the ALJ effectively applied the 2023 LCDs and 2026 LCDs—which explicitly excluded Zenith

and carePATCH from Medicare coverage—even though neither of these LCDs ever took effect.

By ignoring the 2015 LCD and the Agency's long-standing practice of reimbursing skin

substitutes, in favor of applying its newly fashioned Clawback Policy on a retroactive basis, the

Agency acted in violation of the *Accardi* principle. *See, e.g.*, *De Borba Oliveira*, 2025 WL 40541,

at *3 (applying *Accardi*, 347 U.S. 260) (administrative agencies must adhere to their own

legislative and procedural rules). Finally, the ALJ's holding that Ms. Lopez should have known

that the skin substitutes she used would not be covered by Medicare is nonsensical, as Medicare

had been reimbursing skin substitutes for years prior without issue pursuant to the still-effective

2015–2016 LCDs, so there was no reason for Ms. Lopez to believe that it would suddenly reverse course and demand repayment for treatments it had already reimbursed.

138.    On May 7, 2025, Ms. Lopez requested that the Medicare Appeals Council review the ALJ's decision.

139.    By letter dated March 2, 2026, Ms. Lopez, in citing 42 C.F.R. § 405.1132(a), requested that the Medicare Appeals Council grant her request for escalation to federal court. 42 C.F.R. § 405.1132(a)(1). Under these circumstances, the regulations permit you to bypass Council review and seek review of the ALJ's decision in Federal district court. 42 C.F.R. § 405.1132(a)(2)." Exhibit 20 at 2 (Letter requesting escalation).

**Dr. Brian Loder, DPM**

140.    Dr. Loder is a podiatrist who treats Medicare beneficiaries, including patients who suffer from chronic wounds in the form of diabetic foot ulcers and venous leg ulcers that do not respond to conventional treatment methods. Consistent with Medicare's Skin Substitute Coverage Policy, Dr. Loder has provided wound care services to numerous Medicare beneficiaries since at least 2022.

Beneficiary P.B.

141.    In 2023, P.B. was suffering from venous leg ulcers on both of his ankles, measuring as large as 15 x 9.5 centimeters. These wounds were severe enough to leave her fat layers exposed.

142.    For over thirty days, P.B.'s wounds were treated with conventional treatments, including bilateral Unna boots, compression therapy, elevation, and narcotic pain relievers. However, these treatments had no demonstrable impact on P.B.'s wounds.

143.    Following these events, Dr. Loder determined, based on his medical judgment and years of experience, that the application of a skin substitute was medically reasonable and necessary to treat P.B.'s wounds. Dr. Loder elected to use Impax for this treatment.

144.    Dr. Loder applied six separate treatments of Impax to P.B. on April 4, April 11, April 18, May 2, May 16, and May 23, 2023—using up to 40 total units for each round of treatment.

Beneficiary C.R.

145.    In 2023, C.R. was suffering from a non-pressure venous leg ulcer on her lower left leg that measured 2.4 x 1.5 cm in length, with the fat layer exposed.

146.    Dr. Loder determined, based on his medical judgment and years of experience, that the application of a skin substitute was medically reasonable and necessary to treat C.R.'s wounds. Dr. Loder elected to use Impax for this treatment.

147.    Dr. Loder applied three separate treatments of Impax to C.R., on August 17, August 24, and August 31, 2023—using up to four units for each round of treatment.

Beneficiary K.S.

148.    In 2023, K.S. was suffering from a diabetic foot ulcer on her right ankle with the fat layer exposed, measuring 6 x 5 centimeters in length.

149.    K.S. received conventional treatments at a wound care center for three months. However, these treatments had no demonstrable impact on K.S.'s wounds.

150.    Following these events, Dr. Loder determined, based on his medical judgment and years of experience, that the application of a skin substitute was medically reasonable and necessary to treat K.S.'s wounds. Dr. Loder elected to use Impax for this treatment.

151.    Dr. Loder applied four separate treatments of Impax to K.S., on October 3, October 10, October 17, and October 24, 2023—using up to 30 units for each round of treatment.

*Administrative Procedural History*

152.    Dr. Loder billed Medicare for the Impax treatments described above. CMS initially covered all of the treatments without issue.

153.    On December 10 and 11, 2024, Wisconsin Physicians Services ("WPS"), the MAC with purview over these claims, informed Dr. Loder that the reimbursements for treatments of Impax to beneficiaries K.S. and C.R. were made in error.

154.    Then, the UPIC, Covent Bridge Group, determined that an overpayment had been made with regard to Dr. Loder's use of Impax to treat P.B, as well. It determined that the record did not support Dr. Loder's treatment of Impax on P.B. as medically reasonable and necessary. Exhibit 21 (Covent Bridge letter).

155.    WPS upheld this initial decision on redetermination, saying that Dr. Loder's medical records failed to show that P.B. failed an adequate course of conservative treatments. Exhibit 22 (collection of WPS redetermination decisions for P.B.).

156.    WPS also upheld its initial decisions regarding C.R. and K.S. on redetermination, with its rationale for each beneficiary word-for-word the same. It said that "the documentation did not support the beneficiary has failed less expensive standard wound care options." Exhibit 23 (collection of WPS Redetermination Decisions for C.R. and K.S.).

157.    Dr. Loder then timely sought reconsideration of the overpayment assessments as to all three beneficiaries before C2C Innovative Solutions, Inc. ("C2C"), the QIC. C2C subsequently issued unfavorable reconsideration decisions as to all three beneficiaries in practically identical written decisions, determining that the use of Impax was merely "experimental and investigational as denoted by the Q code status nomenclature." Exhibit 24 (collection of C2C decisions).

158.    Dr. Loder filed requests for ALJ hearings arising from these overpayment assessments. His requests were handled by two separate ALJs.

159.    ALJ McClelland held a telephonic hearing on October 30, 2025, concerning the treatments provided to P.B. Consistent with long-standing Medicare Skin Substitute Coverage Policy, Dr. Loder noted that there was more than adequate medical evidence to support the use of Impax to treat P.B.'s wounds.

160.    On November 19, 2025, ALJ McClelland denied those claims, finding that "the record does not support that Dual Layer Impax Membrane is safe, effective, non-experimental, non-investigational, and clinically appropriate for the treatment of [P.B.'s] non-pressure chronic ulcer wounds." Exhibit 7 at 1. Notwithstanding the weight and import of the Medicare Skin Substitute Coverage Policy, as well as the added literature provided by Dr. Loder showing the safety and effectiveness of skin substitutes, the ALJ found that "the record lacks sufficient peer-reviewed, evidence-based literature to support that Impax is safe, effective, non-experimental, and non-investigational." *Id.* at 6. The ALJ determined that the literature needed to endorse specifically Impax as safe and effective, not just skin substitutes generally. Finally, the ALJ held that Dr. Loder was liable for the overpayment because he should have known that Impax was an "investigational product[ ]" and failed to submit documentation supporting the use of such a product. *Id.* at 8.

161.    ALJ Van Duzer conducted a telephonic hearing on November 4, 2025, as to Dr. Loder's treatments provided to K.S. and C.R. Consistent with long-standing Medicare Skin Substitute Coverage Policy, Dr. Loder noted that there was more than adequate medical evidence to support the use of Impax to treat K.S. and C.R.'s wounds.

162.    On December 18, 2025, ALJ Van Duzer handed down identical unfavorable decisions as to K.S. and C.R, reasoning that "the evidence does not support a finding that the dual

layer Impax membrane wound cover is safe and effective for treatment of patients with the appellant's condition." Exhibit 25 (12/18 ALJ Decisions) at 1. The ALJ claimed that the studies submitted by Dr. Loder did not adequately demonstrate that Impax was generally accepted in the medical community. *Id.* at 6. Finally, the ALJ held Dr. Loder liable for the overpayment because he "knew or reasonably should have known the services at issue were not covered by Medicare." *Id.* at 7.

163.    As with the other adverse determinations and denials described above that are part of the overarching Clawback Policy, these ALJ decisions failed to acknowledge, much less provide a reasoned explanation, for this drastic change in approach when Impax treatments have been broadly reimbursed over the last decade under the Skin Substitute Coverage Policy. And the ALJs' holdings that Dr. Loder should have known that the skin substitutes he used would not be covered by Medicare are nonsensical, as Medicare had been reimbursing skin substitutes for years prior without issue pursuant to the still-effective 2015–2016 LCDs, so there was no reason for Dr. Loder to believe that it would suddenly reverse course and treat Impax as "investigational."

164.    While Dr. Loder has filed appeals from the ALJ denials to the Council, those proceedings are an exercise in futility given the broad application of the Clawback Policy by the Council in other similar circumstances to deny payment. Moreover, further delays before Dr. Loder could seek relief in court would exacerbate the substantial harm that the Clawback Policy has already imposed upon him and that threaten his ability to continue serving his patients.

**Healthcare Housecalls LLC**

165.    Dr. Lalia directs a clinic, Healthcare Housecalls LLC ("Healthcare Housecalls"), which treats Medicare beneficiaries, including patients who suffer from chronic wounds in the form of diabetic foot ulcers and venous leg ulcers that do not respond to conventional treatment

methods. Consistent with Medicare's Skin Substitute Coverage Policy, Healthcare Housecalls has provided wound care services to many Medicare beneficiaries over the years.

*Services Involving Amnio-Maxx Provided to Beneficiary E.E.*

166.      Healthcare Housecalls provides treatments to Medicare beneficiaries whose wounds have not responded to conventional treatment methods, including compression therapy, debridement, and pressure relief.

167.      In 2024, beneficiary E.E. was suffering from three venous leg ulcers on his right leg, which had been present for over a year. His largest venous leg ulcer measured 9 x 9 centimeters in length.

168.      E.E. first received treatment from a vascular surgeon who treated his wounds through conventional wound-care methods. However, when E.E.'s wounds no longer responded to those treatments, the vascular surgeon endorsed the use of skin substitute products to treat the wounds.

169.      Healthcare Housecalls applied four separate treatments of Amnio-Maxx to E.E., on or around October 12, 2024—using up to 26 units for each round of treatment.

*Administrative Procedural History*

170.      Healthcare Housecalls billed Medicare for the Amnio-Maxx treatments described above. CMS initially covered all four treatments without issue.

171.      The MAC, First Coast, issued an unfavorable decision on December 31, 2024, and it informed Healthcare Housecalls that it had received Medicare payment for these treatments in error, resulting in an overpayment. Healthcare Housecalls' claim was also denied on redetermination.

172.    On July 22, 2025, C2C, the QIC, issued an unfavorable reconsideration decision, claiming that Medicare cannot cover Amnio-Maxx because it is experimental and investigational.

173.     Healthcare Housecalls filed requests for ALJ hearings arising from these overpayment assessments.

174.    The ALJ held a telephonic hearing on October 23, 2025 concerning one of the four treatments provided to E.E. Consistent with Medicare's Skin Substitute Coverage Policy, Healthcare Housecalls argued that there was more than adequate medical evidence to support the use of Amnio-Maxx to treat E.E.'s wounds.

175.    On December 3, 2025, the ALJ issued an adverse decision. Exhibit 26 (ALJ decision). Originally, the MAC, First Coast, claimed overpayment on that basis that Healthcare Housecalls' use of Amnio-Maxx was non-homologous. However, the QIC through its review found that the use *was* homologous, but still denied coverage, claiming that use of Amnio-Maxx is purportedly experimental. The ALJ then reverted back to First Coast's reasoning, holding that the use of Amnio-Maxx was non- homologous because wound healing is not a basic function of an amniotic tissue donor. Finally, the ALJ held Healthcare Housecalls liable for the overpayment because he "knew, or should have known, that the services would not be found reasonable and necessary." *Id.* at 8.

176.    As with the other adverse determinations and denials described above that are part of the overarching Clawback Policy, the ALJ decision failed to acknowledge, much less provide a reasoned explanation, for this drastic change in approach when Amnio-Maxx and other skin substitute treatments have been broadly reimbursed over the last decade under the First Coast 2015 LCD and broader Skin Substitute Coverage Policy. And the ALJ's holding that Healthcare Housecalls should have known that the skin substitutes he used would not be covered by Medicare

is nonsensical, as Medicare had been reimbursing skin substitutes for years prior without issue pursuant to the still-effective 2015–2016 LCDs, so there was no reason for Healthcare Housecalls to believe that it would suddenly reverse course.

177.    Notably, Healthcare Housecalls received three *favorable* decisions from a different ALJ for treatments of the same beneficiary, with the same product, in the same manner. On December 16, 2025, that ALJ ruled in three identical opinions that Healthcare Housecalls' use of Amnio-Maxx on E.E. was covered by Medicare because Amnio-Maxx is "intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent."

178.    While Healthcare Housecalls has filed an appeal from the ALJ's unfavorable decision to the Council, that proceeding is an exercise in futility given the broad application of the Clawback Policy by the Council in similar circumstances to deny payment. Moreover, further delays before Healthcare Housecalls could seek relief in court would exacerbate the substantial harm that the Clawback Policy has already imposed upon him and that threaten his ability to continue serving his patients.

**Indy Wound Center**

179.    Drs. Patel and Zumbaugh are podiatrists who co-own a clinic, Indy Wound Center for Limb Preservation and Reconstruction dba Indy Wound Center ("Indy Wound Center"), which treats Medicare beneficiaries, including patients suffering from chronic wounds in the form of diabetic foot ulcers and venous leg ulcers that do not respond to conventional treatment methods. Consistent with Medicare's Skin Substitute Coverage Policy, Indy Wound Center provided wound care services to many Medicare beneficiaries over the years.

*Services Involving a Skin Substitute Product Provided to Beneficiary D.K.*

180.     In May 2024, D.K. was suffering from numerous venous leg ulcers on her lower legs so severe that she required hospitalization. One wound was a nearly circumferential wound around her entire left calf with a depth of 0.2 centimeters.

181.     Traditional methods were originally used to treat the wound, such as silicone primary dressing, but these efforts were unsuccessful. While hospitalized, a healthcare provider other than Indy Wound Center applied skin substitutes to D.K.'s lower extremities on May 11, 2024.

182.     D.K. was transferred to another facility on May 17, 2024. On June 3, a venous leg ulcer on her lower left leg measured 18 x 32 x 0.1 centimeters. D.K. was later admitted to a rehabilitation hospital, where she received additional traditional wound care treatments. By June 21, this same left anterior leg wound still measured 9 x 32 by 0.4 centimeters.

183.     By July 2, D.K. had been referred to Indy Wound Center for advanced wound care treatments. During this initial visit, D.K. reported suffering from wounds for over six years. She had tried various topical treatments, alginates, hydrofera, wet-to-dry with saline and betadine, and bedside and surgical debridement. All of these treatments were unsuccessful.

184.     Given this history, Indy Wound Center determined, based on the medical judgment and years of experience of its practitioners, that D.K.'s lower anterior leg wound required the use of a skin substitute to properly heal. When Indy Wound Center began treating the patient, they measured the total wound size through two separate measurements: the anterior dimension and the posterior dimension. At this time, Indy Wound Center measured the anterior dimension at 8.2 x 24.3 x 0.2 centimeters. In contrast to Indy Wound Center's approach, the previous facility documented a single, combined measurement of 18 x 32 x 0.1 centimeters, representing the entire

anterior-posterior dimension. By this time, the anterior wound had failed to show evidence of significant healing despite well over 30 days of comprehensive, conservative care. Indy Wound Center thus elected to use the skin substitute product BioLab Membrane Wrap to treat the wound.

*Administrative Procedural History*

185.    Indy Wound Care billed Medicare for this use of BioLab Membrane Wrap. CMS initially covered the treatment without issue.

186.    The UPIC later determined that this treatment was not covered and notified Indy Wound Center of an overpayment. Indy Wound Care sought redetermination but the MAC (WPS) ruled that the "submitted documentation fail[ed] to demonstrate failed wound care treatments" despite the long record laid out above of multiple facilities struggling mightily to get D.K.'s wounds under control. Exhibit 27 (collection of WPS decisions). It also said that "the documentation [was] insufficient in supporting why this product was chosen for treatment of these wounds." *Id.*

187.    The QIC, C2C, denied reconsideration. It noted that the "medical records contain a letter as well as a visit note to support the procedure was performed along with the baseline assessment and trialed conservative treatment," disputing WPS's assessment that the records did not support the use of conservative treatment. Exhibit 28 (collection of C2C decisions). Nonetheless, C2C denied Indy Wound Care's claims because BioLab Membrane Wrap is supposedly "experimental and investigational as denoted by the Q code status nomenclature." *Id.*

188.    Indy Wound Center requested an ALJ hearing, which occurred telephonically on January 8, 2025. Subsequently, the ALJ rendered a series of unfavorable decisions. Exhibit 29 (collection of ALJ decisions). The ALJ reasoned that because there "is no NCD or LCD addressing the reasonable and necessary threshold for coverage of a skin substitute product," he needed to

look to the contractor guidelines. But despite Indy Wound Center submitting numerous studies demonstrating the efficacy of skin substitutes, the ALJ discounted their relevance because they only demonstrated the efficacy of skin substitutes generally, not of the BioLab Membrane Wrap specifically. Thus, according to the ALJ, "the evidence submitted did not demonstrate that the Membrane wrap product was not experimental." *Id.* The ALJ went on to hold, in the alternative, that the use of Biolab Membrane Wrap in this particular instance was not medically necessary because D.K.'s left anterior leg wound was supposedly "responding" to conservative treatment; the ALJ either did not understand or disregarded the fact that the prior 18 x 32 x 0.1 centimeter measurement documented by the prior facility captured both the anterior and posterior dimension of D.K.'s wound, comparing that to the anterior-specific measurement Indy Wound Center documented on July 2, 2024. *See id.* Finally, the ALJ held Indy Wound Center liable for the overpayment it was supposedly "expected to have known that the Services would not be covered or payable based on the applicable guidelines." *Id.*

189.    As with the other adverse determinations and denials described above that are part of the overarching Clawback Policy, the ALJ decision failed to acknowledge, much less provide a reasoned explanation, for this drastic change in approach when BioLab Membrane Wrap treatments have been broadly reimbursed over the last decade under the Skin Substitute Coverage Policy. And the ALJ's holding that Indy Wound Center should have known that the skin substitutes would not be covered by Medicare is nonsensical, as Medicare had been reimbursing skin substitutes for years prior without issue pursuant to the still-effective 2015–2016 LCDs. There was simply no reason for Indy Wound Center to believe that CMS and its agents would suddenly reverse course and treat Biolab Membrane Wrap as "experimental."

190.    Notably, Indy Wound Center received several *favorable* decisions from a different ALJ for its treatment of a different beneficiary with the same product. On February 20, 2026, that ALJ ruled that Indy Wound Center's use of BioLab Membrane Wrap was covered by Medicare because its "Q codes are not indicated as investigational or experimental."

191.    Indy Wound Center plans to file an appeal from the ALJ's unfavorable decision to the Council, but that proceeding is an exercise in futility given the broad application of the Clawback Policy by the Council in similar circumstances to deny payment. Moreover, further delays before Indy Wound Center could seek relief in court would exacerbate the substantial harm that the Clawback Policy has already imposed upon it and that threaten its ability to continue serving its patients.

**Further Application of the Clawback Policy**

192.    Beginning in or about early 2022, the Defendants' agents initiated a widespread campaign of Medicare Integrity Program post-payment audits and reopenings that broadly recharacterized amniotic skin substitute claims as "experimental" or "investigational" and, on that basis alone, demanded recoupment of previously paid claims. These actions targeted services that were squarely covered under the still-operative 2015–2016 LCDs and the long-standing Skin Substitute Coverage Policy. The pattern is consistent across jurisdictions and contractors: previously paid claims for amniotic HCT/Ps used as wound covers for refractory diabetic foot ulcers and venous leg ulcers are retroactively reopened and denied on "experimental" and "investigational" grounds, regardless of patient-specific documentation of medical necessity or the product's inclusion within the scope of the 2015–2016 LCDs and the Skin Substitute Coverage Policy. *See, e.g.*, Exhibit 30 (Sept. 30, 2025 Denial Letter) (denying Medicare claim for amniotic membrane as a skin substitute graft for wound treatment as "experimental and investigational");

58

Exhibit 31 (Aug. 27, 2025 Denial Letter) (same); Exhibit 32 (Nov. 14, 2023 Denial Letter) (denying Medicare claim for human amniotic membrane allograft because the services provided "were not reasonable and necessary because this skin substitute graft was applied for wound healing treatment, not merely as a cover or barrier for the wound"); Exhibit 33 (Dec. 7, 2023 Denial Letter) (denying Medicare claim because "its use as a skin substitute graft for treatment of an ulcer or wound is non-homologous"). On information and belief, the Defendants' agents have subjected many other providers to similar post-payment audits and denials of appeals on similarly unlawful grounds.

193.    The evidence of a systemwide policy is compelling. Across multiple jurisdictions, providers received form denial language invoking "experimental" and "investigational" denial rationales from adjudicators; UPIC reports and QIC reconsiderations repeated the same product-specific literature requirement; and ALJ and Council decisions increasingly adopted that requirement while disregarding the still operative 2015–2016 LCDs and the Skin Substitute Coverage Policy. *See, e.g.*, Compl. ¶ 5, *Koonce*, No. 5:25-cv-00360 (Medicare Appeals Council vacating, on Council's own motion, three favorable ALJ decisions and because the provider "failed to provide authoritative evidence to support a finding that Impax was 'safe and effective, not experimental or investigational, and appropriate for the beneficiary's condition,'" even though the MAC approved seven of ten treatments for the beneficiary at issue); Compl. ¶ 1 & Ex. A at 14, *Riegelhaupt*, No. 1:24-cv-07606 (Medicare Appeals Council, on its own motion, reversing favorable ALJ decision because it was "ultimately unable to ascertain whether . . . EpiFix, PuraPly AM, and DermACELL products are safe and effective, and not experimental or investigational."); Exhibit 34 (example Council decision) (reversing three favorable ALJ decisions holding that skin substitutes were covered by Medicare because there was insufficient evidence that the products

were not investigational or experimental); Exhibit 35 (example Council decision) (holding that it was unable to find that Impax is not investigational or experimental because the submitted studies did not discuss Impax specifically). In addition, the AdQIC has referred favorable ALJ decisions involving amniotic skin substitutes to the Council for self-initiated review, after which the Council has reversed based on the same "experimental" and "investigational" theory. Exhibit 36 (example Council decision) (reversing favorable ALJ decision after AdQIC referral because there was insufficient evidence to conclude that Impax was not "experimental or investigational" because none of the submitted studies discussed Impax specifically); *see also* Exhibit 37 (example AdQIC referral letter); Exhibit 38 (example AdQIC referral letter). This repeated cycle of events demonstrates centralized oversight designed to enforce a uniform prohibition on coverage for amniotic HCT/Ps, notwithstanding the 2015–2016 LCDs and the Skin Substitute Coverage Policy.

194.    This post-payment activity is not a series of isolated contractor errors; it reflects a coordinated, uniform coverage position that functions as an unpublished, de facto LCD. Through these audits and reopenings, the Defendants' agents are applying a new evidence standard that categorically deems amniotic HCT/Ps "experimental" and "investigational" absent product-specific randomized controlled trials—an evidentiary threshold that is nowhere found in the Medicare statute, regulations, or the 2015–2016 LCDs. In doing so, the Defendants' agents are impermissibly supplanting the in-force 2015–2016 LCDs and the Skin Substitute Coverage Policy without notice, public comment, or a reasoned explanation for its departure from its long-held views, thereby effecting a substantive policy change through enforcement rather than through the procedures Congress mandated.

195.    The Defendants' agents attempt to justify these clawbacks under the Medicare Integrity Program, 42 U.S.C. § 1395ddd(b), but program integrity authority does not permit the

government to rewrite coverage policy retroactively or to disregard LCDs. Program integrity audits are intended to detect and recover improper payments in accordance with existing coverage standards—not to promulgate new standards that conflict with governing LCDs or longstanding Medicare coverage policy. Yet the Defendants' agents' denials repeatedly rely on the same extra-statutory rationale (that amniotic HCT/Ps are "experimental" and "investigational" absent product-specific trials), mirroring the rationale embedded in the rescinded 2023 LCDs and the withdrawn 2026 LCDs. The resulting uniformity across contractors, time periods, and jurisdictions confirms the existence of a policy, not mere case-by-case adjudication. Defendants' attempts to retroactively change coverage through program integrity reviews is arbitrary, capricious, and contrary to law.

196.    The Clawback Policy has caused and is causing substantial concrete harm. Providers face large, retroactive overpayment demands, immediate recoupment that disrupts cash flow, and the chilling of medically necessary wound care for patients that have diabetic foot ulcers and venous leg ulcers that fail standard therapy. This unlawful retroactive shift also upends reliance interests created by years of consistent coverage determinations and the express terms of the operative 2015–2016 LCDs. The resulting harm is irreparable, given the interruption of care for vulnerable Medicare beneficiaries and the ongoing damage to providers' practices that cannot be fully remedied by post hoc administrative review.

197.    CMS has a duty to ensure that its contractors are following the rules by correctly applying the 2015–2016 LCDs and the Skin Substitute Coverage Policy for products like those provided by the Plaintiffs and other class members. The public loses confidence in the LCD public comment process when MACs implement coverage changes that depart from existing standards without any reasoned justification or opportunity for public comment. This is precisely why CMS updated its Medicare Program Integrity Manual to reflect "policy process changes in response to"

the Cures Act and "stakeholder comments ... about the lack of local coverage process transparency." CMS, Local Coverage Determinations (LCDs), No. MM10901, at 1–2 (revised Jan. 11, 2019), *available at* Am. Coll. of Radiology, *ACR Radiology Coding Source™*, https://cs.acr.org/-/media/ACR/Files/Advocacy/Local-Coverage-Determinations-LCDsMLN-Matters-003-11419.pdf.

198.    Moreover, failure by the MACs to follow their own LCDs discourages providers from continuing to use products that they believe are in the best interest of their patients and forces providers to appeal unnecessary claim denials.

## CLASS ACTION ALLEGATIONS

199.    Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2). The Class is defined as:

> All healthcare providers enrolled in Medicare who, in April 2022 or later, provided a skin substitute product derived from donated human amniotic tissue that are not regulated as devices or biologicals in conjunction with the treatment of a chronic wound and whose Part B reimbursement payment for such product has been subjected to a post-payment audit that resulted in a determination that the payment should be recouped on the basis that such products are not reasonable and necessary when used to treat a chronic wound because they are experimental and investigational, i.e., the Clawback Policy, with such claims for reimbursement having been presented to the Secretary.

200.    Each such provider is referred to herein as a "Member."

201.    The Members of the Class are so numerous that the joinder of all Members is impracticable. Fed. R. Civ. P. 23(a)(1). On information and belief, the Class comprises hundreds of Medicare providers with thousands of claims who have been subjected to the Clawback Policy.

202.    There are questions of law and fact common to the Class.

     a.    Common questions of fact include, among others, the origin of the Clawback Policy; the scope of the Clawback Policy; and whether the application of the Clawback Policy departs from the 2015–2016 LCDs and the Skin Substitute Coverage Policy.

     b.    Common questions of law include, among others, whether the Clawback Policy's departure from the 2015–2016 LCDs and the Skin Substitute Coverage Policy violates the Medicare statute; whether that departure violate CMS's regulations; and whether that departure violates the requirements under the Administrative Procedure Act of notice and the opportunity to comment and reasoned decisionmaking.

203.    Plaintiffs' claims are typical of the claims of the Members of the Class because all Members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

204.    Plaintiffs will fairly and adequately protect the interests of the Members of the Class and have retained counsel who are competent and experienced in class action and Medicare reimbursement litigation.

205.    Defendants have acted or refused to act on grounds that apply generally to the Class—i.e., by broadly applying the Clawback Policy and by failing to apply the 2015-2016 LCDs

and the Skin Substitute Coverage Policy—such that final injunctive relief and/or corresponding declaratory relief is appropriate respecting the Class as a whole.

206.    Class Members' claims are at various stages of administrative proceedings. Because the Clawback Policy is a systemic violation of the proper procedures for claim determinations and appeals, exhaustion of administrative proceedings cannot address the merits of the claims alleged herein and would otherwise be futile.

## CLAIMS FOR RELIEF

### COUNT I
Violations of the Administrative Procedure Act

207.    Plaintiffs incorporate and reallege Paragraphs 1 through 206 above as if fully set forth herein.

208.    The Administrative Procedure Act authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

209.    Agency action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

210.    An agency action is also arbitrary and capricious if it departs from agency precedent without explanation. "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Indeed, an agency must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016).

211.    Defendants' adoption and enforcement of the Clawback Policy, which constitutes final agency action, violates these fundamental requirements.

212.    The Secretary and his agents are required to follow the Medicare Program Integrity Manual, the 2015–2016 LCDs, and the Skin Substitute Coverage Policy. Notably, they have not followed notice and comment procedures that would be required to implement a new LCD or revise these existing LCDs. Therefore, contractors are obligated to make coverage and payment determinations consistent with the existing policies on the books, which have for many years held that skin substitutes as a class of products are safe and effective, not experimental or investigational, and therefore covered as medically appropriate to treat chronic, non-healing wounds. *See Fox Television Stations, Inc*., 556 U.S. at 515 ("simpl[e] disregard [for] rules that are still on the books" is hallmark arbitrary and capricious decision-making); *Accardi*, 347 U.S. at 267 (administrative agencies must adhere to their own legislative and procedural rules).

213.    The Secretary and his agents acted arbitrary and capriciously by implementing the Clawback Policy to deny coverage of claims submitted by Plaintiffs and Class Members that are properly reimbursable under the 2015–2016 LCDs and the Skin Substitute Coverage Policy, as these policies have been interpreted and applied for years. Compounding this error, the Secretary failed to provide any reasoned explanation for this drastic change in approach, much less do so through required channels of public notice and comment.

214.    Indeed, the Secretary and his agents through the Clawback Policy have broadly denied claims for amniotic HCT/P skin substitutes, claiming that they are "experimental/investigational" or suffer from a "lack of peer-reviewed, evidence-based literature." That complete reversal in approach from the currently operative 2015–2016 LCDs and the Skin Substitute Coverage Policy functions as a de facto National Coverage Determination, yet

Defendants did not publish this new policy, provide the required notice period, disclose any evidentiary support and source materials, respond to public comments, or articulate a reasoned rationale—all required elements before a coverage standard may lawfully change. 42 U.S.C. § 1395y(a); *Allina Health*, 587 U.S. at 568. The Secretary and his agents through the Clawback Policy are creating and applying specific literature thresholds that belong in the LCD-development process, effectively replacing the 2015–2016 LCDs and Skin Substitute Coverage Policy.

215.    In addition to these substantial procedural deficiencies, the Secretary's Clawback Policy is also faulty on the merits. The Secretary and his agents failed to consider the totality of the clinical literature supporting the efficacy of skin substitutes for chronic wound treatment—the same literature that the MACs relied upon in adopting the 2015–2016 LCDs. The Secretary and his agents have not advanced a justifiable reason for now singling out skin substitutes and classifying them as "experimental and investigational" when these same products have consistently been treated as covered under the 2015-2016 LCDs and the Skin Substitute Coverage Policy for the last decade.

216.    Making matters even worse, the Defendants and their agents failed to consider the significant reliance interests of Plaintiffs and the Class Action Members who furnished skin substitute products with the reasonable expectation of full coverage and payment based on the 2015–2016 LCDs and the Skin Substitute Coverage Policy. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 31–32 (2020) (holding that agencies must consider reliance interests when changing policy); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law").

66

217.    The Clawback Policy constitutes final agency action under the APA because it reflects the culmination of Defendants' decision-making process concerning the coverage of skin substitute products and legal consequences flow from the Policy.

218.    For these and other reasons, the Clawback Policy must be set aside, and Defendants ordered to adjudicate claims in accordance with the still-in-effect 2015–2016 LCDs and the Skin Substitute Coverage Policy.

### COUNT II
Violations of the Medicare and APA Statutes

219.    Plaintiffs incorporate and reallege Paragraphs 1 through 218 above as if fully set forth herein.

220.    The Medicare statute entitles beneficiaries, including Plaintiffs' and Class Members' patients, to coverage for all reasonable and necessary medical and other health services, 42 U.S.C. § 1395k(a)(2), except for services the statute specifically excludes. 42 U.S.C. § 1395y.

221.    The Clawback Policy violates this statutory framework. Plaintiffs provided skin substitute products—including Zenith, carePATCH, Impax, Amnio-Maxx, BioLab Membrane Wrap, and Amnio Quad-Core—to treat the diabetic foot ulcers and venous leg ulcers of their patients. These services are reasonable and medically necessary, as evidenced by the coverage of those products under the 2015–2016 LCDs and the Skin Substitute Coverage Policy. Likewise, Class Members' provision of skin substitute products to treat their patients' chronic wounds is reasonable and medically necessary.

222.    By denying coverage and Part B payment for skin substitute products that are reasonable and necessary to treat chronic wounds, Defendants are effectively denying access to medically necessary care, thereby acting in violation of the statutory entitlement that Congress created.

223.    In addition, the manner by which Defendants and their agents have implemented the Clawback Policy flouts binding requirements set forth under the Medicare statute.

224.    Under 42 U.S.C. § 1395ff(f)(2)(B), an LCD is defined as "a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts, in accordance with section 1395y(a)(1)(A)." Once a MAC issues an LCD determining that a particular item or service is "reasonable and necessary," that determination is binding on the MAC and governs all claims within the MAC's jurisdiction. *See id.*; 42 C.F.R. § 400.202(3).

225.    By applying the Clawback Policy to deny claims for skin substitute products that are covered under the 2015–2016 LCDs and the Skin Substitute Coverage Policy, the Secretary and his agents are acting contrary to these statutory requirements that they adjudicate claims consistently with their own coverage determinations.

226.    Moreover, if the Secretary and his agents wish to change their coverage policies, they can do so only prospectively and only by following the prescribed public-comment process. 42 U.S.C. § 1395ff(f)(2)(B). The Secretary and his agents have violated this requirement by applying the Clawback Policy—which effectively constitutes a new coverage determination—without providing the required 45-day notice period, without making available the evidence upon which the new determination is purportedly based, without providing a clear statement of the rationale, and without responding to public comments. *Cf. Allina Health*, 587 U.S. at 568 (finding that changes in Medicare payment methodology require notice and comment rulemaking when they affect substantive payment standards).

227.    The Clawback Policy, as applied by Defendants and their agents, further violates the Medicare statute's prohibition on retroactive coverage changes. The statutory framework is

intended to ensure that providers can rely on existing coverage determinations when furnishing services to beneficiaries. *See* 42 U.S.C. § 1395y(l)(5)(D) (requiring advance notice *before* coverage changes take effect). By reopening previously paid claims and applying a new "experimental and investigational" standard to services that were subject to and covered under the 2015–2016 LCDs and Skin Substitute Coverage Policy at the time they were rendered, the Secretary and his agents have unlawfully changed and applied the applicable coverage standards retroactively.

228.    The Secretary failed to limit Plaintiffs' liability under 42 U.S.C. § 1395pp(a), 42 C.F.R. § 411.406, and Medicare Claims Processing Manual § 30.2.1 since there was no way Plaintiffs knew or reasonably could have known that the products would not have been covered and no evidence of knowledge by Plaintiffs and Class Members.

229.    The Secretary failed to find Plaintiffs without fault under 42 U.S.C. § 1395gg(b) and Medicare Financial Management Manual ch. 3, § 90 since Plaintiffs exercised reasonable care in billing for, and accepting, Medicare payment for the products and had a reasonable basis for assuming the payment was correct.

## REQUEST FOR RELIEF

230.    Plaintiffs respectfully request that this Court enter judgment in their favor and in favor of the class and grant the following relief:

A.  Certify at an appropriate time that this action is appropriately maintained as a class action under Federal Rule of Civil Procedure 23(b)(2) and that Plaintiffs are appropriate representative of the Class;

B.  Appoint Plaintiffs' counsel as Class Counsel;

C.  Declare that Defendants' application of the Clawback Policy to claims on or after

April 2022 is unlawful;

D.  Declare that Zenith, Impax, carePATCH, Amnio-Maxx, BioLab Membrane Wrap, Amnio Quad-Core and other skin substitutes derived from donated human amniotic tissue after birth that are not regulated as devices or biologicals are "reasonable and necessary" and covered under the 2015–2016 LCDs and the Skin Substitute Coverage Policy when used to treat chronic wounds;

E.  Grant a permanent injunction ordering Defendants to adjudicate Class Members' reimbursement claims in accordance with declarations (C)–(D) above;

F.  Award Plaintiffs costs and attorney's fees as appropriate; and

G.  Provide such other relief as the Court may consider appropriate.

Date: March 4, 2026                    Respectfully submitted,

                                       /s/*Bobby Hill*
                                       Robert M. Hill ("Bobby")
                                       Texas Bar No. 24125624
                                       KING & SPALDING LLP
                                       2601 Olive Street, Suite 2300
                                       Dallas, TX 75201
                                       Tel: 214-764-4414
                                       Fax: 214-764-4601
                                       rhill@kslaw.com

                                       Mark D. Polston (*pro hac vice* forthcoming)
                                       Nikesh Jindal (*pro hac vice* forthcoming)
                                       Ahsin Azim (*pro hac vice* forthcoming)
                                       KING & SPALDING LLP
                                       1700 Pennsylvania Avenue NW
                                       Washington, DC 20006
                                       Tel: 202-737-0500
                                       Fax: 202-626-3737
                                       mpolston@kslaw.com
                                       njindal@kslaw.com
                                       aazim@kslaw.com

                                       Kyle Gotchy (*pro hac vice* forthcoming)
                                       KING & SPALDING LLP
                                       621 Capitol Mall, Suite 1500
                                       Sacramento, CA 95814
                                       Tel: 916-321-4800
                                       Fax: 916-321-4900
                                       kgotchy@kslaw.com

                                       Paul d'Ambrosio (*pro hac vice* forthcoming)
                                       KING & SPALDING LLP
                                       110 N. Wacker Drive, Suite 3800
                                       Chicago, IL 60606
                                       Tel: 312-995-6333
                                       Fax: 312-995-6330
                                       pdambrosio@kslaw.com

                                       Preeya Noronha Pinto (*pro hac vice* forthcoming)
                                       Josh Gardner (*pro hac vice* forthcoming)
                                       Deborah Samenow (*pro hac vice* forthcoming)
                                       DLA PIPER
                                       500 Eighth Street, NW
                                       Washington, DC 20004

(202) 799-4000
Preeya.pinto@us.dlapiper.com
Josh.gardner@us.dlapiper.com
Deborah.samenow@us.dlapiper.com

Allison Velez (*pro hac vice* forthcoming)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
(215) 656-3312
Allison.Velez@us.dlapiper.com

*Counsel for Plaintiffs*