# Complaint Exhibit 13

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Kansas City Field Office
601 E. 12th Street
Suite 1753
Kansas City, MO 64106-2817
(816)-599-3300
(816) 599-3251 Sylvester (Direct)
Team Raff
(816) 527-0051 (Fax)
(844) 566-6258 (Toll Free)

February 20, 2026

ENGAGE HEALTH SOULTIONS
ATTN: WILLIAM OMALLEY
60 PUBLIC SQUARE
STE 602
WILKES-BARRE, PA 18701

**NOTICE OF DECISION**

Appellant: CHRIS MCGEE MD PA
OMHA Appeal Number: 3-15466926879

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

**What if I disagree with the decision?**

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**<u>How much time do I have to file an appeal?</u>**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**<u>How do I file an appeal?</u>**

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **<u>Please do not submit your request for review using more than one method</u>**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod.**

To file a new appeal using MOD E-File, you will need to register by:

1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare

Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

C2C Innovative Solutions, Inc.
Part B South C2C
301 W Bay Street, Ste. 1110
Jacksonville, FL 32231-4006

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | |
|---|---|
| Appeal of: **CHRIS MCGEE MD PA** | OMHA Appeal No.: **3-15466926879** |
| Beneficiary: [redacted] | Medicare Part: B |
| Medicare No.: [redacted] | Before: **Aaron Raff** Administrative Law Judge |

## DECISION

After careful consideration of the evidence and arguments contained in the administrative record and presented at the hearing, I enter an **UNFAVORABLE** decision. The Amnio-Quad Core and related application code supplied and billed by Chris McGee MD PA (Appellant) to the Beneficiary on the date of service at issue (April 3, 2024) are not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the non-covered services and recovery of the overpayment is not waived.

## PROCEDURAL HISTORY

The Appellant submitted a claim for the services to Novitas Solutions, Inc., the Medicare Administrative Contractor (MAC) with jurisdiction, who initially paid the claim in full. However, it was later determined that an overpayment occurred. (File 5). Upon notice of the overpayment, the Appellant requested redetermination, and the MAC issued unfavorable redetermination decision. (File 4). The Appellant was held liable for all outstanding costs and overpayments related to the denied claim. The Appellant then requested reconsideration from C2C Innovative Solutions, Inc., the Qualified Independent Contractor (QIC). The QIC issued an unfavorable reconsideration decision denying coverage for the claim and determining that the overpayment was valid. (File 2). The Appellant/Provider was held liable for all charges related to the denied claims and was found at fault in causing the overpayment.

On October 30, 2025, the Office of Medicare Hearings and Appeals (OMHA) received the Appellant's request for an Administrative Law Judge (ALJ) hearing. (File 1). An ALJ hearing was held on January 7, 2026. Appearing at hearing on behalf of the Appellant was representative William O'Malley. The Beneficiary was notified of the hearing but did not respond or appear. The appearing witness was sworn in prior to providing testimony. All of the indexed files in the administrative record are admitted to the record with the exception of duplicates and non-probative items which are kept in place for identification purposes. The administrative record is now closed.

## ISSUES

The issues brought before this ALJ include all the issues for the claims or appealed matters specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's (not including CMS's) favor. 42 C.F.R. § 405.1032. The ALJ may consider a new issue provided he or she notifies all of the parties about the new issue. § 405.1032(b). The new issue may include issues resulting from the participation of CMS at the ALJ level of adjudication and from any evidence and position papers submitted by CMS for the first time to the ALJ. *Id.*

The following are specifically at issue in this appeal:

I. Were all Medicare coverage and payment requirements met for the Amnio Quad-Core skin substitute product and related application codes at issue warranting payment under Title XVIII of the Social Security Act (Act)?

II. Are the limitations on liability provisions of section 1879 of the Act or the waiver of overpayment provisions under section 1870 of the Act applicable?

## APPLICABLE LAW AND POLICY

Part B of Title XVIII of the Social Security Act (Act), the Supplementary Medical Insurance program, provides coverage for a variety of medical services and supplies, including the durable medical equipment at issue, furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of other specific health-related items and services. Notwithstanding any other provision of the Act, no payment may be made under part A or part B for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A).

Section 1833(e) of the Act states that "[n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." The provider is responsible for providing sufficient documentation to support that payment is due and the services were medically necessary and provided as billed. 42 C.F.R. §424.5(a)(6).

The appellant has the burden of proof by a preponderance of the evidence. 5 U.S.C. § 556(d); *see generally Steadman v. SEC*, 450 U.S. 91, 98-102 (1981). This means that the evidence contained in the record must establish that it is more likely than not that the appellant's position is factually and legally correct. Therefore, the appellant must furnish sufficient evidence to support the claim. *See* Act §§ 1814(a)(1), 1815(a), 1833(e); 42 C.F.R. §§ 424.5(a)(6), 424.11, 424.22(c). If the appellant does not meet the burden of proof, the case must be decided unfavorably to the appellant.

Although not subject to the force and effect of law, the Centers for Medicare & Medicaid Services (CMS) and its contractors have issued policy guidelines and Local Coverage Determinations (LCDs) describing coverage criteria for selected types of items and services. Pursuant to 42 C.F.R. § 405.1062(a), an ALJ is not bound by an LCD, but will give substantial deference to an LCD if it is applicable to a particular case. However, section 1871(a)(2) of the Act provides that no rule, requirement or statement of policy, other than a National Coverage

Determination (NCD), can establish or change a substantive legal standard governing the scope of the benefits or payment for services under the Medicare program unless promulgated as a regulation by CMS.

*Reasonable and Necessary Criteria*

Per the Medicare Program Integrity Manual, CMS issues NCDs that specify whether certain items, services, procedures or technologies are reasonable and necessary under §1862(a)(1)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no LCD exists for a particular item or service, the MACs, CERT, Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
    - o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
    - o Furnished in a setting appropriate to the beneficiary's medical needs and condition;
    - o Ordered and furnished by qualified personnel; and,
    - o One that meets, but does not exceed, the beneficiary's medical need.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury in order to be considered for payment. The exceptions appear in the full text of §1862(a)(l)(A) of the Act. CMS, Medicare Program Integrity Manual *(MPIM) (Internet-Only Manual Pub. 100-08)* ch. 3, § 3.6.2.2. *See also MPIM,* ch. 13, § 13.5.1.

Regarding approved use of drugs, the Medicare Benefit Policy Manual states that drugs or biologicals approved for marketing by the Food and Drug Administration (FDA) are considered safe and effective for purposes of this requirement when used for indications specified on the labeling. As such, the program may pay for the use of an FDA approved drug or biological if it was injected on or after the date of the FDA's approval; it is reasonable and necessary for the individual's patient; and all other applicable coverage requirements are met. The carrier, DMERC, or intermediary will deny coverage for drugs and biologicals which have not received final marketing approval by the FDA unless it receives instructions from CMS to the contrary. If there is reason to question whether the FDA has approved a drug or biological for marketing, the carrier or intermediary must obtain satisfactory evidence of FDA's approval. CMS, Medicare Benefit Policy Manual *(MBPM) (Internet-Only Manual Pub. 100-02)* ch. 15, § 50.4.1.

*Related Services*

Services related to non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services not related to non-covered services can be covered under Medicare. However, any subsequent services that are expected to be incorporated into a global fee are not covered. *MBPM*, ch. 16, § 180.

*Human Cellular and Tissue Based Products (HCT/Ps)*

For a product to be regulated as a human cells, tissues, and cellular and tissue-based product (HCT/P), it must meet specific regulatory requirements as established under section 361 of the of the Public Health Service (PHS) Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 361 of the PHS Act and the Food, Drug, and Cosmetic (FC&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public. The four criteria are:

(1) The HCT/P is minimally manipulated;
(2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
(3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
(4) Either:
  (i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
  (ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
    (a) Is for autologous use;
    (b) Is for allogeneic use in a first-degree or second-degree blood relative; or
    (c) Is for reproductive use.

21 C.F.R. § 1271.10(a).

Homologous use is defined as "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor." 21 C.F.R. § 1271.3(c). HCT/Ps are defined as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." 21 C.F.R. § 1271.3(d).

*Local Coverage Determinations*

Local Coverage Determinations (LCD) LCD L35041 is relevant to this appeal.[1] This LCD provides, in part:

> Medicare covers application of skin substitutes to Ulcers or Wounds with Failed Response that are:
>
> - Partial- or full-thickness ulcers, not involving tendon, muscle, joint capsule or exhibiting exposed bone or sinus tracts, with a clean granular base;
> - Skin deficit at least 1.0 square centimeter (cm) in size;
> - Clean and free of necrotic debris or exudate;
> - Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index [ABI] of no less than 0.60, toe pressure greater than 30 millimeters of mercury [mmHg]);
> - For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.
>
> Wound healing is impaired by the systemic use of tobacco. Therefore, ideally patients who have smoked will have ceased smoking or have refrained from systemic tobacco intake for at least 4 weeks during conservative wound care and prior to planned bioengineered skin replacement therapy.
>
> Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed. Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented. Documentation of smoking cessation counseling and cessation measures prescribed, if applicable, must also be documented in the patient's record.
>
> Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:
>
> - Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.

---

[1] Novitas Solutions, Inc., the MAC with jurisdiction in this instance, had published a revised version of LCD L35041, titled *Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Ulcers (LCD L35041)*, which was scheduled to go into effect on January 1, 2026. While this LCD was not effective on the date of service, and is therefore only persuasive authority, it was helpful to illustrate the availability of published, peer-reviewed literature supporting the use of various, specific skin substitute grafts for use in chronic ulcers. However, on December 24, 2025, prior to the revised LCD going into effect, CMS' MACs withdrew the LCD in favor of modifying the payment and fee schedule for skin substitute graft services. *See* https://www.cms.gov/newsroom/fact-sheets/upcoming-update-final-local-coverage-determinations-lcds-certain-skin-substitutes.

- Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.
- Presence of a full thickness skin loss ulcer that is the result of abscess, injury or trauma that has failed to respond to appropriate control of infection, foreign body, tumor resection, or other disease process for a period of 4 weeks or longer.

Novitas Solutions, Inc, Local Coverage Determination L35041: Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Health Wounds (LCD L35041) (Eff. 09/26/2019).

LCD L35041 provides the following limitations to coverage of bioengineered skin substitutes:

> The following are considered not reasonable and necessary and therefore will be denied:
>
> - Partial thickness loss with the retention of epithelial appendages is not a candidate for grafting or replacement, as epithelium will repopulate the deficit from the appendages, negating the benefit of overgrafting.
> - Skin substitute grafts will be allowed for the episode of wound care in compliance with FDA guidelines for the specific product (see utilization guidelines) not to exceed 10 applications or treatments. In situations where more than one specific product is used, it is expected that the number of applications or treatments will still not exceed 10.
> - Simultaneous use of more than one product for the episode of wound is not covered. Product change within the episode of wound is allowed, not to exceed the 10 application limit per wound per 12 week period of care.
> - Treatment of any chronic skin wound will typically last no more than twelve (12) weeks.
> - Repeat or alternative applications of skin substitute grafts are not considered medically reasonable and necessary when a previous full course of applications was unsuccessful. Unsuccessful treatment is defined as increase in size or depth of an ulcer or no change in baseline size or depth and no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing) for a period of 4 weeks past start of therapy.
> - Retreatment of healed ulcers, those showing greater than 75% size reduction and smaller than 0.5 square cm, is not considered medically reasonable and necessary.
> - Skin substitute grafts are contraindicated and are not considered reasonable and necessary in patients with inadequate control of underlying conditions or exacerbating factors (e.g., uncontrolled diabetes, active infection, and active Charcot arthropathy of the ulcer extremity, vasculitis or continued tobacco smoking without physician attempt to affect smoking cessation).
> - Skin substitute grafts are contraindicated in patients with known hypersensitivity to any component of the specific skin substitute graft (e.g., allergy to avian, bovine, porcine, equine products).
> - Repeat use of surgical preparation services in conjunction with skin substitute application codes will be considered not reasonable and necessary. It is expected that each wound will require the use of

appropriate wound preparation code at least once at initiation of care prior to placement of the skin substitute graft.

- Re-treatment within one (1) year of any given course of skin substitute treatment for a venous stasis ulcer or (diabetic) neuropathic foot ulcer is considered treatment failure and does not meet reasonable and necessary criteria for re-treatment of that ulcer with a skin substitute procedure.

LCD L35041.

***Individual HCPCS and CPT Code Descriptions***

At issue in this appeal are services billed using the CPT and HCPCS codes listed below which are followed by their individual descriptions as detailed in the HCPCS and CPT Codebook applicable on the date of service at issue:

- **15275**: Application of skin substitute graft to high-risk areas (face, hands, feet, etc.), first 25 sq cm or less.
- **Q4294**: Amnio Quad-Core, per sq cm.

***Limitations on Liability***

Section 1879(a) of the Act contains limitation on liability provisions for cases under Medicare Parts A and B. These provisions only apply when a determination is made that Medicare will not pay for an item or service

- because it was not reasonable and necessary for the diagnosis or treatment of illness or injury;
- because it was for custodial care;
- in home health cases, because the beneficiary was not confined to his or her home or did not need skilled care on an intermittent basis;
- in hospice services, because the beneficiary was not terminally ill or because the services were not reasonable and necessary for the palliation or management of terminal illness; or
- for one of a limited number of specific circumstances not relevant to this case.

Act §§ 1814(a)(7)(E), 1833(g)(5)(D), 1833(z), 1879(a)(1), 1879(e), 1879(g), 1879(i). In these circumstances, payment shall nevertheless be made for the items or services if the beneficiary, provider, or suppler "did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services." Act § 1879(a)(2). The regulations at 42 C.F.R. § 411.400 *et seq.*; HCFA Ruling 95-1; and chapter 30 Section 40 of the *Medicare Claims Processing Manual (MCPM)* provide the framework for determining if a beneficiary and provider or supplier's liability for a non-covered item or service is limited under Section 1879 of the Social Security Act.

Section 1870(b) of the Act provides for a waiver of recoupment for an overpayment in certain circumstances where a provider or supplier is "without fault." The Medicare Financial Management Manual (MFMM) instructs that a provider or supplier is "without fault" when the provider or supplier exercised reasonable care in billing for and accepting payment; meaning:

- The provider or supplier made full disclosure of all material facts; and

- On the basis of the information available, including but not limited to, the Medicare instructions and regulations, it has a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

Pursuant to § 1870 of the Act, a waiver requires Appellant to be without fault in regard to the overpayment. This means on the basis of the information available Appellant had a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

## FINDINGS OF FACT AND ANALYSIS

### *Lower-Level Denial Reasons*

The QIC issued an unfavorable reconsideration decision, stating that the medical records reflect the Beneficiary has bilateral lower extremity ulcers for which the physician applied the amniotic membrane. However, the QIC found that Amnio Quad-Core amniotic membrane (Q4294) is experimental and investigational as denoted by the Q code status nomenclature. Under Medicare law, no payment can be made under Medicare for any expenses incurred for items or services that are considered investigational and are not considered reasonable and necessary. Since Amnio Quad-Core amniotic membrane (Q4294) is considered investigational and is not payable as per CMS, it was the QIC's determination that the Amnio Quad-Core amniotic membrane (Q4294) does not meet the medically reasonable and necessary requirements of Section 1862(a)(1)(A) of the Act. Therefore, payment was not allowed and the QIC found the overpayment valid. (File 2).

### *Appellant Statements and Arguments*

The Appellant, in their written appeal request, contends that Amnio Quad-Core is not investigational or experimental. They argue that the QIC's determination that Q-code designation inherently signifies a product is investigational or experimental is inaccurate and procedurally flawed. Rather, Q-codes are used for products that do not yet have a CPT code or permanent national Level II HCPCS code, and Q-codes are routinely assigned to Medicare covered products and services. The Appellant states that a denial based solely on the presence of a Q-code reflects a misunderstanding of CMS's HCPCS coding system and lacks any support in statute, regulation, or CMS guidance and should not be used as a basis for denial. (File 1).

The Appellant also contends that the skin substitute was applied in accordance with LCD L35041, which allows skin substitute product usage for certain defined wound types such as diabetic foot ulcers and venous leg ulcers, includes the product category and/or type (such as an allograft), and does not expressly exclude the specific product at issue. Because the Appellant believes that the product was used in accordance with the coverage parameters outlined in an active LCD, they argue it cannot be considered investigational or experimental and should be entitled to Medicare coverage. (File 1).

At hearing, the Appellant reiterated their issues with the QIC's denial based on Amnio Quad-Core's Q code status. They contend that the claim at issue meets all requirements of LCD L35041 for usage of skin substitute products to treat venous leg ulcers and that, because usage of the category of product at issue for treatment of the Beneficiary's specific condition is allowed by the LCD, it cannot be considered investigational or experimental. The Appellant also testified that the product was used within the scope of an FDA Tissue Reference Group (TRG) letter and that there was nothing to suggest the product was intended for wound healing or inflammation reduction. Rather, the product was used as a wound covering and within manufacturer intent, meaning homologous use requirements were met. (Files 1 and 4).

The Appellant also testified as to the medical necessity of the product for treatment of the Beneficiary and her specific condition. Specifically, the Beneficiary's venous leg ulcers had been present for 22 months on the date of service and, despite extensive conservative measures and best practice wound care, the wounds persisted. Due to failure to respond to conservative treatment, skin substitute grafts were considered reasonable and necessary as the next step in the Beneficiary's treatment. The Beneficiary's wounds responded well to the skin substitute treatments and she experienced an over 90% reduction in wound surface area and volume over the course of treatment. Based on this, the Appellant believes that the escalation to use of skin substitute products for treatment of the Beneficiary was justified. (Files 1 and 4).

***ALJ Findings***

In determining whether the amniotic allograft products are reasonable and necessary for the beneficiaries, the ALJ looked first to whether it was regulated as an HCT/P or being used properly (e.g., a homologous use) as an HCT/P. For a product to be regulated as an HCT/P, it must meet specific regulatory requirements as established under section 361 of the of the PHS Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 351 of the PHS Act and the Food, Drug, & Cosmetic (FD&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public.

The four criteria are: (1) the HCT/P is minimally manipulated; (2) the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent; (3) the manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and (4) either: (i) the HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or (ii) the HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and: (a) is for autologous use; (b) is for allogeneic use in a first-degree or second-degree blood relative; or (c) is for reproductive use. 21 C.F.R. § 1271.10(a). Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor. 21 C.F.R. § 1271.3(c).

A letter was issued by the FDA's Tissue Reference Group (TRG) on September 2, 2022, indicating that Amnio Quad-Core Amniotic Membrane Sheets are registered as being regulated under section 361 of the PHS Act and the regulations in 21 C.F.R. § 1271. (File 4, pp. 142-143). The letter specifies that the product is only regulated this way when used in a homologous way. If the product is not used for a homologous purpose, it is not regulated under section 361 regardless of any letters issued by the TRG. Furthermore, this does not make Amnio Quad-Core an "FDA approved" product.

An FDA approval under Section 361 does not prove (or disprove) a treatment is safe and effective for Medicare purposes. *See* 21 C.F.R. § 1271. Also, the existence of a Level II HCPCS code (e.g., 4294) is not evidence that a product or service is safe and effective. Nor is it evidence

to the contrary.[2] HCPCS codes are not intended to embody legal presumptions in Medicare coverage decisions. *See* CMS Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures. Any argument regarding a HCPCS/Q code supporting safety and efficacy is non-probative and, thus, is immaterial for purposes of this appeal.

Appellant asserted that because Amnio Quad-Core is Section 361 registered, has been assigned a HCPCS code, and is not explicitly barred from coverage per an LCD, the product should not be classified as experimental or investigational for Medicare purposes.

Literature was provided by Appellant to try to satisfy the burden of proof that use of Amnio Quad-Core is not investigational or experimental when used for treatment of chronic ulcers, including venous leg ulcers and diabetic foot ulcers. (*See* File 4, pp. 67-139). However, none of the literature provides a large (n>30) scale, randomized clinical trial that proves the safety or efficacy of Amnio Quad-Core specifically. Rather, the literature is focused on other amniotic membrane products or on general medical-technological trends in the HCT/P wound care field. To the degree other products are reviewed, these products are generally propriety and distinct products that have a multitude of descriptions and uses and the ALJ cannot automatically equate one skin substitute or amniotic membrane product with another. Finally, and notably, the articles indicate that the HCT/P products are being used actively to engage in intracellular signaling and promote a cell or skin reaction to healing. Thus, the uses described in the literature are not merely wound cover uses and not homologous as to Amnio Quad-Core's FDA labeling. When used in this way, the product is exceeding a homologous use, which renders it outside the scope of the FDA label under Section 361.

Even if the ALJ accepts that Amnio Quad-Core was being used solely under Section 361 as a wound cover or barrier, there is minimal evidence in the record that shows the product is safe and effective for this purpose.[3] As stated above, the Appellant did not provide published, peer-reviewed literature to support the use of the specific product at issue, Amnio Quad-Core, or even biosimilar HCT/P products, for treatment of chronic wounds. The product may well be helping, or at a minimum harmless, but that is not the standard to prove safety and effectiveness for Medicare coverage purposes.

In summary, Amnio Quad-Core has not been shown to be regulated under section 361 of the PHS Act when used in the manner in which it was used in this case. Even if the product was assumed to be governed by section 361, it has not been shown to meet Medicare's standards for a treatment considered safe and effective for the purpose for which it was used in this case. This decision is based on Medicare regulations and statutes and makes no determination concerning the physician's decision to treat the beneficiaries with the products at issue. For Medicare purposes Amnio Quad-Core is investigational and experimental and not covered based on the specific record before me.

---

[2] The ALJ agrees with the Appellant's argument that the QIC's denial based on the assignment of a Q-code to the product at issue is neither supported by law nor established Medicare policy.

[3] The ALJ is focused solely on the Medicare context. The ALJ is not purporting to rule on FDA status and is only looking at FDA status or homologous use for purposes of the Medicare coverage analysis. Skin substitutes using placenta/amniotic products have some promise. New LCDs allowing coverage may eventually be published. The product, both individually and as a whole, also could benefit from further study in large, random clinical trials. But these hypotheticals are beyond the scope of this matter, and the record before me does not prove that Amnio Quad-Core is not investigational or experimental.

I find the product at issue, Amnio Quad-Core (Q4294), cannot be covered by Medicare in this instance. I also find the related application code, shown by the CPT code 15275 is not covered, as it is a service related to a non-covered claim. *MBPM*, ch. 16, § 180.

*Medical Necessity*

Basic medical reasonable and necessary criteria is not entirely relevant in this decision, as the primary denial reason is the items/services being considered investigational/experimental, but the ALJ explores the topic briefly here.

The Beneficiary had a medical history including type 2 diabetes mellitus, acquired absence of the right leg below the knee, hyperglycemia, hypertension, peripheral vascular disease, and cerebrovascular accident. (File 4, pp. 54-64). He suffered from chronic diabetic foot ulcers and pressure ulcers. (*Id.* at 49-53). As of February 24, 2024, he had a left heel diabetic foot ulcer measuring 5.1 x 7.0 x 0.1 cm present for two months and a right below knee amputation dehisced surgical incision measuring 1.5 x 2.0 x 0.5 cm present for three months. (*Id.* at 42-48). On that date he began receiving amniotic membrane allograft treatments on the wounds. (*Id.*) Conservative measures attempted prior to use of amniotic membrane allografts included debridement, use of barrier creams, diabetic management and nutritional counseling, and regular cleaning and dressing changes. (*Id.* at 42-53). He was also being treated with linezolid for cultured Methicillin-resistant Staphylococcus aureus (MRSA) present in the dehisced surgical wound. (*Id.* at 46). Amniotic membrane allograft applications occurred weekly between February 24, 2024, and April 3, 3024. (*Id.* at 17-48).[4]

On April 3, 2024, the Beneficiary underwent Amnio Quad-Core amniotic membrane allograft application on his left heel diabetic foot ulcer. (File 4, pp. 17-20). The wound measured 3.0 x 7.0 x 0.1 cm and was considered improving with no signs of infection. (*Id.* at 19). One 4 x 4 cm graft equal to 16 units was applied to this ulcer. (*Id.* at 20). This was the first use of Amnio Quad-Core during the Beneficiary's treatment with amniotic membrane allografts, as previous treatments were with an unspecified membrane between February 24, 2024, and March 13, 2024, and with Membrane Wrap (Q4205) from March 13, 2024, through March 27, 2024. (*Id.* at 24, 28, 32-33, 40-41, 47-48).

Upon review of the medical records, several themes developed. First, the records support the presence of a diabetic foot ulcer(s) present for at least 3 months and unresponsive to appropriate, conservative wound care for at least 30 days. The testimony and records made clear that there was a good faith approach to use of the amniotic membrane allografts, and the clinicians felt the products could work on the wounds at issue. Second, while the amount of this expensive amniotic membrane graft product used caused some concern for the ALJ, LCD L35041 does not explicitly limit the amount of product that can be used on individual ulcers. Rather, it limits the number of treatments to 10 applications over a 12-week maximum period of care. In this instance, the application at issue was the first application (albeit some other products were used) and the wound measurements met general LCD guidelines.

Based on the above, and despite the ALJ's general concerns over usage of this product over more reasonably priced wound coverings, LCD L35041 does not preclude usage of skin substitute products on the Beneficiary's diabetic foot ulcer(s). However, despite meeting LCD guidelines for general skin substitute treatment of diabetic foot ulcers, the specific product used, Amnio Quad-Core, is still found to be investigational or experimental for the reasons detailed

[4] This record is also notable because they were switching between products throughout the course of treatment. Amnio Quad-Core looks to be the third different product used since starting care in February 2024.

above. Because Amnio Quad-Core is found to be investigational or experimental it cannot be considered medically reasonable and necessary and is not entitled to Medicare coverage.

***Liability***

The final issue before the ALJ is liability for the denied services at issue. Medicare coverage does not exist for the services at issue because the services are found to be investigational/experimental, and they are not found to be medically necessary for the beneficiary and date of service at issue. When items or services are found not to be reasonable and necessary under § 1862(a)(1)(A) of the Act, and therefore are not covered by Medicare, the limitation on liability provisions of § 1879 of the Act may apply if neither the beneficiary nor the provider had reason to know the services would not be covered.

The beneficiary whose Medicare claim was denied pursuant to § 1862(a)(1)(A) of the Act is not financially liable for the non-covered services because their liability is limited under § 1879 of the Act. Under the regulations, a beneficiary who receives a non-covered service is considered to have known that Medicare would not cover the service if written notice of non-coverage was furnished by any of the following entities: QIOs, fiscal intermediaries, carriers, utilization review committees, providers, suppliers, or the beneficiary's attending physician. *See* 42 C.F.R. § 411.406. In this instance, the record does not contain any evidence that the beneficiary received written notice of non-coverage, nor does the record contain any other evidence that the beneficiary was made aware of the fact that Medicare might not cover the services at issue. Therefore, the beneficiary is not financially liable for the non-covered services.

A provider who furnishes non-covered services is considered to have known that the services were not covered if the QIO, intermediary, or carrier had informed the supplier that the item furnished was not covered. *See* 42 C.F.R. § 411.406(b). However, the regulations also confer constructive knowledge of non-coverage to providers based on any of the following: (1) receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or QIOs, including notification of QIO screening criteria specific to the condition of the beneficiary for whom the furnished services are at issue and of medical procedures subject to preadmission review by a QIO; (2) Federal Register publications containing notice of national coverage decisions or of other specifications regarding non-coverage of an item or service; or (3) knowledge of what are considered acceptable standards of practice by the local medical community. *See* 42 C.F.R. § 411.406(e).

Under the *MFMM*, a provider, physician, or other supplier is "without fault" in causing an overpayment when the provider: (1) exercised reasonable care in billing for, and accepting, the payment; (2) made full disclosure of all material facts; and (3) had a reasonable basis for assuming that the payment was correct based of the information available to the provider, including, but not limited to, the Medicare instructions and regulations. CMS, *Medicare Financial Management Manual (MFMM) (Internet-Only Manual Publ'n 100-06)* ch. 3 § 90 (Feb. 2017).

The Appellant's liability may neither be limited under § 1879 of the Act nor waived under § 1870 of the Act. The Appellant had access to CMS notices and Federal Register publications and had knowledge of what were considered accepted standards of medical practice on the date at issue. As such, the Appellant knew or should have known that the lack of directly applicable randomized clinical trials, the presence of an FDA Tissue Resource Group (TRG) letter or lack thereof, and the assignment of a billing code is not equivalent to full Medicare approval of an item or service. Relying on manufacturer materials, the mere assignment of a Q

code, or relatively vague LCD is not enough. The Appellant should have known of the danger of an audit on these high-cost wound care products. The Appellant was trying to be careful in their employment of such products; but that also has to mean the Appellant knew the products used might be looked at by CMS or its contractors. Medicare often audits such claims. The ALJ cannot find the Appellant without fault on this record for overpayment purposes under § 1870 and the Appellant had too much knowledge to receive the liability limitation of § 1879. Accordingly, the Appellant remains liable for costs related to the non-covered services and recovery of the overpayment is not waived

## CONCLUSIONS OF LAW

The Amnio-Quad Core and related application service provided to the Beneficiary on the date of service at issue are not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the outstanding costs related to the non-covered services and the overpayment is not waived.

## ORDER

For the reasoning discussed above, this decision is **UNFAVORABLE**. The Appellant is liable for the outstanding costs related to the non-covered services and the overpayment is not waived. I direct the Medicare administrative contractor to process the claims in accordance with this decision.

**SO ORDERED**

Aaron Raff
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

**REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL**

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated____________________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| DATE | | | DATE | | |
|---|---|---|---|---|---|
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | |
|---|---|
| Appeal of: **CHRIS MCGEE MD PA** | OMHA Appeal No.: **3-15466926879** |
| Beneficiary: [redacted] | Medicare Part: **B** |
| Medicare No.: [redacted] | Before: **Aaron Raff** Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| **Exhibit Record** | **Administrative File Reference** File Name | | Page Range |
|---|---|---|---|
| Procedural - CMS Levels: Reconsideration | File 2 | 1 | : 17 |
| Procedural - CMS Levels: Req for Reconsideration: w/evidence | File 4 | 1 | : 64 |
| Procedural - CMS Levels: Redetermination Case File | File 5 | 1 | : 745 |
| Procedural - OMHA Level: Request for ALJ Hearing: w/position statement | File 1 | 1 | : 22 |
| Procedural - OMHA Level: General: App Rep RNOH | File 11 | 1 | : 4 |
| Procedural - OMHA Level: Signed Decision | File 12 | 1 | : 15 |
| Procedural - OMHA Level: Notice of Decision | File 13 | 1 | : 23 |
| Procedural - OMHA Level: Consolidated Notice of Hearing | File 7 | 1 | : 9 |
| Procedural - OMHA Level: General: ROC 1 | File 8 | 1 | : 1 |
| Procedural - OMHA Level: General: ROC 2 | File 9 | 1 | : 1 |
| Proceeding (Audios): General: Hearing Audio | File 10 | 1 | : 1 |

| **Non-Exhibit Record** | **Administrative File Reference** File Name | | Page Range |
|---|---|---|---|
| Records not considered: QIC Acknowledgment Letter | File 3 | 1 | : 3 |
| Records not considered: Transmittal Cover Sheet | File 6 | 1 | : 1 |

OMHA-156
Dated: 2026-02-19

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Kansas City Field Office
601 E. 12th Street
Suite 1753
Kansas City, MO 64106-2817
(816)-599-3300
(816) 599-3251 Sylvester (Direct)
Team Raff
(816) 527-0051 (Fax)
(844) 566-6258 (Toll Free)

February 20, 2026

ENGAGE HEALTH SOULTIONS
ATTN: WILLIAM OMALLEY
60 PUBLIC SQUARE
STE 602
WILKES-BARRE, PA 18701

## NOTICE OF DECISION

Appellant: CHRIS MCGEE MD PA
OMHA Appeal Number: 3-15466926897

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

**What if I disagree with the decision?**

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**How much time do I have to file an appeal?**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**How do I file an appeal?**

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare

Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

C2C Innovative Solutions, Inc.
Part B South C2C
301 W Bay Street, Ste. 1110
Jacksonville, FL 32231-4006

[redacted]

CHRIS MCGEE MD PA
PO BOX 1628
DECATUR, TX 76234

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | |
|---|---|
| Appeal of: **CHRIS MCGEE MD PA** | OMHA Appeal No.: **3-15466926897** |
| Beneficiary: [redacted] | Medicare Part: B |
| Medicare No.: | Before: **Aaron Raff**<br>Administrative Law Judge |

## DECISION

After careful consideration of the evidence and arguments contained in the administrative record and presented at the hearing, I enter an **UNFAVORABLE** decision. The Amnio-Quad Core supplied and billed by Chris McGee MD PA (Appellant) to the Beneficiary on the date of service at issue (April 4, 2024) is not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the non-covered service and recovery of the overpayment is not waived.

## PROCEDURAL HISTORY

The Appellant submitted a claim for the service to Novitas Solutions, Inc., the Medicare Administrative Contractor (MAC) with jurisdiction, who initially paid the claim in full. However, it was later determined that an overpayment occurred. (Files 2, 4 and 6). Upon notice of the overpayment, the Appellant requested redetermination, and the MAC issued unfavorable redetermination decision. The Appellant was held liable for all outstanding costs and overpayments related to the denied claim. The Appellant then requested reconsideration from C2C Innovative Solutions, Inc., the Qualified Independent Contractor (QIC). The QIC issued an unfavorable reconsideration decision denying coverage for the claim and determining that the overpayment was valid. (File 2). The Appellant/Provider was held liable for all charges related to the denied claims and was found at fault in causing the overpayment.

On October 30, 2025, the Office of Medicare Hearings and Appeals (OMHA) received the Appellant's request for an Administrative Law Judge (ALJ) hearing. (File 1). An ALJ hearing was held on January 7, 2026. Appearing at hearing on behalf of the Appellant was representative William O'Malley. The Beneficiary was notified of the hearing but indicated that she did not wish to personally appear at hearing or appeal the claim herself. (File 10). The appearing witness was sworn in prior to providing testimony. All of the indexed files in the administrative record are admitted to the record with the exception of duplicates and non-probative items which are kept in place for identification purposes. The administrative record is now closed.

## ISSUES

The issues brought before this ALJ include all the issues for the claims or appealed matters specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's (not including CMS's) favor. 42 C.F.R. § 405.1032. The ALJ may consider a new issue provided he or she notifies all of the parties about the new issue. § 405.1032(b). The new issue may include issues resulting from the participation of CMS at the ALJ level of adjudication and from any evidence and position papers submitted by CMS for the first time to the ALJ. *Id.*

The following are specifically at issue in this appeal:

I. Were all Medicare coverage and payment requirements met for the Amnio Quad-Core skin substitute product at issue warranting payment under Title XVIII of the Social Security Act (Act)?

II. Are the limitations on liability provisions of section 1879 of the Act or the waiver of overpayment provisions under section 1870 of the Act applicable?

## APPLICABLE LAW AND POLICY

Part B of Title XVIII of the Social Security Act (Act), the Supplementary Medical Insurance program, provides coverage for a variety of medical services and supplies, including the durable medical equipment at issue, furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of other specific health-related items and services. Notwithstanding any other provision of the Act, no payment may be made under part A or part B for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A).

Section 1833(e) of the Act states that "[n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." The provider is responsible for providing sufficient documentation to support that payment is due and the services were medically necessary and provided as billed. 42 C.F.R. §424.5(a)(6).

The appellant has the burden of proof by a preponderance of the evidence. 5 U.S.C. § 556(d); *see generally Steadman v. SEC*, 450 U.S. 91, 98-102 (1981). This means that the evidence contained in the record must establish that it is more likely than not that the appellant's position is factually and legally correct. Therefore, the appellant must furnish sufficient evidence to support the claim. *See* Act §§ 1814(a)(1), 1815(a), 1833(e); 42 C.F.R. §§ 424.5(a)(6), 424.11, 424.22(c). If the appellant does not meet the burden of proof, the case must be decided unfavorably to the appellant.

Although not subject to the force and effect of law, the Centers for Medicare & Medicaid Services (CMS) and its contractors have issued policy guidelines and Local Coverage Determinations (LCDs) describing coverage criteria for selected types of items and services. Pursuant to 42 C.F.R. § 405.1062(a), an ALJ is not bound by an LCD, but will give substantial deference to an LCD if it is applicable to a particular case. However, section 1871(a)(2) of the Act provides that no rule, requirement or statement of policy, other than a National Coverage

Determination (NCD), can establish or change a substantive legal standard governing the scope of the benefits or payment for services under the Medicare program unless promulgated as a regulation by CMS.

*Reasonable and Necessary Criteria*

Per the Medicare Program Integrity Manual, CMS issues NCDs that specify whether certain items, services, procedures or technologies are reasonable and necessary under §1862(a)(1)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no LCD exists for a particular item or service, the MACs, CERT, Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
  - o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
  - o Furnished in a setting appropriate to the beneficiary's medical needs and condition;
  - o Ordered and furnished by qualified personnel; and,
  - o One that meets, but does not exceed, the beneficiary's medical need.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury in order to be considered for payment. The exceptions appear in the full text of §1862(a)(l)(A) of the Act. CMS, Medicare Program Integrity Manual *(MPIM) (Internet-Only Manual Pub. 100-08)* ch. 3, § 3.6.2.2. *See also MPIM,* ch. 13, § 13.5.1.

Regarding approved use of drugs, the Medicare Benefit Policy Manual states that drugs or biologicals approved for marketing by the Food and Drug Administration (FDA) are considered safe and effective for purposes of this requirement when used for indications specified on the labeling. As such, the program may pay for the use of an FDA approved drug or biological if it was injected on or after the date of the FDA's approval; it is reasonable and necessary for the individual's patient; and all other applicable coverage requirements are met. The carrier, DMERC, or intermediary will deny coverage for drugs and biologicals which have not received final marketing approval by the FDA unless it receives instructions from CMS to the contrary. If there is reason to question whether the FDA has approved a drug or biological for marketing, the carrier or intermediary must obtain satisfactory evidence of FDA's approval. CMS, Medicare Benefit Policy Manual *(MBPM) (Internet-Only Manual Pub. 100-02)* ch. 15, § 50.4.1.

*Related Services*

Services related to non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services not related to non-covered services can be covered under Medicare. However, any subsequent services that are expected to be incorporated into a global fee are not covered. *MBPM*, ch. 16, § 180.

*Human Cellular and Tissue Based Products (HCT/Ps)*

For a product to be regulated as a human cells, tissues, and cellular and tissue-based product (HCT/P), it must meet specific regulatory requirements as established under section 361 of the of the Public Health Service (PHS) Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 361 of the PHS Act and the Food, Drug, and Cosmetic (FC&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public. The four criteria are:

> (1) The HCT/P is minimally manipulated;
> (2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
> (3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
> (4) Either:
>> (i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
>> (ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
>>> (a) Is for autologous use;
>>> (b) Is for allogeneic use in a first-degree or second-degree blood relative; or
>>> (c) Is for reproductive use.

21 C.F.R. § 1271.10(a).

Homologous use is defined as "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor." 21 C.F.R. § 1271.3(c). HCT/Ps are defined as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." 21 C.F.R. § 1271.3(d).

*Local Coverage Determinations*

Local Coverage Determinations (LCD) LCD L35041 is relevant to this appeal.[1] This LCD provides, in part:

> Medicare covers application of skin substitutes to Ulcers or Wounds with Failed Response that are:
>
> - Partial- or full-thickness ulcers, not involving tendon, muscle, joint capsule or exhibiting exposed bone or sinus tracts, with a clean granular base;
> - Skin deficit at least 1.0 square centimeter (cm) in size;
> - Clean and free of necrotic debris or exudate;
> - Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index [ABI] of no less than 0.60, toe pressure greater than 30 millimeters of mercury [mmHg]);
> - For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.
>
> Wound healing is impaired by the systemic use of tobacco. Therefore, ideally patients who have smoked will have ceased smoking or have refrained from systemic tobacco intake for at least 4 weeks during conservative wound care and prior to planned bioengineered skin replacement therapy.
>
> Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed. Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented. Documentation of smoking cessation counseling and cessation measures prescribed, if applicable, must also be documented in the patient's record.
>
> Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:
>
> - Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.

---

[1] Novitas Solutions, Inc., the MAC with jurisdiction in this instance, had published a revised version of LCD L35041, titled *Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Ulcers (LCD L35041)*, which was scheduled to go into effect on January 1, 2026. While this LCD was not effective on the date of service, and is therefore only persuasive authority, it was helpful to illustrate the availability of published, peer-reviewed literature supporting the use of various, specific skin substitute grafts for use in chronic ulcers. However, on December 24, 2025, prior to the revised LCD going into effect, CMS' MACs withdrew the LCD in favor of modifying the payment and fee schedule for skin substitute graft services. *See* https://www.cms.gov/newsroom/fact-sheets/upcoming-update-final-local-coverage-determinations-lcds-certain-skin-substitutes.

- Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.
- Presence of a full thickness skin loss ulcer that is the result of abscess, injury or trauma that has failed to respond to appropriate control of infection, foreign body, tumor resection, or other disease process for a period of 4 weeks or longer.

Novitas Solutions, Inc, Local Coverage Determination L35041: Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Health Wounds (LCD L35041) (Eff. 09/26/2019).

LCD L35041 provides the following limitations to coverage of bioengineered skin substitutes:

> The following are considered not reasonable and necessary and therefore will be denied:
>
> - Partial thickness loss with the retention of epithelial appendages is not a candidate for grafting or replacement, as epithelium will repopulate the deficit from the appendages, negating the benefit of overgrafting.
> - Skin substitute grafts will be allowed for the episode of wound care in compliance with FDA guidelines for the specific product (see utilization guidelines) not to exceed 10 applications or treatments. In situations where more than one specific product is used, it is expected that the number of applications or treatments will still not exceed 10.
> - Simultaneous use of more than one product for the episode of wound is not covered. Product change within the episode of wound is allowed, not to exceed the 10 application limit per wound per 12 week period of care.
> - Treatment of any chronic skin wound will typically last no more than twelve (12) weeks.
> - Repeat or alternative applications of skin substitute grafts are not considered medically reasonable and necessary when a previous full course of applications was unsuccessful. Unsuccessful treatment is defined as increase in size or depth of an ulcer or no change in baseline size or depth and no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing) for a period of 4 weeks past start of therapy.
> - Retreatment of healed ulcers, those showing greater than 75% size reduction and smaller than 0.5 square cm, is not considered medically reasonable and necessary.
> - Skin substitute grafts are contraindicated and are not considered reasonable and necessary in patients with inadequate control of underlying conditions or exacerbating factors (e.g., uncontrolled diabetes, active infection, and active Charcot arthropathy of the ulcer extremity, vasculitis or continued tobacco smoking without physician attempt to affect smoking cessation).
> - Skin substitute grafts are contraindicated in patients with known hypersensitivity to any component of the specific skin substitute graft (e.g., allergy to avian, bovine, porcine, equine products).
> - Repeat use of surgical preparation services in conjunction with skin substitute application codes will be considered not reasonable and necessary. It is expected that each wound will require the use of

appropriate wound preparation code at least once at initiation of care prior to placement of the skin substitute graft.
- Re-treatment within one (1) year of any given course of skin substitute treatment for a venous stasis ulcer or (diabetic) neuropathic foot ulcer is considered treatment failure and does not meet reasonable and necessary criteria for re-treatment of that ulcer with a skin substitute procedure.

LCD L35041.

***Individual HCPCS and CPT Code Descriptions***

At issue in this appeal are services billed using the CPT and HCPCS codes listed below which are followed by their individual descriptions as detailed in the HCPCS and CPT Codebook applicable on the date of service at issue:

- **Q4294**: Amnio Quad-Core, per sq cm.

***Limitations on Liability***

Section 1879(a) of the Act contains limitation on liability provisions for cases under Medicare Parts A and B. These provisions only apply when a determination is made that Medicare will not pay for an item or service

- because it was not reasonable and necessary for the diagnosis or treatment of illness or injury;
- because it was for custodial care;
- in home health cases, because the beneficiary was not confined to his or her home or did not need skilled care on an intermittent basis;
- in hospice services, because the beneficiary was not terminally ill or because the services were not reasonable and necessary for the palliation or management of terminal illness; or
- for one of a limited number of specific circumstances not relevant to this case.

Act §§ 1814(a)(7)(E), 1833(g)(5)(D), 1833(z), 1879(a)(1), 1879(e), 1879(g), 1879(i). In these circumstances, payment shall nevertheless be made for the items or services if the beneficiary, provider, or suppler "did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services." Act § 1879(a)(2). The regulations at 42 C.F.R. § 411.400 *et seq.*; HCFA Ruling 95-1; and chapter 30 Section 40 of the *Medicare Claims Processing Manual (MCPM)* provide the framework for determining if a beneficiary and provider or supplier's liability for a non-covered item or service is limited under Section 1879 of the Social Security Act.

Section 1870(b) of the Act provides for a waiver of recoupment for an overpayment in certain circumstances where a provider or supplier is "without fault." The Medicare Financial Management Manual (MFMM) instructs that a provider or supplier is "without fault" when the provider or supplier exercised reasonable care in billing for and accepting payment; meaning:

- The provider or supplier made full disclosure of all material facts; and
- On the basis of the information available, including but not limited to, the Medicare instructions and regulations, it has a reasonable basis for assuming

that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

Pursuant to § 1870 of the Act, a waiver requires Appellant to be without fault in regard to the overpayment. This means on the basis of the information available Appellant had a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

## FINDINGS OF FACT AND ANALYSIS

### *Lower-Level Denial Reasons*

The QIC issued an unfavorable reconsideration decision, stating that the medical records reflect the Beneficiary has bilateral lower extremity ulcers for which the physician applied the amniotic membrane. However, the QIC found that Amnio Quad-Core amniotic membrane (Q4294) is experimental and investigational as denoted by the Q code status nomenclature. Under Medicare law, no payment can be made under Medicare for any expenses incurred for items or services that are considered investigational and are not considered reasonable and necessary. Since Amnio Quad-Core amniotic membrane (Q4294) is considered investigational and is not payable as per CMS, it was the QIC's determination that the Amnio Quad-Core amniotic membrane (Q4294) does not meet the medically reasonable and necessary requirements of Section 1862(a)(1)(A) of the Act. Therefore, payment was not allowed and the QIC found the overpayment valid. (File 2).

### *Appellant Statements and Arguments*

The Appellant, in their written appeal request, contends that Amnio Quad-Core is not investigational or experimental. They argue that the QIC's determination that Q-code designation inherently signifies a product is investigational or experimental is inaccurate and procedurally flawed. Rather, Q-codes are used for products that do not yet have a CPT code or permanent national Level II HCPCS code, and Q-codes are routinely assigned to Medicare covered products and services. The Appellant states that a denial based solely on the presence of a Q-code reflects a misunderstanding of CMS's HCPCS coding system and lacks any support in statute, regulation, or CMS guidance and should not be used as a basis for denial. (File 1).

The Appellant also contends that the skin substitute was applied in accordance with LCD L35041, which allows skin substitute product usage for certain defined wound types such as diabetic foot ulcers and venous leg ulcers, includes the product category and/or type (such as an allograft), and does not expressly exclude the specific product at issue. Because the Appellant believes that the product was used in accordance with the coverage parameters outlined in an active LCD, they argue it cannot be considered investigational or experimental and should be entitled to Medicare coverage. (File 1).

At hearing, the Appellant reiterated their issues with the QIC's denial based on Amnio Quad-Core's Q code status. They contend that the claim at issue meets all requirements of LCD L35041 for usage of skin substitute products to treat venous leg ulcers and that, because usage of the category of product at issue for treatment of the Beneficiary's specific condition is allowed by the LCD, it cannot be considered investigational or experimental. The Appellant also testified that the product was used within the scope of an FDA Tissue Reference Group (TRG) letter and that there was nothing to suggest the product was intended for wound healing or inflammation reduction. Rather, the product was used as a wound covering and within manufacturer intent, meaning homologous use requirements were met. (Files 1, 4 and 6).

The Appellant also testified as to the medical necessity of the product for treatment of the Beneficiary and her specific condition. Specifically, the Beneficiary's venous leg ulcers had been present for 22 months on the date of service and, despite extensive conservative measures and best practice wound care, the wounds persisted. Due to failure to respond to conservative treatment, skin substitute grafts were considered reasonable and necessary as the next step in the Beneficiary's treatment. The Beneficiary's wounds responded well to the skin substitute treatments and she experienced an over 90% reduction in wound surface area and volume over the course of treatment. Based on this, the Appellant believes that the escalation to use of skin substitute products for treatment of the Beneficiary was justified. (*Id.*).

***ALJ Findings***

In determining whether the amniotic allograft products are reasonable and necessary for the beneficiaries, the ALJ looked first to whether it was regulated as an HCT/P or being used properly (e.g., a homologous use) as an HCT/P. For a product to be regulated as an HCT/P, it must meet specific regulatory requirements as established under section 361 of the of the PHS Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 351 of the PHS Act and the Food, Drug, & Cosmetic (FD&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public.

The four criteria are: (1) the HCT/P is minimally manipulated; (2) the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent; (3) the manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and (4) either: (i) the HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or (ii) the HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and: (a) is for autologous use; (b) is for allogeneic use in a first-degree or second-degree blood relative; or (c) is for reproductive use. 21 C.F.R. § 1271.10(a). Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor. 21 C.F.R. § 1271.3(c).

A letter was issued by the FDA's Tissue Reference Group (TRG) on September 2, 2022, indicating that Amnio Quad-Core Amniotic Membrane Sheets are registered as being regulated under section 361 of the PHS Act and the regulations in 21 C.F.R. § 1271. (File 4, pp. 142-143). The letter specifies that the product is only regulated this way when used in a homologous way. If the product is not used for a homologous purpose, it is not regulated under section 361 regardless of any letters issued by the TRG. Furthermore, this does not make Amnio Quad-Core an "FDA approved" product.

An FDA approval under Section 361 does not prove (or disprove) a treatment is safe and effective for Medicare purposes. *See* 21 C.F.R. § 1271. Also, the existence of a Level II HCPCS code (e.g., 4294) is not evidence that a product or service is safe and effective. Nor is it evidence

to the contrary.[2] HCPCS codes are not intended to embody legal presumptions in Medicare coverage decisions. *See* CMS Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures. Any argument regarding a HCPCS/Q code supporting safety and efficacy is non-probative and, thus, is immaterial for purposes of this appeal.

Appellant asserted that because Amnio Quad-Core is Section 361 registered, has been assigned a HCPCS code, and is not explicitly barred from coverage per an LCD, the product should not be classified as experimental or investigational for Medicare purposes.

Literature was provided by Appellant to try to satisfy the burden of proof that use of Amnio Quad-Core is not investigational or experimental when used for treatment of chronic ulcers, including venous leg ulcers and diabetic foot ulcers. (*See* File 4, pp. 67-139). However, none of the literature provides a large (n>30) scale, randomized clinical trial that proves the safety or efficacy of Amnio Quad-Core specifically. Rather, the literature is focused on other amniotic membrane products or on general medical-technological trends in the HCT/P wound care field. To the degree other products are reviewed, these products are generally propriety and distinct products that have a multitude of descriptions and uses and the ALJ cannot automatically equate one skin substitute or amniotic membrane product with another. Finally, and notably, the articles indicate that the HCT/P products are being used actively to engage in intracellular signaling and promote a cell or skin reaction to healing. Thus, the uses described in the literature are not merely wound cover uses and not homologous as to Amnio Quad-Core's FDA labeling. When used in this way, the product is exceeding a homologous use, which renders it outside the scope of the FDA label under Section 361.

Even if the ALJ accepts that Amnio Quad-Core was being used solely under Section 361 as a wound cover or barrier, there is minimal evidence in the record that shows the product is safe and effective for this purpose.[3] As stated above, the Appellant did not provide published, peer-reviewed literature to support the use of the specific product at issue, Amnio Quad-Core, or even biosimilar HCT/P products, for treatment of chronic wounds. The product may well be helping, or at a minimum harmless, but that is not the standard to prove safety and effectiveness for Medicare coverage purposes.

In summary, Amnio Quad-Core has not been shown to be regulated under section 361 of the PHS Act when used in the manner in which it was used in this case. Even if the product was assumed to be governed by section 361, it has not been shown to meet Medicare's standards for a treatment considered safe and effective for the purpose for which it was used in this case. This decision is based on Medicare regulations and statutes and makes no determination concerning the physician's decision to treat the beneficiaries with the products at issue. For Medicare purposes Amnio Quad-Core is investigational and experimental and not covered based on the specific record before me.

I find the product at issue, Amnio Quad-Core (Q4294), cannot be covered by Medicare in this instance. *MBPM*, ch. 16, § 180.

[2] The ALJ agrees with the Appellant's argument that the QIC's denial based on the assignment of a Q-code to the product at issue is neither supported by law nor established Medicare policy.

[3] The ALJ is focused solely on the Medicare context. The ALJ is not purporting to rule on FDA status and is only looking at FDA status or homologous use for purposes of the Medicare coverage analysis. Skin substitutes using placenta/amniotic products have some promise. New LCDs allowing coverage may eventually be published. The product, both individually and as a whole, also could benefit from further study in large, random clinical trials. But these hypotheticals are beyond the scope of this matter, and the record before me does not prove that Amnio Quad-Core is not investigational or experimental.

*Medical Necessity*

Basic medical reasonable and necessary criteria is not entirely relevant in this decision, as the primary denial reason is the items/services being considered investigational/experimental, but the ALJ explores the topic briefly here.

The Beneficiary had a medical history including chronic bilateral lower extremity lymphedema, chronic venous insufficiency, hypertension, and multiple longstanding lower extremity ulcerations secondary to chronic venous insufficiency and lymphedema. (File 4, pp. 15-31). Wounds present on the date of service at issue included a left lateral venous leg ulcers present for two months, a right medial venous leg ulcers present for over six months, a right posterior venous leg ulcers present for over six months, and a right lateral venous leg ulcer present for over six months. (*Id.*) The Beneficiary's wounds had been treated with amniotic membrane allografts weekly since March 20, 2024. (*Id.* at 32-58). Conservative wound care measures attempted prior to amniotic membrane allograft application included surgical debridement, compression, use of a lymphedema pump, and use of standard wound dressings, cleaning, and topical medications. (*Id.* at 46-66).

On April 4, 2024, the Beneficiary underwent Amnio Quad-Core amniotic membrane allograft application on her leg ulcers. (File 4, pp. 15-31). The left lateral leg ulcer measured 2.5 x 6.0 x 0.1 cm with no evidence of infection. (*Id.* at 18). Two 2 x 3 cm grafts equal to 12 units were placed on the left lateral leg wound along with standard wound dressing and wraps. (*Id.* at 30-31). The right medial leg ulcer measured 2.0 x 1.5 x 0.1 cm with no evidence of infection. (*Id.* at 19). The right posterior leg ulcer measured 2.0 x 10.5 x 0.1 cm with no evidence of infection. (*Id.* at 20). One 4 x 6 cm grafts equal to 24 units was placed on the right posterior leg wound along with standard wound dressing and wraps. (*Id.* at 28-29). A small piece of Amnio Quad-Core equal to roughly 2 units was also placed on the right medial leg wound. (*Id.*) The right lateral leg ulcer measured 9.0 x 18.0 x 0.4 cm with no evidence of infection. (*Id.* at 21). Six 4 x 6 cm grafts equal to 144 units of Amnio Quad-Core were placed on the right lateral leg wound along with standard wound dressing and wraps. (*Id.* at 22-27).

Upon review of the medical records, several themes developed. First, the records support the presence of venous leg ulcers present for at least 3 months and unresponsive to appropriate, conservative wound care for at least 30 days. The testimony and records made clear that there was a good faith approach to use of the amniotic membrane allografts, and the clinicians felt the products could work on the wounds at issue. Second, while the amount of this expensive amniotic membrane graft product used caused some concern for the ALJ, LCD L35041 does not explicitly limit the amount of product that can be used on individual ulcers. Rather, it limits the number of treatments to 10 applications over a 12-week maximum period of care. In this instance, the application at issue was the third application and the third week of treatment. Finally, there is an instance in which a single allograft was divided between two of the Beneficiary's ulcers so that a small ulcer could be treated with two units of product. While this again raises some concern, this does not appear to be disallowed by the LCD. LCD L35041 allows for skin substitute treatments of ulcers as long as they are over 1.0 square centimeters in size and the small ulcer treated measured 3.0 square centimeters.

Based on the above, and despite the ALJ's general concerns over usage of this product over more reasonably priced wound coverings, LCD L35041 does not preclude usage of skin substitute products on the Beneficiary's venous leg ulcers. However, despite meeting LCD guidelines for general skin substitute treatment of venous leg ulcers, the specific product used,

Amnio Quad-Core, is still found to be investigational or experimental for the reasons detailed above. Because Amnio Quad-Core is found to be investigational or experimental it cannot be considered medically reasonable and necessary and is not entitled to Medicare coverage.

***Liability***

The final issue before the ALJ is liability for the denied service at issue. Medicare coverage does not exist for the service at issue because the service is found to be investigational/experimental, and it is not found to be medically necessary for the beneficiary and date of service at issue. When items or services are found not to be reasonable and necessary under § 1862(a)(1)(A) of the Act, and therefore are not covered by Medicare, the limitation on liability provisions of § 1879 of the Act may apply if neither the beneficiary nor the provider had reason to know the services would not be covered.

The beneficiary whose Medicare claim was denied pursuant to § 1862(a)(1)(A) of the Act is not financially liable for the non-covered services because their liability is limited under § 1879 of the Act. Under the regulations, a beneficiary who receives a non-covered service is considered to have known that Medicare would not cover the service if written notice of non-coverage was furnished by any of the following entities: QIOs, fiscal intermediaries, carriers, utilization review committees, providers, suppliers, or the beneficiary's attending physician. *See* 42 C.F.R. § 411.406. In this instance, the record does not contain any evidence that the beneficiary received written notice of non-coverage, nor does the record contain any other evidence that the beneficiary was made aware of the fact that Medicare might not cover the services at issue. Therefore, the beneficiary is not financially liable for the non-covered services.

A provider who furnishes non-covered services is considered to have known that the services were not covered if the QIO, intermediary, or carrier had informed the supplier that the item furnished was not covered. *See* 42 C.F.R. § 411.406(b). However, the regulations also confer constructive knowledge of non-coverage to providers based on any of the following: (1) receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or QIOs, including notification of QIO screening criteria specific to the condition of the beneficiary for whom the furnished services are at issue and of medical procedures subject to preadmission review by a QIO; (2) Federal Register publications containing notice of national coverage decisions or of other specifications regarding non-coverage of an item or service; or (3) knowledge of what are considered acceptable standards of practice by the local medical community. *See* 42 C.F.R. § 411.406(e).

Under the *MFMM*, a provider, physician, or other supplier is "without fault" in causing an overpayment when the provider: (1) exercised reasonable care in billing for, and accepting, the payment; (2) made full disclosure of all material facts; and (3) had a reasonable basis for assuming that the payment was correct based of the information available to the provider, including, but not limited to, the Medicare instructions and regulations. CMS, *Medicare Financial Management Manual (MFMM) (Internet-Only Manual Publ'n 100-06)* ch. 3 § 90 (Feb. 2017).

The Appellant's liability may neither be limited under § 1879 of the Act nor waived under § 1870 of the Act. The Appellant had access to CMS notices and Federal Register publications and had knowledge of what were considered accepted standards of medical practice on the date at issue. As such, the Appellant knew or should have known that the lack of directly applicable randomized clinical trials, the presence of an FDA Tissue Resource Group (TRG) letter or lack thereof, and the assignment of a billing code is not equivalent to full Medicare

approval of an item or service. Relying on manufacturer materials, the mere assignment of a Q code, or relatively vague LCD is not enough. The Appellant should have known of the danger of an audit on these high-cost wound care products. The Appellant was trying to be careful in their employment of such products; but that also has to mean the Appellant knew the products used might be looked at by CMS or its contractors. Medicare often audits such claims. The ALJ cannot find the Appellant without fault on this record for overpayment purposes under § 1870 and the Appellant had too much knowledge to receive the liability limitation of § 1879. Accordingly, the Appellant remains liable for costs related to the non-covered service and recovery of the overpayment is not waived

## CONCLUSIONS OF LAW

The Amnio-Quad Core provided to the Beneficiary on the date of service at issue is not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the outstanding costs related to the non-covered service and the overpayment is not waived.

## ORDER

For the reasoning discussed above, this decision is **UNFAVORABLE**. The Appellant is liable for the outstanding costs related to the non-covered service and the overpayment is not waived. I direct the Medicare administrative contractor to process the claim in accordance with this decision.

**SO ORDERED**

Aaron Raff
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

**REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL**

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated__________________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| DATE | | | DATE | | |
|---|---|---|---|---|---|
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

---

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | | | |
|---|---|---|---|
| Appeal of: | **CHRIS MCGEE MD PA** | OMHA Appeal No.: | **3-15466926897** |
| Beneficiary: | [redacted] | Medicare Part: | **B** |
| Medicare No.: | [redacted] | Before: | **Aaron Raff**<br>Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| **Exhibit Record** | **Administrative File Reference** File Name | Page Range |
|---|---|---|
| Procedural - CMS Levels: Reconsideration | File 2 | 1 : 16 |
| Procedural - CMS Levels: Req for Reconsideration: w/evidence | File 4 | 1 : 143 |
| Procedural - CMS Levels: Claims List | File 5 | 1 : 1 |
| Procedural - CMS Levels: Redetermination Case File | File 6 | 1 : 748 |
| Procedural - CMS Levels: Claims Medical Review | File 8 | 1 : 1 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 1 | 1 : 21 |
| Procedural - OMHA Level: Report of Contact : bene concerns | File 10 | 1 : 1 |
| Procedural - OMHA Level: General: ROC 1 | File 11 | 1 : 1 |
| Procedural - OMHA Level: General: ROC 2 | File 12 | 1 : 1 |
| Procedural - OMHA Level: General: App Rep RNOH | File 14 | 1 : 4 |
| Procedural - OMHA Level: Signed Decision | File 15 | 1 : 15 |
| Procedural - OMHA Level: Notice of Decision | File 16 | 1 : 23 |
| Procedural - OMHA Level: Consolidated Notice of Hearing | File 9 | 1 : 9 |
| Proceeding (Audios): General: Hearing Audio | File 13 | 1 : 1 |

| **Non-Exhibit Record** | **Administrative File Reference** File Name | Page Range |
|---|---|---|
| Records not considered: QIC Acknowledgement Letter | File 3 | 1 : 3 |
| Records not considered: Transmittal Cover Sheet | File 7 | 1 : 1 |

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Kansas City Field Office
601 E. 12th Street
Suite 1753
Kansas City, MO 64106-2817
(816)-599-3300
(816) 599-3251 Sylvester (Direct)
Team Raff
(816) 527-0051 (Fax)
(844) 566-6258 (Toll Free)

February 20, 2026

ENGAGE HEALTH SOULTIONS
ATTN: WILLIAM OMALLEY
60 PUBLIC SQUARE
STE 602
WILKES-BARRE, PA 18701

## NOTICE OF DECISION

Appellant: CHRIS MCGEE MD PA
OMHA Appeal Number: 3-15466926905

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

### What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**How much time do I have to file an appeal?**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**How do I file an appeal?**

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare

Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

C2C Innovative Solutions, Inc.
Part B South C2C
301 W Bay Street, Ste. 1110
Jacksonville, FL 32231-4006

CHRIS MCGEE MD PA
PO BOX 1628
DECATUR, TX 76234

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | |
|---|---|
| Appeal of: **CHRIS MCGEE MD PA** | OMHA Appeal No.: **3-15466926905** |
| Beneficiary: [redacted] | Medicare Part: B |
| Medicare No.: | Before: **Aaron Raff** Administrative Law Judge |

## DECISION

After careful consideration of the evidence and arguments contained in the administrative record and presented at the hearing, I enter an **UNFAVORABLE** decision. The Amnio-Quad Core supplied and billed by Chris McGee MD PA (Appellant) to the Beneficiary on the date of service at issue (April 4, 2024) is not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the non-covered services and recovery of the overpayment is not waived.

## PROCEDURAL HISTORY

The Appellant submitted a claim for the service to Novitas Solutions, Inc., the Medicare Administrative Contractor (MAC) with jurisdiction, who initially paid the claim in full. However, it was later determined that an overpayment occurred. (Files 2, 4 and 5). Upon notice of the overpayment, the Appellant requested redetermination, and the MAC issued unfavorable redetermination decision. The Appellant was held liable for all outstanding costs and overpayments related to the denied claim. The Appellant then requested reconsideration from C2C Innovative Solutions, Inc., the Qualified Independent Contractor (QIC). The QIC issued an unfavorable reconsideration decision denying coverage for the claim and determining that the overpayment was valid. (File 2). The Appellant/Provider was held liable for all charges related to the denied claims and was found at fault in causing the overpayment.

On October 30, 2025, the Office of Medicare Hearings and Appeals (OMHA) received the Appellant's request for an Administrative Law Judge (ALJ) hearing. (File 1). An ALJ hearing was held on January 7, 2026. Appearing at hearing on behalf of the Appellant was representative William O'Malley. The Beneficiary was notified of the hearing but indicated that she did not wish to personally appear at hearing or appeal the claim herself. (File 8). The appearing witness was sworn in prior to providing testimony. All of the indexed files in the administrative record are admitted to the record with the exception of duplicates and non-probative items which are kept in place for identification purposes. The administrative record is now closed.

## ISSUES

The issues brought before this ALJ include all the issues for the claims or appealed matters specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's (not including CMS's) favor. 42 C.F.R. § 405.1032. The ALJ may consider a new issue provided he or she notifies all of the parties about the new issue. § 405.1032(b). The new issue may include issues resulting from the participation of CMS at the ALJ level of adjudication and from any evidence and position papers submitted by CMS for the first time to the ALJ. *Id.*

The following are specifically at issue in this appeal:

I. Were all Medicare coverage and payment requirements met for the Amnio Quad-Core skin substitute product and related application codes at issue warranting payment under Title XVIII of the Social Security Act (Act)?

II. Are the limitations on liability provisions of section 1879 of the Act or the waiver of overpayment provisions under section 1870 of the Act applicable?

## APPLICABLE LAW AND POLICY

Part B of Title XVIII of the Social Security Act (Act), the Supplementary Medical Insurance program, provides coverage for a variety of medical services and supplies, including the durable medical equipment at issue, furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of other specific health-related items and services. Notwithstanding any other provision of the Act, no payment may be made under part A or part B for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A).

Section 1833(e) of the Act states that "[n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." The provider is responsible for providing sufficient documentation to support that payment is due and the services were medically necessary and provided as billed. 42 C.F.R. §424.5(a)(6).

The appellant has the burden of proof by a preponderance of the evidence. 5 U.S.C. § 556(d); *see generally Steadman v. SEC*, 450 U.S. 91, 98-102 (1981). This means that the evidence contained in the record must establish that it is more likely than not that the appellant's position is factually and legally correct. Therefore, the appellant must furnish sufficient evidence to support the claim. *See* Act §§ 1814(a)(1), 1815(a), 1833(e); 42 C.F.R. §§ 424.5(a)(6), 424.11, 424.22(c). If the appellant does not meet the burden of proof, the case must be decided unfavorably to the appellant.

Although not subject to the force and effect of law, the Centers for Medicare & Medicaid Services (CMS) and its contractors have issued policy guidelines and Local Coverage Determinations (LCDs) describing coverage criteria for selected types of items and services. Pursuant to 42 C.F.R. § 405.1062(a), an ALJ is not bound by an LCD, but will give substantial deference to an LCD if it is applicable to a particular case. However, section 1871(a)(2) of the Act provides that no rule, requirement or statement of policy, other than a National Coverage

Determination (NCD), can establish or change a substantive legal standard governing the scope of the benefits or payment for services under the Medicare program unless promulgated as a regulation by CMS.

*Reasonable and Necessary Criteria*

Per the Medicare Program Integrity Manual, CMS issues NCDs that specify whether certain items, services, procedures or technologies are reasonable and necessary under §1862(a)(1)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no LCD exists for a particular item or service, the MACs, CERT, Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
  - o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
  - o Furnished in a setting appropriate to the beneficiary's medical needs and condition;
  - o Ordered and furnished by qualified personnel; and,
  - o One that meets, but does not exceed, the beneficiary's medical need.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury in order to be considered for payment. The exceptions appear in the full text of §1862(a)(l)(A) of the Act. CMS, Medicare Program Integrity Manual *(MPIM) (Internet-Only Manual Pub. 100-08)* ch. 3, § 3.6.2.2. *See also MPIM,* ch. 13, § 13.5.1.

Regarding approved use of drugs, the Medicare Benefit Policy Manual states that drugs or biologicals approved for marketing by the Food and Drug Administration (FDA) are considered safe and effective for purposes of this requirement when used for indications specified on the labeling. As such, the program may pay for the use of an FDA approved drug or biological if it was injected on or after the date of the FDA's approval; it is reasonable and necessary for the individual's patient; and all other applicable coverage requirements are met. The carrier, DMERC, or intermediary will deny coverage for drugs and biologicals which have not received final marketing approval by the FDA unless it receives instructions from CMS to the contrary. If there is reason to question whether the FDA has approved a drug or biological for marketing, the carrier or intermediary must obtain satisfactory evidence of FDA's approval. CMS, Medicare Benefit Policy Manual *(MBPM) (Internet-Only Manual Pub. 100-02)* ch. 15, § 50.4.1.

*Related Services*

Services related to non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services not related to non-covered services can be covered under Medicare. However, any subsequent services that are expected to be incorporated into a global fee are not covered. *MBPM*, ch. 16, § 180.

*Human Cellular and Tissue Based Products (HCT/Ps)*

For a product to be regulated as a human cells, tissues, and cellular and tissue-based product (HCT/P), it must meet specific regulatory requirements as established under section 361 of the of the Public Health Service (PHS) Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 361 of the PHS Act and the Food, Drug, and Cosmetic (FC&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public. The four criteria are:

> (1) The HCT/P is minimally manipulated;
> (2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
> (3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
> (4) Either:
>> (i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
>> (ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
>>> (a) Is for autologous use;
>>> (b) Is for allogeneic use in a first-degree or second-degree blood relative; or
>>> (c) Is for reproductive use.

21 C.F.R. § 1271.10(a).

Homologous use is defined as "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor." 21 C.F.R. § 1271.3(c). HCT/Ps are defined as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." 21 C.F.R. § 1271.3(d).

*Local Coverage Determinations*

Local Coverage Determinations (LCD) LCD L35041 is relevant to this appeal.[1] This LCD provides, in part:

> Medicare covers application of skin substitutes to Ulcers or Wounds with Failed Response that are:
>
> - Partial- or full-thickness ulcers, not involving tendon, muscle, joint capsule or exhibiting exposed bone or sinus tracts, with a clean granular base;
> - Skin deficit at least 1.0 square centimeter (cm) in size;
> - Clean and free of necrotic debris or exudate;
> - Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index [ABI] of no less than 0.60, toe pressure greater than 30 millimeters of mercury [mmHg]);
> - For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.
>
> Wound healing is impaired by the systemic use of tobacco. Therefore, ideally patients who have smoked will have ceased smoking or have refrained from systemic tobacco intake for at least 4 weeks during conservative wound care and prior to planned bioengineered skin replacement therapy.
>
> Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed. Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented. Documentation of smoking cessation counseling and cessation measures prescribed, if applicable, must also be documented in the patient's record.
>
> Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:
>
> - Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.

[1] Novitas Solutions, Inc., the MAC with jurisdiction in this instance, had published a revised version of LCD L35041, titled *Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Ulcers (LCD L35041),* which was scheduled to go into effect on January 1, 2026. While this LCD was not effective on the date of service, and is therefore only persuasive authority, it was helpful to illustrate the availability of published, peer-reviewed literature supporting the use of various, specific skin substitute grafts for use in chronic ulcers. However, on December 24, 2025, prior to the revised LCD going into effect, CMS' MACs withdrew the LCD in favor of modifying the payment and fee schedule for skin substitute graft services. *See* https://www.cms.gov/newsroom/fact-sheets/upcoming-update-final-local-coverage-determinations-lcds-certain-skin-substitutes.

- Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.
- Presence of a full thickness skin loss ulcer that is the result of abscess, injury or trauma that has failed to respond to appropriate control of infection, foreign body, tumor resection, or other disease process for a period of 4 weeks or longer.

Novitas Solutions, Inc, Local Coverage Determination L35041: Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Health Wounds (LCD L35041) (Eff. 09/26/2019).

LCD L35041 provides the following limitations to coverage of bioengineered skin substitutes:

> The following are considered not reasonable and necessary and therefore will be denied:
>
> - Partial thickness loss with the retention of epithelial appendages is not a candidate for grafting or replacement, as epithelium will repopulate the deficit from the appendages, negating the benefit of overgrafting.
> - Skin substitute grafts will be allowed for the episode of wound care in compliance with FDA guidelines for the specific product (see utilization guidelines) not to exceed 10 applications or treatments. In situations where more than one specific product is used, it is expected that the number of applications or treatments will still not exceed 10.
> - Simultaneous use of more than one product for the episode of wound is not covered. Product change within the episode of wound is allowed, not to exceed the 10 application limit per wound per 12 week period of care.
> - Treatment of any chronic skin wound will typically last no more than twelve (12) weeks.
> - Repeat or alternative applications of skin substitute grafts are not considered medically reasonable and necessary when a previous full course of applications was unsuccessful. Unsuccessful treatment is defined as increase in size or depth of an ulcer or no change in baseline size or depth and no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing) for a period of 4 weeks past start of therapy.
> - Retreatment of healed ulcers, those showing greater than 75% size reduction and smaller than 0.5 square cm, is not considered medically reasonable and necessary.
> - Skin substitute grafts are contraindicated and are not considered reasonable and necessary in patients with inadequate control of underlying conditions or exacerbating factors (e.g., uncontrolled diabetes, active infection, and active Charcot arthropathy of the ulcer extremity, vasculitis or continued tobacco smoking without physician attempt to affect smoking cessation).
> - Skin substitute grafts are contraindicated in patients with known hypersensitivity to any component of the specific skin substitute graft (e.g., allergy to avian, bovine, porcine, equine products).
> - Repeat use of surgical preparation services in conjunction with skin substitute application codes will be considered not reasonable and necessary. It is expected that each wound will require the use of

appropriate wound preparation code at least once at initiation of care prior to placement of the skin substitute graft.

- Re-treatment within one (1) year of any given course of skin substitute treatment for a venous stasis ulcer or (diabetic) neuropathic foot ulcer is considered treatment failure and does not meet reasonable and necessary criteria for re-treatment of that ulcer with a skin substitute procedure.

LCD L35041.

***Individual HCPCS and CPT Code Descriptions***

At issue in this appeal are services billed using the CPT and HCPCS codes listed below which are followed by their individual descriptions as detailed in the HCPCS and CPT Codebook applicable on the date of service at issue:

- **Q4294**: Amnio Quad-Core, per sq cm.

***Limitations on Liability***

Section 1879(a) of the Act contains limitation on liability provisions for cases under Medicare Parts A and B. These provisions only apply when a determination is made that Medicare will not pay for an item or service

- because it was not reasonable and necessary for the diagnosis or treatment of illness or injury;
- because it was for custodial care;
- in home health cases, because the beneficiary was not confined to his or her home or did not need skilled care on an intermittent basis;
- in hospice services, because the beneficiary was not terminally ill or because the services were not reasonable and necessary for the palliation or management of terminal illness; or
- for one of a limited number of specific circumstances not relevant to this case.

Act §§ 1814(a)(7)(E), 1833(g)(5)(D), 1833(z), 1879(a)(1), 1879(e), 1879(g), 1879(i). In these circumstances, payment shall nevertheless be made for the items or services if the beneficiary, provider, or suppler "did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services." Act § 1879(a)(2). The regulations at 42 C.F.R. § 411.400 *et seq.*; HCFA Ruling 95-1; and chapter 30 Section 40 of the *Medicare Claims Processing Manual (MCPM)* provide the framework for determining if a beneficiary and provider or supplier's liability for a non-covered item or service is limited under Section 1879 of the Social Security Act.

Section 1870(b) of the Act provides for a waiver of recoupment for an overpayment in certain circumstances where a provider or supplier is "without fault." The Medicare Financial Management Manual (MFMM) instructs that a provider or supplier is "without fault" when the provider or supplier exercised reasonable care in billing for and accepting payment; meaning:

- The provider or supplier made full disclosure of all material facts; and
- On the basis of the information available, including but not limited to, the Medicare instructions and regulations, it has a reasonable basis for assuming

that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

Pursuant to § 1870 of the Act, a waiver requires Appellant to be without fault in regard to the overpayment. This means on the basis of the information available Appellant had a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

## FINDINGS OF FACT AND ANALYSIS

### *Lower-Level Denial Reasons*

The QIC issued an unfavorable reconsideration decision, stating that the medical records reflect the Beneficiary has bilateral lower extremity ulcers for which the physician applied the amniotic membrane. However, the QIC found that Amnio Quad-Core amniotic membrane (Q4294) is experimental and investigational as denoted by the Q code status nomenclature. Under Medicare law, no payment can be made under Medicare for any expenses incurred for items or services that are considered investigational and are not considered reasonable and necessary. Since Amnio Quad-Core amniotic membrane (Q4294) is considered investigational and is not payable as per CMS, it was the QIC's determination that the Amnio Quad-Core amniotic membrane (Q4294) does not meet the medically reasonable and necessary requirements of Section 1862(a)(1)(A) of the Act. Therefore, payment was not allowed and the QIC found the overpayment valid. (File 2).

### *Appellant Statements and Arguments*

The Appellant, in their written appeal request, contends that Amnio Quad-Core is not investigational or experimental. They argue that the QIC's determination that Q-code designation inherently signifies a product is investigational or experimental is inaccurate and procedurally flawed. Rather, Q-codes are used for products that do not yet have a CPT code or permanent national Level II HCPCS code, and Q-codes are routinely assigned to Medicare covered products and services. The Appellant states that a denial based solely on the presence of a Q-code reflects a misunderstanding of CMS's HCPCS coding system and lacks any support in statute, regulation, or CMS guidance and should not be used as a basis for denial. (File 1).

The Appellant also contends that the skin substitute was applied in accordance with LCD L35041, which allows skin substitute product usage for certain defined wound types such as diabetic foot ulcers and venous leg ulcers, includes the product category and/or type (such as an allograft), and does not expressly exclude the specific product at issue. Because the Appellant believes that the product was used in accordance with the coverage parameters outlined in an active LCD, they argue it cannot be considered investigational or experimental and should be entitled to Medicare coverage. (File 1).

At hearing, the Appellant reiterated their issues with the QIC's denial based on Amnio Quad-Core's Q code status. They contend that the claim at issue meets all requirements of LCD L35041 for usage of skin substitute products to treat venous leg ulcers and that, because usage of the category of product at issue for treatment of the Beneficiary's specific condition is allowed by the LCD, it cannot be considered investigational or experimental. The Appellant also testified that the product was used within the scope of an FDA Tissue Reference Group (TRG) letter and that there was nothing to suggest the product was intended for wound healing or inflammation reduction. Rather, the product was used as a wound covering and within manufacturer intent, meaning homologous use requirements were met. (Files 1, 4 and 6).

The Appellant also testified as to the medical necessity of the product for treatment of the Beneficiary and her specific condition. Specifically, the Beneficiary's venous leg ulcers had been present for 22 months on the date of service and, despite extensive conservative measures and best practice wound care, the wounds persisted. Due to failure to respond to conservative treatment, skin substitute grafts were considered reasonable and necessary as the next step in the Beneficiary's treatment. The Beneficiary's wounds responded well to the skin substitute treatments and she experienced an over 90% reduction in wound surface area and volume over the course of treatment. Based on this, the Appellant believes that the escalation to use of skin substitute products for treatment of the Beneficiary was justified. (*Id.*).

***ALJ Findings***

In determining whether the amniotic allograft products are reasonable and necessary for the beneficiaries, the ALJ looked first to whether it was regulated as an HCT/P or being used properly (e.g., a homologous use) as an HCT/P. For a product to be regulated as an HCT/P, it must meet specific regulatory requirements as established under section 361 of the of the PHS Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 351 of the PHS Act and the Food, Drug, & Cosmetic (FD&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public.

The four criteria are: (1) the HCT/P is minimally manipulated; (2) the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent; (3) the manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and (4) either: (i) the HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or (ii) the HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and: (a) is for autologous use; (b) is for allogeneic use in a first-degree or second-degree blood relative; or (c) is for reproductive use. 21 C.F.R. § 1271.10(a). Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor. 21 C.F.R. § 1271.3(c).

A letter was issued by the FDA's Tissue Reference Group (TRG) on September 2, 2022, indicating that Amnio Quad-Core Amniotic Membrane Sheets are registered as being regulated under section 361 of the PHS Act and the regulations in 21 C.F.R. § 1271. (File 4, pp. 142-143). The letter specifies that the product is only regulated this way when used in a homologous way. If the product is not used for a homologous purpose, it is not regulated under section 361 regardless of any letters issued by the TRG. Furthermore, this does not make Amnio Quad-Core an "FDA approved" product.

An FDA approval under Section 361 does not prove (or disprove) a treatment is safe and effective for Medicare purposes. *See* 21 C.F.R. § 1271. Also, the existence of a Level II HCPCS code (e.g., 4294) is not evidence that a product or service is safe and effective. Nor is it evidence

to the contrary.[2] HCPCS codes are not intended to embody legal presumptions in Medicare coverage decisions. *See* CMS Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures. Any argument regarding a HCPCS/Q code supporting safety and efficacy is non-probative and, thus, is immaterial for purposes of this appeal.

Appellant asserted that because Amnio Quad-Core is Section 361 registered, has been assigned a HCPCS code, and is not explicitly barred from coverage per an LCD, the product should not be classified as experimental or investigational for Medicare purposes.

Literature was provided by Appellant to try to satisfy the burden of proof that use of Amnio Quad-Core is not investigational or experimental when used for treatment of chronic ulcers, including venous leg ulcers and diabetic foot ulcers. (*See* File 4, pp. 67-139). However, none of the literature provides a large (n>30) scale, randomized clinical trial that proves the safety or efficacy of Amnio Quad-Core specifically. Rather, the literature is focused on other amniotic membrane products or on general medical-technological trends in the HCT/P wound care field. To the degree other products are reviewed, these products are generally propriety and distinct products that have a multitude of descriptions and uses and the ALJ cannot automatically equate one skin substitute or amniotic membrane product with another. Finally, and notably, the articles indicate that the HCT/P products are being used actively to engage in intracellular signaling and promote a cell or skin reaction to healing. Thus, the uses described in the literature are not merely wound cover uses and not homologous as to Amnio Quad-Core's FDA labeling. When used in this way, the product is exceeding a homologous use, which renders it outside the scope of the FDA label under Section 361.

Even if the ALJ accepts that Amnio Quad-Core was being used solely under Section 361 as a wound cover or barrier, there is minimal evidence in the record that shows the product is safe and effective for this purpose.[3] As stated above, the Appellant did not provide published, peer-reviewed literature to support the use of the specific product at issue, Amnio Quad-Core, or even biosimilar HCT/P products, for treatment of chronic wounds. The product may well be helping, or at a minimum harmless, but that is not the standard to prove safety and effectiveness for Medicare coverage purposes.

In summary, Amnio Quad-Core has not been shown to be regulated under section 361 of the PHS Act when used in the manner in which it was used in this case. Even if the product was assumed to be governed by section 361, it has not been shown to meet Medicare's standards for a treatment considered safe and effective for the purpose for which it was used in this case. This decision is based on Medicare regulations and statutes and makes no determination concerning the physician's decision to treat the beneficiaries with the products at issue. For Medicare purposes Amnio Quad-Core is investigational and experimental and not covered based on the specific record before me.

I find the product at issue, Amnio Quad-Core (Q4294), cannot be covered by Medicare in this instance. *MBPM*, ch. 16, § 180.

---

[2] The ALJ agrees with the Appellant's argument that the QIC's denial based on the assignment of a Q-code to the product at issue is neither supported by law nor established Medicare policy.

[3] The ALJ is focused solely on the Medicare context. The ALJ is not purporting to rule on FDA status and is only looking at FDA status or homologous use for purposes of the Medicare coverage analysis. Skin substitutes using placenta/amniotic products have some promise. New LCDs allowing coverage may eventually be published. The product, both individually and as a whole, also could benefit from further study in large, random clinical trials. But these hypotheticals are beyond the scope of this matter, and the record before me does not prove that Amnio Quad-Core is not investigational or experimental.

*Medical Necessity*

Basic medical reasonable and necessary criteria is not entirely relevant in this decision, as the primary denial reason is the items/services being considered investigational/experimental, but the ALJ explores the topic briefly here.

The Beneficiary had a medical history including chronic bilateral lower extremity lymphedema, chronic venous insufficiency, hypertension, and multiple longstanding lower extremity ulcerations secondary to chronic venous insufficiency and lymphedema. (File 4, pp. 15-31). Wounds present on the date of service at issue included a left lateral venous leg ulcers present for two months, a right medial venous leg ulcers present for over six months, a right posterior venous leg ulcers present for over six months, and a right lateral venous leg ulcer present for over six months. (*Id.*) The Beneficiary's wounds had been treated with amniotic membrane allografts weekly since March 20, 2024. (*Id.* at 32-58). Conservative wound care measures attempted prior to amniotic membrane allograft application included surgical debridement, compression, use of a lymphedema pump, and use of standard wound dressings, cleaning, and topical medications. (*Id.* at 46-66).

On April 4, 2024, the Beneficiary underwent Amnio Quad-Core amniotic membrane allograft application on her leg ulcers. (File 4, pp. 15-31). The left lateral leg ulcer measured 2.5 x 6.0 x 0.1 cm with no evidence of infection. (*Id.* at 18). Two 2 x 3 cm grafts equal to 12 units were placed on the left lateral leg wound along with standard wound dressing and wraps. (*Id.* at 30-31). The right medial leg ulcer measured 2.0 x 1.5 x 0.1 cm with no evidence of infection. (*Id.* at 19). The right posterior leg ulcer measured 2.0 x 10.5 x 0.1 cm with no evidence of infection. (*Id.* at 20). One 4 x 6 cm grafts equal to 24 units was placed on the right posterior leg wound along with standard wound dressing and wraps. (*Id.* at 28-29). A small piece of Amnio Quad-Core equal to roughly 2 units was also placed on the right medial leg wound. (*Id.*) The right lateral leg ulcer measured 9.0 x 18.0 x 0.4 cm with no evidence of infection. (*Id.* at 21). Six 4 x 6 cm grafts equal to 144 units of Amnio Quad-Core were placed on the right lateral leg wound along with standard wound dressing and wraps. (*Id.* at 22-27).

Upon review of the medical records, several themes developed. First, the records support the presence of venous leg ulcers present for at least 3 months and unresponsive to appropriate, conservative wound care for at least 30 days. The testimony and records made clear that there was a good faith approach to use of the amniotic membrane allografts, and the clinicians felt the products could work on the wounds at issue. Second, while the amount of this expensive amniotic membrane graft product used caused some concern for the ALJ, LCD L35041 does not explicitly limit the amount of product that can be used on individual ulcers. Rather, it limits the number of treatments to 10 applications over a 12-week maximum period of care. In this instance, the application at issue was the third application and the third week of treatment. Finally, there is an instance in which a single allograft was divided between two of the Beneficiary's ulcers so that a small ulcer could be treated with two units of product. While this again raises some concern, this does not appear to be disallowed by the LCD. LCD L35041 allows for skin substitute treatments of ulcers as long as they are over 1.0 square centimeters in size and the small ulcer treated measured 3.0 square centimeters.

Based on the above, and despite the ALJ's general concerns over usage of this product over more reasonably priced wound coverings, LCD L35041 does not preclude usage of skin substitute products on the Beneficiary's venous leg ulcers. However, despite meeting LCD guidelines for general skin substitute treatment of venous leg ulcers, the specific product used,

Amnio Quad-Core, is still found to be investigational or experimental for the reasons detailed above. Because Amnio Quad-Core is found to be investigational or experimental it cannot be considered medically reasonable and necessary and is not entitled to Medicare coverage.

***Liability***

The final issue before the ALJ is liability for the denied service at issue. Medicare coverage does not exist for the service at issue because the service is found to be investigational/experimental, and is not found to be medically necessary for the beneficiary and date of service at issue. When items or services are found not to be reasonable and necessary under § 1862(a)(1)(A) of the Act, and therefore are not covered by Medicare, the limitation on liability provisions of § 1879 of the Act may apply if neither the beneficiary nor the provider had reason to know the services would not be covered.

The beneficiary whose Medicare claim was denied pursuant to § 1862(a)(1)(A) of the Act is not financially liable for the non-covered services because their liability is limited under § 1879 of the Act. Under the regulations, a beneficiary who receives a non-covered service is considered to have known that Medicare would not cover the service if written notice of non-coverage was furnished by any of the following entities: QIOs, fiscal intermediaries, carriers, utilization review committees, providers, suppliers, or the beneficiary's attending physician. *See* 42 C.F.R. § 411.406. In this instance, the record does not contain any evidence that the beneficiary received written notice of non-coverage, nor does the record contain any other evidence that the beneficiary was made aware of the fact that Medicare might not cover the services at issue. Therefore, the beneficiary is not financially liable for the non-covered services.

A provider who furnishes non-covered services is considered to have known that the services were not covered if the QIO, intermediary, or carrier had informed the supplier that the item furnished was not covered. *See* 42 C.F.R. § 411.406(b). However, the regulations also confer constructive knowledge of non-coverage to providers based on any of the following: (1) receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or QIOs, including notification of QIO screening criteria specific to the condition of the beneficiary for whom the furnished services are at issue and of medical procedures subject to preadmission review by a QIO; (2) Federal Register publications containing notice of national coverage decisions or of other specifications regarding non-coverage of an item or service; or (3) knowledge of what are considered acceptable standards of practice by the local medical community. *See* 42 C.F.R. § 411.406(e).

Under the *MFMM*, a provider, physician, or other supplier is "without fault" in causing an overpayment when the provider: (1) exercised reasonable care in billing for, and accepting, the payment; (2) made full disclosure of all material facts; and (3) had a reasonable basis for assuming that the payment was correct based of the information available to the provider, including, but not limited to, the Medicare instructions and regulations. CMS, *Medicare Financial Management Manual (MFMM) (Internet-Only Manual Publ'n 100-06)* ch. 3 § 90 (Feb. 2017).

The Appellant's liability may neither be limited under § 1879 of the Act nor waived under § 1870 of the Act. The Appellant had access to CMS notices and Federal Register publications and had knowledge of what were considered accepted standards of medical practice on the date at issue. As such, the Appellant knew or should have known that the lack of directly applicable randomized clinical trials, the presence of an FDA Tissue Resource Group (TRG) letter or lack thereof, and the assignment of a billing code is not equivalent to full Medicare

approval of an item or service. Relying on manufacturer materials, the mere assignment of a Q code, or relatively vague LCD is not enough. The Appellant should have known of the danger of an audit on these high-cost wound care products. The Appellant was trying to be careful in their employment of such products; but that also has to mean the Appellant knew the products used might be looked at by CMS or its contractors. Medicare often audits such claims. The ALJ cannot find the Appellant without fault on this record for overpayment purposes under § 1870 and the Appellant had too much knowledge to receive the liability limitation of § 1879. Accordingly, the Appellant remains liable for costs related to the non-covered service and recovery of the overpayment is not waived

## CONCLUSIONS OF LAW

The Amnio-Quad Core provided to the Beneficiary on the date of service at issue is not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the outstanding costs related to the non-covered service and the overpayment is not waived.

## ORDER

For the reasoning discussed above, this decision is **UNFAVORABLE**. The Appellant is liable for the outstanding costs related to the non-covered service and the overpayment is not waived. I direct the Medicare administrative contractor to process the claim in accordance with this decision.

**SO ORDERED**

Aaron Raff
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| | |
|---|---|
| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| | |
|---|---|
| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated__________________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| | | | | | |
|---|---|---|---|---|---|
| DATE | | | DATE | | |
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

Appeal of: **CHRIS MCGEE MD PA**

Beneficiary: [redacted]

Medicare No.: [redacted]

OMHA Appeal No.: **3-15466926905**

Medicare Part: **B**

Before: **Aaron Raff**
Administrative Law Judge

Index of the Administrative Record and Exhibit List

| **Exhibit Record** | **Administrative File Reference** File Name | Page Range | | |
|---|---|---|---|---|
| Procedural - CMS Levels: Reconsideration | File 2 | 1 | : | 16 |
| Procedural - CMS Levels: Request for Reconsideration | File 4 | 1 | : | 143 |
| Procedural - CMS Levels: Redetermination Case File | File 5 | 1 | : | 748 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 1 | 1 | : | 21 |
| Procedural - OMHA Level: General: ROC | File 10 | 1 | : | 1 |
| Procedural - OMHA Level: General: App Rep RNOH | File 11 | 1 | : | 4 |
| Procedural - OMHA Level: Signed Decision | File 12 | 1 | : | 15 |
| Procedural - OMHA Level: Notice of Decision | File 13 | 1 | : | 23 |
| Procedural - OMHA Level: Consolidated Notice of Hearing | File 7 | 1 | : | 9 |
| Procedural - OMHA Level: Report of Contact: Bene concerns | File 8 | 1 | : | 1 |
| Proceeding (Audios): General: Hearing Audio | File 9 | 1 | : | 1 |

| **Non-Exhibit Record** | **Administrative File Reference** File Name | Page Range | | |
|---|---|---|---|---|
| Records not considered: QIC Acknowledgment Letter | File 3 | 1 | : | 3 |
| Records not considered: Transmittal Cover Sheet | File 6 | 1 | : | 1 |

OMHA-156
Dated: 2026-02-19

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Kansas City Field Office
601 E. 12th Street
Suite 1753
Kansas City, MO 64106-2817
(816)-599-3300
(816) 599-3251 Sylvester (Direct)
Team Raff
(816) 527-0051 (Fax)
(844) 566-6258 (Toll Free)

February 20, 2026

ENGAGE HEALTH SOULTIONS
ATTN: WILLIAM OMALLEY
60 PUBLIC SQUARE
STE 602
WILKES-BARRE, PA 18701

**NOTICE OF DECISION**

Appellant: CHRIS MCGEE MD PA
OMHA Appeal Number: 3-15466926933

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

**What if I disagree with the decision?**

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**How much time do I have to file an appeal?**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**How do I file an appeal?**

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare

Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

C2C Innovative Solutions, Inc.
Part B South C2C
301 W Bay Street, Ste. 1110
Jacksonville, FL 32231-4006

CHRIS MCGEE MD PA
PO BOX 1628
DECATUR, TX 76234

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | |
|---|---|
| Appeal of: **CHRIS MCGEE MD PA** | OMHA Appeal No.: **3-15466926933** |
| Beneficiary: [redacted] | Medicare Part: B |
| Medicare No. | Before: **Aaron Raff**<br>Administrative Law Judge |

## DECISION

After careful consideration of the evidence and arguments contained in the administrative record and presented at the hearing, I enter an **UNFAVORABLE** decision. The Amnio-Quad Core and related application codes supplied and billed by Chris McGee MD PA (Appellant) to the Beneficiary on the date of service at issue (April 4, 2024) are not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the non-covered services and recovery of the overpayment is not waived.

## PROCEDURAL HISTORY

The Appellant submitted a claim for the services to Novitas Solutions, Inc., the Medicare Administrative Contractor (MAC) with jurisdiction, who initially paid the claim in full. However, it was later determined that an overpayment occurred. (File 5, pp. 5-12). Upon notice of the overpayment, the Appellant requested redetermination, and the MAC issued unfavorable redetermination decision. (File 4, pp. 7-11). The Appellant was held liable for all outstanding costs and overpayments related to the denied claim. The Appellant then requested reconsideration from C2C Innovative Solutions, Inc., the Qualified Independent Contractor (QIC). The QIC issued an unfavorable reconsideration decision denying coverage for the claim and determining that the overpayment was valid. (File 2). The Appellant/Provider was held liable for all charges related to the denied claims and was found at fault in causing the overpayment.

On October 30, 2025, the Office of Medicare Hearings and Appeals (OMHA) received the Appellant's request for an Administrative Law Judge (ALJ) hearing. (File 1). An ALJ hearing was held on January 7, 2026. Appearing at hearing on behalf of the Appellant was representative William O'Malley. The Beneficiary was notified of the hearing but indicated that she did not wish to personally appear at hearing or appeal the claim herself. (File 8). The appearing witness was sworn in prior to providing testimony. All of the indexed files in the administrative record are admitted to the record with the exception of duplicates and non-probative items which are kept in place for identification purposes. The administrative record is now closed.

## ISSUES

The issues brought before this ALJ include all the issues for the claims or appealed matters specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's (not including CMS's) favor. 42 C.F.R. § 405.1032. The ALJ may consider a new issue provided he or she notifies all of the parties about the new issue. § 405.1032(b). The new issue may include issues resulting from the participation of CMS at the ALJ level of adjudication and from any evidence and position papers submitted by CMS for the first time to the ALJ. *Id.*

The following are specifically at issue in this appeal:

I. Were all Medicare coverage and payment requirements met for the Amnio Quad-Core skin substitute product and related application codes at issue warranting payment under Title XVIII of the Social Security Act (Act)?

II. Are the limitations on liability provisions of section 1879 of the Act or the waiver of overpayment provisions under section 1870 of the Act applicable?

## APPLICABLE LAW AND POLICY

Part B of Title XVIII of the Social Security Act (Act), the Supplementary Medical Insurance program, provides coverage for a variety of medical services and supplies, including the durable medical equipment at issue, furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of other specific health-related items and services. Notwithstanding any other provision of the Act, no payment may be made under part A or part B for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A).

Section 1833(e) of the Act states that "[n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." The provider is responsible for providing sufficient documentation to support that payment is due and the services were medically necessary and provided as billed. 42 C.F.R. §424.5(a)(6).

The appellant has the burden of proof by a preponderance of the evidence. 5 U.S.C. § 556(d); *see generally Steadman v. SEC*, 450 U.S. 91, 98-102 (1981). This means that the evidence contained in the record must establish that it is more likely than not that the appellant's position is factually and legally correct. Therefore, the appellant must furnish sufficient evidence to support the claim. *See* Act §§ 1814(a)(1), 1815(a), 1833(e); 42 C.F.R. §§ 424.5(a)(6), 424.11, 424.22(c). If the appellant does not meet the burden of proof, the case must be decided unfavorably to the appellant.

Although not subject to the force and effect of law, the Centers for Medicare & Medicaid Services (CMS) and its contractors have issued policy guidelines and Local Coverage Determinations (LCDs) describing coverage criteria for selected types of items and services. Pursuant to 42 C.F.R. § 405.1062(a), an ALJ is not bound by an LCD, but will give substantial deference to an LCD if it is applicable to a particular case. However, section 1871(a)(2) of the Act provides that no rule, requirement or statement of policy, other than a National Coverage

Determination (NCD), can establish or change a substantive legal standard governing the scope of the benefits or payment for services under the Medicare program unless promulgated as a regulation by CMS.

*Reasonable and Necessary Criteria*

Per the Medicare Program Integrity Manual, CMS issues NCDs that specify whether certain items, services, procedures or technologies are reasonable and necessary under §1862(a)(1)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no LCD exists for a particular item or service, the MACs, CERT, Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
  - o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
  - o Furnished in a setting appropriate to the beneficiary's medical needs and condition;
  - o Ordered and furnished by qualified personnel; and,
  - o One that meets, but does not exceed, the beneficiary's medical need.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury in order to be considered for payment. The exceptions appear in the full text of §1862(a)(l)(A) of the Act. CMS, Medicare Program Integrity Manual *(MPIM) (Internet-Only Manual Pub. 100-08)* ch. 3, § 3.6.2.2. *See also MPIM,* ch. 13, § 13.5.1.

Regarding approved use of drugs, the Medicare Benefit Policy Manual states that drugs or biologicals approved for marketing by the Food and Drug Administration (FDA) are considered safe and effective for purposes of this requirement when used for indications specified on the labeling. As such, the program may pay for the use of an FDA approved drug or biological if it was injected on or after the date of the FDA's approval; it is reasonable and necessary for the individual's patient; and all other applicable coverage requirements are met. The carrier, DMERC, or intermediary will deny coverage for drugs and biologicals which have not received final marketing approval by the FDA unless it receives instructions from CMS to the contrary. If there is reason to question whether the FDA has approved a drug or biological for marketing, the carrier or intermediary must obtain satisfactory evidence of FDA's approval. CMS, Medicare Benefit Policy Manual *(MBPM) (Internet-Only Manual Pub. 100-02)* ch. 15, § 50.4.1.

*Related Services*

Services related to non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services not related to non-covered services can be covered under Medicare. However, any subsequent services that are expected to be incorporated into a global fee are not covered. *MBPM*, ch. 16, § 180.

*Human Cellular and Tissue Based Products (HCT/Ps)*

For a product to be regulated as a human cells, tissues, and cellular and tissue-based product (HCT/P), it must meet specific regulatory requirements as established under section 361 of the of the Public Health Service (PHS) Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 361 of the PHS Act and the Food, Drug, and Cosmetic (FC&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public. The four criteria are:

(1) The HCT/P is minimally manipulated;
(2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
(3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
(4) Either:
  (i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
  (ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
    (a) Is for autologous use;
    (b) Is for allogeneic use in a first-degree or second-degree blood relative; or
    (c) Is for reproductive use.

21 C.F.R. § 1271.10(a).

Homologous use is defined as "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor." 21 C.F.R. § 1271.3(c). HCT/Ps are defined as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." 21 C.F.R. § 1271.3(d).

*Local Coverage Determinations*

Local Coverage Determinations (LCD) LCD L35041 is relevant to this appeal.[1] This LCD provides, in part:

> Medicare covers application of skin substitutes to Ulcers or Wounds with Failed Response that are:
>
> - Partial- or full-thickness ulcers, not involving tendon, muscle, joint capsule or exhibiting exposed bone or sinus tracts, with a clean granular base;
> - Skin deficit at least 1.0 square centimeter (cm) in size;
> - Clean and free of necrotic debris or exudate;
> - Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index [ABI] of no less than 0.60, toe pressure greater than 30 millimeters of mercury [mmHg]);
> - For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.
>
> Wound healing is impaired by the systemic use of tobacco. Therefore, ideally patients who have smoked will have ceased smoking or have refrained from systemic tobacco intake for at least 4 weeks during conservative wound care and prior to planned bioengineered skin replacement therapy.
>
> Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed. Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented. Documentation of smoking cessation counseling and cessation measures prescribed, if applicable, must also be documented in the patient's record.
>
> Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:
>
> - Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.

[1] Novitas Solutions, Inc., the MAC with jurisdiction in this instance, had published a revised version of LCD L35041, titled *Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Ulcers (LCD L35041)*, which was scheduled to go into effect on January 1, 2026. While this LCD was not effective on the date of service, and is therefore only persuasive authority, it was helpful to illustrate the availability of published, peer-reviewed literature supporting the use of various, specific skin substitute grafts for use in chronic ulcers. However, on December 24, 2025, prior to the revised LCD going into effect, CMS' MACs withdrew the LCD in favor of modifying the payment and fee schedule for skin substitute graft services. *See* https://www.cms.gov/newsroom/fact-sheets/upcoming-update-final-local-coverage-determinations-lcds-certain-skin-substitutes.

- Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.
- Presence of a full thickness skin loss ulcer that is the result of abscess, injury or trauma that has failed to respond to appropriate control of infection, foreign body, tumor resection, or other disease process for a period of 4 weeks or longer.

Novitas Solutions, Inc, Local Coverage Determination L35041: Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Health Wounds (LCD L35041) (Eff. 09/26/2019).

LCD L35041 provides the following limitations to coverage of bioengineered skin substitutes:

> The following are considered not reasonable and necessary and therefore will be denied:
>
> - Partial thickness loss with the retention of epithelial appendages is not a candidate for grafting or replacement, as epithelium will repopulate the deficit from the appendages, negating the benefit of overgrafting.
> - Skin substitute grafts will be allowed for the episode of wound care in compliance with FDA guidelines for the specific product (see utilization guidelines) not to exceed 10 applications or treatments. In situations where more than one specific product is used, it is expected that the number of applications or treatments will still not exceed 10.
> - Simultaneous use of more than one product for the episode of wound is not covered. Product change within the episode of wound is allowed, not to exceed the 10 application limit per wound per 12 week period of care.
> - Treatment of any chronic skin wound will typically last no more than twelve (12) weeks.
> - Repeat or alternative applications of skin substitute grafts are not considered medically reasonable and necessary when a previous full course of applications was unsuccessful. Unsuccessful treatment is defined as increase in size or depth of an ulcer or no change in baseline size or depth and no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing) for a period of 4 weeks past start of therapy.
> - Retreatment of healed ulcers, those showing greater than 75% size reduction and smaller than 0.5 square cm, is not considered medically reasonable and necessary.
> - Skin substitute grafts are contraindicated and are not considered reasonable and necessary in patients with inadequate control of underlying conditions or exacerbating factors (e.g., uncontrolled diabetes, active infection, and active Charcot arthropathy of the ulcer extremity, vasculitis or continued tobacco smoking without physician attempt to affect smoking cessation).
> - Skin substitute grafts are contraindicated in patients with known hypersensitivity to any component of the specific skin substitute graft (e.g., allergy to avian, bovine, porcine, equine products).
> - Repeat use of surgical preparation services in conjunction with skin substitute application codes will be considered not reasonable and necessary. It is expected that each wound will require the use of

appropriate wound preparation code at least once at initiation of care prior to placement of the skin substitute graft.

- Re-treatment within one (1) year of any given course of skin substitute treatment for a venous stasis ulcer or (diabetic) neuropathic foot ulcer is considered treatment failure and does not meet reasonable and necessary criteria for re-treatment of that ulcer with a skin substitute procedure.

LCD L35041.

***Individual HCPCS and CPT Code Descriptions***

At issue in this appeal are services billed using the CPT and HCPCS codes listed below which are followed by their individual descriptions as detailed in the HCPCS and CPT Codebook applicable on the date of service at issue:

- **15271**: Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area.
- **15272**: Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; each additional 25 sq cm wound surface area, or part thereof.
- **Q4294**: Amnio Quad-Core, per sq cm.

***Limitations on Liability***

Section 1879(a) of the Act contains limitation on liability provisions for cases under Medicare Parts A and B. These provisions only apply when a determination is made that Medicare will not pay for an item or service

- because it was not reasonable and necessary for the diagnosis or treatment of illness or injury;
- because it was for custodial care;
- in home health cases, because the beneficiary was not confined to his or her home or did not need skilled care on an intermittent basis;
- in hospice services, because the beneficiary was not terminally ill or because the services were not reasonable and necessary for the palliation or management of terminal illness; or
- for one of a limited number of specific circumstances not relevant to this case.

Act §§ 1814(a)(7)(E), 1833(g)(5)(D), 1833(z), 1879(a)(1), 1879(e), 1879(g), 1879(i). In these circumstances, payment shall nevertheless be made for the items or services if the beneficiary, provider, or suppler "did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services." Act § 1879(a)(2). The regulations at 42 C.F.R. § 411.400 *et seq.*; HCFA Ruling 95-1; and chapter 30 Section 40 of the *Medicare Claims Processing Manual (MCPM)* provide the framework for determining if a beneficiary and provider or supplier's liability for a non-covered item or service is limited under Section 1879 of the Social Security Act.

Section 1870(b) of the Act provides for a waiver of recoupment for an overpayment in certain circumstances where a provider or supplier is "without fault." The Medicare Financial Management Manual (MFMM) instructs that a provider or supplier is "without fault" when the provider or supplier exercised reasonable care in billing for and accepting payment; meaning:

- The provider or supplier made full disclosure of all material facts; and
- On the basis of the information available, including but not limited to, the Medicare instructions and regulations, it has a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

Pursuant to § 1870 of the Act, a waiver requires Appellant to be without fault in regard to the overpayment. This means on the basis of the information available Appellant had a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

## FINDINGS OF FACT AND ANALYSIS

*Lower-Level Denial Reasons*

The QIC issued an unfavorable reconsideration decision, stating that the medical records reflect the Beneficiary has bilateral lower extremity ulcers for which the physician applied the amniotic membrane. However, the QIC found that Amnio Quad-Core amniotic membrane (Q4294) is experimental and investigational as denoted by the Q code status nomenclature. Under Medicare law, no payment can be made under Medicare for any expenses incurred for items or services that are considered investigational and are not considered reasonable and necessary. Since Amnio Quad-Core amniotic membrane (Q4294) is considered investigational and is not payable as per CMS, it was the QIC's determination that the Amnio Quad-Core amniotic membrane (Q4294) does not meet the medically reasonable and necessary requirements of Section 1862(a)(1)(A) of the Act. Therefore, payment was not allowed and the QIC found the overpayment valid. (File 2).

*Appellant Statements and Arguments*

The Appellant, in their written appeal request, contends that Amnio Quad-Core is not investigational or experimental. They argue that the QIC's determination that Q-code designation inherently signifies a product is investigational or experimental is inaccurate and procedurally flawed. Rather, Q-codes are used for products that do not yet have a CPT code or permanent national Level II HCPCS code, and Q-codes are routinely assigned to Medicare covered products and services. The Appellant states that a denial based solely on the presence of a Q-code reflects a misunderstanding of CMS's HCPCS coding system and lacks any support in statute, regulation, or CMS guidance and should not be used as a basis for denial. (File 1).

The Appellant also contends that the skin substitute was applied in accordance with LCD L35041, which allows skin substitute product usage for certain defined wound types such as diabetic foot ulcers and venous leg ulcers, includes the product category and/or type (such as an allograft), and does not expressly exclude the specific product at issue. Because the Appellant believes that the product was used in accordance with the coverage parameters outlined in an active LCD, they argue it cannot be considered investigational or experimental and should be entitled to Medicare coverage. (File 1).

At hearing, the Appellant reiterated their issues with the QIC's denial based on Amnio Quad-Core's Q code status. They contend that the claim at issue meets all requirements of LCD L35041 for usage of skin substitute products to treat venous leg ulcers and that, because usage of the category of product at issue for treatment of the Beneficiary's specific condition is allowed by the LCD, it cannot be considered investigational or experimental. The Appellant also testified that the product was used within the scope of an FDA Tissue Reference Group (TRG) letter and that there was nothing to suggest the product was intended for wound healing or inflammation reduction. Rather, the product was used as a wound covering and within manufacturer intent, meaning homologous use requirements were met. (File 11).

The Appellant also testified as to the medical necessity of the product for treatment of the Beneficiary and her specific condition. Specifically, the Beneficiary's venous leg ulcers had been present for 22 months on the date of service and, despite extensive conservative measures and best practice wound care, the wounds persisted. Due to failure to respond to conservative treatment, skin substitute grafts were considered reasonable and necessary as the next step in the Beneficiary's treatment. The Beneficiary's wounds responded well to the skin substitute treatments and she experienced an over 90% reduction in wound surface area and volume over the course of treatment. Based on this, the Appellant believes that the escalation to use of skin substitute products for treatment of the Beneficiary was justified. (File 11).

***ALJ Findings***

In determining whether the amniotic allograft products are reasonable and necessary for the beneficiaries, the ALJ looked first to whether it was regulated as an HCT/P or being used properly (e.g., a homologous use) as an HCT/P. For a product to be regulated as an HCT/P, it must meet specific regulatory requirements as established under section 361 of the of the PHS Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 351 of the PHS Act and the Food, Drug, & Cosmetic (FD&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public.

The four criteria are: (1) the HCT/P is minimally manipulated; (2) the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent; (3) the manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and (4) either: (i) the HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or (ii) the HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and: (a) is for autologous use; (b) is for allogeneic use in a first-degree or second-degree blood relative; or (c) is for reproductive use. 21 C.F.R. § 1271.10(a). Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor. 21 C.F.R. § 1271.3(c).

A letter was issued by the FDA's Tissue Reference Group (TRG) on September 2, 2022, indicating that Amnio Quad-Core Amniotic Membrane Sheets are registered as being regulated under section 361 of the PHS Act and the regulations in 21 C.F.R. § 1271. (File 4, pp. 142-143). The letter specifies that the product is only regulated this way when used in a homologous way. If the product is not used for a homologous purpose, it is not regulated under section 361 regardless of any letters issued by the TRG. Furthermore, this does not make Amnio Quad-Core an "FDA approved" product.

An FDA approval under Section 361 does not prove (or disprove) a treatment is safe and effective for Medicare purposes. *See* 21 C.F.R. § 1271. Also, the existence of a Level II HCPCS code (e.g., 4294) is not evidence that a product or service is safe and effective. Nor is it evidence

to the contrary.[2] HCPCS codes are not intended to embody legal presumptions in Medicare coverage decisions. *See* CMS Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures. Any argument regarding a HCPCS/Q code supporting safety and efficacy is non-probative and, thus, is immaterial for purposes of this appeal.

Appellant asserted that because Amnio Quad-Core is Section 361 registered, has been assigned a HCPCS code, and is not explicitly barred from coverage per an LCD, the product should not be classified as experimental or investigational for Medicare purposes.

Literature was provided by Appellant to try to satisfy the burden of proof that use of Amnio Quad-Core is not investigational or experimental when used for treatment of chronic ulcers, including venous leg ulcers and diabetic foot ulcers. (*See* File 4, pp. 67-139). However, none of the literature provides a large (n>30) scale, randomized clinical trial that proves the safety or efficacy of Amnio Quad-Core specifically. Rather, the literature is focused on other amniotic membrane products or on general medical-technological trends in the HCT/P wound care field. To the degree other products are reviewed, these products are generally propriety and distinct products that have a multitude of descriptions and uses and the ALJ cannot automatically equate one skin substitute or amniotic membrane product with another. Finally, and notably, the articles indicate that the HCT/P products are being used actively to engage in intracellular signaling and promote a cell or skin reaction to healing. Thus, the uses described in the literature are not merely wound cover uses and not homologous as to Amnio Quad-Core's FDA labeling. When used in this way, the product is exceeding a homologous use, which renders it outside the scope of the FDA label under Section 361.

Even if the ALJ accepts that Amnio Quad-Core was being used solely under Section 361 as a wound cover or barrier, there is minimal evidence in the record that shows the product is safe and effective for this purpose.[3] As stated above, the Appellant did not provide published, peer-reviewed literature to support the use of the specific product at issue, Amnio Quad-Core, or even biosimilar HCT/P products, for treatment of chronic wounds. The product may well be helping, or at a minimum harmless, but that is not the standard to prove safety and effectiveness for Medicare coverage purposes.

In summary, Amnio Quad-Core has not been shown to be regulated under section 361 of the PHS Act when used in the manner in which it was used in this case. Even if the product was assumed to be governed by section 361, it has not been shown to meet Medicare's standards for a treatment considered safe and effective for the purpose for which it was used in this case. This decision is based on Medicare regulations and statutes and makes no determination concerning the physician's decision to treat the beneficiaries with the products at issue. For Medicare purposes Amnio Quad-Core is investigational and experimental and not covered based on the specific record before me.

---

[2] The ALJ agrees with the Appellant's argument that the QIC's denial based on the assignment of a Q-code to the product at issue is neither supported by law nor established Medicare policy.

[3] The ALJ is focused solely on the Medicare context. The ALJ is not purporting to rule on FDA status and is only looking at FDA status or homologous use for purposes of the Medicare coverage analysis. Skin substitutes using placenta/amniotic products have some promise. New LCDs allowing coverage may eventually be published. The product, both individually and as a whole, also could benefit from further study in large, random clinical trials. But these hypotheticals are beyond the scope of this matter, and the record before me does not prove that Amnio Quad-Core is not investigational or experimental.

I find the product at issue, Amnio Quad-Core (Q4294), cannot be covered by Medicare in this instance. I also find the related application codes, shown by the CPT codes 15271 and 15272, are not covered, as they are services related to non-covered claims. *MBPM*, ch. 16, § 180.

*Medical Necessity*

Basic medical reasonable and necessary criteria is not entirely relevant in this decision, as the primary denial reason is the items/services being considered investigational/experimental, but the ALJ explores the topic briefly here.

The Beneficiary had a medical history including chronic bilateral lower extremity lymphedema, chronic venous insufficiency, hypertension, and multiple longstanding lower extremity ulcerations secondary to chronic venous insufficiency and lymphedema. (File 4, pp. 15-31). Wounds present on the date of service at issue included a left lateral venous leg ulcers present for two months, a right medial venous leg ulcers present for over six months, a right posterior venous leg ulcers present for over six months, and a right lateral venous leg ulcer present for over six months. (*Id.*) The Beneficiary's wounds had been treated with amniotic membrane allografts weekly since March 20, 2024. (*Id.* at 32-58). Conservative wound care measures attempted prior to amniotic membrane allograft application included surgical debridement, compression, use of a lymphedema pump, and use of standard wound dressings, cleaning, and topical medications. (*Id.* at 46-66).

On April 4, 2024, the Beneficiary underwent Amnio Quad-Core amniotic membrane allograft application on her leg ulcers. (File 4, pp. 15-31). The left lateral leg ulcer measured 2.5 x 6.0 x 0.1 cm with no evidence of infection. (*Id.* at 18). Two 2 x 3 cm grafts equal to 12 units were placed on the left lateral leg wound along with standard wound dressing and wraps. (*Id.* at 30-31). The right medial leg ulcer measured 2.0 x 1.5 x 0.1 cm with no evidence of infection. (*Id.* at 19). The right posterior leg ulcer measured 2.0 x 10.5 x 0.1 cm with no evidence of infection. (*Id.* at 20). One 4 x 6 cm grafts equal to 24 units was placed on the right posterior leg wound along with standard wound dressing and wraps. (*Id.* at 28-29). A small piece of Amnio Quad-Core equal to roughly 2 units was also placed on the right medial leg wound. (*Id.*) The right lateral leg ulcer measured 9.0 x 18.0 x 0.4 cm with no evidence of infection. (*Id.* at 21). Six 4 x 6 cm grafts equal to 144 units of Amnio Quad-Core were placed on the right lateral leg wound along with standard wound dressing and wraps. (*Id.* at 22-27).

Upon review of the medical records, several themes developed. First, the records support the presence of venous leg ulcers present for at least 3 months and unresponsive to appropriate, conservative wound care for at least 30 days. The testimony and records made clear that there was a good faith approach to use of the amniotic membrane allografts, and the clinicians felt the products could work on the wounds at issue. Second, while the amount of this expensive amniotic membrane graft product used caused some concern for the ALJ, LCD L35041 does not explicitly limit the amount of product that can be used on individual ulcers. Rather, it limits the number of treatments to 10 applications over a 12-week maximum period of care. In this instance, the application at issue was the third application and the third week of treatment. Finally, there is an instance in which a single allograft was divided between two of the Beneficiary's ulcers so that a small ulcer could be treated with two units of product. While this again raises some concern, this does not appear to be disallowed by the LCD. LCD L35041 allows for skin substitute treatments of ulcers as long as they are over 1.0 square centimeters in size and the small ulcer treated measured 3.0 square centimeters.

Based on the above, and despite the ALJ's general concerns over usage of this product over more reasonably priced wound coverings, LCD L35041 does not preclude usage of skin substitute products on the Beneficiary's venous leg ulcers. However, despite meeting LCD guidelines for general skin substitute treatment of venous leg ulcers, the specific product used, Amnio Quad-Core, is still found to be investigational or experimental for the reasons detailed above. Because Amnio Quad-Core is found to be investigational or experimental it cannot be considered medically reasonable and necessary and is not entitled to Medicare coverage.

***Liability***

The final issue before the ALJ is liability for the denied services at issue. Medicare coverage does not exist for the services at issue because the services are found to be investigational/experimental, and they are not found to be medically necessary for the beneficiary and date of service at issue. When items or services are found not to be reasonable and necessary under § 1862(a)(1)(A) of the Act, and therefore are not covered by Medicare, the limitation on liability provisions of § 1879 of the Act may apply if neither the beneficiary nor the provider had reason to know the services would not be covered.

The beneficiary whose Medicare claim was denied pursuant to § 1862(a)(1)(A) of the Act is not financially liable for the non-covered services because their liability is limited under § 1879 of the Act. Under the regulations, a beneficiary who receives a non-covered service is considered to have known that Medicare would not cover the service if written notice of non-coverage was furnished by any of the following entities: QIOs, fiscal intermediaries, carriers, utilization review committees, providers, suppliers, or the beneficiary's attending physician. *See* 42 C.F.R. § 411.406. In this instance, the record does not contain any evidence that the beneficiary received written notice of non-coverage, nor does the record contain any other evidence that the beneficiary was made aware of the fact that Medicare might not cover the services at issue. Therefore, the beneficiary is not financially liable for the non-covered services.

A provider who furnishes non-covered services is considered to have known that the services were not covered if the QIO, intermediary, or carrier had informed the supplier that the item furnished was not covered. *See* 42 C.F.R. § 411.406(b). However, the regulations also confer constructive knowledge of non-coverage to providers based on any of the following: (1) receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or QIOs, including notification of QIO screening criteria specific to the condition of the beneficiary for whom the furnished services are at issue and of medical procedures subject to preadmission review by a QIO; (2) Federal Register publications containing notice of national coverage decisions or of other specifications regarding non-coverage of an item or service; or (3) knowledge of what are considered acceptable standards of practice by the local medical community. *See* 42 C.F.R. § 411.406(e).

Under the *MFMM*, a provider, physician, or other supplier is "without fault" in causing an overpayment when the provider: (1) exercised reasonable care in billing for, and accepting, the payment; (2) made full disclosure of all material facts; and (3) had a reasonable basis for assuming that the payment was correct based of the information available to the provider, including, but not limited to, the Medicare instructions and regulations. CMS, *Medicare Financial Management Manual (MFMM) (Internet-Only Manual Publ'n 100-06)* ch. 3 § 90 (Feb. 2017).

The Appellant's liability may neither be limited under § 1879 of the Act nor waived under § 1870 of the Act. The Appellant had access to CMS notices and Federal Register

publications and had knowledge of what were considered accepted standards of medical practice on the date at issue. As such, the Appellant knew or should have known that the lack of directly applicable randomized clinical trials, the presence of an FDA Tissue Resource Group (TRG) letter or lack thereof, and the assignment of a billing code is not equivalent to full Medicare approval of an item or service. Relying on manufacturer materials, the mere assignment of a Q code, or relatively vague LCD is not enough. The Appellant should have known of the danger of an audit on these high-cost wound care products. The Appellant was trying to be careful in their employment of such products; but that also has to mean the Appellant knew the products used might be looked at by CMS or its contractors. Medicare often audits such claims. The ALJ cannot find the Appellant without fault on this record for overpayment purposes under § 1870 and the Appellant had too much knowledge to receive the liability limitation of § 1879. Accordingly, the Appellant remains liable for costs related to the non-covered services and recovery of the overpayment is not waived

## CONCLUSIONS OF LAW

The Amnio-Quad Core and related application services provided to the Beneficiary on the date of service at issue are not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the outstanding costs related to the non-covered services and the overpayment is not waived.

## ORDER

For the reasoning discussed above, this decision is **UNFAVORABLE**. The Appellant is liable for the outstanding costs related to the non-covered services and the overpayment is not waived. I direct the Medicare administrative contractor to process the claims in accordance with this decision.

**SO ORDERED**

Aaron Raff
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

**REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL**

| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
|---|---|
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |
|---|---|

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated________________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

________________________________________________

________________________________________________

________________________________________________

________________________________________________

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| | | | | | |
|---|---|---|---|---|---|
| DATE | | | DATE | | |
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | | | |
|---|---|---|---|
| Appeal of: | **CHRIS MCGEE MD PA** | OMHA Appeal No.: | **3-15466926933** |
| Beneficiary: | [redacted] | Medicare Part: | **B** |
| Medicare No.: | | Before: | **Aaron Raff**<br>Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| **Exhibit Record** | **Administrative File Reference** File Name | Page Range |
|---|---|---|
| Procedural - CMS Levels: Reconsideration | File 2 | 1 : 16 |
| Procedural - CMS Levels: Request for Reconsideration: w/evidence | File 4 | 1 : 143 |
| Procedural - CMS Levels: Redetermination Case File | File 5 | 1 : 748 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 1 | 1 : 21 |
| Procedural - OMHA Level: General: ROC 2 | File 10 | 1 : 1 |
| Procedural - OMHA Level: General: App Rep RNOH | File 12 | 1 : 4 |
| Procedural - OMHA Level: Signed Decision | File 13 | 1 : 15 |
| Procedural - OMHA Level: Notice of Decision | File 14 | 1 : 23 |
| Procedural - OMHA Level: Consolidated Notice of Hearing | File 6 | 1 : 9 |
| Procedural - OMHA Level: Report of contact: Bene concerns | File 8 | 1 : 1 |
| Procedural - OMHA Level: General: ROC 1 | File 9 | 1 : 1 |
| Proceeding (Audios): General: Hearing Audio | File 11 | 1 : 1 |

| **Non-Exhibit Record** | **Administrative File Reference** File Name | Page Range |
|---|---|---|
| Records not considered: QIC Acknowledgment Letter | File 3 | 1 : 3 |
| Records not considered: Transmittal cover sheet | File 7 | 1 : 1 |

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Kansas City Field Office
601 E. 12th Street
Suite 1753
Kansas City, MO 64106-2817
(816)-599-3300
(816) 599-3251 Sylvester (Direct)
Team Raff
(816) 527-0051 (Fax)
(844) 566-6258 (Toll Free)

February 20, 2026

ENGAGE HEALTH SOULTIONS
ATTN: WILLIAM OMALLEY
60 PUBLIC SQUARE
STE 602
WILKES-BARRE, PA 18701

## NOTICE OF DECISION

Appellant: CHRIS MCGEE MD PA
OMHA Appeal Number: 3-15466927231

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

### What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**<u>How much time do I have to file an appeal?</u>**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**<u>How do I file an appeal?</u>**

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **<u>Please do not submit your request for review using more than one method</u>**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare

Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

C2C Innovative Solutions, Inc.
Part B South C2C
301 W Bay Street, Ste. 1110
Jacksonville, FL 32231-4006

CHRIS MCGEE MD PA
PO BOX 1628
DECATUR, TX 76234

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | | | |
|---|---|---|---|
| Appeal of: | **CHRIS MCGEE MD PA** | OMHA Appeal No.: | **3-15466927231** |
| Beneficiary: | [redacted] | Medicare Part: | B |
| Medicare No.: | | Before: | **Aaron Raff**<br>Administrative Law Judge |

## DECISION

After careful consideration of the evidence and arguments contained in the administrative record and presented at the hearing, I enter an **UNFAVORABLE** decision. The Amnio-Quad Core and related application codes supplied and billed by Chris McGee MD PA (Appellant) to the Beneficiary on the date of service at issue (April 17, 2024) are not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the non-covered services and recovery of the overpayment is not waived.

## PROCEDURAL HISTORY

The Appellant submitted a claim for the services to Novitas Solutions, Inc., the Medicare Administrative Contractor (MAC) with jurisdiction, who initially paid the claim in full. However, it was later determined that an overpayment occurred. (File 5). Upon notice of the overpayment, the Appellant requested redetermination, and the MAC issued unfavorable redetermination decision. (File 4). The Appellant was held liable for all outstanding costs and overpayments related to the denied claim. The Appellant then requested reconsideration from C2C Innovative Solutions, Inc., the Qualified Independent Contractor (QIC). The QIC issued an unfavorable reconsideration decision denying coverage for the claim and determining that the overpayment was valid. (File 2). The Appellant/Provider was held liable for all charges related to the denied claims and was found at fault in causing the overpayment.

On October 30, 2025, the Office of Medicare Hearings and Appeals (OMHA) received the Appellant's request for an Administrative Law Judge (ALJ) hearing. (File 1). An ALJ hearing was held on January 7, 2026. Appearing at hearing on behalf of the Appellant was representative William O'Malley. The Beneficiary was notified of the hearing but did not respond or appear. The appearing witness was sworn in prior to providing testimony. All of the indexed files in the administrative record are admitted to the record with the exception of duplicates and non-probative items which are kept in place for identification purposes. The administrative record is now closed.

## ISSUES

The issues brought before this ALJ include all the issues for the claims or appealed matters specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's (not including CMS's) favor. 42 C.F.R. § 405.1032. The ALJ may consider a new issue provided he or she notifies all of the parties about the new issue. § 405.1032(b). The new issue may include issues resulting from the participation of CMS at the ALJ level of adjudication and from any evidence and position papers submitted by CMS for the first time to the ALJ. *Id.*

The following are specifically at issue in this appeal:

I. Were all Medicare coverage and payment requirements met for the Amnio Quad-Core skin substitute product and related application codes at issue warranting payment under Title XVIII of the Social Security Act (Act)?

II. Are the limitations on liability provisions of section 1879 of the Act or the waiver of overpayment provisions under section 1870 of the Act applicable?

## APPLICABLE LAW AND POLICY

Part B of Title XVIII of the Social Security Act (Act), the Supplementary Medical Insurance program, provides coverage for a variety of medical services and supplies, including the durable medical equipment at issue, furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of other specific health-related items and services. Notwithstanding any other provision of the Act, no payment may be made under part A or part B for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A).

Section 1833(e) of the Act states that "[n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." The provider is responsible for providing sufficient documentation to support that payment is due and the services were medically necessary and provided as billed. 42 C.F.R. §424.5(a)(6).

The appellant has the burden of proof by a preponderance of the evidence. 5 U.S.C. § 556(d); *see generally Steadman v. SEC,* 450 U.S. 91, 98-102 (1981). This means that the evidence contained in the record must establish that it is more likely than not that the appellant's position is factually and legally correct. Therefore, the appellant must furnish sufficient evidence to support the claim. *See* Act §§ 1814(a)(1), 1815(a), 1833(e); 42 C.F.R. §§ 424.5(a)(6), 424.11, 424.22(c). If the appellant does not meet the burden of proof, the case must be decided unfavorably to the appellant.

Although not subject to the force and effect of law, the Centers for Medicare & Medicaid Services (CMS) and its contractors have issued policy guidelines and Local Coverage Determinations (LCDs) describing coverage criteria for selected types of items and services. Pursuant to 42 C.F.R. § 405.1062(a), an ALJ is not bound by an LCD, but will give substantial deference to an LCD if it is applicable to a particular case. However, section 1871(a)(2) of the Act provides that no rule, requirement or statement of policy, other than a National Coverage

Determination (NCD), can establish or change a substantive legal standard governing the scope of the benefits or payment for services under the Medicare program unless promulgated as a regulation by CMS.

*Reasonable and Necessary Criteria*

Per the Medicare Program Integrity Manual, CMS issues NCDs that specify whether certain items, services, procedures or technologies are reasonable and necessary under §1862(a)(1)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no LCD exists for a particular item or service, the MACs, CERT, Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
  - o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
  - o Furnished in a setting appropriate to the beneficiary's medical needs and condition;
  - o Ordered and furnished by qualified personnel; and,
  - o One that meets, but does not exceed, the beneficiary's medical need.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury in order to be considered for payment. The exceptions appear in the full text of §1862(a)(l)(A) of the Act. CMS, Medicare Program Integrity Manual *(MPIM) (Internet-Only Manual Pub. 100-08)* ch. 3, § 3.6.2.2. *See also MPIM,* ch. 13, § 13.5.1.

Regarding approved use of drugs, the Medicare Benefit Policy Manual states that drugs or biologicals approved for marketing by the Food and Drug Administration (FDA) are considered safe and effective for purposes of this requirement when used for indications specified on the labeling. As such, the program may pay for the use of an FDA approved drug or biological if it was injected on or after the date of the FDA's approval; it is reasonable and necessary for the individual's patient; and all other applicable coverage requirements are met. The carrier, DMERC, or intermediary will deny coverage for drugs and biologicals which have not received final marketing approval by the FDA unless it receives instructions from CMS to the contrary. If there is reason to question whether the FDA has approved a drug or biological for marketing, the carrier or intermediary must obtain satisfactory evidence of FDA's approval. CMS, Medicare Benefit Policy Manual *(MBPM) (Internet-Only Manual Pub. 100-02)* ch. 15, § 50.4.1.

*Related Services*

Services related to non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services not related to non-covered services can be covered under Medicare. However, any subsequent services that are expected to be incorporated into a global fee are not covered. *MBPM*, ch. 16, § 180.

*Human Cellular and Tissue Based Products (HCT/Ps)*

For a product to be regulated as a human cells, tissues, and cellular and tissue-based product (HCT/P), it must meet specific regulatory requirements as established under section 361 of the of the Public Health Service (PHS) Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 361 of the PHS Act and the Food, Drug, and Cosmetic (FC&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public. The four criteria are:

> (1) The HCT/P is minimally manipulated;
> (2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
> (3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
> (4) Either:
>> (i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
>> (ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
>>> (a) Is for autologous use;
>>> (b) Is for allogeneic use in a first-degree or second-degree blood relative; or
>>> (c) Is for reproductive use.

21 C.F.R. § 1271.10(a).

Homologous use is defined as "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor." 21 C.F.R. § 1271.3(c). HCT/Ps are defined as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." 21 C.F.R. § 1271.3(d).

*Local Coverage Determinations*

Local Coverage Determinations (LCD) LCD L35041 is relevant to this appeal.[1] This LCD provides, in part:

Medicare covers application of skin substitutes to Ulcers or Wounds with Failed Response that are:

- Partial- or full-thickness ulcers, not involving tendon, muscle, joint capsule or exhibiting exposed bone or sinus tracts, with a clean granular base;
- Skin deficit at least 1.0 square centimeter (cm) in size;
- Clean and free of necrotic debris or exudate;
- Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index [ABI] of no less than 0.60, toe pressure greater than 30 millimeters of mercury [mmHg]);
- For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.

Wound healing is impaired by the systemic use of tobacco. Therefore, ideally patients who have smoked will have ceased smoking or have refrained from systemic tobacco intake for at least 4 weeks during conservative wound care and prior to planned bioengineered skin replacement therapy.

Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed. Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented. Documentation of smoking cessation counseling and cessation measures prescribed, if applicable, must also be documented in the patient's record.

Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:

- Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.

---

[1] Novitas Solutions, Inc., the MAC with jurisdiction in this instance, had published a revised version of LCD L35041, titled *Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Ulcers (LCD L35041)*, which was scheduled to go into effect on January 1, 2026. While this LCD was not effective on the date of service, and is therefore only persuasive authority, it was helpful to illustrate the availability of published, peer-reviewed literature supporting the use of various, specific skin substitute grafts for use in chronic ulcers. However, on December 24, 2025, prior to the revised LCD going into effect, CMS' MACs withdrew the LCD in favor of modifying the payment and fee schedule for skin substitute graft services. *See* https://www.cms.gov/newsroom/fact-sheets/upcoming-update-final-local-coverage-determinations-lcds-certain-skin-substitutes.

- Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.
- Presence of a full thickness skin loss ulcer that is the result of abscess, injury or trauma that has failed to respond to appropriate control of infection, foreign body, tumor resection, or other disease process for a period of 4 weeks or longer.

Novitas Solutions, Inc, Local Coverage Determination L35041: Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Health Wounds (LCD L35041) (Eff. 09/26/2019).

LCD L35041 provides the following limitations to coverage of bioengineered skin substitutes:

> The following are considered not reasonable and necessary and therefore will be denied:
>
> - Partial thickness loss with the retention of epithelial appendages is not a candidate for grafting or replacement, as epithelium will repopulate the deficit from the appendages, negating the benefit of overgrafting.
> - Skin substitute grafts will be allowed for the episode of wound care in compliance with FDA guidelines for the specific product (see utilization guidelines) not to exceed 10 applications or treatments. In situations where more than one specific product is used, it is expected that the number of applications or treatments will still not exceed 10.
> - Simultaneous use of more than one product for the episode of wound is not covered. Product change within the episode of wound is allowed, not to exceed the 10 application limit per wound per 12 week period of care.
> - Treatment of any chronic skin wound will typically last no more than twelve (12) weeks.
> - Repeat or alternative applications of skin substitute grafts are not considered medically reasonable and necessary when a previous full course of applications was unsuccessful. Unsuccessful treatment is defined as increase in size or depth of an ulcer or no change in baseline size or depth and no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing) for a period of 4 weeks past start of therapy.
> - Retreatment of healed ulcers, those showing greater than 75% size reduction and smaller than 0.5 square cm, is not considered medically reasonable and necessary.
> - Skin substitute grafts are contraindicated and are not considered reasonable and necessary in patients with inadequate control of underlying conditions or exacerbating factors (e.g., uncontrolled diabetes, active infection, and active Charcot arthropathy of the ulcer extremity, vasculitis or continued tobacco smoking without physician attempt to affect smoking cessation).
> - Skin substitute grafts are contraindicated in patients with known hypersensitivity to any component of the specific skin substitute graft (e.g., allergy to avian, bovine, porcine, equine products).
> - Repeat use of surgical preparation services in conjunction with skin substitute application codes will be considered not reasonable and necessary. It is expected that each wound will require the use of

appropriate wound preparation code at least once at initiation of care prior to placement of the skin substitute graft.

- Re-treatment within one (1) year of any given course of skin substitute treatment for a venous stasis ulcer or (diabetic) neuropathic foot ulcer is considered treatment failure and does not meet reasonable and necessary criteria for re-treatment of that ulcer with a skin substitute procedure.

LCD L35041.

***Individual HCPCS and CPT Code Descriptions***

At issue in this appeal are services billed using the CPT and HCPCS codes listed below which are followed by their individual descriptions as detailed in the HCPCS and CPT Codebook applicable on the date of service at issue:

- **15271**: Application of skin substitute graft to trunk, arms, legs, total wound surface area up to 100 sq cm; first 25 sq cm or less wound surface area.
- **Q4294**: Amnio Quad-Core, per sq cm.

***Limitations on Liability***

Section 1879(a) of the Act contains limitation on liability provisions for cases under Medicare Parts A and B. These provisions only apply when a determination is made that Medicare will not pay for an item or service

- because it was not reasonable and necessary for the diagnosis or treatment of illness or injury;
- because it was for custodial care;
- in home health cases, because the beneficiary was not confined to his or her home or did not need skilled care on an intermittent basis;
- in hospice services, because the beneficiary was not terminally ill or because the services were not reasonable and necessary for the palliation or management of terminal illness; or
- for one of a limited number of specific circumstances not relevant to this case.

Act §§ 1814(a)(7)(E), 1833(g)(5)(D), 1833(z), 1879(a)(1), 1879(e), 1879(g), 1879(i). In these circumstances, payment shall nevertheless be made for the items or services if the beneficiary, provider, or suppler "did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services." Act § 1879(a)(2). The regulations at 42 C.F.R. § 411.400 *et seq.*; HCFA Ruling 95-1; and chapter 30 Section 40 of the *Medicare Claims Processing Manual (MCPM)* provide the framework for determining if a beneficiary and provider or supplier's liability for a non-covered item or service is limited under Section 1879 of the Social Security Act.

Section 1870(b) of the Act provides for a waiver of recoupment for an overpayment in certain circumstances where a provider or supplier is "without fault." The Medicare Financial Management Manual (MFMM) instructs that a provider or supplier is "without fault" when the provider or supplier exercised reasonable care in billing for and accepting payment; meaning:

- The provider or supplier made full disclosure of all material facts; and

- On the basis of the information available, including but not limited to, the Medicare instructions and regulations, it has a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

Pursuant to § 1870 of the Act, a waiver requires Appellant to be without fault in regard to the overpayment. This means on the basis of the information available Appellant had a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

## FINDINGS OF FACT AND ANALYSIS

### *Lower-Level Denial Reasons*

The QIC issued an unfavorable reconsideration decision, stating that the medical records reflect the Beneficiary has bilateral lower extremity ulcers for which the physician applied the amniotic membrane. However, the QIC found that Amnio Quad-Core amniotic membrane (Q4294) is experimental and investigational as denoted by the Q code status nomenclature. Under Medicare law, no payment can be made under Medicare for any expenses incurred for items or services that are considered investigational and are not considered reasonable and necessary. Since Amnio Quad-Core amniotic membrane (Q4294) is considered investigational and is not payable as per CMS, it was the QIC's determination that the Amnio Quad-Core amniotic membrane (Q4294) does not meet the medically reasonable and necessary requirements of Section 1862(a)(1)(A) of the Act. Therefore, payment was not allowed and the QIC found the overpayment valid. (File 2).

### *Appellant Statements and Arguments*

The Appellant, in their written appeal request, contends that Amnio Quad-Core is not investigational or experimental. They argue that the QIC's determination that Q-code designation inherently signifies a product is investigational or experimental is inaccurate and procedurally flawed. Rather, Q-codes are used for products that do not yet have a CPT code or permanent national Level II HCPCS code, and Q-codes are routinely assigned to Medicare covered products and services. The Appellant states that a denial based solely on the presence of a Q-code reflects a misunderstanding of CMS's HCPCS coding system and lacks any support in statute, regulation, or CMS guidance and should not be used as a basis for denial. (File 1).

The Appellant also contends that the skin substitute was applied in accordance with LCD L35041, which allows skin substitute product usage for certain defined wound types such as diabetic foot ulcers and venous leg ulcers, includes the product category and/or type (such as an allograft), and does not expressly exclude the specific product at issue. Because the Appellant believes that the product was used in accordance with the coverage parameters outlined in an active LCD, they argue it cannot be considered investigational or experimental and should be entitled to Medicare coverage. (File 1).

At hearing, the Appellant reiterated their issues with the QIC's denial based on Amnio Quad-Core's Q code status. They contend that the claim at issue meets all requirements of LCD L35041 for usage of skin substitute products to treat venous leg ulcers and that, because usage of the category of product at issue for treatment of the Beneficiary's specific condition is allowed by the LCD, it cannot be considered investigational or experimental. The Appellant also testified that the product was used within the scope of an FDA Tissue Reference Group (TRG) letter and that there was nothing to suggest the product was intended for wound healing or inflammation reduction. Rather, the product was used as a wound covering and within manufacturer intent, meaning homologous use requirements were met. (File 4).

The Appellant also testified as to the medical necessity of the product for treatment of the Beneficiary and her specific condition. Specifically, the Beneficiary's venous leg ulcers had been present for 22 months on the date of service and, despite extensive conservative measures and best practice wound care, the wounds persisted. Due to failure to respond to conservative treatment, skin substitute grafts were considered reasonable and necessary as the next step in the Beneficiary's treatment. The Beneficiary's wounds responded well to the skin substitute treatments and she experienced an over 90% reduction in wound surface area and volume over the course of treatment. Based on this, the Appellant believes that the escalation to use of skin substitute products for treatment of the Beneficiary was justified. (File 4).

***ALJ Findings***

In determining whether the amniotic allograft products are reasonable and necessary for the beneficiaries, the ALJ looked first to whether it was regulated as an HCT/P or being used properly (e.g., a homologous use) as an HCT/P. For a product to be regulated as an HCT/P, it must meet specific regulatory requirements as established under section 361 of the of the PHS Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 351 of the PHS Act and the Food, Drug, & Cosmetic (FD&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public.

The four criteria are: (1) the HCT/P is minimally manipulated; (2) the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent; (3) the manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and (4) either: (i) the HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or (ii) the HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and: (a) is for autologous use; (b) is for allogeneic use in a first-degree or second-degree blood relative; or (c) is for reproductive use. 21 C.F.R. § 1271.10(a). Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor. 21 C.F.R. § 1271.3(c).

A letter was issued by the FDA's Tissue Reference Group (TRG) on September 2, 2022, indicating that Amnio Quad-Core Amniotic Membrane Sheets are registered as being regulated under section 361 of the PHS Act and the regulations in 21 C.F.R. § 1271. (File 4, pp. 142-143). The letter specifies that the product is only regulated this way when used in a homologous way. If the product is not used for a homologous purpose, it is not regulated under section 361 regardless of any letters issued by the TRG. Furthermore, this does not make Amnio Quad-Core an "FDA approved" product.

An FDA approval under Section 361 does not prove (or disprove) a treatment is safe and effective for Medicare purposes. *See* 21 C.F.R. § 1271. Also, the existence of a Level II HCPCS code (e.g., 4294) is not evidence that a product or service is safe and effective. Nor is it evidence

to the contrary.[2] HCPCS codes are not intended to embody legal presumptions in Medicare coverage decisions. *See* CMS Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures. Any argument regarding a HCPCS/Q code supporting safety and efficacy is non-probative and, thus, is immaterial for purposes of this appeal.

Appellant asserted that because Amnio Quad-Core is Section 361 registered, has been assigned a HCPCS code, and is not explicitly barred from coverage per an LCD, the product should not be classified as experimental or investigational for Medicare purposes.

Literature was provided by Appellant to try to satisfy the burden of proof that use of Amnio Quad-Core is not investigational or experimental when used for treatment of chronic ulcers, including venous leg ulcers and diabetic foot ulcers. (*See* File 4, pp. 67-139). However, none of the literature provides a large (n>30) scale, randomized clinical trial that proves the safety or efficacy of Amnio Quad-Core specifically. Rather, the literature is focused on other amniotic membrane products or on general medical-technological trends in the HCT/P wound care field. To the degree other products are reviewed, these products are generally propriety and distinct products that have a multitude of descriptions and uses and the ALJ cannot automatically equate one skin substitute or amniotic membrane product with another. Finally, and notably, the articles indicate that the HCT/P products are being used actively to engage in intracellular signaling and promote a cell or skin reaction to healing. Thus, the uses described in the literature are not merely wound cover uses and not homologous as to Amnio Quad-Core's FDA labeling. When used in this way, the product is exceeding a homologous use, which renders it outside the scope of the FDA label under Section 361.

Even if the ALJ accepts that Amnio Quad-Core was being used solely under Section 361 as a wound cover or barrier, there is minimal evidence in the record that shows the product is safe and effective for this purpose.[3] As stated above, the Appellant did not provide published, peer-reviewed literature to support the use of the specific product at issue, Amnio Quad-Core, or even biosimilar HCT/P products, for treatment of chronic wounds. The product may well be helping, or at a minimum harmless, but that is not the standard to prove safety and effectiveness for Medicare coverage purposes.

In summary, Amnio Quad-Core has not been shown to be regulated under section 361 of the PHS Act when used in the manner in which it was used in this case. Even if the product was assumed to be governed by section 361, it has not been shown to meet Medicare's standards for a treatment considered safe and effective for the purpose for which it was used in this case. This decision is based on Medicare regulations and statutes and makes no determination concerning the physician's decision to treat the beneficiaries with the products at issue. For Medicare purposes Amnio Quad-Core is investigational and experimental and not covered based on the specific record before me.

---

[2] The ALJ agrees with the Appellant's argument that the QIC's denial based on the assignment of a Q-code to the product at issue is neither supported by law nor established Medicare policy.

[3] The ALJ is focused solely on the Medicare context. The ALJ is not purporting to rule on FDA status and is only looking at FDA status or homologous use for purposes of the Medicare coverage analysis. Skin substitutes using placenta/amniotic products have some promise. New LCDs allowing coverage may eventually be published. The product, both individually and as a whole, also could benefit from further study in large, random clinical trials. But these hypotheticals are beyond the scope of this matter, and the record before me does not prove that Amnio Quad-Core is not investigational or experimental.

I find the product at issue, Amnio Quad-Core (Q4294), cannot be covered by Medicare in this instance. I also find the related application code, shown by the CPT codes 15271, is not covered, as it is a service related to a non-covered claim. *MBPM*, ch. 16, § 180.

*Medical Necessity*

Basic medical reasonable and necessary criteria is not entirely relevant in this decision, as the primary denial reason is the items/services being considered investigational/experimental, but the ALJ explores the topic briefly here.

The Beneficiary had a medical history including chronic venous leg ulcers, chronic diabetic foot ulcers, severe atherosclerotic disease, peripheral artery disease, hepatomegaly with steatosis, chronic venous insufficiency, peripheral vascular disease, lymphedema, and diabetes mellitus type 2. (File 4, pp. 41-50). She suffered from longstanding chronic ulcerations of the lower extremities including both diabetic foot ulcers and venous leg ulcers. (*Id.* 15-40). As of March 20, 2024, she had a right lateral diabetic foot ulcer measuring 1.0 x 0.8 x 0.1 cm present for over six months, a right lateral venous leg ulcers measuring 0.3 x 0.2 x 0.1 cm present for over six months, and a left leg venous leg ulcers measuring 0.6 x 0.5 x 0.1 cm present for over six months. (*Id.* at 34-36). Conservative measures attempted to treat these wounds included compression, off-loading, proper nutritional, diabetes management, debridement as needed, use of protective ointment and polymem foam, and weekly cleaning and dressing changes. (*Id.*) On March 20, 2024, it was determined that the Beneficiary would benefit from use of amniotic tissue allografts. (*Id.* 33).

On April 17, 2024, the Beneficiary underwent Amnio Quad-Core amniotic membrane allograft application on her leg ulcers after previous receiving such treatment on April 10, 2024. (File 4, pp. 15-31). On April 17, 2024, her right lateral venous leg ulcer measured 1.0 x 1.0 x 0.1 cm and was considered improving with no signs of infection. (*Id.* at 16).[4] The right anterior venous leg ulcer measured 1.7 x 1.5 x 0.1 cm and was considered improving with no signs of infection. (*Id.* at 17). The right lateral ankle ulcer measured 2.5 x 4.0 x 0.1 cm and was considered deteriorating but free from infection. (*Id.* at 18). One 2 x 3 cm graft equal to 6 units and 2.5 units of a separate 2 x 3 cm graft were applied to the right lateral ankle ulcer. (*Id.* at 19). The remaining 3.5 units of the divided 2 x 3 cm graft were applied to the right lateral and right anterior venous leg ulcers. (*Id.* at 20).

Upon review of the medical records, several themes developed. First, the records support the presence of diabetic or venous leg ulcers present for at least 6 months and unresponsive to appropriate, conservative wound care for at least 30 days. The testimony and records made clear that there was a good faith approach to use of the amniotic membrane allografts, and the clinicians felt the products could work on the wounds at issue. Second, while the amount of this expensive amniotic membrane graft product used caused some concern for the ALJ, LCD L35041 does not explicitly limit the amount of product that can be used on individual ulcers. Rather, it limits the number of treatments to 10 applications over a 12-week maximum period of care. In this instance, the application(s) at issue come close but do not exceed the LCD number limit. Some of the ulcers were relatively small too, but met the LCD minimum size requirement. See, LCD L35041.

[4] The 1 x 1 x 0.1 ulcer is just barely large enough to satisfy the LCD, which requires an ulcer to be 1.0 square cm or larger for treatment with skin substitute products.

Based on the above, and despite the ALJ's general concerns over usage of this product over more reasonably priced wound coverings, LCD L35041 does not preclude usage of skin substitute products on the Beneficiary's venous leg ulcers. However, despite meeting LCD guidelines for general skin substitute treatment of venous leg ulcers, the specific product used, Amnio Quad-Core, is still found to be investigational or experimental for the reasons detailed above. Because Amnio Quad-Core is found to be investigational or experimental it cannot be considered medically reasonable and necessary and is not entitled to Medicare coverage.

***Liability***

The final issue before the ALJ is liability for the denied services at issue. Medicare coverage does not exist for the services at issue because the services are found to be investigational/experimental, and they are not found to be medically necessary for the beneficiaries and dates of service at issue. When items or services are found not to be reasonable and necessary under § 1862(a)(1)(A) of the Act, and therefore are not covered by Medicare, the limitation on liability provisions of § 1879 of the Act may apply if neither the beneficiary nor the provider had reason to know the services would not be covered.

The beneficiary whose Medicare claim was denied pursuant to § 1862(a)(1)(A) of the Act is not financially liable for the non-covered services because their liability is limited under § 1879 of the Act. Under the regulations, a beneficiary who receives a non-covered service is considered to have known that Medicare would not cover the service if written notice of non-coverage was furnished by any of the following entities: QIOs, fiscal intermediaries, carriers, utilization review committees, providers, suppliers, or the beneficiary's attending physician. *See* 42 C.F.R. § 411.406. In this instance, the record does not contain any evidence that the beneficiary received written notice of non-coverage, nor does the record contain any other evidence that the beneficiary was made aware of the fact that Medicare might not cover the services at issue. Therefore, the beneficiary is not financially liable for the non-covered services.

A provider who furnishes non-covered services is considered to have known that the services were not covered if the QIO, intermediary, or carrier had informed the supplier that the item furnished was not covered. *See* 42 C.F.R. § 411.406(b). However, the regulations also confer constructive knowledge of non-coverage to providers based on any of the following: (1) receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or QIOs, including notification of QIO screening criteria specific to the condition of the beneficiary for whom the furnished services are at issue and of medical procedures subject to preadmission review by a QIO; (2) Federal Register publications containing notice of national coverage decisions or of other specifications regarding non-coverage of an item or service; or (3) knowledge of what are considered acceptable standards of practice by the local medical community. *See* 42 C.F.R. § 411.406(e).

Under the *MFMM*, a provider, physician, or other supplier is "without fault" in causing an overpayment when the provider: (1) exercised reasonable care in billing for, and accepting, the payment; (2) made full disclosure of all material facts; and (3) had a reasonable basis for assuming that the payment was correct based of the information available to the provider, including, but not limited to, the Medicare instructions and regulations. CMS, *Medicare Financial Management Manual (MFMM) (Internet-Only Manual Publ'n 100-06)* ch. 3 § 90 (Feb. 2017).

The Appellant's liability may neither be limited under § 1879 of the Act nor waived under § 1870 of the Act. The Appellant had access to CMS notices and Federal Register

publications and had knowledge of what were considered accepted standards of medical practice on the date at issue. As such, the Appellant knew or should have known that the lack of directly applicable randomized clinical trials, the presence of an FDA Tissue Resource Group (TRG) letter or lack thereof, and the assignment of a billing code is not equivalent to full Medicare approval of an item or service. Relying on manufacturer materials, the mere assignment of a Q code, or relatively vague LCD is not enough. The Appellant should have known of the danger of an audit on these high-cost wound care products. The Appellant was trying to be careful in their employment of such products; but that also has to mean the Appellant knew the products used might be looked at by CMS or its contractors. Medicare often audits such claims. The ALJ cannot find the Appellant without fault on this record for overpayment purposes under § 1870 and the Appellant had too much knowledge to receive the liability limitation of § 1879. Accordingly, the Appellant remains liable for costs related to the non-covered services and recovery of the overpayment is not waived

## CONCLUSIONS OF LAW

The Amnio-Quad Core and related application services provided to the Beneficiary on the date of service at issue are not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the outstanding costs related to the non-covered services and the overpayment is not waived.

## ORDER

For the reasoning discussed above, this decision is **UNFAVORABLE**. The Appellant is liable for the outstanding costs related to the non-covered services and the overpayment is not waived. I direct the Medicare administrative contractor to process the claims in accordance with this decision.

**SO ORDERED**

Aaron Raff
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

## REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL

| | |
|---|---|
| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| | |
|---|---|
| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated____________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

________________________________________

________________________________________

________________________________________

________________________________________

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| | | | | | |
|---|---|---|---|---|---|
| DATE | | | DATE | | |
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

Department of Health and Human Services
OFFICE OF MEDICARE HEARINGS AND APPEALS
Kansas City, MO

| | |
|---|---|
| Appeal of: **CHRIS MCGEE MD PA** | OMHA Appeal No.: **3-15466927231** |
| Beneficiary: [redacted] | Medicare Part: **B** |
| Medicare No.: | Before: **Aaron Raff** Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| **Exhibit Record** | **Administrative File Reference** File Name | Page Range | |
|---|---|---|---|
| Procedural - CMS Levels: Reconsideration | File 2 | 1 | 16 |
| Procedural - CMS Levels: Redetermination Case File | File 3 | 1 | 732 |
| Procedural - CMS Levels: Request for Reconsideration | File 4 | 1 | 50 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 1 | 1 | 21 |
| Procedural - OMHA Level: General: App Rep RNOH | File 11 | 1 | 4 |
| Procedural - OMHA Level: Signed Decision | File 12 | 1 | 15 |
| Procedural - OMHA Level: Notice of Decision | File 13 | 1 | 23 |
| Procedural - OMHA Level: Consolidated Notice of Hearing | File 7 | 1 | 9 |
| Procedural - OMHA Level: General: ROC 1 | File 8 | 1 | 1 |
| Procedural - OMHA Level: General: ROC 2 | File 9 | 1 | 1 |
| Proceeding (Audios): General: Hearing Audio | File 10 | 1 | 1 |

| **Non-Exhibit Record** | **Administrative File Reference** File Name | Page Range | |
|---|---|---|---|
| Records not considered: QIC Acknowledgment | File 5 | 1 | 3 |
| Records not considered: Transmittal Cover Sheet | File 6 | 1 | 1 |

OMHA-156
Dated: 2026-02-19

Department of Health and Human Services
Office of the Secretary

**OFFICE OF MEDICARE HEARINGS AND APPEALS**

Kansas City Field Office
601 E. 12th Street
Suite 1753
Kansas City, MO 64106-2817
(816)-599-3300
(816) 599-3251 Sylvester (Direct)
Team Raff
(816) 527-0051 (Fax)
(844) 566-6258 (Toll Free)

February 20, 2026

ENGAGE HEALTH SOULTIONS
ATTN: WILLIAM OMALLEY
60 PUBLIC SQUARE
STE 602
WILKES-BARRE, PA 18701

## NOTICE OF DECISION

Appellant: CHRIS MCGEE MD PA
OMHA Appeal Number: 3-15466927291

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

### What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

## How much time do I have to file an appeal?

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

## How do I file an appeal?

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **Please do not submit your request for review using more than one method**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**<u>How will the Medicare Appeals Council respond to my appeal?</u>**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**<u>Questions?</u>**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare

Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

C2C Innovative Solutions, Inc.
Part B South C2C
301 W Bay Street, Ste. 1110
Jacksonville, FL 32231-4006

CHRIS MCGEE MD PA
PO BOX 1628
DECATUR, TX 76234

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | | | |
|---|---|---|---|
| Appeal of: | **CHRIS MCGEE MD PA** | OMHA Appeal No.: | **3-15466927291** |
| Beneficiary: | [redacted] | Medicare Part: | B |
| Medicare No.: | | Before: | **Aaron Raff**<br>Administrative Law Judge |

## DECISION

After careful consideration of the evidence and arguments contained in the administrative record and presented at the hearing, I enter an **UNFAVORABLE** decision. The Amnio-Quad Core and related application codes supplied and billed by Chris McGee MD PA (Appellant) to the Beneficiary on the date of service at issue (May 22, 2024) are not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the non-covered services and recovery of the overpayment is not waived.

## PROCEDURAL HISTORY

The Appellant submitted a claim for the services to Novitas Solutions, Inc., the Medicare Administrative Contractor (MAC) with jurisdiction, who initially paid the claim in full. However, it was later determined that an overpayment occurred. (File 4). Upon notice of the overpayment, the Appellant requested redetermination, and the MAC issued unfavorable redetermination decision. (File 3). The Appellant was held liable for all outstanding costs and overpayments related to the denied claim. The Appellant then requested reconsideration from C2C Innovative Solutions, Inc., the Qualified Independent Contractor (QIC). The QIC issued an unfavorable reconsideration decision denying coverage for the claim and determining that the overpayment was valid. (File 2). The Appellant/Provider was held liable for all charges related to the denied claims and was found at fault in causing the overpayment.

On October 30, 2025, the Office of Medicare Hearings and Appeals (OMHA) received the Appellant's request for an Administrative Law Judge (ALJ) hearing. (File 1). An ALJ hearing was held on January 7, 2026. Appearing at hearing on behalf of the Appellant was representative William O'Malley. The Beneficiary was notified of the hearing but did not respond or appear. The appearing witness was sworn in prior to providing testimony. All of the indexed files in the administrative record are admitted to the record with the exception of duplicates and non-probative items which are kept in place for identification purposes. The administrative record is now closed.

## ISSUES

The issues brought before this ALJ include all the issues for the claims or appealed matters specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's (not including CMS's) favor. 42 C.F.R. § 405.1032. The ALJ may consider a new issue provided he or she notifies all of the parties about the new issue. § 405.1032(b). The new issue may include issues resulting from the participation of CMS at the ALJ level of adjudication and from any evidence and position papers submitted by CMS for the first time to the ALJ. *Id.*

The following are specifically at issue in this appeal:

I. Were all Medicare coverage and payment requirements met for the Amnio Quad-Core skin substitute product and related application codes at issue warranting payment under Title XVIII of the Social Security Act (Act)?

II. Are the limitations on liability provisions of section 1879 of the Act or the waiver of overpayment provisions under section 1870 of the Act applicable?

## APPLICABLE LAW AND POLICY

Part B of Title XVIII of the Social Security Act (Act), the Supplementary Medical Insurance program, provides coverage for a variety of medical services and supplies, including the durable medical equipment at issue, furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of other specific health-related items and services. Notwithstanding any other provision of the Act, no payment may be made under part A or part B for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A).

Section 1833(e) of the Act states that "[n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." The provider is responsible for providing sufficient documentation to support that payment is due and the services were medically necessary and provided as billed. 42 C.F.R. §424.5(a)(6).

The appellant has the burden of proof by a preponderance of the evidence. 5 U.S.C. § 556(d); *see generally Steadman v. SEC*, 450 U.S. 91, 98-102 (1981). This means that the evidence contained in the record must establish that it is more likely than not that the appellant's position is factually and legally correct. Therefore, the appellant must furnish sufficient evidence to support the claim. *See* Act §§ 1814(a)(1), 1815(a), 1833(e); 42 C.F.R. §§ 424.5(a)(6), 424.11, 424.22(c). If the appellant does not meet the burden of proof, the case must be decided unfavorably to the appellant.

Although not subject to the force and effect of law, the Centers for Medicare & Medicaid Services (CMS) and its contractors have issued policy guidelines and Local Coverage Determinations (LCDs) describing coverage criteria for selected types of items and services. Pursuant to 42 C.F.R. § 405.1062(a), an ALJ is not bound by an LCD, but will give substantial deference to an LCD if it is applicable to a particular case. However, section 1871(a)(2) of the Act provides that no rule, requirement or statement of policy, other than a National Coverage

Determination (NCD), can establish or change a substantive legal standard governing the scope of the benefits or payment for services under the Medicare program unless promulgated as a regulation by CMS.

*Reasonable and Necessary Criteria*

Per the Medicare Program Integrity Manual, CMS issues NCDs that specify whether certain items, services, procedures or technologies are reasonable and necessary under §1862(a)(1)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no LCD exists for a particular item or service, the MACs, CERT, Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
  - o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
  - o Furnished in a setting appropriate to the beneficiary's medical needs and condition;
  - o Ordered and furnished by qualified personnel; and,
  - o One that meets, but does not exceed, the beneficiary's medical need.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury in order to be considered for payment. The exceptions appear in the full text of §1862(a)(l)(A) of the Act. CMS, Medicare Program Integrity Manual *(MPIM) (Internet-Only Manual Pub. 100-08)* ch. 3, § 3.6.2.2. *See also MPIM,* ch. 13, § 13.5.1.

Regarding approved use of drugs, the Medicare Benefit Policy Manual states that drugs or biologicals approved for marketing by the Food and Drug Administration (FDA) are considered safe and effective for purposes of this requirement when used for indications specified on the labeling. As such, the program may pay for the use of an FDA approved drug or biological if it was injected on or after the date of the FDA's approval; it is reasonable and necessary for the individual's patient; and all other applicable coverage requirements are met. The carrier, DMERC, or intermediary will deny coverage for drugs and biologicals which have not received final marketing approval by the FDA unless it receives instructions from CMS to the contrary. If there is reason to question whether the FDA has approved a drug or biological for marketing, the carrier or intermediary must obtain satisfactory evidence of FDA's approval. CMS, Medicare Benefit Policy Manual *(MBPM) (Internet-Only Manual Pub. 100-02)* ch. 15, § 50.4.1.

*Related Services*

Services related to non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services not related to non-covered services can be covered under Medicare. However, any subsequent services that are expected to be incorporated into a global fee are not covered. *MBPM*, ch. 16, § 180.

*Human Cellular and Tissue Based Products (HCT/Ps)*

For a product to be regulated as a human cells, tissues, and cellular and tissue-based product (HCT/P), it must meet specific regulatory requirements as established under section 361 of the of the Public Health Service (PHS) Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 361 of the PHS Act and the Food, Drug, and Cosmetic (FC&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public. The four criteria are:

> (1) The HCT/P is minimally manipulated;
> (2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
> (3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
> (4) Either:
>> (i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
>> (ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
>>> (a) Is for autologous use;
>>> (b) Is for allogeneic use in a first-degree or second-degree blood relative; or
>>> (c) Is for reproductive use.

21 C.F.R. § 1271.10(a).

Homologous use is defined as "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor." 21 C.F.R. § 1271.3(c). HCT/Ps are defined as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." 21 C.F.R. § 1271.3(d).

*Local Coverage Determinations*

Local Coverage Determinations (LCD) LCD L35041 is relevant to this appeal.[1] This LCD provides, in part:

Medicare covers application of skin substitutes to Ulcers or Wounds with Failed Response that are:

- Partial- or full-thickness ulcers, not involving tendon, muscle, joint capsule or exhibiting exposed bone or sinus tracts, with a clean granular base;
- Skin deficit at least 1.0 square centimeter (cm) in size;
- Clean and free of necrotic debris or exudate;
- Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index [ABI] of no less than 0.60, toe pressure greater than 30 millimeters of mercury [mmHg]);
- For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.

Wound healing is impaired by the systemic use of tobacco. Therefore, ideally patients who have smoked will have ceased smoking or have refrained from systemic tobacco intake for at least 4 weeks during conservative wound care and prior to planned bioengineered skin replacement therapy.

Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed. Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented. Documentation of smoking cessation counseling and cessation measures prescribed, if applicable, must also be documented in the patient's record.

Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:

- Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.

---

[1] Novitas Solutions, Inc., the MAC with jurisdiction in this instance, had published a revised version of LCD L35041, titled *Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Ulcers (LCD L35041)*, which was scheduled to go into effect on January 1, 2026. While this LCD was not effective on the date of service, and is therefore only persuasive authority, it was helpful to illustrate the availability of published, peer-reviewed literature supporting the use of various, specific skin substitute grafts for use in chronic ulcers. However, on December 24, 2025, prior to the revised LCD going into effect, CMS' MACs withdrew the LCD in favor of modifying the payment and fee schedule for skin substitute graft services. *See* https://www.cms.gov/newsroom/fact-sheets/upcoming-update-final-local-coverage-determinations-lcds-certain-skin-substitutes.

- Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.
- Presence of a full thickness skin loss ulcer that is the result of abscess, injury or trauma that has failed to respond to appropriate control of infection, foreign body, tumor resection, or other disease process for a period of 4 weeks or longer.

Novitas Solutions, Inc, Local Coverage Determination L35041: Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Health Wounds (LCD L35041) (Eff. 09/26/2019).

LCD L35041 provides the following limitations to coverage of bioengineered skin substitutes:

> The following are considered not reasonable and necessary and therefore will be denied:
> - Partial thickness loss with the retention of epithelial appendages is not a candidate for grafting or replacement, as epithelium will repopulate the deficit from the appendages, negating the benefit of overgrafting.
> - Skin substitute grafts will be allowed for the episode of wound care in compliance with FDA guidelines for the specific product (see utilization guidelines) not to exceed 10 applications or treatments. In situations where more than one specific product is used, it is expected that the number of applications or treatments will still not exceed 10.
> - Simultaneous use of more than one product for the episode of wound is not covered. Product change within the episode of wound is allowed, not to exceed the 10 application limit per wound per 12 week period of care.
> - Treatment of any chronic skin wound will typically last no more than twelve (12) weeks.
> - Repeat or alternative applications of skin substitute grafts are not considered medically reasonable and necessary when a previous full course of applications was unsuccessful. Unsuccessful treatment is defined as increase in size or depth of an ulcer or no change in baseline size or depth and no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing) for a period of 4 weeks past start of therapy.
> - Retreatment of healed ulcers, those showing greater than 75% size reduction and smaller than 0.5 square cm, is not considered medically reasonable and necessary.
> - Skin substitute grafts are contraindicated and are not considered reasonable and necessary in patients with inadequate control of underlying conditions or exacerbating factors (e.g., uncontrolled diabetes, active infection, and active Charcot arthropathy of the ulcer extremity, vasculitis or continued tobacco smoking without physician attempt to affect smoking cessation).
> - Skin substitute grafts are contraindicated in patients with known hypersensitivity to any component of the specific skin substitute graft (e.g., allergy to avian, bovine, porcine, equine products).
> - Repeat use of surgical preparation services in conjunction with skin substitute application codes will be considered not reasonable and necessary. It is expected that each wound will require the use of

appropriate wound preparation code at least once at initiation of care prior to placement of the skin substitute graft.

- Re-treatment within one (1) year of any given course of skin substitute treatment for a venous stasis ulcer or (diabetic) neuropathic foot ulcer is considered treatment failure and does not meet reasonable and necessary criteria for re-treatment of that ulcer with a skin substitute procedure.

LCD L35041.

***Individual HCPCS and CPT Code Descriptions***

At issue in this appeal are services billed using the CPT and HCPCS codes listed below which are followed by their individual descriptions as detailed in the HCPCS and CPT Codebook applicable on the date of service at issue:

- **15275**: Application of skin substitute graft to high-risk areas (face, hands, feet, etc.), first 25 sq cm or less.
- **Q4294**: Amnio Quad-Core, per sq cm.

***Limitations on Liability***

Section 1879(a) of the Act contains limitation on liability provisions for cases under Medicare Parts A and B. These provisions only apply when a determination is made that Medicare will not pay for an item or service

- because it was not reasonable and necessary for the diagnosis or treatment of illness or injury;
- because it was for custodial care;
- in home health cases, because the beneficiary was not confined to his or her home or did not need skilled care on an intermittent basis;
- in hospice services, because the beneficiary was not terminally ill or because the services were not reasonable and necessary for the palliation or management of terminal illness; or
- for one of a limited number of specific circumstances not relevant to this case.

Act §§ 1814(a)(7)(E), 1833(g)(5)(D), 1833(z), 1879(a)(1), 1879(e), 1879(g), 1879(i). In these circumstances, payment shall nevertheless be made for the items or services if the beneficiary, provider, or suppler "did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services." Act § 1879(a)(2). The regulations at 42 C.F.R. § 411.400 *et seq.*; HCFA Ruling 95-1; and chapter 30 Section 40 of the *Medicare Claims Processing Manual (MCPM)* provide the framework for determining if a beneficiary and provider or supplier's liability for a non-covered item or service is limited under Section 1879 of the Social Security Act.

Section 1870(b) of the Act provides for a waiver of recoupment for an overpayment in certain circumstances where a provider or supplier is "without fault." The Medicare Financial Management Manual (MFMM) instructs that a provider or supplier is "without fault" when the provider or supplier exercised reasonable care in billing for and accepting payment; meaning:

- The provider or supplier made full disclosure of all material facts; and

- On the basis of the information available, including but not limited to, the Medicare instructions and regulations, it has a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

Pursuant to § 1870 of the Act, a waiver requires Appellant to be without fault in regard to the overpayment. This means on the basis of the information available Appellant had a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

## FINDINGS OF FACT AND ANALYSIS

### *Lower-Level Denial Reasons*

The QIC issued an unfavorable reconsideration decision, stating that the medical records reflect the Beneficiary has bilateral lower extremity ulcers for which the physician applied the amniotic membrane. However, the QIC found that Amnio Quad-Core amniotic membrane (Q4294) is experimental and investigational as denoted by the Q code status nomenclature. Under Medicare law, no payment can be made under Medicare for any expenses incurred for items or services that are considered investigational and are not considered reasonable and necessary. Since Amnio Quad-Core amniotic membrane (Q4294) is considered investigational and is not payable as per CMS, it was the QIC's determination that the Amnio Quad-Core amniotic membrane (Q4294) does not meet the medically reasonable and necessary requirements of Section 1862(a)(1)(A) of the Act. Therefore, payment was not allowed and the QIC found the overpayment valid. (File 2).

### *Appellant Statements and Arguments*

The Appellant, in their written appeal request, contends that Amnio Quad-Core is not investigational or experimental. They argue that the QIC's determination that Q-code designation inherently signifies a product is investigational or experimental is inaccurate and procedurally flawed. Rather, Q-codes are used for products that do not yet have a CPT code or permanent national Level II HCPCS code, and Q-codes are routinely assigned to Medicare covered products and services. The Appellant states that a denial based solely on the presence of a Q-code reflects a misunderstanding of CMS's HCPCS coding system and lacks any support in statute, regulation, or CMS guidance and should not be used as a basis for denial. (File 1).

The Appellant also contends that the skin substitute was applied in accordance with LCD L35041, which allows skin substitute product usage for certain defined wound types such as diabetic foot ulcers and venous leg ulcers, includes the product category and/or type (such as an allograft), and does not expressly exclude the specific product at issue. Because the Appellant believes that the product was used in accordance with the coverage parameters outlined in an active LCD, they argue it cannot be considered investigational or experimental and should be entitled to Medicare coverage. (File 1).

At hearing, the Appellant reiterated their issues with the QIC's denial based on Amnio Quad-Core's Q code status. They contend that the claim at issue meets all requirements of LCD L35041 for usage of skin substitute products to treat venous leg ulcers and that, because usage of the category of product at issue for treatment of the Beneficiary's specific condition is allowed by the LCD, it cannot be considered investigational or experimental. The Appellant also testified that the product was used within the scope of an FDA Tissue Reference Group (TRG) letter and that there was nothing to suggest the product was intended for wound healing or inflammation reduction. Rather, the product was used as a wound covering and within manufacturer intent, meaning homologous use requirements were met. (File 4).

The Appellant also testified as to the medical necessity of the product for treatment of the Beneficiary and her specific condition. Specifically, the Beneficiary's venous leg ulcers had been present for 22 months on the date of service and, despite extensive conservative measures and best practice wound care, the wounds persisted. Due to failure to respond to conservative treatment, skin substitute grafts were considered reasonable and necessary as the next step in the Beneficiary's treatment. The Beneficiary's wounds responded well to the skin substitute treatments and she experienced an over 90% reduction in wound surface area and volume over the course of treatment. Based on this, the Appellant believes that the escalation to use of skin substitute products for treatment of the Beneficiary was justified. (File 4).

***ALJ Findings***

In determining whether the amniotic allograft products are reasonable and necessary for the beneficiaries, the ALJ looked first to whether it was regulated as an HCT/P or being used properly (e.g., a homologous use) as an HCT/P. For a product to be regulated as an HCT/P, it must meet specific regulatory requirements as established under section 361 of the of the PHS Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 351 of the PHS Act and the Food, Drug, & Cosmetic (FD&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public.

The four criteria are: (1) the HCT/P is minimally manipulated; (2) the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent; (3) the manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and (4) either: (i) the HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or (ii) the HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and: (a) is for autologous use; (b) is for allogeneic use in a first-degree or second-degree blood relative; or (c) is for reproductive use. 21 C.F.R. § 1271.10(a). Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor. 21 C.F.R. § 1271.3(c).

A letter was issued by the FDA's Tissue Reference Group (TRG) on September 2, 2022, indicating that Amnio Quad-Core Amniotic Membrane Sheets are registered as being regulated under section 361 of the PHS Act and the regulations in 21 C.F.R. § 1271. (File 3). The letter specifies that the product is only regulated this way when used in a homologous way. If the product is not used for a homologous purpose, it is not regulated under section 361 regardless of any letters issued by the TRG. Furthermore, this does not make Amnio Quad-Core an "FDA approved" product.

An FDA approval under Section 361 does not prove (or disprove) a treatment is safe and effective for Medicare purposes. *See* 21 C.F.R. § 1271. Also, the existence of a Level II HCPCS code (e.g., 4294) is not evidence that a product or service is safe and effective. Nor is it evidence

to the contrary.[2] HCPCS codes are not intended to embody legal presumptions in Medicare coverage decisions. *See* CMS Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures. Any argument regarding a HCPCS/Q code supporting safety and efficacy is non-probative and, thus, is immaterial for purposes of this appeal.

Appellant asserted that because Amnio Quad-Core is Section 361 registered, has been assigned a HCPCS code, and is not explicitly barred from coverage per an LCD, the product should not be classified as experimental or investigational for Medicare purposes.

Literature was provided by Appellant to try to satisfy the burden of proof that use of Amnio Quad-Core is not investigational or experimental when used for treatment of chronic ulcers, including venous leg ulcers and diabetic foot ulcers. (*See* File 3). However, none of the literature provides a large (n>30) scale, randomized clinical trial that proves the safety or efficacy of Amnio Quad-Core specifically. Rather, the literature is focused on other amniotic membrane products or on general medical-technological trends in the HCT/P wound care field. To the degree other products are reviewed, these products are generally propriety and distinct products that have a multitude of descriptions and uses and the ALJ cannot automatically equate one skin substitute or amniotic membrane product with another. Finally, and notably, the articles indicate that the HCT/P products are being used actively to engage in intracellular signaling and promote a cell or skin reaction to healing. Thus, the uses described in the literature are not merely wound cover uses and not homologous as to Amnio Quad-Core's FDA labeling. When used in this way, the product is exceeding a homologous use, which renders it outside the scope of the FDA label under Section 361.

Even if the ALJ accepts that Amnio Quad-Core was being used solely under Section 361 as a wound cover or barrier, there is minimal evidence in the record that shows the product is safe and effective for this purpose.[3] As stated above, the Appellant did not provide published, peer-reviewed literature to support the use of the specific product at issue, Amnio Quad-Core, or even biosimilar HCT/P products, for treatment of chronic wounds. The product may well be helping, or at a minimum harmless, but that is not the standard to prove safety and effectiveness for Medicare coverage purposes.

In summary, Amnio Quad-Core has not been shown to be regulated under section 361 of the PHS Act when used in the manner in which it was used in this case. Even if the product was assumed to be governed by section 361, it has not been shown to meet Medicare's standards for a treatment considered safe and effective for the purpose for which it was used in this case. This decision is based on Medicare regulations and statutes and makes no determination concerning the physician's decision to treat the beneficiaries with the products at issue. For Medicare purposes Amnio Quad-Core is investigational and experimental and not covered based on the specific record before me.

---

[2] The ALJ agrees with the Appellant's argument that the QIC's denial based on the assignment of a Q-code to the product at issue is neither supported by law nor established Medicare policy.

[3] The ALJ is focused solely on the Medicare context. The ALJ is not purporting to rule on FDA status and is only looking at FDA status or homologous use for purposes of the Medicare coverage analysis. Skin substitutes using placenta/amniotic products have some promise. New LCDs allowing coverage may eventually be published. The product, both individually and as a whole, also could benefit from further study in large, random clinical trials. But these hypotheticals are beyond the scope of this matter, and the record before me does not prove that Amnio Quad-Core is not investigational or experimental.

I find the product at issue, Amnio Quad-Core (Q4294), cannot be covered by Medicare in this instance. I also find the related application code, shown by the CPT codes 15275, is not covered, as it is a service related to a non-covered claim. *MBPM*, ch. 16, § 180.

*Medical Necessity*

Basic medical reasonable and necessary criteria is not entirely relevant in this decision, as the primary denial reason is the items/services being considered investigational/experimental, but the ALJ explores the topic briefly here.

The Beneficiary had a medical history including chronic venous leg ulcers, chronic diabetic foot ulcers, severe atherosclerotic disease, peripheral artery disease, hepatomegaly with steatosis, chronic venous insufficiency, peripheral vascular disease, lymphedema, and diabetes mellitus type 2. (File 3, pp. 14-55). She suffered from longstanding chronic ulcerations of the lower extremities including both diabetic foot ulcers and venous leg ulcers. (*Id.*). As of March 20, 2024, she had a right lateral diabetic foot ulcer measuring 1.0 x 0.8 x 0.1 cm present for over six months, a right lateral venous leg ulcers measuring 0.3 x 0.2 x 0.1 cm present for over six months, and a left leg venous leg ulcers measuring 0.6 x 0.5 x 0.1 cm present for over six months. (*Id.*). Conservative measures attempted to treat these wounds included compression, off-loading, proper nutritional, diabetes management, debridement as needed, use of protective ointment and polymem foam, and weekly cleaning and dressing changes. (*Id.*) On March 20, 2024, it was determined that the Beneficiary would benefit from use of amniotic tissue allografts. (*Id.*).

On May 22, 2024, the Beneficiary underwent Amnio Quad-Core amniotic membrane allograft application on her leg ulcers after previous receiving such treatments on or about April 17 and 10, 2024. (File 3, pp. 22-55). For background reference, on April 17, 2024, her right lateral venous leg ulcer measured 1.0 x 1.0 x 0.1 cm and was considered improving with no signs of infection.[4] The right anterior venous leg ulcer measured 1.7 x 1.5 x 0.1 cm and was considered improving with no signs of infection. The right lateral ankle ulcer measured 2.5 x 4.0 x 0.1 cm and was considered deteriorating but free from infection. One 2 x 3 cm graft equal to 6 units and 2.5 units of a separate 2 x 3 cm graft were applied to the right lateral ankle ulcer. The remaining 3.5 units of the divided 2 x 3 cm graft were applied to the right lateral and right anterior venous leg ulcers. There was further response to treatment from the May application(s), albeit the ALJ has some lingering doubt about whether April 17 might have been sufficient. (*Id*).

Upon review of the medical records, several themes developed. First, the records support the presence of diabetic or venous leg ulcers present for at least 6 months and unresponsive to appropriate, conservative wound care for at least 30 days. The testimony and records made clear that there was a good faith approach to use of the amniotic membrane allografts, and the clinicians felt the products could work on the wounds at issue. Second, while the amount of this expensive amniotic membrane graft product used caused some concern for the ALJ, LCD L35041 does not explicitly limit the amount of product that can be used on individual ulcers. Rather, it limits the number of treatments to 10 applications over a 12-week maximum period of care. In this instance, the application(s) at issue come close but do not exceed the LCD number limit. Some of the ulcers were relatively small too, but met the LCD minimum size requirement. See, LCD L35041.

[4] The 1 x 1 x 0.1 ulcer is just barely large enough to satisfy the LCD, which requires an ulcer to be 1.0 square cm or larger for treatment with skin substitute products.

Based on the above, and despite the ALJ's general concerns over usage of this product over more reasonably priced wound coverings, LCD L35041 does not preclude usage of skin substitute products on the Beneficiary's diabetic or venous leg ulcers. However, despite meeting LCD guidelines for general skin substitute treatment of diabetic or venous leg ulcers, the specific product used, Amnio Quad-Core, is still found to be investigational or experimental for the reasons detailed above. Because Amnio Quad-Core is found to be investigational or experimental it cannot be considered medically reasonable and necessary and is not entitled to Medicare coverage.

***Liability***

The final issue before the ALJ is liability for the denied services at issue. Medicare coverage does not exist for the services at issue because the services are found to be investigational/experimental, and they are not found to be medically necessary for the beneficiary and date of service at issue. When items or services are found not to be reasonable and necessary under § 1862(a)(1)(A) of the Act, and therefore are not covered by Medicare, the limitation on liability provisions of § 1879 of the Act may apply if neither the beneficiary nor the provider had reason to know the services would not be covered.

The beneficiary whose Medicare claim was denied pursuant to § 1862(a)(1)(A) of the Act is not financially liable for the non-covered services because their liability is limited under § 1879 of the Act. Under the regulations, a beneficiary who receives a non-covered service is considered to have known that Medicare would not cover the service if written notice of non-coverage was furnished by any of the following entities: QIOs, fiscal intermediaries, carriers, utilization review committees, providers, suppliers, or the beneficiary's attending physician. *See* 42 C.F.R. § 411.406. In this instance, the record does not contain any evidence that the beneficiary received written notice of non-coverage, nor does the record contain any other evidence that the beneficiary was made aware of the fact that Medicare might not cover the services at issue. Therefore, the beneficiary is not financially liable for the non-covered services.

A provider who furnishes non-covered services is considered to have known that the services were not covered if the QIO, intermediary, or carrier had informed the supplier that the item furnished was not covered. *See* 42 C.F.R. § 411.406(b). However, the regulations also confer constructive knowledge of non-coverage to providers based on any of the following: (1) receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or QIOs, including notification of QIO screening criteria specific to the condition of the beneficiary for whom the furnished services are at issue and of medical procedures subject to preadmission review by a QIO; (2) Federal Register publications containing notice of national coverage decisions or of other specifications regarding non-coverage of an item or service; or (3) knowledge of what are considered acceptable standards of practice by the local medical community. *See* 42 C.F.R. § 411.406(e).

Under the *MFMM*, a provider, physician, or other supplier is "without fault" in causing an overpayment when the provider: (1) exercised reasonable care in billing for, and accepting, the payment; (2) made full disclosure of all material facts; and (3) had a reasonable basis for assuming that the payment was correct based of the information available to the provider, including, but not limited to, the Medicare instructions and regulations. CMS, *Medicare Financial Management Manual (MFMM) (Internet-Only Manual Publ'n 100-06)* ch. 3 § 90 (Feb. 2017).

The Appellant's liability may neither be limited under § 1879 of the Act nor waived under § 1870 of the Act. The Appellant had access to CMS notices and Federal Register publications and had knowledge of what were considered accepted standards of medical practice on the date at issue. As such, the Appellant knew or should have known that the lack of directly applicable randomized clinical trials, the presence of an FDA Tissue Resource Group (TRG) letter or lack thereof, and the assignment of a billing code is not equivalent to full Medicare approval of an item or service. Relying on manufacturer materials, the mere assignment of a Q code, or relatively vague LCD is not enough. The Appellant should have known of the danger of an audit on these high-cost wound care products. The Appellant was trying to be careful in their employment of such products; but that also has to mean the Appellant knew the products used might be looked at by CMS or its contractors. Medicare often audits such claims. The ALJ cannot find the Appellant without fault on this record for overpayment purposes under § 1870 and the Appellant had too much knowledge to receive the liability limitation of § 1879. Accordingly, the Appellant remains liable for costs related to the non-covered services and recovery of the overpayment is not waived

## CONCLUSIONS OF LAW

The Amnio-Quad Core and related application services provided to the Beneficiary on the date of service at issue are not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the outstanding costs related to the non-covered services and the overpayment is not waived.

## ORDER

For the reasoning discussed above, this decision is **UNFAVORABLE**. The Appellant is liable for the outstanding costs related to the non-covered services and the overpayment is not waived. I direct the Medicare administrative contractor to process the claims in accordance with this decision.

**SO ORDERED**

Aaron Raff
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

**REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL**

| | |
|---|---|
| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| | |
|---|---|
| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated____________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

________________________________________________

________________________________________________

________________________________________________

________________________________________________

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| | | | | | |
|---|---|---|---|---|---|
| DATE | | | DATE | | |
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

---

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | |
|---|---|
| Appeal of: **CHRIS MCGEE MD PA** | OMHA Appeal No.: **3-15466927291** |
| Beneficiary: [redacted] | Medicare Part: **B** |
| Medicare No.: | Before: **Aaron Raff** Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| **Exhibit Record** | **Administrative File Reference** File Name | Page Range | |
|---|---|---|---|
| Procedural - CMS Levels: Reconsideration | File 2 | 1 | : 16 |
| Procedural - CMS Levels: Request for Reconsideration | File 3 | 1 | : 55 |
| Procedural - CMS Levels: Redetermination Case File | File 4 | 1 | : 738 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 1 | 1 | : 21 |
| Procedural - OMHA Level: General: App Rep RNOH | File 10 | 1 | : 4 |
| Procedural - OMHA Level: Signed Decision | File 11 | 1 | : 15 |
| Procedural - OMHA Level: Notice of Decision | File 12 | 1 | : 23 |
| Procedural - OMHA Level: Consolidated Notice of Hearing | File 7 | 1 | : 9 |
| Procedural - OMHA Level: General: ROC | File 8 | 1 | : 1 |
| Proceeding (Audios): General: Hearing Audio | File 9 | 1 | : 1 |

| **Non-Exhibit Record** | **Administrative File Reference** File Name | Page Range | |
|---|---|---|---|
| Records not considered: QIC Acknowledgment | File 5 | 1 | : 3 |
| Records not considered: Transmittal Cover Sheet | File 6 | 1 | : 1 |

OMHA-156
Dated: 2026-02-19

Kansas City Field Office
601 E. 12th Street
Suite 1753
Kansas City, MO 64106-2817
(816)-599-3300
(816) 599-3251 Sylvester (Direct)
Team Raff
(816) 527-0051 (Fax)
(844) 566-6258 (Toll Free)

February 20, 2026

ENGAGE HEALTH SOULTIONS
ATTN: WILLIAM OMALLEY
60 PUBLIC SQUARE
STE 602
WILKES-BARRE, PA 18701

## NOTICE OF DECISION

Appellant: CHRIS MCGEE MD PA
OMHA Appeal Number: 3-15466927299

Enclosed is the decision for the above case. This decision is based on the administrative record, including any evidence or testimony presented at the hearing, if one was held. The decision is not precedential, does not release the appellant from civil or criminal liability, and may be reopened at any time if it was procured by fraud or similar fault. In addition, the decision may be reopened within 180 calendar days from the date of the decision for good cause. Good cause exists when there is new and material evidence that was not available or known at the time of the decision and may result in a different conclusion, or when the evidence that was considered clearly shows on its face that an obvious error was made at the time of the decision.

### What if I disagree with the decision?

If you disagree with the decision, you may file an appeal with the Medicare Appeals Council. Other parties may also appeal the decision. In addition, the Medicare Appeals Council may decide to review the decision on its own motion. If no party appeals the decision and the Medicare Appeals Council does not review the decision, the decision is binding on all parties and you and the other parties will not have the right to ask a federal court to review the decision.

If you are not already represented, you may appoint an attorney or other person to represent you.

**<u>How much time do I have to file an appeal?</u>**

The Medicare Appeals Council must receive your written appeal **within 60 calendar days** of the date that you receive this notice. The Medicare Appeals Council assumes you received this notice 5 calendar days after the date of the notice unless you show that you did not receive it within the 5-day period.

The Medicare Appeals Council will dismiss a late request for review unless you show that you had a good reason for not filing it on time.

**<u>How do I file an appeal?</u>**

To appeal, you must ask the Medicare Appeals Council to review the decision. Your appeal must be in writing, except that a request for expedited review of a Part D decision may be made orally as described below. Your appeal must identify the parts of the decision that you disagree with, and explain why you disagree.

You may submit a written request for review to the Medicare Appeals Council using one of three available methods: mail, fax, or electronic filing (E-File). **<u>Please do not submit your request for review using more than one method</u>**. Regardless of how you file your appeal, **you must always send a copy of your written request for review to the other parties who received a copy of the decision.**

If you are filing a written request for review, you may use the enclosed *Request for Review* (Form DAB-101), or you may write a letter containing the following:

- The beneficiary's/enrollee's name (and telephone number for Part D appeals);
- The beneficiary's/enrollee's Medicare number (Health Insurance Claim Number or Medicare Beneficiary Identifier);
- The item(s), service(s), or specific Part D drug(s) in dispute;
- The specific date(s) the item(s) or service(s) were provided, if applicable;
- For Part D appeals, the plan name;
- For Part D appeals, the OMHA Appeal Number on the adjudicator's decision;
- For Part D appeals requesting expedited review, a statement that you are requesting expedited review;
- The date of the adjudicator's decision (not required for Part D appeals); and
- Your name and signature, and, if applicable, the name and signature of your representative.

**Filing by mail:**

Mail your appeal and a copy of the enclosed decision to:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

**Filing by fax:**

Fax your appeal and a copy of the enclosed decision to **(202) 565-0227.**

**Filing by computer:**

Using your web browser, visit the Medicare Operations Division Electronic Filing System (MOD E-File) website at **https://dab.efile.hhs.gov/mod**.

To file a new appeal using MOD E-File, you will need to register by:

1. Clicking **Register** on the MOD E-File home page;
2. Entering the information requested on the "Register New Account" form; and
3. Clicking **Register Account** at the bottom of the form.

You will use the email address and password you provided during registration to access MOD E-File at **https://dab.efile.hhs.gov/mod/users/new**. You will be able to use MOD E-File to file and access the specific materials for appeals to which you are a party or a party's representative. You may check the status of any appeal on the website homepage without registering.

Once registered, you may file your appeal by:

1. Logging into MOD E-File;
2. Clicking the **File New Appeal** menu button on the top right of the screen;
3. Selecting the type of appeal you are filing (Request for Review or Request for Escalation); and
4. Entering the requested Appeal Information and uploading the requested Appeal Documents on the "File New Appeal - Medicare Operations Division" form. You are required to provide information and documents marked with an asterisk.

At a minimum, the Medicare Appeals Council requires an appellant to file a signed Request for Review and a copy of the enclosed decision. All documents should be submitted in Portable Document Format (PDF) whenever possible. Any document, including a Request for Review, will be deemed to have been filed on a given day, if it is uploaded to MOD E-File on or before 11:59 p.m. EST of that day.

Currently, the documents that may be filed electronically are the:

1. Request for Review;
2. Appointment of Representative form (OMB Form 0938-0950);
3. Copy of Administrative Law Judge or attorney adjudicator decision;
4. Memorandum or brief or other written statement in support of your appeal; and
5. Request to Withdraw your appeal

**No other documents aside from the five (5) listed categories above may be submitted through MOD E-File.**

**Filing by oral request (for expedited review only):**

Oral requests for expedited review of a Part D decision may be made by telephone to **(866) 365-8204.** You must provide the information listed in the bullet points above and a statement that you are requesting an expedited review within 60 calendar days after receipt of this notice of decision. The Medicare Appeals Council will document the oral request in writing and maintain the documentation in the case file.

Please note that your request for review will only be expedited (1) the appeal involves an issue specified in 42 C.F.R. § 423.566(b), but does not include solely a request for payment of a Part D drug that has already been furnished, and (2) the prescribing physician (or other prescriber) indicates, or the Medicare Appeals Council determines, that the standard time frame may seriously jeopardize your life, health, or ability to regain maximum function.

**How will the Medicare Appeals Council respond to my appeal?**

The Medicare Appeals Council will limit its review to the issues raised in the appeal, unless the appeal is filed by an unrepresented beneficiary/enrollee. It may change the parts of the decision that you agree with. It may adopt, modify, or reverse the decision, in whole or in part, or it may send the case back to OMHA for further action. It may also dismiss your appeal.

**Questions?**

You may call or write our office. A toll-free phone number and mailing address are at the top of this notice.

Additional information about filing an appeal with the Medicare Appeals Council is available at http://www.hhs.gov/dab/. You can also call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100 or (866) 365-8204 (toll free), if you have questions about filing an appeal.

cc:

C2C Innovative Solutions, Inc.
Part B South C2C
301 W Bay Street, Ste. 1110
Jacksonville, FL 32231-4006

CHRIS MCGEE MD PA
PO BOX 1628
DECATUR, TX 76234

Enclosures:
OMHA-152, Decision
DAB-101, Request for Review
OMHA-156, Exhibit List

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | |
|---|---|
| Appeal of: **CHRIS MCGEE MD PA** | OMHA Appeal No.: **3-15466927299** |
| Beneficiary: [redacted] | Medicare Part: B |
| Medicare No.: | Before: **Aaron Raff** Administrative Law Judge |

## DECISION

After careful consideration of the evidence and arguments contained in the administrative record and presented at the hearing, I enter an **UNFAVORABLE** decision. The Amnio-Quad Core and related application codes supplied and billed by Chris McGee MD PA (Appellant) to the Beneficiary on the date of service at issue (May 29, 2024) are not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the non-covered services and recovery of the overpayment is not waived.

## PROCEDURAL HISTORY

The Appellant submitted a claim for the services to Novitas Solutions, Inc., the Medicare Administrative Contractor (MAC) with jurisdiction, who initially paid the claim in full. However, it was later determined that an overpayment occurred. (File 4). Upon notice of the overpayment, the Appellant requested redetermination, and the MAC issued unfavorable redetermination decision. (File 3). The Appellant was held liable for all outstanding costs and overpayments related to the denied claim. The Appellant then requested reconsideration from C2C Innovative Solutions, Inc., the Qualified Independent Contractor (QIC). The QIC issued an unfavorable reconsideration decision denying coverage for the claim and determining that the overpayment was valid. (File 2). The Appellant/Provider was held liable for all charges related to the denied claims and was found at fault in causing the overpayment.

On October 30, 2025, the Office of Medicare Hearings and Appeals (OMHA) received the Appellant's request for an Administrative Law Judge (ALJ) hearing. (File 1). An ALJ hearing was held on January 7, 2026. Appearing at hearing on behalf of the Appellant was representative William O'Malley. The Beneficiary was notified of the hearing but did not respond or appear. The appearing witness was sworn in prior to providing testimony. All of the indexed files in the administrative record are admitted to the record with the exception of duplicates and non-probative items which are kept in place for identification purposes. The administrative record is now closed.

## ISSUES

The issues brought before this ALJ include all the issues for the claims or appealed matters specified in the request for hearing that were brought out in the initial determination, redetermination, or reconsideration that were not decided entirely in a party's (not including CMS's) favor. 42 C.F.R. § 405.1032. The ALJ may consider a new issue provided he or she notifies all of the parties about the new issue. § 405.1032(b). The new issue may include issues resulting from the participation of CMS at the ALJ level of adjudication and from any evidence and position papers submitted by CMS for the first time to the ALJ. *Id.*

The following are specifically at issue in this appeal:

I. Were all Medicare coverage and payment requirements met for the Amnio Quad-Core skin substitute product and related application codes at issue warranting payment under Title XVIII of the Social Security Act (Act)?

II. Are the limitations on liability provisions of section 1879 of the Act or the waiver of overpayment provisions under section 1870 of the Act applicable?

## APPLICABLE LAW AND POLICY

Part B of Title XVIII of the Social Security Act (Act), the Supplementary Medical Insurance program, provides coverage for a variety of medical services and supplies, including the durable medical equipment at issue, furnished by physicians, or by others in connection with physicians' services, for outpatient hospital services, and for a number of other specific health-related items and services. Notwithstanding any other provision of the Act, no payment may be made under part A or part B for items and services that are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Act § 1862(a)(1)(A).

Section 1833(e) of the Act states that "[n]o payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." The provider is responsible for providing sufficient documentation to support that payment is due and the services were medically necessary and provided as billed. 42 C.F.R. §424.5(a)(6).

The appellant has the burden of proof by a preponderance of the evidence. 5 U.S.C. § 556(d); *see generally Steadman v. SEC,* 450 U.S. 91, 98-102 (1981). This means that the evidence contained in the record must establish that it is more likely than not that the appellant's position is factually and legally correct. Therefore, the appellant must furnish sufficient evidence to support the claim. *See* Act §§ 1814(a)(1), 1815(a), 1833(e); 42 C.F.R. §§ 424.5(a)(6), 424.11, 424.22(c). If the appellant does not meet the burden of proof, the case must be decided unfavorably to the appellant.

Although not subject to the force and effect of law, the Centers for Medicare & Medicaid Services (CMS) and its contractors have issued policy guidelines and Local Coverage Determinations (LCDs) describing coverage criteria for selected types of items and services. Pursuant to 42 C.F.R. § 405.1062(a), an ALJ is not bound by an LCD, but will give substantial deference to an LCD if it is applicable to a particular case. However, section 1871(a)(2) of the Act provides that no rule, requirement or statement of policy, other than a National Coverage

Determination (NCD), can establish or change a substantive legal standard governing the scope of the benefits or payment for services under the Medicare program unless promulgated as a regulation by CMS.

*Reasonable and Necessary Criteria*

Per the Medicare Program Integrity Manual, CMS issues NCDs that specify whether certain items, services, procedures or technologies are reasonable and necessary under §1862(a)(1)(A) of the Act. In the absence of an NCD, Medicare contractors are responsible for determining whether services are reasonable and necessary. If no LCD exists for a particular item or service, the MACs, CERT, Recovery Auditors, and UPICs shall consider an item or service to be reasonable and necessary if the item or service meets the following criteria:

- It is safe and effective;
- It is not experimental or investigational; and
- It is appropriate, including the duration and frequency in terms of whether the service or item is:
  - o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member;
  - o Furnished in a setting appropriate to the beneficiary's medical needs and condition;
  - o Ordered and furnished by qualified personnel; and,
  - o One that meets, but does not exceed, the beneficiary's medical need.

There are several exceptions to the requirement that a service be reasonable and necessary for diagnosis or treatment of illness or injury in order to be considered for payment. The exceptions appear in the full text of §1862(a)(l)(A) of the Act. CMS, Medicare Program Integrity Manual *(MPIM) (Internet-Only Manual Pub. 100-08)* ch. 3, § 3.6.2.2. *See also MPIM*, ch. 13, § 13.5.1.

Regarding approved use of drugs, the Medicare Benefit Policy Manual states that drugs or biologicals approved for marketing by the Food and Drug Administration (FDA) are considered safe and effective for purposes of this requirement when used for indications specified on the labeling. As such, the program may pay for the use of an FDA approved drug or biological if it was injected on or after the date of the FDA's approval; it is reasonable and necessary for the individual's patient; and all other applicable coverage requirements are met. The carrier, DMERC, or intermediary will deny coverage for drugs and biologicals which have not received final marketing approval by the FDA unless it receives instructions from CMS to the contrary. If there is reason to question whether the FDA has approved a drug or biological for marketing, the carrier or intermediary must obtain satisfactory evidence of FDA's approval. CMS, Medicare Benefit Policy Manual *(MBPM) (Internet-Only Manual Pub. 100-02)* ch. 15, § 50.4.1.

*Related Services*

Services related to non-covered services including services related to follow-up care and complications of non-covered services which require treatment during a hospital stay in which the non-covered service was performed, are not covered services under Medicare. Services not related to non-covered services can be covered under Medicare. However, any subsequent services that are expected to be incorporated into a global fee are not covered. *MBPM*, ch. 16, § 180.

*Human Cellular and Tissue Based Products (HCT/Ps)*

For a product to be regulated as a human cells, tissues, and cellular and tissue-based product (HCT/P), it must meet specific regulatory requirements as established under section 361 of the of the Public Health Service (PHS) Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 361 of the PHS Act and the Food, Drug, and Cosmetic (FC&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public. The four criteria are:

> (1) The HCT/P is minimally manipulated;
> (2) The HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent;
> (3) The manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and
> (4) Either:
>> (i) The HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or
>> (ii) The HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and:
>>> (a) Is for autologous use;
>>> (b) Is for allogeneic use in a first-degree or second-degree blood relative; or
>>> (c) Is for reproductive use.

21 C.F.R. § 1271.10(a).

Homologous use is defined as "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor." 21 C.F.R. § 1271.3(c). HCT/Ps are defined as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." 21 C.F.R. § 1271.3(d).

*Local Coverage Determinations*

Local Coverage Determinations (LCD) LCD L35041 is relevant to this appeal.[1] This LCD provides, in part:

> Medicare covers application of skin substitutes to Ulcers or Wounds with Failed Response that are:
>
> - Partial- or full-thickness ulcers, not involving tendon, muscle, joint capsule or exhibiting exposed bone or sinus tracts, with a clean granular base;
> - Skin deficit at least 1.0 square centimeter (cm) in size;
> - Clean and free of necrotic debris or exudate;
> - Have adequate circulation/oxygenation to support tissue growth/wound healing as evidenced by physical examination (e.g., Ankle-Brachial Index [ABI] of no less than 0.60, toe pressure greater than 30 millimeters of mercury [mmHg]);
> - For diabetic foot ulcers, the patient's medical record reflects a diagnosis of Type 1 or Type 2 Diabetes and also reflects medical management for this condition.
>
> Wound healing is impaired by the systemic use of tobacco. Therefore, ideally patients who have smoked will have ceased smoking or have refrained from systemic tobacco intake for at least 4 weeks during conservative wound care and prior to planned bioengineered skin replacement therapy.
>
> Documentation (in the pre-service record) specifically addressing circumstances as to why the wound has failed to respond to standard wound care treatment of greater than 4 weeks and must reference specific interventions that have failed. Such record should include updated medication history, review of pertinent medical problems that may have occurred since the previous wound evaluation, and explanation of the planned skin replacement surgery with choice of skin substitute graft product. The procedure risks and complications should also be reviewed and documented. Documentation of smoking cessation counseling and cessation measures prescribed, if applicable, must also be documented in the patient's record.
>
> Application of a skin substitute graft for lower extremity chronic wound (DFU and VLU) will be covered when the following conditions are met for the individual patient:
>
> - Presence of neuropathic diabetic foot ulcer(s) having failed to respond to documented conservative wound-care measures of greater than four weeks, during which the patient is compliant with recommendations, and without evidence of underlying osteomyelitis or nidus of infection.

---

[1] Novitas Solutions, Inc., the MAC with jurisdiction in this instance, had published a revised version of LCD L35041, titled *Skin Substitute Grafts/Cellular and Tissue-Based Products for the Treatment of Diabetic Foot Ulcers and Venous Ulcers (LCD L35041),* which was scheduled to go into effect on January 1, 2026. While this LCD was not effective on the date of service, and is therefore only persuasive authority, it was helpful to illustrate the availability of published, peer-reviewed literature supporting the use of various, specific skin substitute grafts for use in chronic ulcers. However, on December 24, 2025, prior to the revised LCD going into effect, CMS' MACs withdrew the LCD in favor of modifying the payment and fee schedule for skin substitute graft services. *See* https://www.cms.gov/newsroom/fact-sheets/upcoming-update-final-local-coverage-determinations-lcds-certain-skin-substitutes.

- Presence of a venous stasis ulcer for at least 3 months but unresponsive to appropriate wound care for at least 30 days with documented compliance.
- Presence of a full thickness skin loss ulcer that is the result of abscess, injury or trauma that has failed to respond to appropriate control of infection, foreign body, tumor resection, or other disease process for a period of 4 weeks or longer.

Novitas Solutions, Inc, Local Coverage Determination L35041: Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Health Wounds (LCD L35041) (Eff. 09/26/2019).

LCD L35041 provides the following limitations to coverage of bioengineered skin substitutes:

> The following are considered not reasonable and necessary and therefore will be denied:
>
> - Partial thickness loss with the retention of epithelial appendages is not a candidate for grafting or replacement, as epithelium will repopulate the deficit from the appendages, negating the benefit of overgrafting.
> - Skin substitute grafts will be allowed for the episode of wound care in compliance with FDA guidelines for the specific product (see utilization guidelines) not to exceed 10 applications or treatments. In situations where more than one specific product is used, it is expected that the number of applications or treatments will still not exceed 10.
> - Simultaneous use of more than one product for the episode of wound is not covered. Product change within the episode of wound is allowed, not to exceed the 10 application limit per wound per 12 week period of care.
> - Treatment of any chronic skin wound will typically last no more than twelve (12) weeks.
> - Repeat or alternative applications of skin substitute grafts are not considered medically reasonable and necessary when a previous full course of applications was unsuccessful. Unsuccessful treatment is defined as increase in size or depth of an ulcer or no change in baseline size or depth and no sign of improvement or indication that improvement is likely (such as granulation, epithelialization or progress towards closing) for a period of 4 weeks past start of therapy.
> - Retreatment of healed ulcers, those showing greater than 75% size reduction and smaller than 0.5 square cm, is not considered medically reasonable and necessary.
> - Skin substitute grafts are contraindicated and are not considered reasonable and necessary in patients with inadequate control of underlying conditions or exacerbating factors (e.g., uncontrolled diabetes, active infection, and active Charcot arthropathy of the ulcer extremity, vasculitis or continued tobacco smoking without physician attempt to affect smoking cessation).
> - Skin substitute grafts are contraindicated in patients with known hypersensitivity to any component of the specific skin substitute graft (e.g., allergy to avian, bovine, porcine, equine products).
> - Repeat use of surgical preparation services in conjunction with skin substitute application codes will be considered not reasonable and necessary. It is expected that each wound will require the use of

appropriate wound preparation code at least once at initiation of care prior to placement of the skin substitute graft.

- Re-treatment within one (1) year of any given course of skin substitute treatment for a venous stasis ulcer or (diabetic) neuropathic foot ulcer is considered treatment failure and does not meet reasonable and necessary criteria for re-treatment of that ulcer with a skin substitute procedure.

LCD L35041.

***Individual HCPCS and CPT Code Descriptions***

At issue in this appeal are services billed using the CPT and HCPCS codes listed below which are followed by their individual descriptions as detailed in the HCPCS and CPT Codebook applicable on the date of service at issue:

- **15275**: Application of skin substitute graft to high-risk areas (face, hands, feet, etc.), first 25 sq cm or less.
- **Q4294**: Amnio Quad-Core, per sq cm.

***Limitations on Liability***

Section 1879(a) of the Act contains limitation on liability provisions for cases under Medicare Parts A and B. These provisions only apply when a determination is made that Medicare will not pay for an item or service

- because it was not reasonable and necessary for the diagnosis or treatment of illness or injury;
- because it was for custodial care;
- in home health cases, because the beneficiary was not confined to his or her home or did not need skilled care on an intermittent basis;
- in hospice services, because the beneficiary was not terminally ill or because the services were not reasonable and necessary for the palliation or management of terminal illness; or
- for one of a limited number of specific circumstances not relevant to this case.

Act §§ 1814(a)(7)(E), 1833(g)(5)(D), 1833(z), 1879(a)(1), 1879(e), 1879(g), 1879(i). In these circumstances, payment shall nevertheless be made for the items or services if the beneficiary, provider, or supplier "did not know, and could not reasonably have been expected to know, that payment would not be made for such items or services." Act § 1879(a)(2). The regulations at 42 C.F.R. § 411.400 *et seq.*; HCFA Ruling 95-1; and chapter 30 Section 40 of the *Medicare Claims Processing Manual (MCPM)* provide the framework for determining if a beneficiary and provider or supplier's liability for a non-covered item or service is limited under Section 1879 of the Social Security Act.

Section 1870(b) of the Act provides for a waiver of recoupment for an overpayment in certain circumstances where a provider or supplier is "without fault." The Medicare Financial Management Manual (MFMM) instructs that a provider or supplier is "without fault" when the provider or supplier exercised reasonable care in billing for and accepting payment; meaning:

- The provider or supplier made full disclosure of all material facts; and

- On the basis of the information available, including but not limited to, the Medicare instructions and regulations, it has a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

Pursuant to § 1870 of the Act, a waiver requires Appellant to be without fault in regard to the overpayment. This means on the basis of the information available Appellant had a reasonable basis for assuming that the payment was correct, or, if it had reason to question the payment; it promptly brought the question to the contractor's attention.

## FINDINGS OF FACT AND ANALYSIS

***Lower-Level Denial Reasons***

The QIC issued an unfavorable reconsideration decision, stating that the medical records reflect the Beneficiary has bilateral lower extremity ulcers for which the physician applied the amniotic membrane. However, the QIC found that Amnio Quad-Core amniotic membrane (Q4294) is experimental and investigational as denoted by the Q code status nomenclature. Under Medicare law, no payment can be made under Medicare for any expenses incurred for items or services that are considered investigational and are not considered reasonable and necessary. Since Amnio Quad-Core amniotic membrane (Q4294) is considered investigational and is not payable as per CMS, it was the QIC's determination that the Amnio Quad-Core amniotic membrane (Q4294) does not meet the medically reasonable and necessary requirements of Section 1862(a)(1)(A) of the Act. Therefore, payment was not allowed and the QIC found the overpayment valid. (File 2).

***Appellant Statements and Arguments***

The Appellant, in their written appeal request, contends that Amnio Quad-Core is not investigational or experimental. They argue that the QIC's determination that Q-code designation inherently signifies a product is investigational or experimental is inaccurate and procedurally flawed. Rather, Q-codes are used for products that do not yet have a CPT code or permanent national Level II HCPCS code, and Q-codes are routinely assigned to Medicare covered products and services. The Appellant states that a denial based solely on the presence of a Q-code reflects a misunderstanding of CMS's HCPCS coding system and lacks any support in statute, regulation, or CMS guidance and should not be used as a basis for denial. (File 1).

The Appellant also contends that the skin substitute was applied in accordance with LCD L35041, which allows skin substitute product usage for certain defined wound types such as diabetic foot ulcers and venous leg ulcers, includes the product category and/or type (such as an allograft), and does not expressly exclude the specific product at issue. Because the Appellant believes that the product was used in accordance with the coverage parameters outlined in an active LCD, they argue it cannot be considered investigational or experimental and should be entitled to Medicare coverage. (File 1).

At hearing, the Appellant reiterated their issues with the QIC's denial based on Amnio Quad-Core's Q code status. They contend that the claim at issue meets all requirements of LCD L35041 for usage of skin substitute products to treat venous leg ulcers and that, because usage of the category of product at issue for treatment of the Beneficiary's specific condition is allowed by the LCD, it cannot be considered investigational or experimental. The Appellant also testified that the product was used within the scope of an FDA Tissue Reference Group (TRG) letter and that there was nothing to suggest the product was intended for wound healing or inflammation reduction. Rather, the product was used as a wound covering and within manufacturer intent, meaning homologous use requirements were met. (File 4).

The Appellant also testified as to the medical necessity of the product for treatment of the Beneficiary and her specific condition. Specifically, the Beneficiary's venous leg ulcers had been present for 22 months on the date of service and, despite extensive conservative measures and best practice wound care, the wounds persisted. Due to failure to respond to conservative treatment, skin substitute grafts were considered reasonable and necessary as the next step in the Beneficiary's treatment. The Beneficiary's wounds responded well to the skin substitute treatments and she experienced an over 90% reduction in wound surface area and volume over the course of treatment. Based on this, the Appellant believes that the escalation to use of skin substitute products for treatment of the Beneficiary was justified. (File 4).

***ALJ Findings***

In determining whether the amniotic allograft products are reasonable and necessary for the beneficiaries, the ALJ looked first to whether it was regulated as an HCT/P or being used properly (e.g., a homologous use) as an HCT/P. For a product to be regulated as an HCT/P, it must meet specific regulatory requirements as established under section 361 of the of the PHS Act and further delineated in regulations at 21 C.F.R. § 1271.10. In general, if a product does not qualify as an HCT/P, by default the product must be regulated as a drug and/or biological under section 351 of the PHS Act and the Food, Drug, & Cosmetic (FD&C) Act; or must seek approval as a 510K medical device as per the FD&C Act. However, should a product be appropriately designated as an HCT/P under section 361, it may bypass the formal FDA drug/biological/device approval process and go straight to market to be sold to the public.

The four criteria are: (1) the HCT/P is minimally manipulated; (2) the HCT/P is intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent; (3) the manufacture of the HCT/P does not involve the combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise new clinical safety concerns with respect to the HCT/P; and (4) either: (i) the HCT/P does not have a systemic effect and is not dependent upon the metabolic activity of living cells for its primary function; or (ii) the HCT/P has a systemic effect or is dependent upon the metabolic activity of living cells for its primary function, and: (a) is for autologous use; (b) is for allogeneic use in a first-degree or second-degree blood relative; or (c) is for reproductive use. 21 C.F.R. § 1271.10(a). Homologous use means the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor. 21 C.F.R. § 1271.3(c).

A letter was issued by the FDA's Tissue Reference Group (TRG) on September 2, 2022, indicating that Amnio Quad-Core Amniotic Membrane Sheets are registered as being regulated under section 361 of the PHS Act and the regulations in 21 C.F.R. § 1271. (File 4, pp. 142-143). The letter specifies that the product is only regulated this way when used in a homologous way. If the product is not used for a homologous purpose, it is not regulated under section 361 regardless of any letters issued by the TRG. Furthermore, this does not make Amnio Quad-Core an "FDA approved" product.

An FDA approval under Section 361 does not prove (or disprove) a treatment is safe and effective for Medicare purposes. *See* 21 C.F.R. § 1271. Also, the existence of a Level II HCPCS code (e.g., 4294) is not evidence that a product or service is safe and effective. Nor is it evidence

to the contrary.[2] HCPCS codes are not intended to embody legal presumptions in Medicare coverage decisions. *See* CMS Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures. Any argument regarding a HCPCS/Q code supporting safety and efficacy is non-probative and, thus, is immaterial for purposes of this appeal.

Appellant asserted that because Amnio Quad-Core is Section 361 registered, has been assigned a HCPCS code, and is not explicitly barred from coverage per an LCD, the product should not be classified as experimental or investigational for Medicare purposes.

Literature was provided by Appellant to try to satisfy the burden of proof that use of Amnio Quad-Core is not investigational or experimental when used for treatment of chronic ulcers, including venous leg ulcers and diabetic foot ulcers. (*See* File 4, pp. 67-139). However, none of the literature provides a large (n>30) scale, randomized clinical trial that proves the safety or efficacy of Amnio Quad-Core specifically. Rather, the literature is focused on other amniotic membrane products or on general medical-technological trends in the HCT/P wound care field. To the degree other products are reviewed, these products are generally propriety and distinct products that have a multitude of descriptions and uses and the ALJ cannot automatically equate one skin substitute or amniotic membrane product with another. Finally, and notably, the articles indicate that the HCT/P products are being used actively to engage in intracellular signaling and promote a cell or skin reaction to healing. Thus, the uses described in the literature are not merely wound cover uses and not homologous as to Amnio Quad-Core's FDA labeling. When used in this way, the product is exceeding a homologous use, which renders it outside the scope of the FDA label under Section 361.

Even if the ALJ accepts that Amnio Quad-Core was being used solely under Section 361 as a wound cover or barrier, there is minimal evidence in the record that shows the product is safe and effective for this purpose.[3] As stated above, the Appellant did not provide published, peer-reviewed literature to support the use of the specific product at issue, Amnio Quad-Core, or even biosimilar HCT/P products, for treatment of chronic wounds. The product may well be helping, or at a minimum harmless, but that is not the standard to prove safety and effectiveness for Medicare coverage purposes.

In summary, Amnio Quad-Core has not been shown to be regulated under section 361 of the PHS Act when used in the manner in which it was used in this case. Even if the product was assumed to be governed by section 361, it has not been shown to meet Medicare's standards for a treatment considered safe and effective for the purpose for which it was used in this case. This decision is based on Medicare regulations and statutes and makes no determination concerning the physician's decision to treat the beneficiaries with the products at issue. For Medicare purposes Amnio Quad-Core is investigational and experimental and not covered based on the specific record before me.

---

[2] The ALJ agrees with the Appellant's argument that the QIC's denial based on the assignment of a Q-code to the product at issue is neither supported by law nor established Medicare policy.

[3] The ALJ is focused solely on the Medicare context. The ALJ is not purporting to rule on FDA status and is only looking at FDA status or homologous use for purposes of the Medicare coverage analysis. Skin substitutes using placenta/amniotic products have some promise. New LCDs allowing coverage may eventually be published. The product, both individually and as a whole, also could benefit from further study in large, random clinical trials. But these hypotheticals are beyond the scope of this matter, and the record before me does not prove that Amnio Quad-Core is not investigational or experimental.

I find the product at issue, Amnio Quad-Core (Q4294), cannot be covered by Medicare in this instance. I also find the related application code, shown by the CPT codes 15271, is not covered, as it is a service related to a non-covered claim. *MBPM*, ch. 16, § 180.

*Medical Necessity*

Basic medical reasonable and necessary criteria is not entirely relevant in this decision, as the primary denial reason is the items/services being considered investigational/experimental, but the ALJ explores the topic briefly here.

The Beneficiary had a medical history including chronic venous leg ulcers, chronic diabetic foot ulcers, severe atherosclerotic disease, peripheral artery disease, hepatomegaly with steatosis, chronic venous insufficiency, peripheral vascular disease, lymphedema, and diabetes mellitus type 2. (File 3, pp. 22-55). She suffered from longstanding chronic ulcerations of the lower extremities including both diabetic foot ulcers and venous leg ulcers. As of March 20, 2024, she had a right lateral diabetic foot ulcer measuring 1.0 x 0.8 x 0.1 cm present for over six months, a right lateral venous leg ulcers measuring 0.3 x 0.2 x 0.1 cm present for over six months, and a left leg venous leg ulcers measuring 0.6 x 0.5 x 0.1 cm present for over six months. Conservative measures attempted to treat these wounds included compression, off-loading, proper nutritional, diabetes management, debridement as needed, use of protective ointment and polymem foam, and weekly cleaning and dressing changes. On March 20, 2024, it was determined that the Beneficiary would benefit from use of amniotic tissue allografts. (*Id.*).

On May 29, 2024, the Beneficiary underwent Amnio Quad-Core amniotic membrane allograft application on her leg ulcers after previous receiving such treatments on or about May 22 and April 17, 2024. (File 3, pp. 22-55). For background reference, on April 17, 2024, her right lateral venous leg ulcer measured 1.0 x 1.0 x 0.1 cm and was considered improving with no signs of infection.[4] The right anterior venous leg ulcer measured 1.7 x 1.5 x 0.1 cm and was considered improving with no signs of infection. The right lateral ankle ulcer measured 2.5 x 4.0 x 0.1 cm and was considered deteriorating but free from infection. One 2 x 3 cm graft equal to 6 units and 2.5 units of a separate 2 x 3 cm graft were applied to the right lateral ankle ulcer. The remaining 3.5 units of the divided 2 x 3 cm graft were applied to the right lateral and right anterior venous leg ulcers. There was further response to treatment from the May applications, albeit the ALJ has some lingering doubt about whether April 17 might have been sufficient. (*Id*).

Upon review of the medical records, several themes developed. First, the records support the presence of diabetic or venous leg ulcers present for at least 6 months and unresponsive to appropriate, conservative wound care for at least 30 days. The testimony and records made clear that there was a good faith approach to use of the amniotic membrane allografts, and the clinicians felt the products could work on the wounds at issue. Second, while the amount of this expensive amniotic membrane graft product used caused some concern for the ALJ, LCD L35041 does not explicitly limit the amount of product that can be used on individual ulcers. Rather, it limits the number of treatments to 10 applications over a 12-week maximum period of care. In this instance, the application(s) at issue come close but do not exceed the LCD number limit. Some of the ulcers were relatively small too, but met the LCD minimum size requirement. See, LCD L35041.

---

[4] The 1 x 1 x 0.1 ulcer is just barely large enough to satisfy the LCD, which requires an ulcer to be 1.0 square cm or larger for treatment with skin substitute products.

Based on the above, and despite the ALJ's general concerns over usage of this product over more reasonably priced wound coverings, LCD L35041 does not preclude usage of skin substitute products on the Beneficiary's diabetic or venous leg ulcers. However, despite meeting LCD guidelines for general skin substitute treatment of diabetic or venous leg ulcers, the specific product used, Amnio Quad-Core, is still found to be investigational or experimental for the reasons detailed above. Because Amnio Quad-Core is found to be investigational or experimental it cannot be considered medically reasonable and necessary and is not entitled to Medicare coverage.

***Liability***

The final issue before the ALJ is liability for the denied services at issue. Medicare coverage does not exist for the services at issue because the services are found to be investigational/experimental, and they are not found to be medically necessary for the beneficiary and date of service at issue. When items or services are found not to be reasonable and necessary under § 1862(a)(1)(A) of the Act, and therefore are not covered by Medicare, the limitation on liability provisions of § 1879 of the Act may apply if neither the beneficiary nor the provider had reason to know the services would not be covered.

The beneficiary whose Medicare claim was denied pursuant to § 1862(a)(1)(A) of the Act is not financially liable for the non-covered services because their liability is limited under § 1879 of the Act. Under the regulations, a beneficiary who receives a non-covered service is considered to have known that Medicare would not cover the service if written notice of non-coverage was furnished by any of the following entities: QIOs, fiscal intermediaries, carriers, utilization review committees, providers, suppliers, or the beneficiary's attending physician. *See* 42 C.F.R. § 411.406. In this instance, the record does not contain any evidence that the beneficiary received written notice of non-coverage, nor does the record contain any other evidence that the beneficiary was made aware of the fact that Medicare might not cover the services at issue. Therefore, the beneficiary is not financially liable for the non-covered services.

A provider who furnishes non-covered services is considered to have known that the services were not covered if the QIO, intermediary, or carrier had informed the supplier that the item furnished was not covered. *See* 42 C.F.R. § 411.406(b). However, the regulations also confer constructive knowledge of non-coverage to providers based on any of the following: (1) receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or QIOs, including notification of QIO screening criteria specific to the condition of the beneficiary for whom the furnished services are at issue and of medical procedures subject to preadmission review by a QIO; (2) Federal Register publications containing notice of national coverage decisions or of other specifications regarding non-coverage of an item or service; or (3) knowledge of what are considered acceptable standards of practice by the local medical community. *See* 42 C.F.R. § 411.406(e).

Under the *MFMM*, a provider, physician, or other supplier is "without fault" in causing an overpayment when the provider: (1) exercised reasonable care in billing for, and accepting, the payment; (2) made full disclosure of all material facts; and (3) had a reasonable basis for assuming that the payment was correct based of the information available to the provider, including, but not limited to, the Medicare instructions and regulations. CMS, *Medicare Financial Management Manual (MFMM) (Internet-Only Manual Publ'n 100-06)* ch. 3 § 90 (Feb. 2017).

The Appellant's liability may neither be limited under § 1879 of the Act nor waived under § 1870 of the Act. The Appellant had access to CMS notices and Federal Register publications and had knowledge of what were considered accepted standards of medical practice on the date at issue. As such, the Appellant knew or should have known that the lack of directly applicable randomized clinical trials, the presence of an FDA Tissue Resource Group (TRG) letter or lack thereof, and the assignment of a billing code is not equivalent to full Medicare approval of an item or service. Relying on manufacturer materials, the mere assignment of a Q code, or relatively vague LCD is not enough. The Appellant should have known of the danger of an audit on these high-cost wound care products. The Appellant was trying to be careful in their employment of such products; but that also has to mean the Appellant knew the products used might be looked at by CMS or its contractors. Medicare often audits such claims. The ALJ cannot find the Appellant without fault on this record for overpayment purposes under § 1870 and the Appellant had too much knowledge to receive the liability limitation of § 1879. Accordingly, the Appellant remains liable for costs related to the non-covered services and recovery of the overpayment is not waived

## CONCLUSIONS OF LAW

The Amnio-Quad Core and related application services provided to the Beneficiary on the date of service at issue are not entitled to Medicare coverage as detailed in this decision. The Appellant remains liable for the outstanding costs related to the non-covered services and the overpayment is not waived.

## ORDER

For the reasoning discussed above, this decision is **UNFAVORABLE**. The Appellant is liable for the outstanding costs related to the non-covered services and the overpayment is not waived. I direct the Medicare administrative contractor to process the claims in accordance with this decision.

**SO ORDERED**

Aaron Raff
Administrative Law Judge

DEPARTMENT OF HEALTH AND HUMAN SERVICES (DHHS) / DEPARTMENTAL APPEALS BOARD Form DAB-101 (12/19)

**REQUEST FOR REVIEW OF ADMINISTRATIVE LAW JUDGE (ALJ) MEDICARE DECISION / DISMISSAL**

| | |
|---|---|
| 1. APPELLANT (the party requesting review) | 2. ALJ APPEAL NUMBER (on the decision or dismissal) |
| 3. BENEFICIARY* | 4. MEDICARE NUMBER (Health Insurance Claim Number (HICN) or Medicare Beneficiary Identifier (MBI))* |

*If the request involves multiple claims or multiple beneficiaries, attach a list of beneficiaries, Medicare numbers, and any other information to identify all claims being appealed.

| | |
|---|---|
| 5. PROVIDER, PRACTITIONER, OR SUPPLIER | 6. SPECIFIC ITEM(S) OR SERVICE(S) |

7. Medicare claim type: ☐ Part A ☐ Part B ☐ Part C - Medicare Advantage
☐ Part D - Medicare Prescription Drug Plan ☐ Entitlement/enrollment for Part A or Part B

8. Does this request involve authorization for an item or service that has not yet been furnished?
☐ Yes If Yes, skip to Block 9.
☐ No If No, Specific Dates of Service:

9. If the request involves authorization for a prescription drug under Medicare Part D, would application of the standard appellate timeframe seriously jeopardize the beneficiary's life, health, or ability to regain maximum function (as documented by a physician) such that expedited review is appropriate? ☐ Yes ☐ No

I request that the Medicare Appeals Council review the ALJ's ☐ decision or ☐ dismissal order [check one] dated_____________________________. I disagree with the ALJ's action because (specify the parts of the ALJ's decision or dismissal you disagree with and why you think the ALJ was wrong):

________________________________________________________

________________________________________________________

________________________________________________________

________________________________________________________

(Attach additional sheets if you need more space)

**PLEASE ATTACH A COPY OF THE ALJ DECISION OR DISMISSAL ORDER YOU ARE APPEALING.**

| | | | | | |
|---|---|---|---|---|---|
| DATE | | | DATE | | |
| APPELLANT'S NAME (the party requesting review) | | | REPRESENTATIVE'S NAME (include signed appointment of representative if not already submitted) | | |
| ADDRESS | | | ADDRESS | | |
| CITY, STATE, ZIP CODE | | | CITY, STATE, ZIP CODE | | |
| TELEPHONE NUMBER | FAX NUMBER | E-MAIL | TELEPHONE NUMBER | FAX NUMBER | E-MAIL |

(SEE FURTHER INSTRUCTIONS ON PAGE 2)

Form DAB-101 (12/19)

If you have additional evidence, submit it with this request for review. If you need more time, you must request an extension of time in writing now, explaining why you are unable to submit the evidence or legal argument now.

*If you are a provider, supplier, or a beneficiary represented by a provider or supplier, and your case was reconsidered by a Qualified Independent Contractor (QIC), the Medicare Appeals Council will not consider new evidence related to issues the QIC has already considered unless you show that you have a good reason for submitting it for the first time to the Medicare Appeals Council.*

**IMPORTANT: Include the HICN or MBI and ALJ Appeal Number on any letter or other material you submit.**

This request must be received within 60 calendar days after you receive the ALJ's decision or dismissal, unless we extend the time limit for good cause. We assume you received the decision or dismissal 5 calendar days after it was issued, unless you show you received it later. If this request will not be received within 65 calendar days from the date on the decision or dismissal order, please explain why on a separate sheet.

---

You must file your request for review in writing with the Medicare Appeals Council at:

Department of Health and Human Services
Departmental Appeals Board
Medicare Appeals Council, MS 6127
Cohen Building Room G-644
330 Independence Ave., S.W.
Washington, D.C. 20201

You may send the request for review by U.S. Mail, a common carrier such as FedEx, or by fax to (202) 565-0227. If you send a fax, please do not also mail a copy. ***You must send a copy of your appeal to the other parties and indicate that all parties, to include all beneficiaries, have been copied on the request for review. For claims involving multiple beneficiaries, you may submit a copy of the cover letters issued or a spreadsheet of the beneficiaries and addresses who received a copy of the request for review.***

If you have any questions about your request for review or wish to request expedited review of a claim involving authorization of your prescription drug under Medicare Part D, you may call the Medicare Appeals Council's staff in the Medicare Operations Division of the Departmental Appeals Board at (202) 565-0100. You may also visit our web site at www.hhs.gov/dab for additional information on how to file your request for review.

## PRIVACY ACT STATEMENT

The collection of information on this form is authorized by the Social Security Act (section 205(a) of title II, section 702 of title VII, section 1155 of Title XI, and sections 1852(g)(5), 1869(b)(1), 1871, 1872, and 1876(c)(5)(B) of title XVIII, as appropriate). The information provided will be used to further document your claim. Information requested on this form is voluntary, but failure to provide all or any part of the requested information may affect the determination of your claim. Information you furnish on this form may be disclosed by the Department of Health and Human Services or the Social Security Administration to another person or governmental agency only with respect to programs under the Social Security Act and to comply with Federal laws requiring the disclosure of information or the exchange of information between the Department of Health and Human Services, the Social Security Administration, or other agencies.

**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Kansas City, MO**

| | |
|---|---|
| Appeal of: **CHRIS MCGEE MD PA** | OMHA Appeal No.: **3-15466927299** |
| Beneficiary: [redacted] | Medicare Part: **B** |
| Medicare No.: | Before: **Aaron Raff**<br>Administrative Law Judge |

Index of the Administrative Record and Exhibit List

| **Exhibit Record** | **Administrative File Reference** File Name | Page Range |
|---|---|---|
| Procedural - CMS Levels: Reconsideration | File 2 | 1 : 16 |
| Procedural - CMS Levels: Request for Reconsideration | File 3 | 1 : 132 |
| Procedural - CMS Levels: Redetermination case file | File 4 | 1 : 737 |
| Procedural - OMHA Level: Request for ALJ Hearing | File 1 | 1 : 21 |
| Procedural - OMHA Level: General: App Rep RNOH | File 10 | 1 : 4 |
| Procedural - OMHA Level: Signed Decision | File 11 | 1 : 15 |
| Procedural - OMHA Level: Notice of Decision | File 12 | 1 : 23 |
| Procedural - OMHA Level: Consolidated Notice of Hearing | File 7 | 1 : 9 |
| Procedural - OMHA Level: General: ROC | File 8 | 1 : 1 |
| Proceeding (Audios): General: Hearing Audio | File 9 | 1 : 1 |

| **Non-Exhibit Record** | **Administrative File Reference** File Name | Page Range |
|---|---|---|
| Records not considered: Transmittal cover sheet | File 5 | 1 : 1 |
| Records not considered: QIC Acknowledgment letter | File 6 | 1 : 3 |

OMHA-156
Dated: 2026-02-19