# Complaint Exhibit 36

DEPARTMENT OF HEALTH & HUMAN SERVICES Office of the Secretary

Departmental Appeals Board, MS 6127
Medicare Appeals Council
330 Independence Avenue
Cohen Building, Room G-644
Washington, DC 20201
(202)565-0100/Toll Free:1-866-365-8204

Docket Number: M-25-3366
OMHA Appeal Number: 3-14462036656

[redacted]

# NOTICE OF OWN MOTION REVIEW AND DECISION OF MEDICARE APPEALS COUNCIL

## Notice to Beneficiaries

You are one of the beneficiaries whose Medicare claim is included in this decision. To preserve your privacy, only the appellant will receive a list of all beneficiaries. Each beneficiary will receive a redacted beneficiary list.

## What This Notice Means

The Medicare Appeals Council (Council), under the authority of 42 C.F.R. § 405.1110, has decided, on its own motion, to review the Administrative Law Judge (ALJ)'s action dated May 28, 2025. In the enclosed decision, we explain why.

In deciding to review the action below, the Council has considered the memorandum from the Centers for Medicare & Medicaid Services (CMS) dated July 18, 2025. A copy of the memorandum, with any attachments, was previously provided to you by CMS.

If you have any questions, you may contact the CMS regional office or the local Medicare contractor.

## Your Right to Court Review

If you desire court review of the Council's decision and the amount in controversy is $1,900 or more, you may commence a civil action by filing a complaint in the United

States District Court for the judicial district in which you reside or have your principal place of business. *See* § 1869(b) of the Social Security Act, 42 U.S.C. § 1395ff(b). The complaint must be filed within sixty days after the date this letter is received. 42 C.F.R. § 405.1130. It will be presumed that this letter is received within five days after the date shown above unless a reasonable showing to the contrary is made. 42 C.F.R. § 405.1136(c)(2).

If you cannot file your complaint within sixty days, you may ask the Council to extend the time in which you may begin a civil action. However, the Council will only extend the time if you provide a good reason for not meeting the deadline. Your reason must be set forth clearly in your request. 42 C.F.R. § 405.1134.

If a civil action is commenced, the complaint should name the Secretary of Health and Human Services as the defendant and should include the Council's docket number and ALJ appeal number shown at the top of this notice. 42 C.F.R. § 405.1136(d). The Secretary must be served by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of Health and Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201. In addition, you must serve the United States Attorney for the district in which you file your complaint and the Attorney General of the United States. *See* rules 4(c) and (i) of the Federal Rules of Civil Procedure and 45 C.F.R. § 4.1.

This notice and enclosed order were mailed on: October 8, 2025.

Enclosure

cc: Beneficiaries
[redacted]

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
**Medicare Appeals Council**
**Docket No. M-25-3366**

[redacted] Appellant
OMHA Appeal No. 3-14462036656

## DECISION

The Medicare Appeals Council (Council) has decided, on its own motion, to review the Administrative Law Judge (ALJ)'s decision dated May 28, 2025, concerning Medicare Part B coverage of Artacent wound, per sq cm (Healthcare Common Procedure Coding System (HCPCS) code Q4169), carePATCH, per sq cm (HCPCS code Q4236), Zenith Amniotic Membrane, per sq cm (HCPCS code Q4253), and application of skin substitute grafts (Current Procedural Terminology (CPT) codes 15271, 15272, 15273 and 15275) that the appellant furnished to five beneficiaries on various dates of service.[1,2] The ALJ found that Medicare covers the grafts and application procedures at issue.[3]

By memorandum dated July 18, 2025, the Centers for Medicare & Medicaid Services (CMS) has asked the Medicare Appeals Council (Council) to review the ALJ's decision. 42 C.F.R. § 405.1110. The Council limits its consideration of the ALJ's decision to the specific exceptions raised by CMS. *Id.* § 405.1110(c). We enter the CMS referral memorandum into the record as Exhibit (Exh.) MAC-1. CMS provided notice of its referral to the appellant and beneficiaries, and we enter the notice letter into the record as Exh. MAC-2. We did not receive a response from any of the copied beneficiaries.

The appellant filed a response; however, the response did not indicate the appellant provided copies of its response to the beneficiaries despite notice from CMS of the regulatory requirement. *See* Exh. MAC-2 (citing 42 C.F.R. § 405.1110 and stating

---

[1] CMS does not challenge the ALJ's decision with respect to Zenith Amniotic Membrane, per sq cm (HCPCS code Q4253) and the related application codes. *See* Exh. MAC-1 at 1-2; File 2 at 12-24. Therefore, we do not disturb the ALJ's conclusions regarding Q4253 and the related application codes as they pertain to each beneficiary.

[2] The appellant sought reconsideration for both HCPCS Q4253 and application code 15271 for beneficiary [redacted] on the date of service of October 19, 2022. File 12 at 9. However, the Qualified Independent Contractor adjudicated only application code 15271 for that date of service. *See* File 2 at 23. The ALJ addressed this date of service and ruled fully favorably. *See* Decision at 22, 24-25. Therefore, as application code 15271 related to the application of Q4253, which CMS does not challenge here, the Council will not disturb the ALJ's favorable ruling for application code 15271 for this date of service.

[3] A complete list of beneficiaries, HCPCS and CPT codes at issue, and dates of service, is included as Attachment A to this decision but, for privacy purposes, each beneficiary will receive a redacted version of the attachment that contains only the information that corresponds to them.

"[y]ou must also send a copy to the AdQIC at the address below and all other parties to the ALJ's decision who received a copy of the hearing decision or notice of dismissal"); Notice of Decision (NOD) at 6. Therefore, we exclude the appellant's response. 42 C.F.R. § 405.1110(b)(2).

For the reasons set forth below, we find that the preponderance of the evidence does not support a determination of reasonableness and necessity for the services at issue. *Id.* § 405.1110. The Council, thus, reverses the ALJ's decision, and finds that Medicare does not cover the Artacent Wound, per sq cm, (Q4169) and carePATCH (Q4236) allografts and the related application codes (CPT codes 15271, 15272, 15273 and 15275). The appellant is liable for the non-covered costs and not entitled to waiver of the overpayment.

## DISCUSSION

At issue in this case is Medicare coverage of Artacent Wound, per sq cm, (Q4169) and carePATCH (Q4236) allografts and the related application codes (CPT codes 15271, 15272, 15273 and 15275), for which the appellant submitted claims to Medicare for reimbursement. The allografts at issue were ordered for all five beneficiaries to treat complaints of chronic diabetic wounds to the left heel for beneficiary [redacted] (File 9 at 37, 40), to the left ankle (*id.* at 511, 519, 688, 699, 707), right ankle (*id.* at 519, 525, 533, 539, 664, 670, 682, 688, 699, 707), and sacrum of beneficiary [redacted] (*id.* at 688, 699, 707), to the right heel of beneficiary [redacted] (*id.* at 3763, 3766, 3769, 3772, 3775, 3778, 3781, 3791, 3803, 3809, 3812, 3816), sacrum of beneficiary [redacted] (*id.* at 2036, 2041), and to the right heel of beneficiary [redacted] (*id.* at 5161, 5164, 5184). Initially, the Medicare contractor paid the claims.

Subsequently, a Unified Program Integrity Contractor (UPIC) conducted a post-payment review and notified the appellant of the review results and overpayment determination. File 4. The UPIC identified overpayments of claims made to the appellant for the products and services at issue. *Id.* at 9, 11-13, 26, 35-37, 39, 50, 62-64, 67-69, 78-80, 83-85, 108.

In its redetermination decision, the Medicare Administrative Contractor denied coverage because the documentation did not support that baseline measurements with a prior course of conservative treatment were provided and that, for some beneficiaries, no documentation was submitted. File 5 at 5-9. This denial of coverage was affirmed by the Qualified Independent Contractor (QIC) in its reconsideration decision. File 2 at 1–28. Specifically, the QIC noted that the documentation failed to demonstrate previous wound care treatments were provided, failed to demonstrate wound healing was not progressing as expected, did not support a clinical condition listed in Local Coverage Determination (LCD) L36466, and that "[g]iven the lack of peer-reviewed, evidence-based literature in support of Q4169, Q4236, and Q4253, it is the QIC's determination that the [appellant]

has not met their burden of showing the services meet the medically reasonable and necessary requirements" of the regulations and that the related application codes are not separately payable. File 2 at 10.

Following a hearing, the ALJ issued a fully favorable decision regarding the five beneficiaries at issue. *See* Decision (Dec.). The ALJ found the allografts furnished to the beneficiaries were medically reasonable and necessary in accordance with § 1862(a) of the Social Security Act (Act). *Id.* at 4-25. The ALJ determined that there was no applicable National Coverage Determination (NCD) or LCD in this case, thus an item or service must be reasonable and necessary based on the factors outlined in the Medicare Program Integrity Manual (MPIM), CMS Pub. 100-08, Ch. 3, § 3.6.2.2. *Id.* at 2-3. Applying these factors, the ALJ concluded that each beneficiary suffered from chronic diabetic wounds, failed conservative treatment measures, that amniotic membrane skin grafts were within the standard of care and were provided by the appropriate practitioner in the appropriate setting, and the allografts met, but did not exceed, each beneficiary's medical need. *See id.* at 6, 8, 11, 14, 17, 19-21, 24-25.

Relevant here, the ALJ found the allografts at issue were safe and effective and not experimental or investigational. *Id.* at 3. Specifically, the ALJ found that although the clinical studies presented did not address the specific allografts at issue, the studies demonstrated generally that "amniotic-membrane based skin substitute grafts are both safe and effective in the treatment of venous and diabetic wounds." *Id.* The ALJ was persuaded by the argument that the allografts at issue were similar to those presented in the studies and that the studies showed "clinically significant improved healing in the groups administered amniotic membrane skin substitute grafts compared to other bioengineered products or standard collagen dressing." *Id.* The ALJ noted that the studies did not indicate any safety concerns with amniotic membrane skin grafts. *Id.*

Before the Council, CMS contends the ALJ erred as a matter of law in determining that the Artacent and carePATCH allografts and their related graft application services were medically reasonable and necessary under the MPIM because the ALJ did not properly apply this Medicare authority. Exh. MAC-1 at 2-3, 16-19. CMS contends that, while the ALJ's decision used pertinent language from applicable guidelines, the ALJ did not perform the appropriate analysis, such as whether the allografts at issue are safe and effective, not investigational or experimental, and appropriate for the treatment of the specific wounds in this case based on the available evidence of general acceptance by the medical community, including peer-reviewed literature, as required by Medicare authorities. *Id.* at 3, 16-19. Instead, CMS argues that the ALJ acknowledged the appellant's clinical literature did not mention the specific allografts at issue and erroneously concluded that the studies showed clinically significant improvement in healing from amniotic membrane skin substitutes, did not indicate any safety concerns, and that "these products and those like them" have been in use for over ten years to treat chronic wounds. *Id.* at 3. CMS asserts that the submitted articles do not establish

evidence in the administrative record that the Artacent and carePATCH allografts were reasonable and necessary for treatment of the beneficiaries' wounds. *Id.* Finally, CMS contends that, because the allografts are not reasonable and necessary, the related application services were also not reasonable and necessary. *Id.* at 19. Thus, CMS concludes that the ALJ's decision contains an error of law material to the outcome of the appellant's claims because it resulted in orders for Medicare coverage and payment without a determination that the services were medically reasonable and necessary in accordance with CMS policies. *Id.* at 19-22.

Additionally, CMS asserts that the preponderance of the evidence does not support a determination of reasonableness and necessity as set forth in the MPIM. *Id.* at 19-21. CMS explains that none of the articles in the record are sufficient to show that the application of Artacent and carePATCH allografts were reasonable and necessary for the treatment of the beneficiaries' ankle, foot, or sacrum wounds. *Id.* at 20.

Upon review, we agree with CMS that, after applying pertinent CMS guidance for determining medical reasonableness and necessity in the absence of an NCD, LCD, or other guidance, the administrative record fails to support by a preponderance of the evidence that Medicare coverage is warranted. *See* 42 C.F.R. § 405.1110(b)(1).

Relevant here, § 1862(a)(1)(A) of the Act provides that Medicare will cover only items and services that are medically reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the function of a malformed body member. As the party seeking payment, the appellant has the burden to demonstrate that the services for which it seeks coverage are reasonable and necessary for the purposes provided. 42 C.F.R. § 424.5(a)(6).

Absent an applicable NCD, LCD, or policy manual guidance, as is the case here, contractors and adjudicators must make individual reasonable and necessary determinations by assessing whether the service is safe and effective, not experimental or investigational, and appropriate. MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1-3.6.2.2. Medicare defines "appropriate" to require, among other things, that the service must be furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition or to improve the function of a malformed body member; that it is a service that meets, but does not exceed, the beneficiary's medical need; and that it is furnished in a setting appropriate to the beneficiary's medical needs and condition. *See id.* § 3.6.2.2.

The MPIM further states that, when developing an LCD, a MAC shall use evidence of "general acceptance by the medical community" including "published original research in peer-reviewed medical journals, systematic reviews and meta-analyses, evidence-based consensus statements and clinical guidelines." MPIM, Ch. 13, § 13.5.3; *see also id.* § 13.2.3 ("[a]cceptance by individual health care providers, or even a limited group of

health care providers, does not indicate general acceptance of the item or service by the medical community."). While these MPIM provisions constitute guidance for contractors assessing medical reasonableness and necessity and in conducting an evidentiary review during an LCD's development, they necessarily apply to adjudicators, including ALJs and the Council, reviewing the contractor's medical reasonableness and necessity determination in the absence of an applicable NCD or LCD. The manual provisions thus treat the underlying medical literature as an inherent part of evaluating whether an item or service is reasonable and necessary, including whether it is safe and effective, not experimental or investigational, and appropriate. *See* MPIM, Ch. 3, § 3.6.2.2; 42 C.F.R. § 405.1046(a) (noting that the ALJ's decision should include "a summary of any clinical or scientific evidence used in making the determination"); *see also* MPIM, Ch. 13, §§ 13.2.3, 13.5.3, 13.5.4.

In addition, in making coverage determinations, CMS has historically interpreted the terms "reasonable and necessary" to mean that the item or service in question is safe and effective and not experimental, based on "acceptable clinical evidence" and "authoritative evidence." *See* 54 Fed. Reg. 4249, 4304 (Jan. 30, 1989); 52 Fed. Reg. 15560, 15561-62 (Apr. 29, 1987). Also, in the context of reviewing individual coverage determinations, the regulations specifically contemplate consideration of scientific evidence. *See* 42 C.F.R. § 405.1046(a).

In this case, the Council agrees with CMS and finds the preponderance of the evidence contained within the administrative record fails to sufficiently satisfy the reasonable and necessary standards set forth in the MPIM. *See* MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1-3.6.2.2; *see also* MPIM, Ch. 13, §§ 13.5.3, 13.5.4. We acknowledge that the ALJ made findings that clinical studies demonstrate "amniotic membrane allografts applied as skin substitutes" are safe and effective for the treatment of diabetic wounds and are not experimental or investigational. Dec. at 3. However, as the ALJ acknowledged, "none of the studies presented included the skin substitute grafts at issue, only similar products." *Id.* Thus, as explained further below, we find the record before us does not demonstrate the MPIM medical necessity factors were not met in this case. *See id.*; MPIM, Ch. 3, § 3.6.2.2; *see also* MPIM, Ch. 13, § 13.5.3.

The record contains an "Artacent AC" product description from PodiatrySource, an Artacent wound application guide from Tides Medical, a carePATCH product listing from Medcillary, a Zenith amniotic membrane allograft product description, medical journal articles, and the beneficiaries' medical records. File 9 at 13-5422; File 23 at 40-92, 144-183; File 25 at 2; File 26 at 2, File 27 at 2-3, File 28 at 2-5; File 29 at 2-4. The record also contains the following medical literature:

- D. Snyder Ph.D, et. al., *Skin Substitutes for Treating Chronic Wounds*, Technology Assessment Program (2020)[4];
- Charles M. Zelen, et. al., *A Prospective, Randomised, Controlled, Multi-Centre Comparative Effectiveness Study of Healing Using Dehydrated Human Amnion/Chorion Membrane Allograft, Bioengineered Skin Substitute or Standard of Care for Treatment of Chronic Lower Extremity Ulcers*, International Wound Journal (2014);
- Charles M. Zelen, et. at., *A Prospective Randomised Comparative Study of Weekly Versus Biweekly Application of Dehydrated Human Amnion/Chorion Membrane Allograft in the Management of Diabetic Foot Ulcers*, International Wound Journal (2014);
- Lawrence A. DiDomenico, et. al., *Use of Aseptically Processed, Dehydrated Human Amnion and Chorion Membrane Improves Likelihood and Rate of Healing in Chronic Diabetic Foot Ulcers: A Prospective, Randomised, Multi-Centre Clinical Trial in 80 Patients*, International Wound Journal (2018);
- Paul Glat, M.D., et. al., *Placental Membrane Provides Improved Healing Efficacy and Lower Cost Versus a Tissue-Engineered Human Skin in the Treatment of Diabetic Foot Ulcerations*, PRS Global Open (2019);
- Robert D. Galiano, M.D., et. al., *A Prospective Multicenter Study of a Weekly Application Regimen of Viable Human Amnion Membrane Allograft in the Management of Nonhealing Diabetic Foot Ulcers*, PRS Global Open (2023);
- Thomas E. Serena, M.D., et. al., *A Multicenter, Randomized, Controlled, Clinical Trial Evaluating Dehydrated Human Amniotic Membrane in the Treatment of Venous Leg Ulcers*, PRS Journal (November 2022);
- Beverly Douglas, M.D., et. al. *The Fate of Homologous and Heterologous Chorionic Transplants as observed by the Transparent Tissue Chamber Technique in the Mouse* (1953);
- John A. McIntyre, et. al., *Antigens of Human Trophoblast: Effects of Heterologous Anti-Trophoblast Sera on Lymphocyte Responses in Vitro*, J. Exp. Med. (April 1979);
- Antonietta R. Silini, et. al., *The Long Path of Human Placenta, and its Derivatives, in Regenerative Medicine*, Frontiers in Bioengineering and Biotechnology (October 2015); and
- Alexandra M. Haugh, B.A., et. al., *Amnion Membrane in Diabetic Foot Wounds: A Meta-analysis*, PRS Global Open (2017).

*See id.*[5]

---

[4] Only the abstract was provided; the full article was not in the record.

[5] Some of the provided articles do not provide sufficient information to accurately cite, including journal volume numbers, and publish dates. However, as the literature is provided in its entirety we proceed with review of the articles and cite to them given the information that appears in the record.

As discussed above, without an applicable NCD or LCD, the MPIM clarifies that reasonableness, and necessity depends on whether the treatment is safe and effective, not experimental or investigational, and appropriate. *See* MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1-3.6.2.2; *see also* MPIM, Ch. 13, § 13.5.4. Based on our review of the entire record, we first find the record does not demonstrate Artacent nor carePATCH were safe and effective treatments for the beneficiaries' conditions.

The evidence provided, including the appellant's testimony, the product descriptions, wound application guide, and the beneficiaries' medical records, describe Artacent and carePATCH and their indications for use as a wound covering, but the evidence does not demonstrate that Artacent and carePATCH are safe and effective under Medicare criteria. *See* File 25 at 2; File 27 at 2, Hearing Audio (Files 31-37). Further, none of the above-referenced medical literature articles discuss Artacent or carePATCH at all, much less specifically for the treatment of chronic diabetic wounds to the heel, ankle or sacrum. *See* File 23 at 40-92, 144-183; File 28 at 2-5.

Rather, *A Prospective, Randomised, Controlled, Multi-Centre Comparative Effectiveness Study of Healing Using Dehydrated Human Amnion/Chorion Membrane Allograft, Bioengineered Skin Substitute or Standard of Care for Treatment of Chronic Lower Extremity Ulcers*, is an article summarizing a study intended to compare the healing characteristics of lower extremity ulcers treated with Apligraf and EpiFix, not Artacent or carePATCH. File 23 at 41. Further, the study included a variety of lower extremity diabetic ulcers and was unable to stratify by location or perform any meaningful sub-group analysis. *Id.* at 47. We do not find that evidentiary support for use of a specific product in the treatment of a specific condition translates into evidentiary support for use of another product for the treatment of that condition or another condition.

*A Prospective Randomised Comparative Study of Weekly Versus Biweekly Application of Dehydrated Human Amnion/Chorion Membrane Allograft in the Management of Diabetic Foot Ulcers*, is an article summarizing a study of diabetic foot ulcers treated with EpiFix. *Id.* at 50-51. Listed among the limitations of the study is the lack of a standard care group as the intent of the study "was solely to examine rates of healing according to frequency of application and not compare with other treatment modalities." *Id.* at 55. It concluded that "[a]s we did not include other advanced therapies in our study, we do not know if the product is as good as, or better, than other available advanced wound care products. Additional comparative effectiveness studies are required to address those questions." *Id.*

We note that two of the journal articles, *A Multicenter, Randomized, Controlled, Clinical Trial Evaluating Dehydrated Human Amniotic Membrane in the Treatment of Venous Leg Ulcers* and *A Prospective Multicenter Study of a Weekly Application Regimen of Viable Human Amnion Membrane Allograft in the Management of Nonhealing Diabetic Foot Ulcers* were published in November 2022 and sometime in 2023, respectively,

which is after many of the dates of service at issue here. *See* File 23 at 76-92. This is insufficient evidentiary support for use of Artacent or carePATCH allografts to treat the wounds at issue here.

The record also includes *Amnion Membrane in Diabetic Foot Wounds: A Meta-analysis*, an article intended to review commercially available products that have been compared to the standard of care and synthesize those results. File 23 at 179. The article described studies involving Grafix, a cryopreserved amniotic product, EpiFix, and Apligraf. *Id.* at 179-180. The focus was "solely on data that compared amniotic tissue products" with the standard of care, indicating that for diabetic foot wounds, amniotic tissue products were not yet the standard of care. *Id.* at 179. The article concluded that "amniotic membrane has great potential" but "it is unclear how these products would translate into every day clinical care of diabetic patients" as the clinical trial patients had been screened to ensure adequate tissue perfusion and lack of any signs of infection. *Id.* at 182. It concluded that further studies are necessary to "determine whether amniotic products have the same impact on all diabetic patients seen in clinical practice." *Id.*

The record includes several additional articles that likewise do not address the Artacent or carePATCH allografts at issue. *Skin Substitutes for Treating Chronic Wounds*, is a technical brief that identified and categorized 76 commercially available skin substitutes. File 28 at 2-5. The provided abstract does not identify the Artacent or carePATCH allografts at issue and ultimately concludes there is a "lack of studies examining the efficacy of most skin substitute products" and identifies the need for more studies. *Id.* at 3.

The record further includes *Antigens of Human Trophoblast*: *Effects of Heterologous Anti-Trophoblast Sera on Lymphocyte Responses in Vitro*, an article published in 1979, describing a study of the "inhibition of human mixed lymphocyte culture (MLC) reactions by rabbit antisera to intact and detergent solubilized, fractionated, human trophoblast membranes" and does not address Artacent or carePATCH allografts. *Id.* at 149-161. Furthermore, the record includes *The Fate of Homologous and Heterologous Chorionic Transplants as observed by the Transparent Tissue Chamber Technique in the Mouse*, an article published in 1953, which found that "[t]here is evidence (in the mouse) that transplants of fetal membranes serve as viable transplants, capable of cellular division and epithelialization", which indicated that "human chorionic grafts may be more useful as temporary coverage of wounds than are homoplastic grafts of skin." *Id.* at 148. Again, this article does not address Artacent or carePATCH, nor does it address the specific types of human wounds experienced by the beneficiaries in this case. *See id.* at 144-148.

Furthermore, *Use of Aseptically Processed, Dehydrated Human Amnion and Chorion Membrane Improves Likelihood and Rate of Healing in Chronic Diabetic Foot Ulcers: A Prospective, Randomised, Multi-Centre Clinical Trial in 80 Patients*, is an article

summarizing a study of diabetic foot ulcers treated with dehydrated human amnion and chorion allograft (dHACA, AmnioBand Membrane, Musculoskeletal Transplant Foundation [MTF], Edison, New Jersey). File 23 at 58-65. The study provided patients with either dHACA plus the standard of care, or the standard of care alone, again indicating that the allografts are not yet the standard of care. *Id.* at 59. The study concluded that the wound healing of dHACA was superior to the wound healing rate of Graftjacket and OASIS Wound Matrix, two allografts studied previously, but noted that future studies would need to include patients with a higher proportion of serious comorbidities in order to obtain a "more 'real world' scenario." *Id.* at 64-65. Again, the study did not address the Artacent or carePATCH allografts at issue. *See id.* at 58-65.

Additionally, *Placental Membrane Provides Improved Healing Efficacy and Lower Cost Versus a Tissue-Engineered Human Skin in the Treatment of Diabetic Foot Ulcerations*, is an article summarizing a study that compared the healing time in patients with diabetic foot ulcers after six weeks of treatment with Apligraf and dHACA, as adjunct therapies to the standard of care. File 23 at 67-69. The study concluded that dHACA in addition to the standard of care was superior to Apligraf in terms of healing efficacy, endpoints, graft cost and graft wastage. *Id.* at 74. However, again, the study did not address the Artacent or carePATCH allografts at issue. *See id.* at 67-75.

Lastly, the record includes *The Long Path of Human Placenta, and its Derivatives, in Regenerative Medicine*, which provides a history of the use the human placenta and summarizes current clinical applications of placenta. *Id.* at 163-164. The article mentions the use Epifix, a dehydrated human amnion/chorion membrane, in the healing of diabetic foot ulcers, and Amniofix in the healing of plantar fasciitis. *Id.* at 164. The article concluded by stating that "there are still many open questions" regarding the clinical use of placental cells and that future studies would be crucial in "establishing the true value of placental derivatives." *Id.* at 173. Again, the article does not address Artacent or carePATCH. *See id.* at 162-177.

Absent clinical evidence showing that Artacent and carePATCH are safe and effective for patients with chronic diabetic wounds -- such as to the heel, ankle and sacrum -- the appellant has not met its burden of showing that Artacent and carePATCH are a safe and effective treatment for the beneficiaries' conditions. *See* MPIM, Ch. 3, §§ 3.3.3, 3.6.2.1-3.6.2.2; *see also* MPIM, Ch. 13, § 13.5.3; 42 C.F.R. § 424.5(a)(6) (indicating that the supplier has the burden of proof). Thus, a review of the provided clinical documentation reveals insufficient documentation to support that Artacent and carePATCH were safe and effective for these beneficiaries.

The record also does not include sufficient evidence that Artacent and carePATCH are not experimental or investigational. *See* MPIM, Ch. 3, § 3.6.2.2. While the carePATCH product listing states that carePATCH is processed and distributed in accordance with FDA requirements for HCT/Ps under 21 C.F.R. § 1271, the record before us does not

include any evidence of FDA regulation or categorization. *See* File 27 at 2-3. Nonetheless, the regulations clarify that "CMS *may* consider" FDA categorization "as *a factor* in making Medicare coverage decisions." 42 C.F.R. § 405.201(a)(1) (emphasis added). Thus, under Medicare regulations, FDA approval or categorization alone is not determinative of Medicare coverage.

Importantly, as discussed above, none of the clinical studies provided by the appellant discuss the use of Artacent and carePATCH at all. Moreover, the articles consistently reference the preliminary and investigative nature of studies, and the majority conclude that further research is required with the respective mechanisms, products, and therapies reviewed. *See* e g. File 23 at 50-55 (stating "we do not know if the product is as good as, or better, than other available advanced wound care products. Additional comparative effectiveness studies are required to address those questions."), 179-182 (noting "it is unclear how these products would translate into every day clinical care of diabetic patients."). Thus, we find that the record does not sufficiently demonstrate that Procenta was not experimental or investigational. *See* MPIM Ch. 3, § 3.6.2.2.

Finally, we find that the record does not include evidence to support that Artacent and carePATCH were "appropriate" for the treatment of the beneficiaries' conditions, as defined in the MPIM. As previously stated, medical literature was provided that does not document or recommend the use of Artacent or carePATCH at all, much less to treat chronic diabetic wounds to the ankle, foot or sacrum. Indeed, articles such as *Use of Aseptically Processed, Dehydrated Human Amnion and Chorion Membrane Improves Likelihood and Rate of Healing in Chronic Diabetic Foot Ulcers: A Prospective, Randomised, Multi-Centre Clinical Trial in 80 Patients*, and *Placental Membrane Provides Improved Healing Efficacy and Lower Cost Versus a Tissue-Engineered Human Skin in the Treatment of Diabetic Foot Ulcerations*, represent investigation of the use of Amniotic products *in addition to* the standard of care, making clear that these products do not currently represent the standard of care. As such, there is no evidence that Artacent and carePATCH were "furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the beneficiary's condition[.]" *See* MPIM, Ch. 3, § 3.6.2.2.

The record therefore does not demonstrate that Artacent and carePATCH were furnished in accordance with accepted standards of medical practice for the beneficiaries' conditions, that the treatments met but did not exceed the beneficiaries' medical need, nor that the treatments were at least as beneficial as existing and available medically appropriate alternatives. *See id.*; MPIM Ch. 13, § 13.5.4. As such, the record does not demonstrate that Artacent and carePATCH were generally accepted by the medical community as "appropriate" for the beneficiaries.

Ultimately, the burden is on the appellant to submit sufficient information for coverage of the services. Act § 1833(e). Here, the appellant has not submitted any authoritative

evidence to support a finding that the products at issue are safe and effective, not experimental or investigational, and appropriate for the beneficiaries' conditions. MPIM, Ch. 3, § 3.6.2.2; MPIM, *see also* Ch. 13, §§ 13.5.3-13.5.4. Without such evidence, we simply cannot find that the products and services at issue were medical reasonable and necessary in accordance with the MPIM.

Based on the discussion above, and in accordance with the standards set forth in the MPIM, the Council finds a preponderance of the evidence does not support a determination of reasonableness and necessity as set forth in the MPIM. The record does not demonstrate Artacent and carePATCH allografts, and their corresponding application services, were medically reasonable and necessary under the applicable manual requirements, which is necessary to support coverage. 42 C.F.R. § 424.5(a)(6). Therefore, Medicare Part B does not cover the Artacent Wound (Q4169) and carePATCH (Q4236) allografts at issue, nor the application services (CPT codes 15271, 15272, 15273 and 15275). *See* MPIM, Ch. 3, § 3.6.2.2; *see also* MPIM, Ch. 13, §§ 13.5.3-13.5.4; MBPM, CMS Pub. 100-02, Ch. 16, § 180 (indicating that Medicare payment is not made for medical services that are related to a non-covered service).

At the lower levels of review, the contractors found that the appellant was liable for the non-covered costs pursuant and overpayment pursuant to §§ 1879 and 1870 of the Act. *See* File 2 at 5; File 5 at 7. Though the appellant's exceptions raised here have been excluded, the appellant raised the issue before the QIC, which we now address. *See* File 12 at 5. Before the QIC, the appellant asserted that it should not be held liable for the non-covered costs because "the services and treatment provided were medically reasonable and necessary for the care and treatment of the beneficiaries, sufficiently documented, properly coded, and otherwise provided consistent with Medicare guidelines." *Id.* However, the appellant, as a Medicare supplier, is deemed to have constructive notice of the requirements for Medicare coverage, including those found in the regulations and Medicare program guidance. 42 C.F.R. § 411.406. The appellant should have known that Medicare coverage requirements were not satisfied when it did not produce evidence sufficient to show that the Artacent and carePATH were reasonable and necessary pursuant to the MPIM. *See* MPIM, Ch. 3, § 3.6.2.2; *see also* MPIM, Ch. 13, § 13.5.3. Therefore, we find that the appellant is liable for the non-covered costs under § 1879 of the Act.

Regarding waiver of the overpayment, Section 1870(b) of the Act allows for Medicare's recovery of an overpayment to be waived if a provider is without fault in incurring the overpayment. However, as discussed above, the appellant should have known that Medicare coverage requirements were not met in this case. *See* MPIM, Ch. 3, § 3.6.2.2; *see also* MPIM, Ch. 13, § 13.5.3. That same determination supports a conclusion that the appellant is not "without fault" under § 1870(b) of the Act. *See* Medicare Financial Management Manual, CMS Pub. 100-06, Ch. 3, §§ 90, 90.1 (Rev. 29, Effective Feb. 6,

2004) (providing guidance on applying the term "without fault"). Accordingly, the appellant is not without fault, and recovery of the overpayments will not be waived.

## DECISION

The Council reverses the ALJ's decision. The Council finds that Medicare Part B does not cover the Artacent Wound (Q4169), carePATCH (Q4236) allografts or their corresponding application codes (CPT 15271, 15272, 15273 and 15275) furnished to the beneficiaries on the dates of service at issue. We do not disturb the ALJ's remaining coverage determinations for Zenith Amniotic Membrane, per sq cm (HCPCS code Q4253) and their corresponding application codes. The appellant is liable for the non-covered costs and not entitled to waiver of the overpayments.

**MEDICARE APPEALS COUNCIL**

Jordy Hirschfeld
Administrative Appeals Judge

Cherise V. Neville
Administrative Appeals Judge

Date: October 8, 2025