**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

CHRIS MCGEE, MD PA, APRIL E. LOPEZ, FNP-BC, LLC DBA LOPEZ FAMILY CLINIC, BRIAN G. LODER, DPM, PLC DBA DETROIT FOOT AND ANKLE, HEALTHCARE HOUSECALLS LLC, INDY WOUND CENTER FOR LIMB PRESERVATION & RECONSTRUCTION DBA INDY WOUND CENTER, INTEGRATED WOUND CARE CONNECTICUT PLLC, WOUND MANAGEMENT SPECIALISTS LLC, WYOMING MEDICAL ASSOCIATES, LLC, and CARLO DOMINGO, AGNP-C, individually and on behalf of all others similarly situated

*Plaintiffs*,

*v.*

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,

DR. MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES

CENTERS FOR MEDICARE & MEDICAID SERVICES

*Defendants.*

Civil Action No. 4:26-cv-00243-O

**PLAINTIFFS' MOTION TO CERTIFY THE CLASS UNDER RULE 23(b)(2)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 4

A. Medicare and Its Program Administration ........ 4

B. The History of Skin Substitutes and Medicare ........ 6

C. The Clawback Policy ........ 11

D. Procedural History ........ 14

III. ARGUMENT ........ 14

A. Numerosity ........ 16

B. Commonality ........ 18

C. Typicality ........ 20

D. Adequacy ........ 20

E. Eligibility for Classwide Relief Under Rule 23(b)(2) ........ 22

IV. CONCLUSION ........ 23

## TABLE OF AUTHORITIES

### Cases

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ........ 23

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........ 22

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ........ 15

*Angell v. GEICO Advantage Ins. Co.*,
67 F.4th 727 (5th Cir. 2023) ........ 20

*Brown v. City of Barre*,
No. 5:10-cv-81, 2010 WL 5141783 (D. Vt. Dec. 13, 2010) ........ 17

*Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*,
624 F.3d 185 (5th Cir. 2010) ........ 22

*Castro v. Collecto, Inc.*,
256 F.R.D. 534 (W.D. Tex. 2009) ........ 18

*Celestine v. Citgo Petroleum Corp.*,
165 F.R.D. 463 (W.D. La. 1995) ........ 17

*Conn. Off. of Prot. & Advocacy for Persons with Disabilities v. Connecticut*,
706 F. Supp. 2d 266 (D. Conn. 2010) ........ 17

*Gen. Tel. Co. v. Falcon*,
457 U.S. 147 (1982) ........ 15

*Goldman v. Azar*,
No. 4:20-cv-463, 2021 WL 3729032 (S.D. Tex. June 25, 2021) ........ 8

*Hays v. Sebelius*,
589 F.3d 1279 (D.C. Cir. 2009) ........ 5

*Hicks v. Client Servs., Inc.*,
No. 07-61822-CIV, 2008 WL 5479111 (S.D. Fla. Dec. 11, 2008) ........ 18

*Horton ex rel. Horton v. Goose Creek Indep. Sch. Dist.*,
690 F.2d 470 (5th Cir. 1982) ........ 15

*Howard v. Liquidity Servs. Inc.*,
322 F.R.D. 103 (D.D.C. 2017) ........ 16

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ........ 15, 19

*In re TWL Corp.*,
712 F.3d 886 (5th Cir. 2013) ........ 18

*James v. City of Dallas*,
254 F.3d 551 (5th Cir. 2001) ........ 20

*Jones v. Diamond*,
519 F.2d 1090 (5th Cir. 1975) ........ 15

*Kase v. Salomon Smith Barney, Inc.*,
218 F.R.D. 149 (S.D. Tex. 2003) ........ 17

*Lightbourn v. Cnty. of El Paso*,
118 F.3d 421 (5th Cir. 1997) ........ 19

*Marisol A. ex rel. Forbes v. Giuliani*,
126 F.3d 372 (2d Cir. 1997) ........ 21, 22

*Maupin v. Azar*,
424 F. Supp. 3d 830 (C.D. Cal. 2019) ........ 8, 9

*Miller v. Grand Canyon Univ., Inc.*,
540 F. Supp. 3d 625 (N.D. Tex. 2021) ........ 21

*Miller v. Mackey Int'l, Inc.*,
452 F.2d 424 (5th Cir. 1971) ........ 15

*Mullen v. Treasure Chest Casino, LLC*,
186 F.3d 620 (5th Cir. 1999) ........ 16, 20

*Neese v. Becerra*,
342 F.R.D. 399 (N.D. Tex. 2022) ........ 19, 20

*Pederson v. Kinder Morgan Inc.*,
345 F.R.D. 302 (S.D. Tex. 2024) ........ 16

*Phillips v. Joint Legis. Comm. on Performance & Expenditure Rev.*,
637 F.2d 1014 (5th Cir. 1981) ........ 16

*Raymond v. Rowland*,
220 F.R.D. 173 (D. Conn. 2004) ........ 22

*Slade v. Progressive Sec. Ins. Co.*,
856 F.3d 408 (5th Cir. 2017) ........ 21

*Stirman v. Exxon Corp.*,
280 F.3d 554 (5th Cir. 2002) .......... 20

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... *passim*

*White v. Imperial Adjustment Corp.*,
No. CivA. 99-3804, 2002 WL 1809084 (E.D. La. Aug. 6, 2002) .......... 22

*Zeidman v. J. Ray McDermott & Co.*,
651 F.2d 1030 (5th Cir. 1981) .......... 15, 16

**Statutes**

42 U.S.C. § 1395ff(b) .......... 6

42 U.S.C. § 1395ff(f) .......... 8

42 U.S.C. § 1395k(a) .......... 4

42 U.S.C. § 1395y(a) .......... 5

**Regulations**

42 C.F.R. § 405.1100 .......... 6

42 C.F.R. § 405.1100(a) .......... 6

42 C.F.R. § 405.1102(a) .......... 6

42 C.F.R. § 405.948 .......... 6

42 C.F.R. § 405.968(a) .......... 6

**Rules**

Fed. R. Civ. P. 23(a) .......... 16, 19, 20, 23

Fed. R. Civ. P. 23(b)(2) .......... *passim*

Fed. R. Civ. P. 23(g) .......... 21

**Other Authorities**

5 Moore's Federal Practice - Civil § 23.22(f) (2026) .......... 18

CMS,
Fact Sheet: *Final Local Coverage Determinations (LCDs) for Certain Skin Substitutes Withdrawn* (Dec. 24, 2025), https://tinyurl.com/54zjkvks .......... 11

Medicare Program Integrity Manual § 13.5.4 (2019) .................................................................... 5

Press Release,
CMS, *CMS Modernizes Payment Accuracy and Significantly Cuts Spending Waste* (Oct. 31, 2025), https://tinyurl.com/93rr9b7x .................... 9

Santema, Trientje B., Paul P.C. Poyck, & Dirk T. Ubbink,
*Skin Grafting and Tissue Replacement for Treating Foot Ulcers in People with Diabetes*, 2 Cochrane Database Systematic Revs. 1 (2016), https://tinyurl.com/2t98z5kc .......................................................................................... 7

Vecin, Nicole M. & Robert S. Kirsner,
*Skin Substitutes as Treatment for Chronic Wounds: Current and Future Directions,* 10 Frontiers in Med. 1 (2023), https://tinyurl.com/y8497x97.......................................................................................... 7

Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs Dr. Chris McGee, April Lopez, Dr. Brian Loder, Healthcare Housecalls LLC, Indy Wound Center, Integrated Wound Care Connecticut, Wound Management Specialists LLC, Wyoming Medical Associates, LLC, and Carlo Domingo, AGNP-C, respectfully move the Court for an order certifying the requested class in this case. Specifically, Plaintiffs seek to represent a class of all providers whose claims for Medicare Part B reimbursement for skin substitutes were subject to unlawful post-payment audits and recoupment demands on the grounds that such products are experimental and investigational (*i.e.*, the Clawback Policy).

## I. INTRODUCTION

This case involves Defendants' arbitrary and capricious decision to ignore their own skin-substitute coverage policy and claw back hundreds of millions of dollars in legitimately paid Medicare claims as part of an illegal effort to reduce Medicare spending by decimating the ranks of wound-care providers. As discussed below, class certification is both appropriate and necessary to ensure that those medical providers who have been harmed by Defendants' unlawful practices can obtain adequate relief.

Plaintiffs are medical providers who specialize in caring for patients with chronic open wounds, including diabetic foot ulcers and venous leg ulcers. These sorts of chronic wounds do not always respond to traditional treatments, such as applying ointment and covering the wounds with gauze. If these patients are unable to receive more advanced treatments, they will likely require limb amputations—if the patients survive at all. Fortunately, a well-recognized wound-care treatment exists that is proven to safely and effectively close chronic wounds when conservative treatments fail (as they too often do). Called "skin substitutes," these FDA-regulated products are derived from minimally processed human amniotic tissue and have been a major

factor in improving wound-closure rates, reducing the comorbidities that accompany chronic wounds, and achieving better health outcomes nationwide.

Defendant Centers for Medicare & Medicaid Services (CMS) recognized the efficacy and benefits of skin substitutes for years, as it consistently covered and reimbursed Medicare Part B claims from providers for their use of skin substitutes to save their patients' limbs. Indeed, three of CMS's Medicare Administrative Contractors (MACs)—CMS's primary fiscal intermediaries for Medicare Part B payments—have had Local Coverage Determinations (LCDs) on the books since 2015 and 2016 which explicitly extend Medicare coverage to amniotic skin substitutes that are used to treat diabetic foot ulcers and venous leg ulcers. The remaining four MACs have followed these LCDs and reimbursed wound care providers for skin substitutes. In reasonable reliance on these operative LCDs and the longstanding practice of CMS and every MAC to broadly reimburse Medicare Part B claims for skin substitutes (even when there was not an official LCD on the books), Plaintiffs and countless other providers used skin substitutes to treat Medicare beneficiaries with severe chronic wounds that would not respond to conservative treatment, saving untold numbers of lives and limbs.

Because CMS and its agents consistently reimbursed skin-substitute claims without issue for years, Plaintiffs were stunned when CMS contractors began demanding that Plaintiffs give back the money that CMS had already reimbursed for their use of skin substitutes to treat their patients. Beginning around April 2022, CMS instituted an unannounced, unexplained change in policy, directing its contractors and agents to claw back previously reimbursed skin-substitute claims. Medicare agents would notify Plaintiffs that they had received an "overpayment" and demand that they pay Medicare back what they had previously been reimbursed. These demands often total millions of dollars for each provider. What is more, these claims were submitted and

paid years ago, and the Plaintiffs long ago paid their suppliers for the skin substitutes used for treatment.

Plaintiffs have fought this Clawback Policy at every level of Medicare's administrative process, up through ALJ hearings and (in most cases) requests for review to the Medicare Appeals Council. But all of Plaintiffs' claims were denied for the same legally invalid reason: skin substitutes are supposedly "experimental" or "investigational," even though these same products have been widely used and reimbursed by Medicare for years as essential treatments to improve (and save) patients' lives. Tellingly, until recently, Plaintiffs had not had a skin-substitute reimbursement claim denied on this basis, and this newly formulated position is at odds with CMS's long-held recognition that skin substitutes are neither "experimental" nor "investigational," but instead are "medically reasonable and necessary" when used to treat chronic wounds.

But Plaintiffs are hardly alone. Defendants and their agents have been clawing back previously reimbursed skin-substitute claims and monolithically denying providers' administrative appeals on the same, invented basis that skin substitutes are "experimental" or "investigational" (to the point that any effort to appeal to the agency is futile). Every healthcare provider that treats Medicare beneficiaries with skin substitutes has been treated nearly identically by Defendants, and for the same reasons. Defendants' push to claw back previously reimbursed skin-substitute claims is not driven by a concern about either patient safety or welfare, or the undisputed efficacy of skin substitutes, but rather is part of a broader effort to reduce Medicare spending on the products, entirely ignoring the life-changing benefits these products have provided to tens of thousands of patients. If these clawbacks drive wound care providers out of business, all the better from the Defendants' perspective because fewer providers means fewer skin-substitute treatments and less spent by Medicare. But even assuming these concerns about costs are legitimate, making

Medicare-coverage decisions based on the government's out-of-pocket costs—rather than patient wellbeing—is unlawful.

Defendants' unexplained reversal that skin substitutes are "experimental" or "investigational" after reimbursing the products without issue for years lacks any basis in fact or law. And this newfound designation to justify clawing back reimbursements Medicare already paid to healthcare providers has already disrupted the wound care industry and caused widespread harm to every provider that needs skin substitutes to treat their patients and reasonably relied on Defendants' prior representations that Medicare would cover their uses of them. Plaintiffs therefore move this Court to certify a class action under Rule 23(b)(2) so it can provide the declaratory and injunctive relief necessary to allow all providers to continue using skin substitutes to treat their patients with proper assurance that they will be appropriately reimbursed by Medicare for these treatments. This Clawback Policy impacts at least hundreds of providers across the country, the questions of whether this Clawback Policy exists and whether it is lawful will be dispositive for every member of the proposed class, and the named Plaintiffs all had their skin-substitute reimbursement claims denied because the products are supposedly "experimental" or "investigational," the same unlawful reason the proposed class members had their claims denied. The Court should therefore certify this matter as a class action under Rule 23(b)(2).

## II. BACKGROUND

### A. Medicare and Its Program Administration

Medicare, which is codified at Title XVIII of the Social Security Act, is the federally funded and administered program of health insurance for those who are 65 and over or are disabled. Medicare Part B consists of a voluntary program of supplemental medical insurance providing coverage of outpatient hospital services, physicians, nurse practitioners, home health, physical,

speech and occupational therapy, diagnostic services, and durable medical equipment. 42 U.S.C. § 1395k(a). The threshold for Medicare coverage is codified in its medical necessity requirement:

> [N]o payment may be made . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

*Id.* § 1395y(a)(1)(A). In other words, when the service is reasonable and necessary, Medicare coverage is required. *Hays v. Sebelius*, 589 F.3d 1279, 1283 (D.C. Cir. 2009).

CMS has never outlined in notice and comment the standards it applies when determining whether an item is medically "reasonable and necessary." It has, however, given instructions to the MACs concluding that an item or service is "reasonable and necessary" if it is medically appropriate (including its duration and frequency), safe and effective, and not "experimental or investigational." *See, e.g.*, Medicare Program Integrity Manual (MPIM) § 13.5.4 (2019). Similarly, CMS has never articulated in rulemaking the standards a MAC must apply to determine whether an item or service is "medically appropriate," nor has it specified what level of clinical data or scientific evidence is necessary to establish that an item or service is well-proven versus "investigational." But nowhere in the statute, regulations, or manuals are Defendants authorized to consider the cost of a procedure, treatment, or product when determining whether to extend Medicare coverage to it. To the contrary, the D.C. Circuit has held that Defendants cannot deny reimbursement for a reasonable and necessary treatment even if there is a less costly alternative. *Hays*, 589 F.3d at 1283.

To administer reimbursements under Medicare Part B, Defendants have divided the country into various regions that are each administered by one of the seven MACs: Noridian, NGS, WPS, Novitas, CGS, Palmetto, and First Coast Service Options. When a claim is submitted to Medicare, the claim is handled by the MAC for the relevant region, who makes the initial decision of whether to grant or deny the claim and maintains records of these denial and payment

determinations. The MACs also audit claims that they already have paid out and demand Medicare's money back if fraud or "overpayments" occurred, and they are assisted in those efforts by entities called Unified Program Integrity Contractors (UPICs) and Recovery Audit Contractors (RACs). These entities are financially incentivized to claw back as much money for the Medicare program as possible. *See* Am. Compl. ¶ 14.

If the MAC denies a reimbursement claim (either at the outset or after an audit), the aggrieved provider can seek "redetermination" of that decision from the MAC. *See* 42 C.F.R. § 405.948. If the MAC denies redetermination, the provider can then appeal to a Qualified Independent Contractor (QIC), which reviews all the evidence to determine if the MAC committed an error. *See* 42 C.F.R. § 405.968(a)(1). Providers who disagree with the QIC's reconsideration decision may then request a hearing with the Office of Medicare Hearings and Appeals, which is typically conducted by an Administrative Law Judge (ALJ). Any unfavorable ALJ decisions can be appealed up to the Medicare Appeals Council ("the Council"). 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1100(a), 405.1102(a)(1). But favorable ALJ opinions can be subjected to the Council's scrutiny, as well. An entity called the Administrative QIC (AdQIC) can make referrals to the Council to review ALJ decisions on the Council's own motion. 42 C.F.R. § 405.1100. Accordingly, favorable ALJ decisions do not always lead to providers obtaining relief. In fact, in the case of skin substitutes, the AdQIC has referred to the Council many decisions where an ALJ has found the skin substitute products at issue are *not* "experimental" and "investigational," claiming they are legally erroneous because the skin substitute product *is* "experimental" and "investigational." *See* Am. Compl. ¶ 287; Am. Compl. Exhibits 53–55.

### B. The History of Skin Substitutes and Medicare

Skin substitutes are FDA-regulated products derived from minimally processed human amniotic tissue that are used to treat chronic wounds, such as diabetic foot ulcers and venous leg

ulcers. Am. Compl. ¶¶ 7, 57–60. The products defined as "skin substitutes" in this litigation are those products derived from donated human amniotic tissue after birth that are not regulated as devices or biologicals and, therefore, are not subject to the FDA's device and biological clearance processes. Instead, the FDA classifies the products at issue here as "human cell and tissue-based products" (HCT/Ps) because these "skin substitutes" are comprised of human cells and tissues. Am. Compl. ¶ 68. These skin substitutes are regulated under Section 361 of the Public Health Service Act. *Id.*

Diabetic foot ulcers and venous leg ulcers are very slow-healing wounds that often result in severe complications for those forced to endure them. They are painful, generate a strong and unpleasant odor, and cause decreased mobility, all of which can lead to social isolation. *See* Nicole M. Vecin & Robert S. Kirsner, *Skin Substitutes as Treatment for Chronic Wounds: Current and Future Directions,* 10 Frontiers in Med. 1, 1 (2023), https://tinyurl.com/y8497x97; Trientje B. Santema, Paul P.C. Poyck, & Dirk T. Ubbink, *Skin Grafting and Tissue Replacement for Treating Foot Ulcers in People with Diabetes*, 2 Cochrane Database Systematic Revs. 1 (2016), https://tinyurl.com/2t98z5kc. While these wounds are sometimes treatable with standard debridement and wound dressing, such conservative care is often not effective, with the wounds often becoming chronic, leading to amputations and even death. Am. Compl. ¶¶ 10, 59.

Skin substitutes, fortunately, have changed the game. While conventional dressings cover wounds to prevent infection and maintain a moist environment, skin substitutes do that and more. According to multiple MACs, skin substitutes also "may provide protein or growth factors proposed to stimulate or facilitate healing or promote epithelization." Am. Compl. Exhibit 3 at 4, CGS 2016 LCD; Am. Compl. Exhibit 5 at 7, Novitas 2015 LCD. In the words of Novitas and CGS:

> The addition of Skin Substitutes or Cellular or Tissue Based Products (CTPs) to certain wounds may afford a healing advantage over dressings and conservative treatments when these options appear insufficient to affect complete healing.

Am. Compl. Exhibit 3 at 3; Am. Compl. Exhibit 5 at 6. Due to skin substitutes' widely recognized efficacy, their application is considered the standard medical practice for chronic wounds that fail to heal through conservative wound treatments. Am. Compl. ¶ 60.

Recognizing the "healing advantage" of skin substitutes, a majority of the MACs codified their coverage of skin substitutes in Local Coverage Determinations (LCDs).[1] In 2015 and 2016, Novitas, CGS, First Coast Service Options, and Palmetto each published LCDs that expressly covered a wide range of skin-substitute products and declared them to be medically reasonable and necessary when used to treat chronic wounds. Am. Compl. ¶ 77; Am. Compl. Exhibit 3, CGS 2016 LCD; Am. Compl. Exhibit 4, First Coast 2015 LCD; Am. Compl. Exhibit 5, Novitas 2015 LCD;[2] Am. Compl. Exhibit 6, 2016 Palmetto LCD. While Palmetto retired its LCD in 2019, Am. Compl. ¶ 80, it continued to pay Medicare claims for skin substitutes. The other three LCDs remain in effect and bind the MACs' coverage decisions within their respective jurisdictions. *See* Am.

---

[1] LCDs are advanced pronouncements regarding whether, and under what indications, a specific item or service is considered reasonable and necessary within a given MAC's jurisdiction. 42 U.S.C. § 1395ff(f)(2)(B). MACs adopt LCDs so that providers and beneficiaries can make treatment decisions knowing that the item or service will be covered. By law, each MAC is bound to follow its own LCDs, therefore eliminating any uncertainty about whether a treatment will be covered by Medicare. Am. Compl. ¶ 76; *Maupin v. Azar*, 424 F. Supp. 3d 830, 832 (C.D. Cal. 2019). And while LCDs are not binding on ALJs, Attorney Adjudicators, and the Council, they are required to give LCDs "substantial deference." *Goldman v. Azar*, No. 4:20-cv-463, 2021 WL 3729032, at *1 (S.D. Tex. June 25, 2021).

[2] Moreover, CGS and Novitas's LCDs provide that "all products with U.S. Food and Drug Administration (FDA) clearance/approval or designated 361 HCT/P exemption used in accordance with that product's individualized application guidelines will be equally considered for purpose of this LCD and may be considered reasonable and necessary." Am. Compl. Exhibit 5 at 8; Am. Compl. Exhibit 3 at 5; Am. Compl. ¶ 118. These MACs thus relied on the FDA's approval of skin substitutes and correctly trusted that the products it has approved are effective and accordingly, medically reasonable and necessary.

Compl. ¶ 76; *Maupin v. Azar*, 424 F. Supp. 3d 830, 832 (C.D. Cal. 2019). And even the MACs that did not have express LCDs for skin substitutes still covered Medicare Part B reimbursement claims for these products, paying out almost as much in total payments as MACs that had applicable LCDs. *See* Am. Compl. ¶ 80. Providers throughout the country came to reasonably rely on the fact that Medicare would cover their use of skin substitutes to treat their patients' wounds because, for years, every MAC did so without issue or giving any indication that skin substitutes were not covered products.

That is, until the Defendants decided to target skin substitutes and severely cut their reimbursement. Skin substitutes' effectiveness led to unprecedented usage and, naturally, Medicare spending on the products has increased over the last several years. According to Defendants, Medicare spending on skin substitutes increased from $256 million in 2019 to $10 billion in 2024.[3] Apparently deciding that this was too much to spend on these potentially life-saving treatments, Defendants made at least three policy changes aimed at reducing the amount of government expenditures on skin substitutes.

First, CMS developed a new physician fee schedule for skin substitutes that lowered the amount at which providers would be reimbursed for skin substitutes and established specific, pre-set rates for such reimbursements, regardless of how much the provider actually spent to treat patients.[4]

Second, the three MACs that have operative LCDs expressly extending coverage to skin substitutes made efforts to rescind those LCDs. In 2022, First Coast Service Options, Novitas, and CGS all proposed and adopted new LCDs that significantly narrowed the definition of "skin

---

[3] Press Release, CMS, *CMS Modernizes Payment Accuracy and Significantly Cuts Spending Waste* (Oct. 31, 2025), https://tinyurl.com/93rr9b7x.

[4] *Supra* note 3.

substitute" to only include products that generate a "sheet scaffolding for skin growth," a definition which excludes the products at issue here (and almost every skin substitute on the market) that are commonly used for their homologous purpose as wound covers. Am. Compl. ¶ 81; *see, e.g.,* Am. Compl. Exhibit 10 at 3. The MACs were forced to rescind those LCDs in 2023 before they became effective due to several legal defects, including the failure to notify the public that they were changing the definition of skin substitutes. Am. Compl. ¶¶ 81–82. But the MACs tried their hand again at limiting coverage of skin substitute products in proposing a new set of LCDs in 2025. *Id.* ¶ 82. This time, all seven MACs coordinated with CMS[5] to draft nearly identical LCDs that again defined skin substitutes so narrowly that they would have denied Medicare coverage for virtually all amniotic tissue products, including all the skin-substitute products that Plaintiffs rely on to treat their patients. *Id.* ¶¶ 82, 85–86; Am. Compl. Exhibit 11. But this time, they took a different approach. Under the newly proposed LCDs, all skin substitutes would now be considered "experimental" or "investigational"—and not medically reasonable and necessary—unless the wound-care provider submitted clinical evidence specific to a particular skin-substitute product that proved it was effective. Am. Compl. ¶ 30; Am. Compl. Exhibit 8. In direct violation of the law, and as CMS's own emails with the MACs show, cost-cutting was the impetus behind these proposed LCDs; CMS asked the MACs exactly how much money Medicare would save if these LCDs went into effect. *See, e.g.,* Am. Compl. Exhibit 1; *see also* Motion Exhibit A (noting that CGS's proposed LCD was "very much needed" to protect Medicare's "Trust Fund"). But CMS withdrew all these proposed LCDs before they went into effect, so the "experimental" or "investigational" rationale never became the coverage standard in any MAC jurisdiction, and the

[5] CMS's emails with the MACs show that it was "deeply interested" in these proposed LCDs and coordinated with the MACs to prepare responses to stakeholder questions about them. *See* Motion Exhibit A (emails between CMS and CGS).

2015-2016 LCDs—which specifically say skin substitutes are medically reasonable and necessary for the treatment of chronic wounds—continue to remain binding in the jurisdictions where Novitas, CGS, and First Coast Service Options serve as MACs.[6] Am. Compl. ¶¶ 77, 85–86.

Third, frustrated with their inability to revoke Medicare coverage of skin substitutes through the appropriate rulemaking procedures, Defendants have engaged in a full-throated effort to recover hundreds of millions of dollars in appropriately paid claims and drive as many wound-care providers out of business as possible through the Clawback Policy at issue here.

### C. The Clawback Policy

Beginning as early as April 2022—around the same time the MACs began their first unsuccessful attempt to remove LCD coverage for skin substitutes—Defendants began a campaign to claw back as much money as possible by retroactively auditing, reopening, and then denying previously paid Medicare Part B claims for skin substitutes. Am. Compl. ¶¶ 15, 286. Around this time, CMS contractors and agents began auditing and reopening the skin-substitute claims they had already reimbursed before demanding that the providers pay their already-vested money back. Am. Compl. ¶ 14. When providers challenged these sudden repayment demands through Medicare's appeal process, they ultimately received unfavorable decisions and had their claims denied on the same basis: the same skin substitutes that they had for years treated patients with and consistently been reimbursed for were, for the first time, considered "experimental" or "investigational." These determinations directly contravene the existing LCDs that provide for coverage and the practices of the remaining MACs who had provided coverage as a matter of long-standing policy. Am. Compl. ¶ 13. Effectively, Defendants' agents applied the above-mentioned

[6] CMS, Fact Sheet: *Final Local Coverage Determinations (LCDs) for Certain Skin Substitutes Withdrawn* (Dec. 24, 2025), https://tinyurl.com/54zjkvks.

proposed LCDs that never went into effect—even citing the language from the proposed LCDs that the products were not payable because they were not grafts to grow new skin—and they did not provide the slightest explanation why they were relying on inoperative LCDs instead of operative LCDs and years of prior practice.

Each named Plaintiff frequently uses amniotic skin substitutes approved under Section 361 to treat their patients, and they all experienced this same bait-and-switch outlined above. For example, Medicare initially paid Dr. Chris McGee's reimbursement claims without issue, but after a UPIC audit, Novitas retroactively denied his claims, ostensibly for poor record keeping. Am. Compl. ¶¶ 104–05. But when Dr. McGee appealed these denials, both the QIC and the ALJ upheld them for an entirely different reason; namely, because the skin-substitute product he used was supposedly "experimental and investigational." Am. Compl. ¶¶ 106–08. Novitas similarly clawed back its reimbursements to Ms. April Lopez totaling over $1.5 million, *see* Am. Compl. ¶ 145, both because her records were supposedly not detailed enough and because "Medicare does not cover the service at issue in your appeal," a rationale the QIC affirmed. Am. Compl. ¶¶ 145–48. But the ALJ ruled unfavorably purely because the skin substitutes she used were "experimental and investigational and not supported by peer-reviewed human trials." Am. Compl. Exhibit 19 at 1. The ALJs in both Dr. McGee's and Ms. Lopez's appeals inexplicably cited to and appear to have relied on the 2026 LCDs to deny the claims, even though those LCDs never went into effect and, in Dr. McGee's case, had already been withdrawn at the time of the decision. *See* Am. Compl. ¶¶ 108–09, 151–52; Am. Compl. Exhibit 13 at 10 n.1 (citing to 2026 LCDs to support unfavorable decision to Plaintiff McGee); Am. Compl. Exhibit 19 at 13 (citing 2026 LCDs to support unfavorable decision to Plaintiff Lopez).

The same story played out for the other Plaintiffs. Medicare reimbursed Dr. Brian Loder's claims before the MAC clawed them back due to supposedly inadequate documentation, only for the QIC and ALJ to uphold the denials on the basis that the skin substitute he used was "experimental and investigational." Am. Compl. ¶¶ 205–14. Wound Management initially had its claims reimbursed without issue, too, but the MAC clawed the reimbursement back after deciding that the treatments were "investigational and experimental," a rationale both the QIC and ALJ upheld. *Id.* ¶¶ 185–91. Integrated Wound Care Connecticut was subjected to demands from the local UPIC to repay over $900,000 worth of claims that had already been reimbursed to it due to "questionable billing of skin substitute services," and its appeals to the QIC and ALJ were denied because all three skin-substitute products it used are supposedly "experimental and investigational." *Id.* ¶¶ 265–73. And Healthcare Housecalls LLC, Indy Wound Center, and Carlo Domingo also lost their appeals at both the QIC and ALJ levels because the decisionmakers concluded that the skin substitutes the providers relied upon were experimental and/or investigational. *Id.* ¶¶ 223–28, 238–41, 279–84. And other similarly situated providers endured the same experience of having their claims denied on the basis that the use of skin substitutes was "experimental" or "investigational." Am. Compl. ¶ 286 & Exhibits 49–52.

This baseless rationale is also being invoked at the highest level of review. The Council has issued several opinions denying claims for skin substitutes on this same "experimental or investigational" basis. *Id.* ¶ 287; Am. Compl. Exhibits 53–55. One of these opinions came in the case of Wyoming Medical Associates (WMA). Like its co-plaintiffs, the MAC clawed back WMA's skin-substitute reimbursement money because its uses of the skin substitute Xwrap were "investigational," and it lost its appeal to the QIC for that same reason. Am. Compl. ¶¶ 158–60. But WMA actually won at the ALJ level, as the ALJ determined that Xwrap *was* medically

reasonable and necessary and *not* merely investigational after applying the MPIM's criteria. *Id.* ¶ 162. But it was all for naught. Despite the ALJ's favorable decision, CMS filed a memorandum with the Council asking it to review the ALJ's decision on its own motion. Am. Compl. Exhibit 25. The Council then reversed the ALJ and held that Xwrap is experimental and investigational, discarding the testimony of WMA's expert witness and deeming "insufficient" ten peer-reviewed studies finding that skin substitutes are highly effective. *Id.* ¶¶ 163–64; Am. Compl. Exhibit 25.

Defendants never publicly announced that skin substitutes are no longer covered by Medicare, nor have they ever provided any public rationale for ceasing Medicare coverage for skin substitutes and clawing back reimbursement payments the providers have already received. *See* Am. Compl. ¶ 13. Years of industry practice—and years of reliance interest that the providers built up—were discarded without warning or explanation, let alone notice-and-comment rulemaking.

### D. Procedural History

Plaintiffs filed this suit on March 4, 2026, alleging violations of the APA and the Medicare statute and seeking declaratory and injunctive relief. Am. Compl. ¶¶ 301–24. As of the time of this filing, Defendants have yet to file a responsive pleading. Plaintiffs have met and conferred with counsel for the Defendants regarding, among other things, the necessity of Plaintiffs receiving discovery from the government to help prove their class allegations.

## III. ARGUMENT

Plaintiffs challenge a singular CMS policy that has impacted a large number of skin substitute providers in the same manner by denying them reimbursement based on a legally erroneous determination that the skin substitute products they used to treat patients are "experimental" or "investigational." The resolution of controlling common issues over injuries that typify the class makes this case particularly well-suited for class certification under Rule 23(b)(2).

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Miller v. Mackey Int'l, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971). Class certification is not a "dress rehearsal for the merits." *In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014). While the Court must perform a "rigorous analysis" to determine whether to certify a class, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)), the Court may not require the plaintiffs to establish their claims at the class certification stage, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). The Fifth Circuit instructs courts to "err in favor of certification." *Horton ex rel. Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 487 (5th Cir. 1982) (per curiam); *see also Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (holding courts should not apply rules about the burden of proof "rigidly or blindly" in civil rights cases (quoting *Jones v. Diamond*, 519 F.2d 1090, 1099 (5th Cir. 1975)).

Under Rule 23, the party seeking class certification must show that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). This case satisfies each of those fundamental class action prerequisites, known respectively as numerosity, commonality, typicality, and adequacy.

In the present case, Plaintiffs' proposed class is:

> All healthcare providers enrolled in Medicare who, in April 2022 or later, provided a skin substitute product derived from donated human amniotic tissue that is not

> regulated as devices or biologicals in conjunction with the treatment of a chronic wound and whose Part B reimbursement payment for such product has been subjected to a post-payment audit that resulted in a determination that the payment should be recouped on the basis that such products are not reasonable and necessary when used to treat a chronic wound because they are experimental and investigational, i.e., the Clawback Policy, with such claims for reimbursement having been presented to the Secretary.

Am. Compl. ¶ 293. Thus, the class consists of only those providers/claims that were/are denied or recouped payment pursuant to the Clawback Policy. That is the basis for the denial and recoupment of Plaintiffs' claims and of every class member identified above.

**A. Numerosity**

Pursuant to Federal Rule of Civil Procedure 23(a)(1), Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." To establish numerosity, a party need not provide a precise number of class members as long as there is a reasonable basis to estimate it. *See, e.g., Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 117 (D.D.C. 2017). Instead, the relevant question is "whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Zeidman*, 651 F.2d at 1038 (quoting *Phillips v. Joint Legis. Comm. on Performance & Expenditure Rev.*, 637 F.2d 1014, 1022 (5th Cir. 1981)). Joinder is presumptively impracticable when a class consists of forty members or more. *Pederson v. Kinder Morgan Inc.*, 345 F.R.D. 302, 312 (S.D. Tex. 2024) (citing *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999)). While neither the plaintiffs nor the court may simply speculate as to how large the class may be, the "party seeking class certification may rely on reasonable, common-sense assumptions and inferences to satisfy the requirements for class certification." *Kase v. Salomon Smith Barney, Inc.*, 218 F.R.D. 149, 152 (S.D. Tex. 2003); *see also, e.g., Brown v. City of Barre*, No. 5:10-cv-81, 2010 WL 5141783, at *4 (D. Vt. Dec. 13, 2010) (noting that the "court may make common sense assumptions to support a finding of numerosity" (quotation marks omitted)); *Conn. Off. of Prot. & Advocacy for Persons with Disabilities v. Connecticut*, 706 F.

Supp. 2d 266, 287 (D. Conn. 2010) (noting that it is "permissible for the plaintiffs to rely on reasonable inferences drawn from the available facts" (quotation marks omitted)).

In this case, the numbers alone are sufficient to resolve the matter. Although Defendants possess the records Plaintiffs and the Court will need to know the exact number of denials subject to the Clawback Policy,[7] reasonable inferences drawn from Plaintiffs' allegations show that the proposed class far exceeds the forty-member threshold, almost certainly extending into the hundreds. Plaintiffs have alleged that the Class includes hundreds of Medicare providers with thousands of claims who have been subjected to the Clawback Policy. Am. Compl. ¶ 295; *see Celestine v. Citgo Petroleum Corp.*, 165 F.R.D. 463, 466 (W.D. La. 1995) (numerosity established when the plaintiffs alleged that the class consisted of over 1,000 persons).

This allegation is a reasonable one given the facts known at this time, even without the benefit of discovery. From 2015 to 2023 alone, all seven MACs paid over 1.3 million skin substitute claims, representing hundreds of thousands of Medicare beneficiaries seeking treatment from providers. Am. Compl. ¶ 10. Since at least April 2022, Defendants' agents have subjected a substantial portion of these providers to post-payment audits and recoupment demands. *Id.* ¶ 15. Even if only a small fraction of the skin-substitute claims Medicare has paid since April 1, 2022, were audited, denied, and recouped in the same manner Plaintiffs' claims were, the class would still be too large for joinder to be practicable. Courts consistently find that the numerosity requirement is met in similar circumstances. *See Castro v. Collecto, Inc.*, 256 F.R.D. 534, 540 (W.D. Tex. 2009) (finding the numerosity requirement met because "even if one-fifth of the more than 500 letters were related to such a debt, joinder would be impracticable"); *Hicks v. Client*

[7] Plaintiffs have initiated discussions with Defendants regarding the need to take discovery in this matter and are in the process of serving initial written discovery requests on Defendants.

*Servs., Inc.*, No. 07-61822-CIV, 2008 WL 5479111, at *4 (S.D. Fla. Dec. 11, 2008) (numerosity established when defendant left over 1,000 allegedly unlawful messages, and the court could "reasonably assume that at least 0.5%, or 50, were left on voice mail systems rather than with third persons").

The available information also demonstrates that the class is sufficiently large to preclude joinder as a practical possibility. First, more providers will likely have reimbursed claims clawed back in the future. *See* 5 Moore's Federal Practice - Civil § 23.22(f) (2026) ("Class-action plaintiffs seeking injunctive or declaratory relief frequently seek to define a class to include people who might be injured in the future. Courts in these cases often find that joinder [of separate suits] would be impracticable because those who have not yet been injured, or who do not know that they have been injured, are unlikely to join a lawsuit."). Second, joinder is impracticable because of the great geographic distribution of all the class members. *See In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013) ("[A]ssessing numerosity also entails consideration of the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." (quotation marks omitted)). Just the named Plaintiffs alone range from Michigan to Texas to Florida. Am. Compl. ¶¶ 36–42. As Defendants have applied the Clawback Policy nationwide, Am. Compl. ¶ 2, the geographic distribution of the full class is accordingly broad (although Plaintiffs will need discovery to confirm its precise breadth). Plaintiffs easily establish numerosity.

**B. Commonality**

The next two factors, commonality and typicality, "tend to merge." *Dukes*, 564 U.S. at 349 n.5. Under Rule 23(a)(2), Plaintiffs must show commonality, *i.e.*, that "there are questions of law or fact common to the class." Commonality requires that the class members' claims "depend upon a common contention" such that "determination of its truth or falsity will resolve an issue

that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. The threshold for satisfying the commonality prerequisite is "not demanding." *Lightbourn v. Cnty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997). "To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d at 810.

Here, there are a number of common questions of both law and fact. The common questions of law include whether (1) the Clawback Policy's departure from the 2015–2016 LCDs and the MACs' longstanding practice of reimbursing skin-substitute claims violates the Medicare statute; (2) that departure violates CMS's regulations; and (3) that departure violates the requirements under the Administrative Procedure Act of notice and the opportunity to comment and reasoned decision making. *See* Am. Compl. ¶ 296. Common answers to these central issues will "drive the resolution of the litigation." *Neese v. Becerra*, 342 F.R.D. 399, 408 (N.D. Tex. 2022) (quoting *Dukes*, 564 U.S. at 350). The common questions of fact include (1) whether Defendants instituted the Clawback Policy, (2) the origin of the Clawback Policy; (3) the scope of the Clawback Policy; and (4) whether the application of the Clawback Policy departs from the 2015–2016 LCDs and the Skin Substitute Coverage Policy. *See* Am. Compl. ¶ 296. The "truth or falsity" of those allegations will determine every class member's entitlement to relief. *Neese*, 342 F.R.D. at 408 (quoting *Dukes*, 564 U.S. at 350). Plaintiffs have thus alleged that all class members "have suffered the same injury" based on the same policy and the factual determinations of whether the Clawback Policy exists and is being applied broadly will resolve issues "central to the validity of each one of [Plaintiffs'] claims in one stroke." *Id.* (quoting *Dukes*, 564 U.S. at 350). Thus, the test for commonality is easily met.

### C. Typicality

To establish typicality, the named Plaintiffs claims must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The test for typicality is also "not demanding." *Mullen*, 186 F.3d at 625. "Typicality does not require a complete identity of claims." *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) (quotation marks omitted), *abrogated on other grounds by M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 839–41 (5th Cir. 2012). In analyzing typicality, "the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *Id.* (quotation marks omitted).

Here, all the Plaintiffs had their Medicare Part B reimbursement claims for skin substitutes denied and clawed back by Defendants, and for the same reasons: skin substitutes are ostensibly "experimental" or "investigational." *See* Am. Compl. ¶¶ 94–243. This is the same harm that is alleged to have been suffered by every member of the proposed class, as Defendants denied their reimbursement claims under the same legally invalid rationale applied to Plaintiffs' claims. *See id.* ¶ 296. And there are good reasons for this allegation; the Council has issued adverse decisions to other providers using the same bogus "experimental" or "investigational" reasoning that Defendants' agents used to claw back and deny Plaintiffs' reimbursement claims. *See* Am. Compl. Exhibits 53–55. Because Plaintiffs claims "arise from a similar course of conduct and share the same legal theory," typicality is easily satisfied in this case. *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023) (quoting *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)).

### D. Adequacy

The final certification requirement is adequacy of representation. This requirement "is motivated by concerns similar to those driving the commonality and typicality requirements, namely, the efficiency and fairness of class certification." *Marisol A. ex rel. Forbes v. Giuliani*,

126 F.3d 372, 378 (2d Cir. 1997) (per curiam). "This requirement is met when: (1) class counsel prosecutes the action zealously and competently; (2) representative parties are willing and able to control the litigation and protect absentee class members' interests; and (3) there are no conflicts of interest between the representative parties and the class members." *Miller v. Grand Canyon Univ., Inc.*, 540 F. Supp. 3d 625, 636 (N.D. Tex. 2021) (citing *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017)).

On the first prong, Plaintiffs' counsel have demonstrated their knowledge of the applicable law and ability to handle this litigation by vigorously representing Medicare providers and beneficiaries for many years and are experienced class-action counsel.[8] *See* Fed. R. Civ. P. 23(g)(1)(A)(ii)–(iii). And counsel's law firms—King & Spalding and DLA Piper—are two of the largest firms in the world, so counsel have ample resources to commit to representing the class. *See* Fed. R. Civ. P. 23(g)(1)(A)(iv).

Regarding the second prong, Plaintiffs are all medical professionals who possess the health, energy, and determination necessary to treat patients full time. *See* Am. Compl. ¶¶ 36–44. They are all motivated to ensure that Medicare covers their uses of skin substitutes, which they rely on to treat a large percentage of their patients.

As for the final prong, there are no class conflicts. Plaintiffs' motivation to obtain the requested relief for themselves will necessarily lead to them zealously pursuing it on behalf of the class. There is no reason to believe any of Plaintiffs would be prejudiced when, for instance, an unnamed class-member doctor has his denied reimbursement claim re-adjudicated after Plaintiffs successfully obtain declaratory and injunctive relief from this Court. Plaintiffs' interests are thus

[8] Plaintiffs' counsel have submitted declarations concurrent with this motion explaining their relevant experience and qualifications to serve as effective class counsel.

"aligned with, and not antagonistic to, unnamed class members." *White v. Imperial Adjustment Corp.*, No. CivA. 99-3804, 2002 WL 1809084, at *12 (E.D. La. Aug. 6, 2002).

**E. Eligibility for Classwide Relief Under Rule 23(b)(2)**

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). "Rule 23(b)(2) applies . . . when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360.

The present case easily qualifies as a Rule 23(b)(2) class. Defendants have clawed back Medicare Part B reimbursements on grounds that apply in the same manner to the entire class. Each class member's claim for reimbursement stands denied or clawed back on the grounds that skin substitutes are "experimental" or "investigational." Putting aside everything else, Plaintiffs need only show that Defendants have exhibited common behavior towards the members of the class. *See Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 198 (5th Cir. 2010) ("Instead of requiring common issues, 23(b)(2) requires common behavior by the defendant towards the class."). Since the "deficiencies . . . stem from central and systemic failures" by the Secretary, class certification under Rule 23(b)(2) is the appropriate vehicle for resolving the matter. *Marisol A.*, 126 F.3d at 378; *Raymond v. Rowland*, 220 F.R.D. 173, 181 (D. Conn. 2004) ("Cases . . . alleging systemic failure of governmental bodies to properly fulfill statutory requirements, have been held to be appropriate for class certification under Rule 23(b)(2)").

Here, Plaintiffs are not seeking money damages or any legal remedy from Defendants, only declaratory and injunctive relief. An injunction and declaratory judgment in this case setting aside Defendants' unlawful Clawback policy will provide relief to every class member because it will enable them to pursue recoupment of their previously clawed-back reimbursement payments in administrative proceedings no longer marred by the incorrect designation of skin substitutes as

"experimental" or "investigational." All pending reimbursement claims would be sent back to CMS and its contractors for re-processing and re-review in fresh proceedings where the government would apply the coverage standards that were in place before the Clawback Policy began, so providers would not have their claims denied on contrived "experimental" or "investigational" grounds. And most importantly, the Court's declaration and injunction would apply prospectively to all future reimbursement claims, as well, barring Defendants and their agents from applying the "experimental" or "investigational" rationale to any future claims, just as it was before the Clawback Policy began. This equitable relief would ensure that all wound-care providers can continue treating Medicare beneficiaries with skin substitutes just as they have for years with assurances that CMS will reimburse their medically necessary applications of these products without issue. Because Plaintiffs seek these "uniform group remedies," certification under Rule 23(b)(2) is appropriate. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 414 (5th Cir. 1998).

## IV. CONCLUSION

As Plaintiffs meet all the requirements of Rule 23(a) and Rule 23(b)(2), the Court should certify the class.

Date: May 15, 2026

Respectfully submitted,

*/s/ Robert M. Hill*
Robert M. Hill ("Bobby")
Texas Bar No. 24125624
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
Tel: 214-764-4414
Fax: 214-764-4601
rhill@kslaw.com

Mark D. Polston (admitted *pro hac vice*)
Nikesh Jindal (admitted *pro hac vice*)
Ahsin Azim (admitted *pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-737-0500
Fax: 202-626-3737
mpolston@kslaw.com
njindal@kslaw.com
aazim@kslaw.com

Kyle Gotchy (admitted *pro hac vice*)
KING & SPALDING LLP
621 Capitol Mall, Suite 1500
Sacramento, CA 95814
Tel: 916-321-4800
Fax: 916-321-4900
kgotchy@kslaw.com

Paul d'Ambrosio (admitted *pro hac vice*)
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Tel: 312-995-6333
Fax: 312-995-6330
pdambrosio@kslaw.com

Preeya Noronha Pinto (admitted *pro hac vice*)
Josh Gardner (admitted *pro hac vice*)
Deborah Samenow (admitted *pro hac vice*)
DLA PIPER
500 Eighth Street, NW
Washington, DC 20004

(202) 799-4000
Preeya.pinto@us.dlapiper.com
Josh.gardner@us.dlapiper.com
Deborah.samenow@us.dlapiper.com

Allison Velez (admitted *pro hac vice*)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
(215) 656-3312
Allison.Velez@us.dlapiper.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2026, I served a true and correct copy of the foregoing on Defendants by delivering it electronically to Defendants' attorney, Assistant U.S. Attorney Brian Stoltz, with Mr. Stolz's consent.

*/s/ Robert M. Hill*