**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| CHRIS MCGEE, MD PA, APRIL E. LOPEZ, FNP-BC, LLC DBA LOPEZ FAMILY CLINIC, BRIAN G. LODER, DPM, PLC DBA DETROIT FOOT AND ANKLE, HEALTHCARE HOUSECALLS LLC, INDY WOUND CENTER FOR LIMB PRESERVATION & RECONSTRUCTION DBA INDY WOUND CENTER, INTEGRATED WOUND CARE CONNECTICUT PLLC, WOUND MANAGEMENT SPECIALISTS LLC, WYOMING MEDICAL ASSOCIATES, LLC, and CARLO DOMINGO, AGNP-C, individually and on behalf of all others similarly situated | |
| *Plaintiffs*, | |
| *v.* | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, | Civil Action No. 4:26-cv-00243-O |
| DR. MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services | Hon. Reed O'Connor |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES | |
| CENTERS FOR MEDICARE & MEDICAID SERVICES | |
| *Defendants.* | |

**PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF**

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

BACKGROUND .......... 3

I. Medicare and Its Program Administration .......... 3

II. The History of Skin Substitutes and Medicare .......... 5

III. The Clawback Policy and Its Harm to Plaintiffs and Their Patients .......... 9

IV. Procedural History .......... 12

LEGAL STANDARD .......... 12

ARGUMENT .......... 13

I. Plaintiffs Are Entitled to Preliminary Relief. .......... 14

a. Plaintiffs Will Likely Succeed on the Merits. .......... 14

i. The Clawback Policy Violates the Medicare Statute .......... 14

ii. The Clawback Policy Violates the APA .......... 16

iii. Even if the Clawback Policy Were Valid, Plaintiffs Are Faultless .......... 20

b. Plaintiffs Face a Substantial Threat of Irreparable Harm .......... 21

c. Equitable Factors Favor a Stay or Injunction. .......... 23

II. The Court's Relief Should Bar CMS from All Further Enforcement of the Clawback Policy .......... 24

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.A.R.P. v. Trump*,
605 U.S. 91, 98 (2025) .......... 14, 24

*Agendia, Inc. v. Becerra*,
4 F.4th 896 (9th Cir. 2021) .......... 7

*All. for Hippocratic Med. v. FDA*,
78 F.4th 210 (5th Cir. 2023) .......... 12, 21, 24

*Americans for Beneficiary Choice v. HHS*,
No. 4:24-cv-00439, 2024 WL 3297527 (N.D. Tex. July 3, 2024) (O'Connor, J.) .......... 22, 23

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) .......... 4, 14, 15, 16

*Baqer v. St. Tammany Parish Gov't*,
No. 20-980, 2020 WL 1820040 (E.D. La. Apr. 11, 2020) .......... 23

*Barbara v. Trump*,
790 F. Supp. 3d 80 (D.N.H. 2025) .......... 24

*Canal Auth. v. Callaway*,
489 F.2d 567 (5th Cir. 1974) .......... 13

*Career Colls. & Schs. v. U.S. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) .......... 22

*Caring Hearts Pers. Home Servs., Inc. v. Burwell*,
824 F.3d 968 (10th Cir. 2016) .......... 21

*Chamber of Com. v. SEC*,
85 F.4th 760 (5th Cir. 2023) .......... 19

*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
628 F. Supp. 3d 243 (D.D.C. 2022) .......... 17, 19

*Cypress Home Care, Inc. v. Azar*,
326 F. Supp. 3d 307 (E.D. Tex. 2018) .......... 21

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) .......... 17, 20

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 17, 19

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)........................................................................................ 16, 17, 19, 20

*Goldman v. Azar*,
No. 4:20-cv-463, 2021 WL 3729032 (S.D. Tex. June 25, 2021).................................. 7, 15, 16

*Hays v. Sebelius*,
589 F.3d 1279 (D.C. Cir. 2009) ........................................................................... 4, 20

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) .............................................................................. 14

*Maupin v. Azar*,
424 F. Supp. 3d 830 (C.D. Cal. 2019)........................................................................ 7

*M-J-M-A- v. Hermosillo*,
--- F. Supp. 3d ---, 2026 WL 562063 (D. Or. Feb. 27, 2026).................................................. 17

*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023)................................................................................... 13

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010).............................................................................................. 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*,
463 U.S. 29 (1983)......................................................................................... 17, 18, 20

*Nken v. Holder*,
556 U.S. 418 (2009).............................................................................................. 23

*Porzecanski v. Azar*,
316 F. Supp. 3d 11 (D.D.C. 2018) ..................................................................... 7, 15, 16

*R.J. Reynolds Vapor Co. v. FDA*,
65 F.4th 182 (5th Cir. 2023) ................................................................................... 17

*Roho, Inc. v. Marquis*,
902 F.2d 356 (5th Cir. 1990) ................................................................................... 14

*Speaks v. Kruse*,
445 F.3d 396 (5th Cir. 2006)................................................................................... 13

*Texas v. Becerra*,
89 F.4th 529 (5th Cir. 2024)............................................................................. 14, 15, 16

*Texas v. Biden*,
10 F.4th 538 (5th Cir. 2021) .................................................................................... 23

*Texas v. EPA*,
829 F.3d 405 (5th Cir. 2016) ... 21

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ... 14, 25

*U.S. Navy SEALs 1–26 v. Austin*,
594 F. Supp. 3d 767 (N.D. Tex. 2022) ... 25

**Statutes**

5 U.S.C. § 705 ... 12, 24

42 U.S.C. § 1395k(a) ... 4, 14

42 U.S.C. § 1395y(a) ... 4, 20

42 U.S.C. § 1395ff(b) ... 5

42 U.S.C. § 1395ff(f) ... 7

42 U.S.C. § 1395gg(b) ... 21

42 U.S.C. § 1395hh(a) ... 4, 14, 16

42 U.S.C. § 1395hh(e) ... 14, 16, 21

42 U.S.C. § 1395pp(a) ... 21

**Regulations & Rules**

21 C.F.R. § 1271.3 ... 6, 18

42 C.F.R. § 405.1100 ... 5

42 C.F.R. § 405.1102(a) ... 5

42 C.F.R. § 405.948 ... 5

42 C.F.R. § 405.968(a) ... 5

54 Fed. Reg. 4302 (Jan. 30, 1989) ... 4, 15

89 Fed. Reg. 93912 (Nov. 27, 2024) ... 18

**Other Authorities**

CMS,
*Fact Sheets: Calendar Year (CY) 2026 Medicare Physician Fee Schedule Final Rule (CMS-1832-F)* (Oct. 31, 2025), https://tinyurl.com/yj3z724b.................................................. 8

CMS,
*Fact Sheets: Final Local Coverage Determinations (LCDs) for Certain Skin Substitutes Withdrawn* (Dec. 24, 2025), https://tinyurl.com/54zjkvks ...................................... 9

Medicare Program Integrity Manual (MPIM) § 3.6.2.2 (2020)............................................... 5, 15

Press Release,
CMS, CMS Modernizes Payment Accuracy and Significantly Cuts Spending Waste (Oct. 31, 2025), https://tinyurl.com/93rr9b7x................................................................. 8

2 Rubenstein, William B.
Newberg and Rubenstein on Class Actions § 4:30 (6th ed.).................................................. 25

Schmiedova, Iveta, et al.,
*Using of Amniotic Membrane Derivatives for the Treatment of Chronic Wounds*, 11 Membranes 1 (2021), https://pubmed.ncbi.nlm.nih.gov/34940442/................................... 18

11A Wright & Miller,
Federal Practice and Procedure § 2948.3 (2d ed. 1995) ......................................................... 14

## INTRODUCTION

This case involves Defendants' unlawful scheme to ignore their own binding skin-substitute coverage policy and claw back hundreds of millions of dollars in legitimately paid Medicare claims. Skin substitutes are FDA-regulated products derived from minimally processed human amniotic tissue that are used to treat chronic, open wounds, and they are generally understood to be safe and effective for patients who otherwise risk amputation or death. Skin substitutes have been a major factor in improving wound-closure rates, reducing comorbidities, and achieving better health outcomes for wound-care patients nationwide, especially among the elderly and infirm patients who suffer from these wounds the most. Due to their efficacy and broad acceptance in the medical community, Medicare has covered treatment for chronic wounds with skin substitutes since at least 2015, saving innumerable lives and limbs.

But around 2022, the Centers for Medicare and Medicaid Services (CMS)[1] decided that the lifesaving benefits skin substitutes provide had grown too expensive and decided to claw that money back. Because it is, of course, generally unlawful for the government to retroactively change Medicare coverage policies, the government could not admit what it was doing. So, CMS changed course secretly to claw back millions of dollars in Medicare spending, instructing the Medicare Appeals Council and "training" Administrative Law Judges ("ALJs") to deny Medicare claims for these products by applying pretextual reimbursement standards that CMS has never applied before. But this covert Clawback Policy is unlawful, too. The Medicare statute makes clear that new standards or changes impacting Medicare coverage or payment must undergo notice and comment, and moreover courts have long held that an agency changing course without providing any warning to those affected or an opportunity to be heard is arbitrary and capricious.

[1] Throughout, all Defendants are referred to collectively as "CMS."

For about ten years, CMS and its agents consistently reimbursed skin-substitute claims without issue. Plaintiffs, who specialize in treating patients with chronic wounds, were therefore stunned when CMS contractors began demanding repayment of funds already reimbursed for skin substitutes used to treat their elderly, immobile patients. And because these claims were submitted and paid years ago, Plaintiffs had paid their suppliers for the skin-substitute products long ago as well. Consequently, CMS's clawbacks have caused great financial strain on Plaintiffs' often small, independent businesses, to the point where one practice in Wise County has already closed down. But the government does not care. Despite clear prohibitions in both the Medicare statute and the APA against changing policies that have engendered serious reliance interests without notice and an opportunity to be heard, CMS denied claims that it had previously reimbursed for years without any indication that skin substitutes were not covered products. And it did so for the singular, invalid reason that it "does not want to pay for these products." Dearman Aff. ¶ 5; Harrell Aff. ¶ 4.

Plaintiffs have fought this Clawback Policy at every level of Medicare's administrative process, but their claims were ultimately denied for the same legally invalid reason: skin substitutes are supposedly "experimental" or "investigational," even though these same products have been widely used and reimbursed by Medicare for years as essential treatments to improve (and save) patients' lives. Until recently, Plaintiffs had not had a skin-substitute reimbursement claim denied on this basis. This newly formulated position is at odds with CMS's long-held recognition that skin substitutes are neither "experimental" nor "investigational," but instead are "medically reasonable and necessary" when used to treat chronic wounds that do not respond to conservative treatment.

CMS has embarked on its clawback crusade with total indifference for its real-world harms. The Clawback Policy is crushing Plaintiffs' practices—from April Lopez's family-run clinic to Wound Management Specialists' (WMS) larger practice—as the millions of dollars CMS is

demanding from Plaintiffs is far too much for them to bear. Stacked on top of that is the undeniable threat of additional clawback audits targeting even more of the Plaintiffs' paid claims for skin substitutes. These audits threaten Plaintiffs' ability to continue treating patients with skin substitutes due to fear that CMS will claw back the payments after they have used most of it to pay their suppliers. And these business harms to Plaintiffs naturally result in health harms to their patients. Plaintiffs are seeing more of their patients hospitalized and needing amputations than ever before due to no longer being able to treat them with skin substitutes. These access-to-care problems are real, and these harms will exacerbate further if Plaintiffs' practices go under and their patients—who largely live in rural, underserved areas—lose their wound-care providers entirely.

Plaintiffs and their patients cannot afford to wait for CMS to act lawfully or for a favorable final disposition on their meritorious claims. They now move for preliminary relief to save themselves from irreparable financial ruin and save their patients from avoidable amputations and deaths. They are entitled to interim relief because they have a strong case on the merits, because they are suffering irreparable harm from the financial strain the government is putting on their businesses, and because interim relief will save lives and livelihoods in the communities that rely on them for critical medical care. CMS will face no harm if it is required to follow its own decade-long policy during the pendency of the litigation. And because Plaintiffs bring a class action on behalf of hundreds of wound-care providers who CMS has mistreated the same way, this Court should provide this same preliminary relief to the entire class.

## BACKGROUND

### I. Medicare and Its Program Administration

Medicare, which is codified at Title XVIII of the Social Security Act, is the federally funded and administered program of health insurance for those who are 65 and over or are disabled. Medicare Part B consists of a voluntary program of supplemental medical insurance providing

coverage of outpatient hospital services, physicians, nurse practitioners, home health, physical, speech and occupational therapy, diagnostic services, and durable medical equipment. 42 U.S.C. § 1395k(a). The threshold for Medicare coverage is codified in its medical necessity requirement:

> [N]o payment may be made . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

*Id.* § 1395y(a)(1)(A). In other words, when the service is reasonable and necessary, Medicare coverage is required. *Hays v. Sebelius*, 589 F.3d 1279, 1283 (D.C. Cir. 2009). Crucially, cost cannot be used to determine medical necessity. Nowhere in the statute or regulations is CMS authorized to consider the cost of an item or service when determining whether to extend Medicare coverage to it. To the contrary, the D.C. Circuit has held that CMS cannot deny reimbursement for a reasonable and necessary treatment even if there is a less costly alternative. *Id.*

The Medicare statute further specifies that CMS may make "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits[ or] the payment for services" without going through notice and comment. 42 U.S.C. § 1395hh(a)(2); *see Azar v. Allina Health Servs.*, 587 U.S. 566, 568 (2019) (finding that changes in Medicare payment methodology require notice and comment rulemaking when they affect substantive payment standards). CMS has never implemented regulations on the standards it applies when determining if an item is medically "reasonable and necessary"; it proposed a rule setting such standards in the 1980s, but it never finalized it. *See* 54 Fed. Reg. 4302, 4304 (Jan. 30, 1989) (proposed rule on definition of "reasonable and necessary"). It has instead set out instructions on this standard in a guidance document that has never gone through notice and comment rulemaking: The Medicare Program Integrity Manual (MPIM). This guidance advises that an item or service is "reasonable and necessary" if it is medically appropriate (including its duration and frequency), safe, effective, and not "experimental or investigational." MPIM § 3.6.2.2

(2020). CMS has never specified what clinical data or scientific evidence it believes is necessary to establish that an item or service is proven and not "investigational."

To administer Medicare Part B reimbursements, CMS has divided the country into various regions that are each administered by one of seven Medicare Administrative Contractors, or MACs: Noridian, NGS, WPS, Novitas, CGS, Palmetto, and First Coast. When a provider submits a claim, the MAC for the relevant region makes the initial decision of whether to grant or deny the claim. It also audits claims that it already paid and demands Medicare's money back if it determines an "overpayment" occurred, assisted by other contractors which receive financial incentives to claw back as much money for Medicare as possible. *See* ECF 25 ¶ 14. If the MAC denies a claim, the aggrieved provider may seek "redetermination" of that decision from the MAC. *See* 42 C.F.R. § 405.948. If the MAC denies redetermination, the provider can then appeal to a Qualified Independent Contractor (QIC), who reviews the evidence to determine if the MAC committed an error. *See* 42 C.F.R. § 405.968(a)(1). Providers who disagree with the QIC's reconsideration decision may then request a hearing with the Office of Medicare Hearings and Appeals, which is typically conducted by an ALJ. As with the QIC, ALJs are supposed to be independent adjudicators who apply the law and coverage standards in effect. Any unfavorable ALJ decisions can be appealed up to the Medicare Appeals Council ("the Council"). 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1100(a), 405.1102(a)(1).

An important feature of the Medicare appeals process is that favorable ALJ opinions can face the Council's scrutiny, as well. A CMS contractor called the Administrative QIC (AdQIC) monitors ALJ decisions and makes referrals to the Council to review ALJ decisions. 42 C.F.R. § 405.1100. Accordingly, favorable ALJ decisions do not always lead to providers obtaining relief.

## II. The History of Skin Substitutes and Medicare

Skin substitutes are FDA-regulated products derived from minimally processed human

amniotic tissue that are used to treat chronic wounds, such as diabetic foot ulcers and venous leg ulcers. ECF 25 ¶¶ 7, 57–60. The products defined as "skin substitutes" in this litigation are those products derived from donated human amniotic tissue after birth that are not regulated as devices or biologicals and, therefore, are not subject to the FDA's device and biological clearance processes. Instead, the FDA classifies the products at issue here as "human cell and tissue-based products" (HCT/Ps) because these "skin substitutes" are comprised of human cells and tissues. *Id.* ¶ 68. These skin substitutes are regulated under Section 361 of the Public Health Service Act because they are "minimally manipulated," meaning that their processing "does not alter the relevant biological characteristics of cells or tissues." 21 C.F.R. § 1271.3. In essence, skin substitutes are unaltered amniotic-membrane cells, no matter who produces them, and they all function in the same manner when applied to chronic wounds.

Diabetic foot ulcers and venous leg ulcers are slow-healing wounds that often cause severe complications in those who endure them. While these wounds are sometimes treatable with debridement and wound dressing, such conservative care is often not effective, with the wounds often becoming chronic, leading to amputations and even death. ECF 25 ¶¶ 10, 59. But skin substitutes have changed the game. While conventional dressings prevent infection and maintain a moist environment, skin substitutes do that and more. According to multiple MACs (CMS's own contractors), skin substitutes also "may provide protein or growth factors proposed to stimulate or facilitate healing or promote epithelization." ECF 25-3 at 4, CGS 2016 LCD; ECF 25-5 at 7, Novitas 2015 LCD. "The addition of Cellular and/or Tissue Based Products (CTPs) to certain wounds may afford a healing advantage over dressings and conservative treatments when these options appear insufficient to affect complete healing." ECF 25-3 at 3; ECF 25-5 at 6. Due to skin substitutes' widely recognized efficacy, their application is considered standard for chronic wounds

that fail to heal after conservative wound treatments. ECF 25 ¶ 60.

Recognizing skin substitutes' "healing advantage," many MACs codified their coverage of skin substitutes through LCDs.[2] In 2015 and 2016, Novitas, CGS, First Coast Service Options, and Palmetto each published LCDs that expressly covered a wide range of skin-substitute products and declared them to be medically reasonable and necessary when used to treat chronic wounds. ECF 25 ¶ 77 & ECF 25-3–ECF 25-6. CGS and Novitas's LCDs also provide that "all products with U.S. Food and Drug Administration (FDA) clearance/approval or designated 361 HCT/P exemption used in accordance with that product's individualized application guidelines will be equally considered for purpose of this LCD and may be considered reasonable and necessary." ECF 25-5 at 9; ECF 25-3 at 5. In other words, these MACs recognize that every product cleared by Section 361 is *automatically* medically reasonable and necessary, skin substitutes included.

The Novitas, CGS, and First Coast LCDs remain in effect and bind the MACs' coverage decisions within their respective jurisdictions.[3] *Porzecanski v. Azar*, 316 F. Supp. 3d 11, 15 (D.D.C. 2018); ECF 25 ¶ 76. And even the MACs that did not have express LCDs for skin substitutes still considered them to be medically necessary, as non-LCD MAC jurisdictions accounted for the

---

[2] LCDs are advanced pronouncements regarding whether, and under what indications, a specific item or service is considered reasonable and necessary within a given MAC's jurisdiction. 42 U.S.C. § 1395ff(f)(2)(B). MACs adopt LCDs so providers and beneficiaries can make treatment decisions knowing that the item or service will be covered. MACs are bound to follow their own LCDs, eliminating any uncertainty about whether a treatment is covered by Medicare. ECF 25 ¶ 76; *Porzecanski v. Azar*, 316 F. Supp. 3d 11, 15 (D.D.C. 2018). And while LCDs are not binding on ALJs, Attorney Adjudicators, and the Council, they are required to give LCDs "substantial deference." *Goldman v. Azar*, No. 4:20-cv-463, 2021 WL 3729032, at *1 (S.D. Tex. June 25, 2021). They may only disregard them due to "the facts of a particular case," and when doing so, the adjudicator must "explain their reasons for departing from it." *Maupin v. Azar*, 424 F. Supp. 3d 830, 832 (C.D. Cal. 2019); *Agendia, Inc. v. Becerra*, 4 F.4th 896, 902 (9th Cir. 2021).

[3] These three, still effective LCDs are referred to hereinafter as the "2015-16 LCDs." While Palmetto retired its LCD in 2019, ECF 25 ¶ 80, it continued to pay Medicare claims for skin substitutes until the Clawback Policy began.

majority of skin-substitute reimbursement payments from 2015 to 2024. *See* ECF 25 ¶¶ 79–80. Providers throughout the country thus came to reasonably rely on Medicare covering their uses of skin substitutes to treat their patients' wounds. Indeed, WMS and Dr. McGee structured their wound-care protocols around compliance with Novitas's LCD because they trusted that Medicare would reimburse them as long as they carefully adhered to the LCD's criteria. Baine Decl. ¶¶ 1, 14 & Exs. B & C; Smith Decl. ¶ 10 & Exs. B & C; McGee Decl. ¶ 12. There was simply no indication that skin substitutes were not covered.

But CMS decided, behind closed doors, that it was spending too much and changed course unbeknownst to the general public. Skin substitutes' effectiveness led to unprecedented usage and, naturally, Medicare spending on the products has increased over the last several years. According to CMS, Medicare spending on skin substitutes increased from $256 million in 2019 to $10 billion in 2024.[4] Apparently deciding that this was too much to spend on these potentially life-saving treatments, CMS has made at least three policy changes aimed at cutting spending. First, CMS recently created a new physician fee schedule for skin substitutes, lowering the amount at which providers would be reimbursed for skin substitutes as of January 1, 2026.[5] Second, the three MACs with operative LCDs expressly extending coverage to skin substitutes tried to rescind them and implement new LCDs that excluded the skin substitutes at issue here from coverage. *See* ECF 27 at 9–11. As CMS's own emails with the MACs show, the impetus behind CMS's new LCDs was not patient welfare or provider fairness, but cost cutting; CMS asked the MACs exactly how much money Medicare would save if these new LCDs went into effect. *See, e.g.,* ECF 25-1; *see also*

---

[4] Press Release, CMS, CMS Modernizes Payment Accuracy and Significantly Cuts Spending Waste (Oct. 31, 2025), https://tinyurl.com/93rr9b7x.

[5] CMS, *Fact Sheets: Calendar Year (CY) 2026 Medicare Physician Fee Schedule Final Rule (CMS-1832-F)* (Oct. 31, 2025), https://tinyurl.com/yj3z724b.

ECF 27-9 (noting that CGS's proposed LCD was "very much needed" to protect Medicare's "Trust Fund"). But due to pushback and legal infirmities, these new LCDs never became effective.[6] The 2015-16 LCDs—which specifically say skin substitutes are medically reasonable and necessary for the treatment of chronic wounds—remain binding on Novitas, CGS, and First Coast Service Options, the MACs who adopted them. ECF 25 ¶¶ 77, 85–86.

Third, frustrated with their inability to revoke Medicare coverage of skin substitutes through the appropriate rulemaking procedures, CMS has engaged in a sustained effort to recover hundreds of millions of dollars in appropriately paid claims and drive as many wound-care providers out of business as possible through the Clawback Policy at issue here.

## III. The Clawback Policy and Its Harm to Plaintiffs and Their Patients

Beginning as early as April 2022—around the same time the MACs began their first unsuccessful attempt to remove LCD coverage for skin substitutes—CMS began a campaign to claw back as much money as possible by retroactively auditing, reopening, and then denying previously paid Medicare Part B claims for skin substitutes. ECF 25 ¶¶ 14, 15, 286. When providers challenged these sudden repayment demands through Medicare's appeal process, they ultimately received unfavorable decisions and all had their claims denied on the same basis: the same skin substitutes that they had for years treated patients with and consistently been reimbursed for were, for the first time, "experimental" or "investigational" because the providers did not support their claims with studies proving that the specific skin substitute they used was effective. *See generally* ECF 25 ¶¶ 94–292 & ECF 25-12–ECF 25-57. Despite providing no notice whatsoever to providers that the skin substitutes Medicare had been covering for years were suddenly considered "experimental," CMS forced providers to pay back all the money they had

---

[6] CMS, *Fact Sheets: Final Local Coverage Determinations (LCDs) for Certain Skin Substitutes Withdrawn* (Dec. 24, 2025), https://tinyurl.com/54zjkvks.

been reimbursed because they somehow "should have known" that their uses of the products would not be covered. *See, e.g.*, ECF 25-13 at 18–19; ECF 25-19 at 14.

This is not a case of individual contractors or ALJs going rogue. CMS is directing the Clawback Policy from the top, ordering its agents to deny claims for skin substitutes. During a training session, CMS told its ALJs that it "does not want to pay for these products," instructing them to only issue favorable reimbursement decisions if the provider submits "peer-reviewed literature that specifically names the skin substitute product used." Dearman Aff. ¶ 5; Harrell Aff. ¶ 4. CMS has also repeatedly referred favorable ALJ rulings to the Council, requesting that it review and reverse these ALJ decisions. *See* ECF 25 ¶ 287; ECF 25-56; ECF 25-57. The Council has then reversed the ALJ on grounds that skin substitutes are "experimental" or "investigational" in *every* case of which Plaintiffs are aware. *See, e.g.*, ECF 25-53; ECF 25-54; ECF 25-55. Plaintiff Wyoming Medical Associates (WMA), for example, won before an ALJ, who determined that the skin substitute WMA used, Xwrap, *was* medically reasonable and necessary, not merely investigational. ECF 25 ¶ 162. Yet after CMS requested that the Council review the ALJ's decision, ECF 25-25 at 1, the Council reversed and held that Xwrap is experimental and investigational, discarding all the evidence that the product is highly effective simply because the submitted studies did not "specifically mention XWrap." *Id.* at 8–11. The Council relied on the MPIM to deny WMA's claim despite that guidance document having never gone through notice and comment rulemaking. *See id.* at 11 ("[I]n accordance with the standards set forth in the MPIM, the Council concludes that the appellant has not demonstrated that the Xwrap at issue was medically reasonable and necessary under the applicable manual requirements."). In this way, CMS has denied providers an independent administrative appeals system, leaving federal court as their only option.

The financial consequences on Plaintiffs are devastating. Dr. McGee has already been

forced to close his wound-care practice, Cutting Edge Wound Solutions, under a $40,000/month repayment obligation at 12% interest. McGee Decl. ¶¶ 23–24. Moreover, WMS faces up to $58 million in liability and is projected to go out of business by September (Smith Decl. ¶¶ 48–49); WMA faces a $2.6 million demand and is on a five-year repayment plan requiring approximately $47,000/month at 11.65% interest—a shorter, eighteen-month plan requiring $100,000/month was unworkable (Jack Decl. ¶ 15); CMS is withholding 100% of Zeta Visiting Physician's Medicare payments, forcing its founder to consider draining his retirement savings (Domingo Decl. ¶¶ 15, 19); Dr. Lalia's practice is on the verge of bankruptcy (Lalia Decl. ¶ 15); Integrated Wound Care has endured nine audits since August 2024 with approximately $4.2 million at issue (Lusas Decl. ¶ 23); and April Lopez's small, family-run clinic faces 100% Medicare payment withholding after failing to keep up with a $60,000/month repayment plan, leaving her with only enough funds for two more payrolls (Lopez Decl. ¶¶ 22, 25–26). Many Plaintiffs attest they are certain to go out of business if forced to repay these sums. As a result, providers have been forced to stop using skin substitutes altogether—not because the products don't work, but because the audit risk is too high. Lopez Decl. ¶ 29; Domingo Decl. ¶ 16; Zumbaugh Decl. ¶ 13; Loder Decl. ¶ 17; Lusas Decl. ¶ 32.

This all, sadly, has terrible effects on Plaintiffs' patients. Ms. Lopez attests to patients having toes amputated, being hospitalized, and even being admitted to hospice—all for wounds that could have been healed. Lopez Decl. ¶ 35. Dr. Thomas Zumbaugh of Indy Wound Center attests that one patient whose chronic foot ulcer had previously been healed with skin substitutes needed an amputation for a similar wound because Dr. Zumbaugh was unable to offer skin substitutes due to audit risk. Zumbaugh Decl. ¶ 17. Carlo Domingo attests that one homebound patient was hospitalized for nearly two weeks with a life-threatening blood infection from a wound that has remained open for thirteen months. Domingo Decl. ¶ 22. And Dr. Loder predicts

significantly more amputations, and patients are returning to his practice asking him to resume grafting—but he cannot. Loder Decl. ¶¶ 25–27; *see also* McGee Decl. ¶¶ 29–31.

And it will only get worse for many patients if the Clawback Policy continues and the wound-care providers they rely on go out of business. Many Plaintiffs practice in underserved regions and provide wound-care services that people in their communities cannot receive anywhere else. For instance, WMS serves mostly homebound patients in rural and remote areas. Smith Decl. ¶ 52. WMA is the only practice offering advanced wound care within a two-hour drive in rural Northeastern Wyoming. Jack Decl. ¶ 5. And Ms. Lopez's clinic is the only wound-care provider offering home visits in McAllen, Texas. Lopez Decl. ¶ 38. These communities losing their wound-care providers to government-induced insolvency will only lead to more preventable hospitalizations, amputations, and deaths.

## IV. Procedural History

Plaintiffs filed this suit on March 4, 2026, ECF 1, and filed their First Amended Complaint on May 8, alleging violations of the Administrative Procedure Act ("APA") and the Medicare statute and seeking declaratory and injunctive relief. ECF 25 ¶¶ 301–24. Plaintiffs moved to certify this case as a class action on May 15, ECF 27, and CMS moved to dismiss on May 26, ECF 29.

## LEGAL STANDARD

Under the APA, "the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The Court also has the authority to enjoin unlawful conduct at the outset to prevent the plaintiffs from suffering ongoing harm, and both forms of relief are guided by the same factors. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 241–42 (5th Cir. 2023). "A preliminary injunction should issue if the movant establishes" four factors: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury, (3) that

the threatened injury outweighs any harm that will result if the relief is granted, and (4) that preliminary relief will not disserve the public interest. *Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006). No factor "has a fixed quantitative value." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (quotation marks omitted). "Rather," courts use "a sliding scale" which "takes into account the intensity of each in a given calculus." *Id.*

**ARGUMENT**

The purpose of both a Section 705 stay and a preliminary injunction is "to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision . . . on the merits." *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). Here, every factor weighs in favor of granting that interim relief. Plaintiffs are likely to prevail on the merits of their claims. The Medicare statute bars CMS from denying claims based on standards that did not go through notice and comment. Moreover, it is well established that CMS cannot, as it has done here, adopt policies that are entirely contrary to the evidence before it, nor may it abruptly change its policy without any prior announcement or providing the public with any reasoning. Without preliminary relief, Plaintiffs will suffer irreparable harm in the form of severe, unrecoverable economic losses, as CMS's policy is causing Plaintiffs' practices to fail. The balance of harms and the public interest also weigh heavily in favor of an injunction. Plaintiffs risk losing their businesses and are being forced to limit the services they can offer their patients, harming the vulnerable populations which depend on their services. Meanwhile, there is no harm to CMS in requiring it to follow its operative policy during the pendency of the litigation. There is every reason to cease CMS's Clawback Policy and revert the coverage policy for skin substitutes back to the regime in place before April 2022 (when the products were broadly covered) pending the Court's review of the merits.

The Court should halt the Clawback Policy under Section 705 or, alternatively, grant

injunctive relief to the entire putative class that Plaintiffs represent. Under *A.A.R.P. v. Trump*, district courts "may issue temporary relief to a putative class." 605 U.S. 91, 98 (2025) (per curiam). And Justice Kavanaugh's concurrence in *Trump v. CASA, Inc.*, clarified that *CASA* does not disturb *A.A.R.P.*'s rule. 606 U.S. 831, 869 (2025) (Kavanaugh, J., concurring).

**I. Plaintiffs Are Entitled to Preliminary Relief.**

**a. Plaintiffs Will Likely Succeed on the Merits.**

The movant for interim relief "must present a prima facie case but need not show that he is certain to win." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quoting 11A Wright & Miller, Federal Practice and Procedure § 2948.3 (2d ed. 1995)). "To determine the likelihood of success on the merits, [the Court] look[s] to the standards provided by the substantive law." *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990). As described below, the Clawback Policy is legally infirm as it violates core tenets of the Medicare statute and is otherwise arbitrary and capricious in violation of the APA.

**i. The Clawback Policy Violates the Medicare Statute**

The Medicare statute entitles beneficiaries to coverage for all reasonable and necessary medical treatment. 42 U.S.C. § 1395k(a)(2). The statute requires "notice-and-comment rulemaking when promulgating any 'rule, requirement, or other statement of policy that establishes or changes a substantive legal standard governing the payment for services.'" *Texas v. Becerra*, 89 F.4th 529, 545 (5th Cir. 2024) (quoting 42 U.S.C. § 1395hh(a)(2)) (cleaned up); *Allina*, 587 U.S. at 568 (finding that changes in Medicare payment methodology require notice and comment rulemaking when they affect substantive payment standards). Moreover, if CMS wishes to change its coverage policies, it may not apply the change retroactively "to items and services furnished before" the policy changed. 42 U.S.C. § 1395hh(e). And when a MAC's LCD determines that a particular item or service is "reasonable and necessary," that determination binds the MAC and governs all claims

within its jurisdiction, and subsequent adjudicators must give "substantial deference" to the LCD's determination. *See Porzecanski*, 316 F. Supp. 3d at 15; *Goldman v. Azar*, No. 4:20-cv-463, 2021 WL 3729032, at *1 (S.D. Tex. June 25, 2021).

CMS's Clawback Policy violates all these basic principles of Medicare coverage. First, CMS is denying skin-substitute claims based on standards that have never gone through notice and comment rulemaking. The "experimental or investigational" standard is not found in any statute or promulgated rule; it instead comes from the MPIM and a *proposed* rule from 1989. *See* MPIM § 3.6.2.2; 54 Fed. Reg. at 4304. These nonbinding, nonfinal documents cannot establish legal standards for whether a service is covered; only promulgated rules may do that. *Becerra*, 89 F.4th at 545; *Allina*, 587 U.S. at 568. Yet CMS is relying on these documents to deny Plaintiffs' and class members' claims. *See, e.g.*, ECF 25-25 at 11 (denying WMA's claim based on "standards set forth in the MPIM" and citing 1989 proposed rule); ECF 25-53 at 6 (holding that ALJ erred in conferring coverage "without a full consideration of medical necessity under the relevant MPIM provision"); ECF 25-54 at 8 (Council "clarify[ing] that the coverage denial is ***based on*** the MPIM" (emphasis added)); ECF 25-55 (relying on MPIM throughout). Under *Allina*, anything that "affects a [provider's] right to payment" is a substantive legal standard that must go through notice and comment rulemaking. *Allina*, 587 U.S. at 573. Obviously, that includes the standard CMS uses to approve or deny claims. Because CMS cannot deny claims based on a standard that appears only in guidance, this Court must vacate every decision relying on the "experimental and investigational" standard to deny a claim.

Even if it were proper for CMS to rely on these nonfinal standards to make coverage determinations, it also improperly changed its coverage standards—ruling that all products will be considered experimental if not supported by product-specific studies—without providing any

public notice whatsoever about the new requirements. *See* 42 U.S.C. § 1395hh(a)(2). Changing what providers must show to obtain coverage clearly "affects a [provider's] right to payment," so CMS violated the statute when it instituted the Clawback Policy without providing notice or opportunity to comment on the new policy. *Becerra*, 89 F.4th at 545; *Allina*, 587 U.S. at 568, 573.

Further, CMS and its agents are breaking the rules that MACs must adhere to their own LCDs and adjudicators must defer to them. *See Porzecanski*, 316 F. Supp. 3d at 15; *Goldman*, 2021 WL 3729032, at *1. The MACs—including the three with the 2015-16 LCDs on the books—are habitually auditing and retroactively denying skin-substitute claims at the initial stage even though their LCDs explicitly state that these products are medically reasonable and necessary. *See* ECF 25 ¶¶ 94–154, 167–91, 217–30 & ECF 25-12–ECF 25-19, ECF 25-26–ECF 25-28, ECF 25-36. And in their decisions upholding these denials, the QICs, ALJs, and the Council are not affording the 2015-16 LCDs any deference. *See, e.g.,* ECF 25-19 at 12–13 (ignoring Novitas's effective LCD and instead applying 2026 LCD that the MAC ultimately withdrew); ECF 25-13 at 10 & n.1 (similar). This casual disregard for the rules violates both the Medicare statute and the APA. *Porzecanski*, 316 F. Supp. 3d at 15; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Finally, CMS is unlawfully applying this substantive change retroactively. The Clawback Policy's defining feature is that it claws back payments *already approved and paid to providers*, who submitted their claims while having reasonably relied on CMS's operative policy that the products they used were not "experimental" or "investigational." *See generally* ECF 25 ¶¶ 94–292 & ECF 25-12–ECF 25-57. Retroactively applying a new policy without prior notice violates the statute and offends basic concepts of due process and fairness. *See* 42 U.S.C. § 1395hh(e).

**ii. The Clawback Policy Violates the APA**

Agency action is arbitrary and capricious when the agency "relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the

problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 43 (1983). The APA requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotation marks omitted). Agency action is also arbitrary and capricious if it departs from agency precedent without explanation. "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox Television*, 556 U.S. at 515. Instead, it must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). And "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation marks omitted). "To keep things fair, agencies must give notice of [the] conduct the agency 'prohibits or requires' and cannot 'surprise' a party by penalizing it for 'good-faith reliance' on the agency's prior positions." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) (citation omitted). This is true even if the policy does not appear in a regulation or guidance. "The fact that a policy, pattern, or practice is not committed to writing is not dispositive," *M-J-M-A- v. Hermosillo*, --- F. Supp. 3d ---, 2026 WL 562063, at *18 (D. Or. Feb. 27, 2026), and an "agency remains obligated to weigh reliance interests against policy concerns even if the policy . . . was never formally implemented." *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp. 3d 243, 259 (D.D.C. 2022).

Here, CMS's contractors have themselves long recognized that skin substitutes are safe and effective and medically reasonable and necessary when used as wound covers. Two of their 2015-16 LCDs noted that skin substitutes "may afford a healing advantage" by "stimulat[ing] or facilitate[ing] healing or promotion of epithelization," and they recognize that "all products with

[FDA] clearance/approval or designated 361 HCT/P exemption [which includes skin substitutes] used in accordance with that product's individualized application guidelines . . . *may be considered reasonable and necessary*." ECF 25-3 at 3–5, ECF 25-5 at 6–8 (emphasis added). CMS recognizes their effectiveness in other ways as well as it has continuously reimbursed these products for years and even published Medicare billing codes for all but two of the products at issue here, an odd thing to do if it truly believed the products were experimental *per se* and should never be reimbursed. *See* 89 Fed. Reg. 93912, 94253–54 (Nov. 27, 2024). And numerous studies show that skin substitutes are a safe and highly effective chronic-wound treatment. *See, e.g.,* Iveta Schmiedova et al., *Using of Amniotic Membrane Derivatives for the Treatment of Chronic Wounds*, 11 Membranes 1, 6–8 (2021), https://pubmed.ncbi.nlm.nih.gov/34940442/. Suffice it to say, CMS initiated the Clawback Policy despite all the evidence in front of it saying skin substitutes are medically reasonable and necessary. *See State Farm*, 463 U.S. at 43.

CMS's excuse for clawing back skin-substitute claims despite this wealth of evidence lacks any reasoned basis. *See id.* The agency claims that these studies do not matter because they do not examine *specific skin-substitute brands*, and each individual product is merely "experimental" or "investigational" unless a study examining that specific product shows that it is effective. *See* ECF 25-25 at 10 (denying coverage because submitted studies failed to "specifically mention Xwrap"); Dearman Aff. ¶ 5; Harrell Aff. ¶ 4 (both attesting that CMS trained its ALJs that "providers must have peer-reviewed literature that specifically names the skin substitute product used"). But this rationale itself ignores the pertinent evidence because all skin substitutes are basically the same. Products can only be regulated under Section 361 if they "do not alter the relevant biological characteristics of cells or tissues." 21 C.F.R. § 1271.3. The very fact that skin substitutes are Section 361 products means that they are all, at bottom, just human cells, making it

impossible for them to differ meaningfully. Even the Council and the MACs have accepted that every skin-substitute type is "functionally identical," so there is no basis for requiring product-specific proof of efficacy. ECF 25-25 at 4 (Council specifically *crediting* expert testimony that all skin substitutes are functionally identical but denying claim anyway); *see* ECF 25-5 at 10 (Novitas LCD noting that "no product has demonstrated individual superiority for the treatment of [leg and foot ulcers]"). CMS has never articulated why product-specific studies are required when it itself acknowledges that the various skin substitutes do not meaningfully differ, failing to address evidence that "challenge[s] a fundamental premise underlying" its policy. *Chamber of Com. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023) (quotation marks omitted); *see* ECF 25 ¶ 13.

Moreover, the 2015-16 LCDs are "still on the books" and expressly state that skin substitutes are covered by Medicare, and CMS had consistently covered the products nationwide for years regardless of whether the provider's reimbursement claim came from a jurisdiction covered by these LCDs. *Fox Television*, 556 U.S. at 515; ECF 25 ¶¶ 11, 77–80 & ECF 25-3–ECF 25-6. These written LCDs and consistent, years-long practice establish that CMS had a policy of extending coverage to skin substitutes, so it could not deviate from it without providing a "reasoned explanation for the change." *Encino*, 579 U.S. at 221–22; *see CSL Plasma*, 628 F. Supp. 3d at 259. But CMS provided no explanation whatsoever. Instead, it simply began retroactively denying skin-substitute claims on the basis that they are "experimental or investigational" without any prior notice that it was changing its coverage standard, let alone any reasoned explanation for the change. *See Encino*, 579 U.S. at 221–22. So when Plaintiffs and the class submitted their claims in good-faith reliance on the 2015-16 LCDs and CMS's countless prior instances of covering the products, they were oblivious that CMS would later claw back millions of dollars in reimbursements from them. CMS's casual disregard of its own longstanding policy extending

coverage to skin substitutes is a clear violation of the well-established principle that agencies must follow their own rules, *see Fox Television*, 556 U.S. at 515, and its decision to do so without warning or reasoning is a callous disregard of the serious reliance interests wound-care providers have built up over the years. *Regents of Univ. of Cal.*, 591 U.S. at 30. Initiating the Clawback Policy *sub silentio* was arbitrary and capricious. *See Fox Television*, 556 U.S. at 515.

Finally, the Clawback Policy is motivated by a factor Congress did not intend for CMS to consider: cost. Nowhere in any statute, regulation, or guidance is CMS authorized to outright deny coverage for a product or treatment because it costs too much; coverage depends only on whether the item or service is "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A); *see Hays*, 589 F.3d at 1283. But cost concerns are the Clawback Policy's driving force. CMS asked the MACs to provide it with precise figures of how much Medicare would save if the 2026 LCDs went into effect, stating that these LCDs and their dramatic narrowing of skin-substitute coverage were "very much needed" to protect Medicare's Trust Fund. ECF 25-1; ECF 27-9. An ALJ has stated that "CMS does not want to pay for these products . . . and will continue to disallow claims until someone takes them to Federal Court." Dearman Aff. ¶ 5; Harrell Aff. ¶ 4. And multiple ALJs have ruled against WMS explicitly on grounds that skin substitutes are too expensive. *See* Smith Decl. ¶¶ 15–20, Ex. H–I at 17–18 (stating that "surely the cost of the skin substitutes is relevant" to whether they are reasonable and necessary), Exs. D–G at 10–11 (saying "the use of this product is simply not reasonable, given the cost"). CMS's reliance on a factor "Congress has not intended [for] it to consider" is arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

**iii. Even if the Clawback Policy Were Valid, Plaintiffs Are Faultless**

The Medicare statute provides that money cannot be recouped from providers who are not at fault for providing services that are not covered and that such providers should have their liability waived if they "did not know, and could not reasonably have been expected to know" that

the service was not covered. 42 U.S.C. § 1395gg(b)(2); 42 U.S.C. § 1395pp(a)(2); *see Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 970 (10th Cir. 2016) (holding that CMS must reimburse the provider if it "couldn't have known" CMS would not cover the treatment "at the time it provided its services"); *Cypress Home Care, Inc. v. Azar*, 326 F. Supp. 3d 307, 317–22 (E.D. Tex. 2018) (same). Crucially, the statute forbids CMS from acting against a provider for "noncompliance with [ ] a substantive change" if it "follows the written guidance . . . provided by the Secretary or by a medicare contractor," such as an LCD. 42 U.S.C. § 1395hh(e)(2)(A)(i).

Even if skin substitutes are not covered products (they are), it is absurd to think that Plaintiffs were at fault for believing otherwise. Novitas, CGS, and First Coast have had LCDs in place for the past ten years that cover skin substitutes when used to heal chronic wounds. *See* ECF 25-3; ECF 25-4; ECF 25-5. Dr. McGee, Ms. Lopez, Dr. Lalia, and WMS all followed LCDs that bound these MACs to cover their uses of skin substitutes, so CMS is statutorily barred from acting against their supposed noncompliance with its coverage standards. *See* 42 U.S.C. § 1395hh(e)(2)(A)(i). And the remaining four MACs were clearly applying the same policy, as the *majority* of skin-substitute reimbursements from 2015–2024 occurred in non-LCD MAC jurisdictions. ECF 25 ¶¶ 79–80. As detailed above, Plaintiffs were wholly justified in relying on this longstanding CMS practice and had no notice whatsoever that CMS changed this longstanding policy at the time it denied their reimbursement claims. They thus "couldn't have known" CMS would deny the claims at issue here. *Caring Hearts*, 824 F.3d at 970.

**b. Plaintiffs Face a Substantial Threat of Irreparable Harm**

A movant seeking interim relief must demonstrate a substantial threat of irreparable harm in the absence of that relief. *See All. for Hippocratic Med.*, 78 F.4th at 241. A threatened financial loss satisfies this requirement when there is no available remedy for that loss. *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016). Because federal agencies are generally immune from any action for

monetary damages, compliance with an agency action "later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.* at 433 (quotation marks omitted).

Plaintiffs and the class members face irreparable harm because CMS's Clawback Policy saddles them with unrecoverable economic losses. As examples, Dr. McGee's practice has already been forced to close; WMS ostensibly owes the agency $58 million and cannot remain in business past September; Dr. Loder has liquidated his personal investment accounts to repay over $1 million; Indy Wound Center faces a hard deadline of September 2026 to restructure its business or shut down; and April Lopez—who has reduced her own salary to $327 per pay period—has only enough funds to make payroll twice more. *See* McGee Decl. ¶ 24; Smith Decl. ¶¶ 48–49; Loder Decl. ¶ 34; Zumbaugh Decl. ¶ 15; Lopez Decl. ¶¶ 26, 31. This Court has held in past Medicare cases that comparable threats to providers' business operations constitute irreparable harm. *See Americans for Beneficiary Choice v. HHS*, No. 4:24-cv-00439, 2024 WL 3297527, at *6 (N.D. Tex. July 3, 2024) (O'Connor, J.) (finding substantial threat of irreparable harm when the plaintiffs showed that a CMS rule would "alter their business operation"); *see also Career Colls. & Schs. v. U.S. Dep't of Educ.*, 98 F.4th 220, 237 (5th Cir. 2024) (similar). It should do so again here.

Plaintiffs are also chilled from treating their current patients with skin substitutes out of understandable concern that CMS will deny their claims again. Multiple Plaintiffs attest they have completely stopped using skin substitutes—not because the products stopped working, but because they cannot survive another audit. *See, e.g.*, Domingo Decl. ¶ 16; Zumbaugh Decl. ¶ 17; Lalia Decl. ¶ 16; Loder Decl. ¶ 17; Lusas Decl. ¶ 32; Lopez Decl. ¶ 29; *see also supra* at 11. And the chilling effect is already causing negative patient outcomes—a proximal amputation (carrying a 35% five-year mortality rate), a life-threatening hospitalization, a toe amputation, emergency room visits, and hospice admissions—all for wounds that might have been healed with skin substitutes.

*See* Zumbaugh Decl. ¶ 17; Domingo Decl. ¶ 22; Lopez Decl. ¶¶ 34–35.

Because Plaintiffs' practices are based around complex wound care, the combination of retroactive clawbacks and prospective chilling of skin-substitute use is driving them out of business. The Court should prevent CMS from causing irreparable harm to medical providers' businesses, just as it has before. *See Americans for Beneficiary Choice*, 2024 WL 3297527, at *6.

**c. Equitable Factors Favor a Stay or Injunction.**

Equitable considerations also weigh in favor of interim relief. The last two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). On one hand, as Plaintiffs have shown, the Clawback Policy is poised to cause them substantial irreparable harm. *See generally* Plaintiff Declarations. On the other, CMS cannot seriously contend that it will be harmed by reverting skin-substitute coverage back to how it was before April 2022 while the Court considers the merits of Plaintiffs' claims. "[T]he public interest is in having governmental agencies abide by the federal laws that govern their existence and operations. . . . And there is generally no public interest in the perpetuation of unlawful agency action." *Texas v. Biden*, 10 F.4th 538, 559–60 (5th Cir. 2021) (per curiam) (cleaned up).

Moreover, interim relief from the Court would prevent amputations and even save lives by ensuring that thousands of Medicare beneficiaries receive necessary skin-substitute treatment on their open wounds. *See Baqer v. St. Tammany Parish Gov't*, No. 20-980, 2020 WL 1820040, at *14 (E.D. La. Apr. 11, 2020) (finding injunction to be in the public interest when it would "prevent unnecessary illness in a group of people"). Plaintiffs are already witnessing these consequences: amputations, emergency room visits, hospice admissions, and life-threatening infections from unhealed wounds. *See, e.g.*, Lopez Decl. ¶¶ 34–35; Zumbaugh Decl. ¶ 17; Domingo Decl. ¶ 22; Loder Decl. ¶¶ 25–27. Many Plaintiffs also serve underserved communities where they are one of the only—if not *the* only—provider of advanced wound care in the area. *See, e.g.*, Baine Decl.

¶¶ 10, 26 (various rural areas); Jack Decl. ¶ 5 (Gillette, Wyoming); Lopez Decl. ¶ 38 (home visits in McAllen, Texas). If these practices go out of business, entire communities will lose access to necessary wound-care treatment, leading to preventable losses of lives and limbs.

## II. The Court's Relief Should Bar CMS from All Further Enforcement of the Clawback Policy

The Court can offer Plaintiffs the relief requested herein as either a stay under 5 U.S.C. § 705 or a preliminary injunction. They respectfully submit that a stay under 5 U.S.C. § 705 would be a particularly appropriate interim remedy for two reasons. First, "[i]n the same way that a preliminary injunction is the temporary form of a permanent injunction, a [Section 705] stay is the temporary form of vacatur," which is the traditional relief in an APA suit. *All. for Hippocratic Med.*, 78 F.4th at 254. "Between vacatur and an injunction, the former is the 'less drastic remedy.' That is so because vacatur does not order the defendant to do anything; it only removes the source of the defendant's authority." *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). Second, a Section 705 stay is well suited to the circumstances of this case. It would be simpler for the Court to remove CMS's authority to institute the Clawback Policy than it would be to ensure CMS's numerous agents are complying with an injunction.

If the Court elects to grant a preliminary injunction as opposed to a stay, it should enjoin the Clawback Policy classwide. "Courts routinely grant provisional class certification for purposes of entering injunctive relief." *Barbara v. Trump*, 790 F. Supp. 3d 80, 90 (D.N.H. 2025) (quotation marks omitted). Just last year, the Supreme Court reaffirmed that district courts "may issue temporary relief to a putative class," even before the class is certified. *A.A.R.P.*, 605 U.S. at 98. While *A.A.R.P.* slightly predates the Supreme Court's decision to restrict nationwide injunctive relief in *Trump v. CASA, Inc.*, Justice Kavanaugh's concurrence clarifies that, when plaintiffs bring their case as a class action, courts may still issue broad preliminary relief to the entire class.

> To be sure, in the wake of the Court's decision, plaintiffs who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief ***may sometimes seek to proceed by class action . . . and ask a court to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide***. And in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily "set aside" a new agency rule.

*CASA*, 606 U.S. at 869 (Kavanaugh, J., concurring) (emphasis added) (also reinforcing the administrative stay procedures discussed above). *A.A.R.P.*'s holding "means that the filing of a class suit ('a putative class'), coupled with a showing that the standard for interim relief has been met, is sufficient to enable such relief *to the entire putative class*. *Nothing more*, in terms of class certification, *is necessary*." 2 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 4:30 (6th ed.) (emphasis added) (footnote omitted).[7]

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion and provide the preliminary relief set forth in the Proposed Order. Plaintiffs request oral argument on all their pending motions.

---

[7] While Plaintiffs maintain they are entitled to classwide preliminary relief simply because they have met the standard for interim relief, the Court may "be on safest ground if it were to go through the entire Rule 23 analysis prior to granting preliminary relief." 2 Newberg and Rubenstein on Class Actions § 4:30. If the Court must conduct the full Rule 23 analysis to grant classwide relief, then Plaintiffs respectfully request that the Court consider and grant Plaintiffs' Motion to Certify (ECF 27) concurrently with this motion. *See U.S. Navy SEALs 1–26 v. Austin*, 594 F. Supp. 3d 767 (N.D. Tex. 2022) (O'Connor, J.) (granting interim relief and certifying class in the same order).

Dated: June 9, 2026

Respectfully submitted,

/s/ *William R. Morris III*
William R. Morris III
Texas Bar No. 24124582
Robert M. Hill ("Bobby")
Texas Bar No. 24125624
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
Tel: 214-764-4414
Fax: 214-764-4601
wrmorris@kslaw.com
rhill@kslaw.com

Mark D. Polston (admitted *pro hac vice*)
Nikesh Jindal (admitted *pro hac vice*)
Ahsin Azim (admitted *pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-737-0500
Fax: 202-626-3737
mpolston@kslaw.com
njindal@kslaw.com
aazim@kslaw.com

Kyle Gotchy (admitted *pro hac vice*)
KING & SPALDING LLP
621 Capitol Mall, Suite 1500
Sacramento, CA 95814
Tel: 916-321-4800
Fax: 916-321-4900
kgotchy@kslaw.com

Paul d'Ambrosio (admitted *pro hac vice*)
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Tel: 312-995-6333
Fax: 312-995-6330
pdambrosio@kslaw.com

Preeya Noronha Pinto (admitted *pro hac vice*)
Josh Gardner (admitted *pro hac vice*)
Deborah Samenow (admitted *pro hac vice*)

DLA PIPER
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4000
Preeya.pinto@us.dlapiper.com
Josh.gardner@us.dlapiper.com
Deborah.samenow@us.dlapiper.com

Allison Velez (admitted *pro hac vice*)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
(215) 656-3312
Allison.Velez@us.dlapiper.com

*Counsel for Plaintiffs*

**CERTIFICATE OF CONFERENCE**

I hereby certify that Plaintiffs' counsel Nikesh Jindal and Mark Polston conferred with Defendants' Counsel Brian Stoltz and Glen Girdharry on June 3, 2026, regarding this Motion for Preliminary Relief and the Motion to Expedite Discovery. Defendants' counsel advised that Defendants wished to oppose both motions, that Defendants are not open to providing Plaintiffs with any preliminary relief, and that they do not believe that any discovery is appropriate at this time in the case.

/s/ *William R. Morris III*

## CERTIFICATE OF SERVICE

On June 9, 2026, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the court's electronic case filing system. Thus, all parties were served electronically.

/s/ *William R. Morris III*