**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

CHRIS MCGEE, MD PA, APRIL E. LOPEZ, FNP-BC, LLC DBA LOPEZ FAMILY CLINIC, BRIAN G. LODER, DPM, PLC DBA DETROIT FOOT AND ANKLE, HEALTHCARE HOUSECALLS LLC, INDY WOUND CENTER FOR LIMB PRESERVATION & RECONSTRUCTION DBA INDY WOUND CENTER, INTEGRATED WOUND CARE CONNECTICUT PLLC, WOUND MANAGEMENT SPECIALISTS LLC, WYOMING MEDICAL ASSOCIATES, LLC, and CARLO DOMINGO, AGNP-C, individually and on behalf of all others similarly situated

*Plaintiffs*,

*v.*

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,

DR. MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES

CENTERS FOR MEDICARE & MEDICAID SERVICES

*Defendants.*

Civil Action No. 4:26-cv-00243-O

The Honorable Reed C. O’Connor

**PLAINTIFFS’ RESPONSE IN OPPOSITION TO**
**DEFENDANTS’ MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 3

A. Medicare and Its Program Administration ........ 3

B. The History of Skin Substitutes and Medicare ........ 5

C. Plaintiffs' Challenges to the Clawback Policy ........ 7

D. Procedural History ........ 11

LEGAL STANDARD ........ 13

ARGUMENT ........ 13

I. All Plaintiffs Presented Their Claims to CMS, and the Court Should Excuse Six Plaintiffs' Lack of Exhaustion as Futile ........ 13

A. All Plaintiffs Presented Concrete Claims for Benefits to CMS ........ 14

B. Further Proceedings Before the Council Are Futile Because Plaintiffs Cannot Meet CMS's Contrived Coverage Standard ........ 17

C. Plaintiffs Are Suffering Irreparable Harm and Cannot Wait to Exhaust Administrative Remedies ........ 22

II. If Venue Is Improper, the Court Should Transfer This Case to Either the Southern District of Mississippi or the Southern District of Texas ........ 23

III. If the Court Finds That Plaintiffs Must Plead More Facts to Establish Its Jurisdiction, Plaintiffs Respectfully Request Leave to Do So ........ 25

CONCLUSION ........ 25

CERTIFICATE OF SERVICE ........ 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. FDA*,
No. 23-10362, 2023 WL 2913725 (5th Cir. Apr. 12, 2023) .................... 17, 20

*Ambraco, Inc. v. Bossclip B.V.*,
570 F.3d 233 (5th Cir. 2009) .................... 13

*American Hosp. Ass'n v. Azar*,
385 F. Supp. 3d 1 (D.D.C. 2019) .................... 5

*Anderson v. Sullivan*,
806 F. Supp. 134 (E.D. Tex. 1992) .................... 15

*Baylor All Saints Med. Ctr. v. Kennedy*,
161 F.4th 298 (5th Cir. 2025) .................... 15

*Bowen v. City of New York*,
476 U.S. 467 (1986) .................... *passim*

*Cowart v. Erwin*,
837 F.3d 444 (5th Cir. 2016) .................... 13

*Davis v. United States*,
597 F.3d 646 (5th Cir. 2009) .................... 13

*Electricians Health, Welfare & Pension Plans, I.B.E.W., Loc. No. 995 v. Gulino*,
594 F. Supp. 1265 (M.D. La. 1984) .................... 17

*Family Rehab., Inc. v. Azar*,
886 F.3d 496 (5th Cir. 2018) .................... 4

*Goldman v. Azar*,
No. 4:20-cv-463, 2021 WL 3729032 (S.D. Tex. June 25, 2021) .................... 6

*Hays v. Sebelius*,
589 F.3d 1279 (D.C. Cir. 2009) .................... 4

*Hilliard v. BellSouth Med. Assistance Plan*,
918 F. Supp. 1016 (S.D. Miss. 1995) .................... 22, 23

*Hodges v. Callaway*,
499 F.2d 417 (5th Cir. 1974) .................... 19

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ..... 5

*McCarthy v. Madigan*,
503 U.S. 140 (1992) ..... 17

*Palm Valley Health Care, Inc. v. Azar*,
947 F.3d 321 (5th Cir. 2020) ..... 16

*Physician Hosps. of America v. Sebelius*,
691 F.3d 649 (5th Cir. 2012) ..... 21

*Porzecanski v. Azar*,
316 F. Supp. 3d 11 (D.D.C. 2018) ..... 6

*Ramming v. United States*,
281 F.3d 158 (5th Cir. 2001) ..... 13, 25

*Rhodes v. United States*,
574 F.2d 1179 (5th Cir. 1978) ..... 22

*Shalala v. Ill. Council on Long Term Care, Inc.*,
529 U.S. 1 (2000) ..... 5, 21

*Smith v. Berryhill*,
587 U.S. 471 (2019) ..... 14

*Spotts v. United States*,
613 F.3d 559 (5th Cir. 2010) ..... 25

*Stewart v. Tex. Tech Univ. Health Scis. Ctr.*,
741 F. Supp. 3d 528 (N.D. Tex. 2024) ..... 24

*StimLabs, LLC v. Becerra*,
636 F. Supp. 3d 165 (D.D.C. 2022) ..... 17

*Swindol v. Aurora Flight Scis. Corp.*,
805 F.3d 516 (5th Cir. 2015) ..... 25

*Tataranowicz v. Sullivan*,
959 F.2d 268 (D.C. Cir. 1992) ..... 20

*Tesoro Refin. & Mktg. Co. v. FERC*,
552 F.3d 868 (D.C. Cir. 2009) ..... 17

*U.S. Navy Seals 1-26 v. Biden*,
578 F. Supp. 3d 822 (N.D. Tex. 2022) ..... 17, 18, 19, 21

*United States v. Mayorga*,
359 F. Supp. 3d 484 (W.D. Tex. 2019) ........ 17

*Williamson-Dickie Mfg. Co. v. M/V Heinrich J*,
762 F. Supp. 2d 1023 (S.D. Tex. 2011) ........ 24

*Wolcott v. Sebelius*,
635 F.3d 757 (5th Cir. 2011) ........ 13, 25

*Youman v. Newfield Expl. Co.*,
977 F. Supp. 809 (E.D. Tex. 1997) ........ 23

**Statutes**

28 U.S.C. § 1331 ........ 21

28 U.S.C. § 1391(e) ........ 24

28 U.S.C. § 1406(a) ........ 23

28 U.S.C. § 1653 ........ 25

42 U.S.C. § 405(g) ........ 5, 12, 13, 22

42 U.S.C. § 405(h) ........ 5, 22

42 U.S.C. § 1395k(a) ........ 3

42 U.S.C. § 1395y(a) ........ 3

42 U.S.C. § 1395ff ........ 5, 6, 21

42 U.S.C. § 1395ii ........ 5

**Regulations**

21 C.F.R. § 1271.3 ........ 6

42 C.F.R. § 405.1062(a) ........ 6

42 C.F.R. § 405.1100 ........ 4

42 C.F.R. § 405.1132 ........ 5, 12

42 C.F.R. § 405.1136 ........ 5

**Other Authorities**

Compl. Ex. 1,
*Preferred Healthcare, LLC v. Kennedy*,
No. 1:26-cv-02578 (N.D. Ga. May 7, 2026), ECF 1-1 .......... 10, 18

Compl. Ex. 5,
*Koonce v. Kennedy*,
No. 5:25-cv-00360 (N.D. Ala. Mar. 7, 2025), ECF 1-10 .......... 10, 18

Compl. Ex. A,
*Riegelhaupt v. Becerra*,
No. 1:24-cv-07606 (N.D. Ill. Aug. 22, 2024), ECF 1-1 .......... 10, 18, 19

HHS,
*Departmental Appeals Board Medicare Operations Division Electronic Filing System*,
https://dab.efile.hhs.gov/mod/appeals/public_status .......... 12

Medicare Program Integrity Manual ("MPIM") § 3.6.2.2 (2020) .......... 18

Medicare Program Integrity Manual ("MPIM") § 13.5.3 (2019) .......... 18

## INTRODUCTION

Plaintiffs allege that the Centers for Medicare and Medicaid Services (CMS),[1] through its contractors and its own adjudicators, has sought to deny Medicare Part B reimbursement claims for skin substitutes unless the provider submits studies proving that the specific skin-substitute brand it used was effective. Plaintiffs allege not only that this policy is unlawful on its face (as there is no clinical difference between different skin-substitute brands), but that CMS violated numerous procedural safeguards when it implemented it *sub silentio*, without publishing a proposed rule, issuing new guidance, or even announcing what it was doing. And they bring this case as a class action because they allege that this systemic policy is impacting hundreds of providers in every corner of the United States. Plaintiffs' claims are well-founded, have been properly presented to the agency, and require this Court's intervention, particularly to prevent the substantial and irreparable harm that many providers are incurring due to this unlawful Clawback Policy. Yet, CMS seeks to evade any review of its unlawful actions and have this lawsuit dismissed on baseless grounds that should be squarely rejected by this Court.

As CMS does not seek dismissal under 12(b)(6), the agency concedes that Plaintiffs have sufficiently pleaded that this alleged "Clawback Policy" exists and is unlawful. That by itself underscores the need for this Court's review. And in opposing Plaintiffs' motion to certify this case as a class action (ECF 35), CMS does not challenge the claim of numerosity, effectively conceding that the Clawback Policy is adversely impacting hundreds of providers across the country. Instead, CMS resorts purely to misplaced jurisdictional arguments, relying on the bureaucratic morass that is the Medicare administrative appeal process to shield from judicial review its unlawful policy. But these jurisdictional arguments are meritless.

---

[1] Throughout, all Defendants are referred to collectively as "CMS."

First, CMS contends that Plaintiffs did not adequately present their claims to the agency because, in protesting the agency's clawbacks that were based on frivolous experimental and investigational grounds, they did not use the magic words of calling these denials a "Clawback Policy." But to satisfy the jurisdictional presentment requirement, Plaintiffs were only required to present a *concrete claim for benefits* to CMS—no more, no less—and CMS does not dispute that they all did so by arguing that they were entitled to Medicare reimbursement for treating patients with skin substitutes because such treatments were medically reasonable and necessary. And even if they needed to "present" specific arguments to the agency, "Clawback Policy" is simply the descriptive label Plaintiffs have used in this litigation for the agency's practices of denying *everyone's* skin substitute claims on "experimental or investigational" grounds, not some standalone claim for relief. Plaintiffs define the Clawback Policy as CMS's crusade to deny all claims for skin substitutes because they are "experimental" or "investigational," and every Plaintiff argued to the agency that denying claims on this ground is improper.

Second, three Plaintiffs have fully exhausted the Medicare administrative process, which includes an unfavorable ruling from the Medicare Appeals Council ("the Council") echoing the same flawed reasoning as the Clawback Policy—that, despite years of Medicare coverage, skin substitute products are now suddenly experimental or investigational absent product-specific studies supporting their efficacy. These Plaintiffs unquestionably are entitled to judicial review of their claims, and CMS does not seriously argue otherwise. As for the remaining Plaintiffs who have presented their claims to the Secretary but have not fully exhausted their claims culminating in review by the same Council that has firmly embraced the unlawful Clawback Policy, it would have been futile for them to exhaust their administrative remedies before seeking relief in this Court. In an effort to cut Medicare spending, CMS has specifically trained its adjudicators to deny

all claims for skin substitutes unless providers can support them with product-specific studies, fully aware that such studies do not exist. The Council has faithfully applied this new standard, denying every skin-substitute claim that has crossed its desk for want of product-specific studies. And because Plaintiffs cannot present these nonexistent studies to the Council, their pending appeals to that administrative body have no chance whatsoever of succeeding. Moreover, as detailed in Plaintiffs' Motion for Preliminary Relief, ECF 36, many Plaintiffs' practices are on the brink of closure due to the massive amounts of money CMS is demanding they pay back. Plaintiffs need relief from the Court *now* and cannot afford to wait until Medicare's byzantine appeals process plays out.

For these reasons and others stated below, the Court should deny CMS's Motion to Dismiss. But if the Court finds that it lacks jurisdiction over the six unexhausted Plaintiffs' claims, it should transfer the case to either the Southern District of Mississippi or the Southern District of Texas, which are unquestionably proper forums for this case.

## BACKGROUND

### A. Medicare and Its Program Administration

Medicare is the federally funded and administered program of health insurance for those who are 65 and over or are disabled. Medicare Part B consists of a voluntary program of supplemental medical insurance providing coverage of outpatient hospital services, physicians, nurse practitioners, home health, physical, speech and occupational therapy, diagnostic services, and durable medical equipment. 42 U.S.C. § 1395k(a). The threshold for Medicare coverage is codified in its medical necessity requirement:

> [N]o payment may be made . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

*Id.* § 1395y(a)(1)(A). Crucially, cost cannot be used to determine medical necessity. Nowhere in

the statute or regulations is CMS authorized to consider the cost of an item or service when determining whether to extend Medicare coverage to it. To the contrary, the D.C. Circuit has held that CMS cannot deny reimbursement for a reasonable and necessary treatment even if there is a less costly alternative. *Hays v. Sebelius*, 589 F.3d 1279, 1283 (D.C. Cir. 2009).

To administer reimbursements under Medicare Part B, CMS has retained seven Medicare Administrative Contractors, or MACs. When a claim is submitted to Medicare, the MAC for the relevant region handles the claim, makes the initial decision of whether to grant or deny it, and maintains records of these denial and payment determinations. The MACs also audit claims that they already have paid out and demand Medicare's money back if fraud or "overpayments" occurred. *See* ECF 25 ¶ 14.

If a MAC improperly denies a claim for reimbursement, and the provider wishes to challenge the denial, the provider must navigate an appeals process that the Fifth Circuit has termed a "harrowing labyrinth." *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 499 (5th Cir. 2018). As detailed in Plaintiffs' Motion for Preliminary Relief, ECF 36 at 5, the process has four levels: "redetermination" by the MAC, "reconsideration" by a Qualified Independent Contractor (QIC), an Administrative Law Judge (ALJ) hearing, and a final appeal to the Medicare Appeals Council ("the Council"), the agency's ultimate adjudicator. And the Council does not only review unfavorable ALJ decisions that providers appeal. An entity called the Administrative QIC sometimes refers favorable ALJ decisions that it believes were erroneous to the Council for it to review on its own motion. *See* 42 C.F.R. § 405.1100. Thus, even providers who received favorable ALJ decisions can still have their claims denied, as happened to Plaintiff Wyoming Medical Associates (WMA). *See generally* ECF 25-25. A provider may then file an action in federal district court within sixty calendar days of receiving notice of an adverse Council decision or after it

receives the Council's notice that the Council cannot issue a decision within the adjudication period, thereby allowing for "escalation" to federal court. 42 C.F.R. §§ 405.1136, 405.1132; *see also* 42 U.S.C. §§ 405(g), 1395ff(b).

Claims "arising under" the Medicare statute—including claims for Medicare Part B reimbursement—are generally channeled through a system of administrative review before judicial review. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 8–9 (2000) (emphasis omitted) (quoting 42 U.S.C. § 405(h)). The statute provides that "[n]o . . . decision of the [Secretary] shall be reviewed . . . except as herein provided" and that "[n]o action against the [Secretary] . . . shall be brought under" general federal question jurisdiction "to recover on any claim arising under" Medicare. 42 U.S.C. § 405(h) (as applied to Medicare by 42 U.S.C. § 1395ii). Judicial review of these claims is available after a "final decision" by the Secretary, *id.* § 405(g), which involves two elements: a jurisdictional presentment element and a waivable element that the plaintiff has exhausted administrative remedies. *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976). So while courts lack jurisdiction to hear unpresented claims, they can hear unexhausted claims under certain circumstances, such as when exhaustion would be futile or the plaintiff would be irreparably harmed if required to wait for full exhaustion. *See id.*; *American Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 8 (D.D.C. 2019).

**B. The History of Skin Substitutes and Medicare**

Skin substitutes are FDA-regulated products derived from minimally processed human amniotic tissue that are used to treat chronic wounds, such as diabetic foot ulcers and venous leg ulcers. ECF 25 ¶¶ 7, 57–60. The FDA classifies the products at issue here as "human cell and tissue-based products" (HCT/Ps) because these "skin substitutes" are comprised of human cells and tissues. *Id.* ¶ 68. These skin substitutes are regulated under Section 361 of the Public Health Service Act because they are "[m]inimally manipulated," meaning that their processing "does not

alter the relevant biological characteristics of cells or tissues." 21 C.F.R. § 1271.3. In essence, skin substitutes are unaltered amniotic-membrane cells, no matter who produces them, and they all function in the same manner when applied to chronic wounds.

As explained in Plaintiffs' pending motions, skin substitutes have proven to be effective for treating chronic wounds, and recognizing this, Medicare had covered skin-substitute reimbursement claims across the country without issue since 2015. ECF 36 at 6–8. Four MACs even issued Local Coverage Determinations (LCDs)[2] which explicitly stated that skin substitutes are covered products as long as providers used them in the manner specified in the LCDs. *Id.* at 7. But despite these products' effectiveness and positive impacts on beneficiaries, CMS decided that covering them was too expensive and made multiple efforts to cut Medicare spending on them. *See id.* at 8–9. CMS coordinated with all seven MACs to draft new, nearly identical LCDs which would have considered all skin substitutes "experimental" or "investigational" unless the wound-care provider submitted clinical studies stating that the specific skin-substitute brand the provider used was effective. *See* ECF 25 ¶¶ 30, 82–84, 85–86; ECF 25-8; ECF 27 at 9–11. But all seven MACs withdrew these LCDs before their effective dates, so this product-specific requirement never became the coverage standard anywhere. *See* ECF 25 ¶¶ 30, 85.

However, despite the new LCDs never becoming effective anywhere, CMS and its adjudicators are applying its product-specific standard anyway. *See* ECF 25 ¶¶ 289, 308.

---

[2] LCDs are advanced pronouncements regarding whether, and under what indications, a specific item or service is considered reasonable and necessary within a given MAC's jurisdiction. 42 U.S.C. § 1395ff(f)(2)(B). MACs adopt LCDs so providers and beneficiaries can make treatment decisions knowing that the item or service will be covered. MACs are bound to follow their own LCDs, and ALJs and the Council must give them "substantial deference." ECF 25 ¶ 76; *Porzecanski v. Azar*, 316 F. Supp. 3d 11, 15 (D.D.C. 2018) (quoting 42 C.F.R. § 405.1062(a)); *Goldman v. Azar*, No. 4:20-cv-463, 2021 WL 3729032, at *1 (S.D. Tex. June 25, 2021).

### C. Plaintiffs' Challenges to the Clawback Policy

Beginning as early as April 2022, CMS began a campaign to claw back as much money as possible by retroactively auditing, reopening, and then denying previously paid Medicare Part B claims for skin substitutes. ECF 25 ¶¶ 15, 286. Around this time, CMS contractors and agents began auditing and reopening the skin-substitute claims they had already reimbursed before demanding that the providers pay their already-vested money back. *Id.* ¶ 14. When providers challenged these sudden repayment demands through Medicare's appeal process, they ultimately received unfavorable decisions and had their claims denied on the same basis: the skin substitutes that they had for years treated patients with and consistently been reimbursed for were, for the first time, considered "experimental" or "investigational" simply because they did not support their claims with studies proving that the specific skin-substitute product they used was effective. *See, e.g.*, *id.* ¶¶ 25, 288–89. Because studies on the efficacy of specific brands of skin substitutes do not exist for most products (as there is no need for brand-specific studies when they are all functionally the same), providers cannot meet this new standard.

Each named Plaintiff frequently used amniotic skin substitutes approved under Section 361 to treat their patients, and they all experienced this bait-and-switch. *See generally* ECF 25 ¶¶ 94–292. They also all appealed their retroactively denied claims to ALJs. *See id.* In those appeals, every Plaintiff argued to CMS that skin-substitute products they used were medically reasonable and necessary and covered by Medicare because a wealth of scientific studies prove their safety and efficacy, so they are not "experimental" or "investigational." But the ALJs upheld the denials of Plaintiffs' claims for the same reason: Plaintiffs could not support their claims with studies saying that the specific brands of skin substitutes they used are not experimental or investigational.

For example, in his half-dozen unsuccessful ALJ appeals, Dr. McGee specifically argued that "Amnio Quad-Core is not investigational or experimental" and submitted scientific literature

to prove it. But the ALJ held that "the specific product used, Amnio Quad-Core, is still found to be investigational or experimental" because the claim was not supported with studies about "the specific product at issue," inexplicably citing to the MAC Novitas's never-effective 2026 LCD (that had already been withdrawn at the time) in support of requiring this. ECF 25-13 at 10 n.1, 14, 16–18. April Lopez argued to the ALJ that "all HCT/Ps are similar in that they are for homologous use and need to be minimally manipulated," so product-specific literature was not necessary for coverage. ECF 25-19 at 12–13. But the ALJ ruled unfavorably solely because the specific skin substitutes she used were "experimental and investigational and . . . not supported by peer-reviewed human trials," relying on a response to a public comment on the never-operative 2026 Novitas LCD for the idea that every skin-substitute product has "unique characteristics." *Id.* at 7, 13. Wound Management Specialists (WMS) argued in its several unsuccessful appeals that skin substitutes are "essentially interchangeable" and that the LCD did not require peer-reviewed studies on the specific skin substitute used for the product to be covered. ECF 25-28 at 16–18. But the ALJ upheld the denial anyway because "the FDA has not reviewed and approved Woundfix and Zenith, specifically" and because "there is insufficient scientific literature supporting" those specific products' efficacy, wholly and inexplicably relying on the "future effective version of the [Novitas] LCD" for that requirement. *Id.* And Dr. Loder, Dr. Lalia, Indy Wound Center, and Integrated Wound Care all submitted numerous studies showing that skin substitutes are generally safe and effective when used as wound covers and argued that all skin substitutes are clinically the same, yet the ALJs rejected all of their arguments due to the absence of studies on the specific products they used to treat patients. ECF 25-35 at 10–11 (studies about general skin-substitute efficacy did not "support a finding that the dual layer Impax membrane wound cover is safe and effective"); ECF 25-36 at 12 (upholding denial despite expert testimony that a "brand name has

no clinical significance"); ECF 25-39 at 10–11 (ruling unfavorably because "[t]he only published studies and reviews submitted by Appellant were evaluations of the efficacy of amniotic membrane derivatives generally"); ECF 25-44 at 13–14, 31 (noting "no studies or medical literature of any kind was produced showing that these specific products would be successful"); *see also* ECF 25-48 at 10 (unfavorably ruling on Mr. Domingo's claim because there "is insufficient evidence of efficacy over traditional conservative wound care").

This baseless requirement that the provider needs to submit studies on the efficacy of the specific skin substitute it used for Medicare to cover its services is also being consistently applied at the highest level of review: the Medicare Appeals Council. Take the case of Plaintiff Wyoming Medical Associates (WMA). Like its co-plaintiffs, the MAC clawed back WMA's skin-substitute reimbursement money because its uses of the skin substitute Xwrap were "investigational." ECF 25 ¶¶ 158–60. But WMA actually won at the ALJ level, in large part because the ALJ found "detailed and highly persuasive" expert testimony that "all amnion products are essentially the same," rejecting the argument that studies must "explicitly involve the product" because "no such requirement is specified in Medicare regulations." ECF 25-24 at 11. But it was all for naught. Despite the ALJ's favorable decision, CMS filed a memorandum with the Council asking it to review the ALJ's decision on its own motion. ECF 25-25 at 3. The Council then reversed the ALJ and held that Xwrap is experimental and investigational, discarding the testimony of WMA's expert witness and deeming "insufficient" ten peer-reviewed studies finding that skin substitutes are highly effective simply because "none of them specifically mention Xwrap." *Id.* at 10.[3]

[3] While the Council acknowledged an eleventh study WMA submitted which analyzed a product that is "functionally identical to" XWrap, the Council discredited this study simply because it excluded people with liver cirrhosis, and the beneficiary at issue had "ascites related to liver cirrhosis." ECF 25-25 at 10. The Council did not explain why this was significant.

And WMA is far from alone. In every case Plaintiffs are aware of, the Council has denied the provider's skin-substitute claims on the same ground that they are not supported by product-specific studies. In one case, the Council reversed a favorable ALJ decision because the provider did not submit "any published, peer-reviewed, evidence-based literature to support that the Amniowrap2 and Xwrap were safe, effective, and non-investigational." ECF 25-53 at 6. In another, the Council held that the provider's use of the skin substitute Impax was not covered because "[n]one of the submitted medical literature articles discuss Impax membrane at all, much less specifically for the treatment of chronic venous insufficiency ulcers." ECF 25-54 at 9. It also used nearly identical language in an entirely separate case, reversing a favorable ALJ decision because "none of the above-referenced medical literature articles discuss Artacent or carePATCH at all, much less specifically for the treatment of chronic diabetic wounds." ECF 25-55 at 9. It even faulted the ALJ for crediting evidence that "the allografts at issue were similar to those presented in the studies." *Id.* at 5. The Council also reversed an ALJ's favorable decision in *Koonce v. Kennedy* because "there is no indication that Impax was the subject of the article [the ALJ relied upon], but rather amniotic membrane grafts more broadly." Compl. Ex. 5 at 10, No. 5:25-cv-00360 (N.D. Ala. Mar. 7, 2025), ECF 1-10. It reversed again in *Riegelhaupt v. Becerra* because the provider submitted no studies at all, and it held that "hearing testimony alone" was insufficient to show that a service was not experimental or investigational. Compl. Ex. A at 12–13, No. 1:24-cv-07606 (N.D. Ill. Aug. 22, 2024), ECF 1-1. And in *Preferred Healthcare, LLC v. Kennedy*, the Council yet again overturned a favorable ALJ decision because "the record includes no medical literature demonstrating that Woundfix, or even amniotic skin substitutes more generally, are safe and effective, [and] not experimental or investigational." Compl. Ex. 1 at 7, No. 1:26-cv-02578 (N.D. Ga. May 7, 2026), ECF 1-1.

It is no mystery why the ALJs and the Council are consistently denying claims for the same class of products for the same reason: CMS is instructing them to do so. CMS is directing "a coordinated, uniform coverage position" by creating a new, national rule for skin-substitute coverage—binding on all its adjudicators—without reducing it to writing. ECF 25 ¶ 288; *see id.* ¶¶ 15, 307–08. In furtherance of this new rule, CMS has explicitly directed its adjudicators to deny all reimbursement claims for skin substitutes unless the providers submit studies supporting the efficacy of the specific skin substitutes they employed. Witnesses attest that a CMS ALJ said the agency specifically trained its adjudicators to deny skin-substitute claims unless the provider presented studies vouching for the efficacy of the specific skin substitute they used because "CMS does not want to pay for these products . . . and will continue to disallow claims until someone takes them to Federal Court." ECF 36-10, Dearman Aff. ¶ 5; ECF 36-9, Harrell Aff. ¶ 4; *see also id.* (attesting ALJ said he was "just following orders"). In doing so, CMS has denied providers an independent administrative appeals system, leaving federal court as their only option.

Plaintiffs' practices are suffering ongoing, severe, and irreparable financial and non-financial harms from these claim denials. *See generally* ECF 36. WMS will go out of business by September; Ms. Lopez can only afford to make payroll twice more; Healthcare Housecalls is facing bankruptcy; Indy Wound Center must restructure its business by September or shut down; Mr. Domingo's father is considering liquidating his retirement funds to keep their shared practice open. ECF 36-16 ¶ 49; ECF 36-5 ¶¶ 26, 31; ECF 36-3 ¶ 15; ECF 36-8 ¶ 15; ECF 36-1 ¶ 19. And it may already be too late for Dr. McGee; his practice has already been forced to close. ECF 36-7 ¶ 2.

### D. Procedural History

All Plaintiffs have adverse ALJ decisions and appealed them to the Council (except WMA, which already had its favorable ALJ decision reversed by the Council). ECF 25 ¶¶ 111, 154, 166, 191, 216, 230, 243, 274, 285. Their appeals are at various stages. Ms. Lopez and WMS received

escalation letters from the Council, so they (as CMS concedes) have fully exhausted the administrative appeal process. *Id.* ¶¶ 154, 191. Dr. Loder and Healthcare Housecalls are on the brink of fully exhausting their administrative appeals, as both are eligible to request escalation because their appeals have been pending for over 90 days. And Dr. McGee, Mr. Domingo, Indy Wound Center, and Integrated Wound Care will all have exhausted their administrative remedies in the near future. Dr. McGee and Indy Wound Center appealed to the Council on March 30, Integrated Wound Care on March 26, and Mr. Domingo on April 29.[4] The Council has ninety days from the date of their appeals to issue a decision before Plaintiffs have the right to request escalation to federal court. 42 C.F.R. § 405.1132(a). Once Plaintiffs request escalation, the Council must either rule on their cases or grant their escalation requests within five calendar days. *Id.* So, all Plaintiffs except Mr. Domingo will have exhausted their administrative appeals by the time CMS's Motion is fully briefed, and Mr. Domingo will have exhausted his remedies in early August.[5]

---

[4] Council appeals statuses can be accessed at HHS, *Departmental Appeals Board Medicare Operations Division Electronic Filing System*, https://dab.efile.hhs.gov/mod/appeals/public_status. All unexhausted Plaintiffs' appeals are shown as currently pending. Dr. McGee's docket numbers are M-26-2922 and M-26-2692; Dr. Lalia's is M-26-1844; Mr. Domingo's is M-26-3283; Integrated Wound Care's is M-26-2640; Indy Wound Center's is M-26-2907; and Dr. Loder's are M-26-1627, M-26-1629, and M-26-1630.

[5] It is entirely unremarkable that some plaintiffs or class members will be in the middle of their administrative appeals process at the time a class action is filed. Given the narrow sixty-day window for escalation to federal court under 42 U.S.C. § 405(g), it would be impossible for every similarly situated party to have exhausted, yet unexpired, claims at exactly the same time. Indeed, in *Bowen v. City of New York*, the Court held "that the District Court did not err in waiving exhaustion in this case either with respect to those claimants whose time to pursue further administrative appeals had lapsed, or with respect to those claimants who still had time to pursue administrative remedies," especially given that "[t]hough [the class members] knew of the denial or loss of benefits, they did not and could not know that those adverse decisions had been made on the basis of a systematic procedural irregularity that rendered them subject to court challenge." 476 U.S. 467, 486 (1986).

## LEGAL STANDARD

"A Rule 12(b)(1) motion should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction." *Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009) (quotation marks omitted); *see Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). When examining a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), however, unlike a motion under Rule 12(b)(6), the district court is entitled to consider disputed facts as well as undisputed facts in the record, including material from outside the four corners of the complaint. *See Wolcott v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011); *Ramming*, 281 F.3d at 161. Indeed, when ruling on such a motion, a court may consider "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts," which are reviewed for clear error on appeal. *Wolcott*, 635 F.3d at 762 (quoting *Ramming*, 281 F.3d at 161); *Cowart v. Erwin*, 837 F.3d 444, 450 (5th Cir. 2016). Similarly, "the court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments" in resolving a venue-based motion under Rule 12(b)(3). *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009) (quotation marks omitted).

## ARGUMENT

### I. All Plaintiffs Presented Their Claims to CMS, and the Court Should Excuse Six Plaintiffs' Lack of Exhaustion as Futile

This Court has jurisdiction over every named Plaintiff's claim under 42 U.S.C. § 405(g). Under *Bowen v. City of New York*, there is a "final decision" challengeable in court under section 405(g) if two conditions are satisfied: (1) a nonwaivable requirement that the claim has been presented to the agency in the form of a concrete claim for benefits and (2) a waivable requirement that the administrative process be fully exhausted. 476 U.S. 467, 482–83 (1986). Only the first

criterion, presentment, is jurisdictional. *Id*. The second criterion, administrative exhaustion, is waivable by the Secretary or by the Court. *See id.*

Plaintiffs easily satisfy both criteria. *First*, all Plaintiffs presented their claims to the Secretary when they submitted to the agency that they were entitled to reimbursement for using skin substitutes to treat Medicare beneficiaries. And when Medicare contractors retroactively denied their claims and demanded the reimbursement money back, Plaintiffs challenged their denied claims before agency adjudicators by arguing that the skin-substitute products they used are not "experimental" or "investigational," but were instead reasonable and necessary to treat their patients and thus covered by Medicare. *Second*, for the subset of six Plaintiffs that have not fully exhausted their appeals, the Court should excuse that failure because exhaustion is futile under these facts. The agency specifically trained its adjudicators to deny all claims for skin substitutes unless the providers submit studies that prove the specific skin substitute brands they used are effective. Furthermore, the Council has faithfully applied this requirement by denying every skin substitute claim it has considered for want of such studies. Because no brand-specific studies exist for the skin substitutes Plaintiffs used, it is a foregone conclusion that the Council will uphold their unfavorable ALJ decisions. *Finally*, the Court should also excuse exhaustion because Plaintiffs are suffering irreparable harm and could not afford to wait until their administrative appeals played out before seeking judicial relief. Many of Plaintiffs' medical practices are at risk of imminent closure if they do not soon receive relief from this Court, and Dr. McGee (who resides in this district) has already been forced to shut his practice down and may need to exit the practice of medicine entirely if he does not soon receive relief.

### A. All Plaintiffs Presented Concrete Claims for Benefits to CMS

To bring suit in federal court over the denial of a Medicare reimbursement claim, the claim must first be "presented to the agency." *Smith v. Berryhill*, 587 U.S. 471, 478 (2019). "For a claim

to be presented to an agency, the agency must have an 'opportunity to rule on a concrete claim for reimbursement.'" *Baylor All Saints Med. Ctr. v. Kennedy*, 161 F.4th 298, 303 (5th Cir. 2025) (quotation marks omitted). But the bar for meeting this requirement is not high; the simple "[s]ubmission of a claim for the benefits to the Secretary satisfies the presentment element of the final decision requirement." *Anderson v. Sullivan*, 806 F. Supp. 134, 137 (E.D. Tex. 1992).

Plaintiffs presented their *claims* to the Secretary in the appropriate administrative process.[6] Plaintiffs not only presented their claims but followed the administrative process through several layers of review and have either entirely exhausted administrative remedies or have received a denial from an Administrative Law Judge after a hearing. *See generally* ECF 25 ¶¶ 94–285 & ECF 25-12 – ECF 25-48. And they clearly argued *why* they were entitled to Medicare reimbursement. They argued to the ALJs and the Council that skin substitutes are medically reasonable and necessary when used in the manner Plaintiffs used them and that declaring the products "experimental" or "investigational" was an improper basis for denying the claim. *See generally* ECF 25-13, -19, -25, -28, -35–36, -39, -44, -48. They even specifically argued that skin substitute brands are "essentially interchangeable," "essentially the same," and the "brand name has no clinical significance." ECF 25-28 at 17; ECF 25-24 at 11; ECF 25-36 at 11. In short, Plaintiffs presented the same claims and made the same arguments that they now assert to the Court. *See* ECF 25 ¶¶ 15, 31, 288–91, 316.

CMS's argument that Plaintiffs have not presented their claims is mistaken on two counts. First, it is not an argument about presentation of claims at all; rather, CMS conflates presentment with issue exhaustion, a wholly different concept which states that plaintiffs generally cannot make

---

[6] In fact, adequate presentment is required for becoming a member of the class Plaintiffs seek to represent. ECF 25 ¶ 293.

a new argument in court that they did not make to the agency. *See* ECF 29 at 19–21. But as explained above, Plaintiffs *did* make the same arguments to the agency that they make here. And as will be explained below (and as the Supreme Court has explained more than once), *exhaustion* is not jurisdictional. *See City of New York*, 476 U.S. at 483.

Second, while no Plaintiff used the term "Clawback Policy" during their administrative proceedings, that is irrelevant. "Clawback Policy" is merely the shorthand label Plaintiffs use to describe the unlawful process CMS used to improperly deny the entire class's claims for the same, legally unsound reason. The Amended Complaint defines the "Clawback Policy" as the "recoupment program in which Defendants' agents . . . claim . . . that skin substitute products are 'investigational' or 'experimental.'" ECF 25 ¶ 15. Again, Plaintiffs all argued that skin substitutes are *not* experimental or investigational and that it was improper for CMS to deny their claims on that basis. The only difference now is that Plaintiffs claim that CMS is applying this unlawful policy not just to them, but to *all* providers who treat Medicare beneficiaries with skin substitutes. But the *scope* of CMS's product-specific requirement was irrelevant to Plaintiffs' agency adjudications, and CMS cites no authority for its proposition that Plaintiffs must describe to the agency how broadly it is applying an incorrect standard in order to present its claim or exhaust the issue.

CMS's cited cases are inapposite. In *Palm Valley Health Care, Inc. v. Azar*, the plaintiff argued for the first time in federal court that CMS's definition of "homebound" was too narrow, an argument it could have easily made during administrative proceedings, as well. 947 F.3d 321, 327 (5th Cir. 2020). Here, by contrast, *all* Plaintiffs directly challenged before CMS the agency's denials based on the same "investigational" or "experimental" grounds that are the subject of this lawsuit. And in *StimLabs, LLC v. Becerra*, the plaintiff "put neither [its] appeal nor the [Council's]

determination letter before the court," so the court could not even tell what claims or arguments the plaintiff presented to CMS. 636 F. Supp. 3d 165, 176 (D.D.C. 2022). That is far from the case here, where Plaintiffs have cited to where they presented their claims and how they made the same arguments they raise before this Court.

### B. Further Proceedings Before the Council Are Futile Because Plaintiffs Cannot Meet CMS's Contrived Coverage Standard

While exhaustion of administrative remedies is generally required, "the Fifth Circuit recognizes some limited exceptions to this rule." *United States v. Mayorga*, 359 F. Supp. 3d 484, 496 (W.D. Tex. 2019). As this Court has previously noted, exhaustion is not required "where the administrative body is shown to be biased or has otherwise predetermined the issue before it." *U.S. Navy Seals 1-26 v. Biden*, 578 F. Supp. 3d 822, 832 (N.D. Tex. 2022) (O'Connor, J.) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 148 (1992)). And plaintiffs need not exhaust administrative remedies when "exhaustion would be clearly useless and it is certain [their] claim[s] will be denied." *All. for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 2913725, at *16 (5th Cir. Apr. 12, 2023) (per curiam) (quotation marks omitted) (quoting *Tesoro Refin. & Mktg. Co. v. FERC*, 552 F.3d 868, 874 (D.C. Cir. 2009)). For instance, the Fifth Circuit has previously held that exhaustion would be useless when the agency previously rejected the exact same claims. In *Alliance for Hippocratic Medicine*, the court held that it would have been futile for the plaintiffs to challenge a drug's approval in a citizen petition and exhaust their claims because the FDA had previously denied two petitions challenging the exact same approval. *Id.*; *see also Electricians Health, Welfare & Pension Plans, I.B.E.W., Loc. No. 995 v. Gulino*, 594 F. Supp. 1265, 1272 n.16 (M.D. La. 1984) ("[A] court making a judicial review of an action taken by an administrative agency may decline to require exhaustion of administrative remedies where the agency's position is so clear and fixed that it would be futile to require proceedings at the agency level.").

Here, CMS has predetermined that Plaintiffs' claims should be denied. *See U.S. Navy Seals 1-26*, 578 F. Supp. 3d at 832. The agency has specifically instructed its adjudicators to deny all reimbursement claims for skin substitutes unless the providers "have peer-reviewed literature that specifically names the skin substitutes product used." ECF 36-10, Dearman Aff. ¶ 5; ECF 36-9, Harrell Aff. ¶ 4. And the Council is following this top-down directive. In every case of which Plaintiffs are aware, the Council denied the skin-substitute claim at issue because the provider could not support its claim with studies that mentioned the brand of skin substitutes it used by name. ECF 25-25 at 10; ECF 25-53 at 6; ECF 25-54 at 9; ECF 25-55 at 9; Compl. Ex. A at 12–13, *Riegelhaupt*, No. 1:24-cv-07606, ECF 1-1; Compl. Ex. 5 at 10, *Koonce*, No. 5:25-cv-00360, ECF 1-10; Compl. Ex. 1 at 7, *Preferred Healthcare*, No. 1:26-cv-02578, ECF 1-1.

These denials are not individual fact-based assessments. Rather, they result from a specific top-down Clawback Policy that has been—for lack of a better phrase—grafted onto general, pre-existing agency guidance. Namely, the Medicare Program Integrity Manual ("MPIM") § 3.6.2.2 (2020) provides that to be "reasonable and necessary" a treatment must not be "experimental or investigational." *Id*. In the context of skin substitutes, CMS and the Council are unreasonably interpreting the manual provision to require that there must be randomized controlled trials in peer-reviewed journals (or systematic reviews or meta-analyses based on such journals) on individual skin substitute products by brand name showing the product is efficacious, or it will be deemed experimental or investigational. *See, e.g.*, ECF 25-25 at 8–11 (denying WMA's claim because submitted studies did not "specifically mention XWrap," making it not "medically reasonable and necessary under the applicable manual requirements"); *see also* MPIM § 13.5.3 (2019). And as CMS well knows, studies specifically mentioning the brands of skin substitutes Plaintiffs chose to

use do not exist—as the Council or ALJs found in each of the appeals at issue.[7] *See generally* ECF 25-13, -19, -25, -28, -35–36, -39, -44, -48. So, Plaintiffs cannot meet this standard.

CMS's argument to the contrary, that the adjudicators will make "individual reasonable and necessary determinations," ECF 29 at 13, lacks support and is beside the point. CMS does not contend that any of those "individual" determinations would result in coverage. Nor could it, given the uncontradicted evidence of a coordinated policy of denials. And as this Court has recognized before, that the agency "could hypothetically grant a request does not, on this record, 'provide a real opportunity for adequate relief.'" *U.S. Navy Seals 1-26*, 578 F. Supp. 3d at 832 (quoting *Hodges v. Callaway*, 499 F.2d 417, 420 (5th Cir. 1974)).

Nothing in CMS's motion suggests otherwise. It does not disavow the (unlawful) uniform standard that the Council is applying to each case or suggest that the Council (or ALJs) would have discretion to reach different results in individual cases. *See generally* ECF 29. Indeed, the record is replete with examples where CMS has argued, and the Council has accepted, that an ALJ's failure to follow CMS's Clawback Policy was legal error.[8] *See, e.g.*, ECF 25-55 at 5 (holding that

---

[7] In fact, the Council has already ruled that some of the *specific products* that the unexhausted Plaintiffs used to treat patients are experimental or investigational and thus not covered by Medicare, underscoring how there is no chance of a favorable result for them before the Council. *Compare* ECF 25 ¶ 20 (alleging Dr. Loder treated beneficiaries with Impax) *and id.* ¶ 23 (alleging Integrated Wound Care treated beneficiaries with carePATCH) *with* ECF 25-54 at 9 (holding that Impax is not covered because there are no product-specific studies on it) *and* ECF 25-55 at 9 (holding that carePATCH is not covered due to lack of product-specific studies). And while it is not the product at issue in Dr. McGee's appeals before this Court, he has also used Epifix to treat patients in the past, which the Council specifically held was not covered in *Riegelhaupt*. Compl. Ex. A at 11–15, No. 1:24-cv-07606, ECF 1-1.

[8] CMS may suggest on reply that Plaintiffs could succeed before the agency because some of them have received favorable ALJ decisions regarding dates of service not at issue here. *See* ECF 25 ¶¶ 110, 229, 242. But that is irrelevant for Plaintiffs, as the next step for the six of them with appeals still pending is the Council. And at that highest level of review, parties similarly situated to Plaintiffs always lose. Moreover, CMS has identified no exceptions to that trend. Of course, even if CMS is able to identify some counterexample heretofore unknown to Plaintiffs, that does not fundamentally undermine Plaintiffs' claims. *See City of New York*, 476 U.S. at 485–86 (noting

the ALJ erred by finding that all skin substitutes are similar and not requiring studies about the specific brand's efficacy). Therefore, it is certain that the Council will deny Plaintiffs' claims. *See All. for Hippocratic Med.*, 2023 WL 2913725, at *16. Like in *Alliance for Hippocratic Medicine*, where exhaustion was clearly futile when the FDA had rejected the same challenge in two prior citizen petitions, it is futile here because the Council has rejected the same claims for the same reasons at least *seven* times. *See id.*

This case is remarkably similar to *City of New York*. In that case, "the District Court found a systemwide, unrevealed policy that" did not "depend on the particular facts of the case before it." 476 U.S. at 485. This is precisely what has happened here, where after more than a decade of covering skin substitutes without question, CMS changed course without explanation and concluded that functionally identical products were experimental unless specific research had been conducted by brand name. In such a case, the purposes of exhaustion—building up a detailed factual record specific to each case and allowing the agency to bring its expertise to bear—would not be served. *Id.* In short, none of the purposes of exhaustion would be served by requiring it here. *See Tataranowicz v. Sullivan*, 959 F.2d 268, 274–75 (D.C. Cir. 1992) ("[I]t seems wholly formalistic not to regard further appeals as completely futile.").

Aggravating matters is the fact that the agency's new, functionally insurmountable standard for skin-substitute coverage is born entirely out of bias and the desire to save money. CMS is not directing its adjudicators to apply this new rule out of concern for patient welfare, but purely because "CMS does not want to pay for these products." ECF 36-10, Dearman Aff. ¶ 5; ECF 36-9, Harrell Aff. ¶ 4. This improper motivation is further evidenced by CMS asking the MACs

---

that even if some class members "might have received benefits despite the illegal policy," that limited scenario "do[es] not aid the Court in deciding when exhaustion should be excused").

exactly how much money Medicare would save if they adopted LCDs that heavily restricted skin substitutes, further noting that such LCDs were "very much needed" to protect Medicare's "Trust Fund." ECF 25-1; ECF 27-9.[9] Because cost-cutting is the real driver behind Plaintiffs' claim denials, not the impartial application of Medicare's statute and regulations, it is useless for Plaintiffs to proceed to the Council and argue that the law says they should be reimbursed. Because CMS "is shown to be biased" against Plaintiffs' claims, the Court should excuse the exhaustion requirement. *U.S. Navy Seals 1-26*, 578 F. Supp. 3d at 832.

CMS's arguments on futility are non sequiturs, as the agency discusses a different legal standard that is not at issue here. There are "two competing jurisdictional routes through which" a plaintiff challenging a Medicare rule might get to federal court: traditional federal question jurisdiction under 28 U.S.C. § 1331, or "the special Medicare review route" under 42 U.S.C. § 1395ff. *Ill. Council*, 529 U.S. at 7. As noted, for claims "arising under" the Medicare statute, the Section 1395ff route is the statutorily required jurisdictional pathway, with only limited exceptions. It is precisely this pathway that Plaintiffs have followed to bring their claims before this Court, having fully presented their claims to CMS and with three of the Plaintiffs having fully exhausted their appeals (and the other six remaining Plaintiffs properly excused from any further appeal efforts that would be futile and only worsen their ongoing substantial and irreparable injuries).

Nonetheless, CMS mistakenly appears to think that Plaintiffs are pursuing the Section 1331 route, raising arguments that have no relevance to Section 1395ff jurisdiction. Indeed, CMS relies on *Physician Hospitals of America v. Sebelius*, 691 F.3d 649, 657 (5th Cir. 2012), which is explicitly about whether the plaintiffs could proceed under Section 1331, not Section 1395ff. *See*

[9] Some ALJs have denied claims on explicitly cost-based grounds. *See* ECF 36-26 at 17–18 (noting "surely the cost of the skin substitutes is relevant" to whether they are reasonable and necessary); ECF 36-21 at 10 ("[T]he use of this product is simply not reasonable, given the cost.").

ECF 29 at 17. And it similarly relies on *Illinois Council* for a proposition not relevant here. Section 405(h) provides that "[n]o action against the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 [federal defendant jurisdiction] of title 28 to recover on any claim arising under this subchapter." 42 U.S.C. § 405(h). When CMS relies on *Illinois Council* to argue that the "futility exception" does not apply, it is citing the authority for when the futility exception to Section 405(h) applies, not when a court may excuse exhaustion and proceed under Section 405(g). *See* ECF 29 at 13. Futility, as argued by Plaintiffs, shows why all Plaintiffs should be allowed to pursue their claims under Section 1395ff because the Court can properly waive this element; it is *not* the basis of jurisdiction under *Illinois Council*, which concerns an entirely separate (and inapplicable) principle that Medicare channeling is not required if it would frustrate judicial review altogether. The fact that CMS conflates these principles and very different showings of "futility" underscores the utter lack of merit to their motion.

### C. Plaintiffs Are Suffering Irreparable Harm and Cannot Wait to Exhaust Administrative Remedies

Exhaustion of administrative remedies under § 405(g) may also be excused when "the harm imposed by exhaustion would be irreparable." *City of New York*, 476 U.S. at 476. "Where an administrative proceeding[] would unreasonably delay the action and create a risk of irreparable injury, the exhaustion requirement may be bypassed." *Hilliard v. BellSouth Med. Assistance Plan*, 918 F. Supp. 1016, 1026 (S.D. Miss. 1995); *see Rhodes v. United States*, 574 F.2d 1179, 1181 (5th Cir. 1978) ("A clear showing of irreparable injury may also support an exception."). In *Hilliard*, the plaintiff had cancer, but his insurance company denied him coverage for multiple advanced cancer treatments. 918 F. Supp. at 1021. The court excused the plaintiff from going through all potential ERISA appeals because if he were forced to wait for them to play out before seeking court relief, "valuable time will be lost," and the "treatment sought by the plaintiff may no longer

be effective" after he had exhausted. *Id.* at 1026.

Here, as detailed at greater length in Plaintiffs' Motion for Preliminary Relief, ECF 36, many of the unexhausted Plaintiffs' businesses are at imminent risk of closure. Healthcare Housecalls is already facing bankruptcy. ECF 36-3 ¶ 15. Mr. Domingo's father and business partner has considered draining his retirement savings to keep their practice open. ECF 36-1 ¶ 19. And Indy Wound Center faces an imminent September deadline to either fundamentally restructure its operation or shut down for good. ECF 36-8 ¶ 15. But their appeals to the Council are still pending. If they had waited until their Council appeals played out to file in federal court, they would have run an unacceptably high risk that the Court could not provide them with relief until it was too late, just like the *Hilliard* plaintiff. *See* 918 F. Supp. at 1021. And Dr. McGee's practice has *already* closed, and he is on the verge of being driven out of the practice of medicine entirely. ECF 36-7 ¶¶ 24, 37. Obviously, waiting until early July (the earliest he could receive Council authorization to escalate to federal court) would have been too late. And that is before even factoring in the Plaintiffs' patients who—like the plaintiff in *Hilliard*—are suffering grievous medical ailments that may result in permanent disfigurement or death if they cannot timely access the wound care treatments they need. *See* ECF 36 at 22–24.

## II. If Venue Is Improper, the Court Should Transfer This Case to Either the Southern District of Mississippi or the Southern District of Texas

If the Court finds it lacks jurisdiction over Dr. McGee's claims and that this Court is not a proper venue, the Court should not dismiss the entire case. The Court instead should transfer the case to a proper venue rather than dismiss it because transfer is in the interest of justice. 28 U.S.C. § 1406(a). "Whether dismissal or transfer is appropriate lies within the sound discretion of the district court," *Youman v. Newfield Expl. Co.*, 977 F. Supp. 809, 812 (E.D. Tex. 1997), and "the majority of district courts in the Fifth Circuit prefer transfer rather than dismissal for improper

venue, when possible." *Williamson-Dickie Mfg. Co. v. M/V Heinrich J*, 762 F. Supp. 2d 1023, 1026 (S.D. Tex. 2011). Here, CMS concedes that at least three Plaintiffs have presented and fully exhausted at least some of their claims, leaving the Court with several options for transfer. While venue would be proper in the Defendants' home districts, it would also be proper in any district where "the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). And the three fully exhausted Plaintiffs reside in the Southern District of Mississippi, the Southern District of Texas, and the District of Wyoming.

When choosing between different proper venues to transfer a case to, "district courts in the Fifth Circuit look to the Section 1404(a) factors to determine which forum is more convenient for transfer." *Stewart v. Tex. Tech Univ. Health Scis. Ctr.*, 741 F. Supp. 3d 528, 559 (N.D. Tex. 2024). Those factors are as follows:

> The private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. The public interest factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law.

*Id.* (quotation marks omitted).

Plaintiffs submit that the Southern District of Mississippi and the Southern District of Texas would be the most convenient forums to transfer this case to if the Court decides it must do so. Because Ms. Lopez and WMS treated their patients, submitted the at-issue Medicare claims, and had their initial claims denied by Medicare contractors in these districts, most of the evidence and witnesses are present in them. Either district would be easier for all three Plaintiffs and their members to travel to for proceedings than Maryland or Washington, D.C. would be. And these two courts are the most convenient for the additional reason that they are both in the Fifth Circuit and

apply the same circuit law as this Court, so the parties would not need to re-brief the other three motions that are already pending before this Court upon transfer to another one.

### III. If the Court Finds That Plaintiffs Must Plead More Facts to Establish Its Jurisdiction, Plaintiffs Respectfully Request Leave to Do So

Plaintiffs maintain that their First Amended Complaint alone establishes the Court's subject-matter jurisdiction and that the Court may consider record evidence outside its four corners when considering its own jurisdiction. *See Wolcott*, 635 F.3d at 762; *Spotts v. United States*, 613 F.3d 559, 565–66 (5th Cir. 2010) (per curiam); *Ramming*, 281 F.3d at 161. However, if the Court finds that Plaintiffs must affirmatively plead all the facts cited herein that support the Court's jurisdiction (particularly the affidavits and declarations Plaintiffs filed in support of their Motion for Preliminary Relief, ECF 36), Plaintiffs respectfully request that the Court grant them leave to do so. *See* 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."); *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 518 (5th Cir. 2015) ("Motions to amend under Section 1653 may be considered when our discretionary examination of the record as a whole establishes at least a substantial likelihood that jurisdiction exists." (quotation marks omitted)).

## CONCLUSION

For the reasons set forth above, the Court should deny CMS's Motion to Dismiss. But if the Court must transfer this case, it should transfer it to either the Southern District of Mississippi or the Southern District of Texas.

Dated: June 23, 2026

Respectfully submitted,

/s/ *William R. Morris III*
William R. Morris III
Texas Bar No. 24124582
Robert M. Hill ("Bobby")
Texas Bar No. 24125624
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
Tel: 214-764-4414
Fax: 214-764-4601
wrmorris@kslaw.com
rhill@kslaw.com

Mark D. Polston (admitted *pro hac vice*)
Nikesh Jindal (admitted *pro hac vice*)
Ahsin Azim (admitted *pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-737-0500
Fax: 202-626-3737
mpolston@kslaw.com
njindal@kslaw.com
aazim@kslaw.com

Kyle Gotchy (admitted *pro hac vice*)
KING & SPALDING LLP
621 Capitol Mall, Suite 1500
Sacramento, CA 95814
Tel: 916-321-4800
Fax: 916-321-4900
kgotchy@kslaw.com

Paul d'Ambrosio (admitted *pro hac vice*)
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Tel: 312-995-6333
Fax: 312-995-6330
pdambrosio@kslaw.com

Preeya Noronha Pinto (admitted *pro hac vice*)
Josh Gardner (admitted *pro hac vice*)
Deborah Samenow (admitted *pro hac vice*)

DLA PIPER
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4000
Preeya.pinto@us.dlapiper.com
Josh.gardner@us.dlapiper.com
Deborah.samenow@us.dlapiper.com

Allison Velez (admitted *pro hac vice*)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
(215) 656-3312
Allison.Velez@us.dlapiper.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

On June 23, 2026, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the court's electronic case filing system. Thus, all parties were served electronically.

*<u>/s/ William R. Morris III</u>*