IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CHRIS MCGEE, *et al.*,

Plaintiffs,

v.

ROBERT F. KENNEDY, JR., *et al.*,

Defendants.

Civil Action No. 4:26-CV-243-O

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF**

RYAN RAYBOULD
UNITED STATES ATTORNEY

Brian Stoltz
Assistant United States Attorney
Texas Bar No.
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8626
Facsimile: 214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

# Table of Contents


I. Introduction .......... 1

II. Background .......... 2

A. The Medicare Program .......... 2

B. Post-Payment Auditing Procedures .......... 3

C. The Medicare Program Integrity Program .......... 4

D. Section 361 of the Public Health Service Act .......... 5

III. Plaintiffs' Motion for Preliminary Relief and Legal Standard .......... 6

IV. Argument and Authorities .......... 6

A. Plaintiffs fail to establish subject-matter jurisdiction or proper venue for their claims (and thus cannot show any likelihood of success here). .......... 6

B. No likelihood of success is shown even if jurisdiction did exist. .......... 7

1. Notice-and-comment rulemaking was not required because CMS did not establish or change a substantive legal standard. .......... 7

2. The Medicare statute expressly authorizes post-payment review and recovery of improper payments. .......... 12

3. The Secretary has not acted arbitrarily or capriciously. .......... 13

4. Other courts have rejected similar arguments. .......... 17

5. The Medicare statute requires case-by-case coverage determinations, not the blanket relief Plaintiffs seek. .......... 18

6. Plaintiffs cannot prevail on their limitation on liability claim. .......... 20

C. Plaintiffs fail to establish irreparable harm. .......... 21

D. The public interest weighs against any preliminary relief. .......... 25

E. Plaintiffs' request for classwide preliminary relief amounts to an improper universal injunction. .......... 27

F. If the Court orders injunctive relief, a substantial bond should be required. .......... 29

V. Conclusion .......... 30

**Table of Authorities**

Cases

*Allied Mktg. Grp. v. CDL Mktg., Inc.*,
878 F.2d 806 (5th Cir. 1989) ....................6

*Almy v. Sebelius*,
679 F.3d 297 (4th Cir. 2012) ....................12

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019)....................3, 8

*Baqer v. St. Tammany Par. Gov't*,
No. 20-980, 2020 WL 1820040 (E.D. La. Apr. 11, 2020)....................25, 26

*Califano v. Yamasaki*,
442 U.S. 682 (1979)....................28

*Camp v. Pitts*,
411 U.S. 138 (1973)....................20

*Canal Auth. v. Callaway*,
489 F.2d 567 (5th Cir. 1974) ....................6

*Ctr. for Innovations in Evaluative Med., LLC v. Becerra*,
No. 24-CV-362, 2026 WL 1676388 (M.D. La. May 22, 2026)....................12, 13, 21

*Dennis Melancon, Inc. v. New Orleans*,
703 F.3d 262 (5th Cir. 2012) ....................22

*Dominion Ambulance, L.L.C. v. Azar*,
968 F.3d 429 (5th Cir. 2020) ....................4

*Elevance Health, Inc. v. Kennedy*,
795 F. Supp. 3d 861 (N.D. Tex. 2025). ....................19

*Erringer v. Thompson*,
371 F.3d 625 (9th Cir. 2004) ....................2

*Family Foot & Leg Ctr., P.A. v. Kennedy*,
No. 24-CV-547, 2025 WL 2538474 (M.D. Fla. Sept. 4, 2025)....................19, 20, 21, 28

*Gill v. Whitford*,
585 U.S. 48 (2018)....................29

*Golden Cheek Ventures, L.P. v. Brazos Elec. Power Coop.*,
No. 4:15-CV-0821-O, 2015 WL 13469994 (N.D. Tex. Nov. 10, 2015) ...........................23

*Greiner Orthopedics, LLC v. Kennedy*,
No. 23-CV-1047, 2026 WL 63318 (D.D.C. Jan. 8, 2026)..............................11, 12, 17, 18

*Griego v. Leavitt*,
No. 3:07-CV-1708-D, 2008 WL 2200052 (N.D. Tex. May 16, 2008).............................22

*Gulfcoast Med. Supply, Inc. v. Sec'y, Dep't of Health & Hum. Servs.*,
468 F.3d 1347 (11th Cir. 2006) ..........................................................................................3

*Indeplus Grp. of Cos. v. Sebelieus*,
No. 3:10-CV-0557-O, 2010 WL 1372488 (N.D. Tex. Apr. 7, 2010)...............................22

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) ............................................................................................24

*Justin Indus., Inc. v. Choctaw Sec., L.P.*,
920 F.2d 262, 268 n.7 (5th Cir. 1990) ..............................................................................27

*Macomb Foot, Ankle & Wound Care v. Kennedy*, No. 24-CV-869, 2026 WL 875235, at *8
(D.D.C. Mar. 31, 2026)...........................................................................................12, 13, 18

*Martinez v. Mathews*,
544 F.2d 1233 (5th Cir. 1976) ..........................................................................................27

*Morice v. Hosp. Serv. Dist. #3*,
No. 18-7945, 2019 WL 1517954 (E.D. La. Apr. 8, 2019)................................................25

*New York ex rel. Bodnar v. Sec'y of Health & Hum. Servs.*,
903 F.2d 122 (2d Cir. 1990)...............................................................................................19

*Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*,
636 F.3d 1150 (9th Cir. 2011) ..........................................................................................27

*Phillips v. Charles Schreiner Bank*,
894 F.2d 127 (5th Cir. 1990) ............................................................................................29

*Porzecanski v. Azar*,
943 F.3d 472 (D.C. Cir. 2019)...................................................................................20, 28, 29

*Sahara Health Care, Inc. v. Azar*,
975 F.3d 523 (5th Cir. 2020) ..........................................................................................3, 4

*Schrier v Univ. of Colo.*,
427 F.3d 1253 (10th Cir. 2005). .......................................................................................27

*Shalala v. Illinois Council on Long Term Care, Inc.*,
529 U.S. 1 (2000)........................................................................................................26

*StimLabs, LLC v. Becerra*,
636 F. Supp. 3d 165 (D.D.C. 2022)............................................................................17, 18

*Texas v. Becerra*,
89 F.4th 529 (5th Cir. 2024)............................................................................................8

*Texas v. Biden*,
646 F. Supp. 3d 753, 771 (N.D. Tex. 2022)...................................................................6

*Texas v. Ysleta del Sur Pueblo*,
No. EP-17-CV-179-PRM, 2018 WL 1566866 (W.D. Tex. Mar. 29, 2018)......................27

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)........................................................................................................28

*United States v. Texas*,
599 U.S. 670 (2023)........................................................................................................29

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)........................................................................................................6, 25

Statutes, Regulations, Rules, and Other Authorities

21 C.F.R. § 1271.3(d)........................................................................................................5

21 C.F.R. § 1271.20............................................................................................................6

21 U.S.C. § 393(b)..............................................................................................................5

42 C.F.R. § 405.273(b)......................................................................................................24

42 C.F.R. § 405.374............................................................................................................4

42 C.F.R. § 405.379(d)(5)...................................................................................................5

42 C.F.R. § 405.379(e).......................................................................................................5

42 C.F.R. § 405.980..........................................................................................................12

42 C.F.R. § 405.1062(a)................................................................................................3, 13

42 C.F.R. § 424.5(a)(6)..................................................................................................8, 14

42 C.F.R. § 424.516(f).......................................................................................................15

42 U.S.C. § 1395*l*(e) ..........8, 14

42 U.S.C. § 1395u(c)(2)(B)(i)..........3

42 U.S.C. § 1395y(a) ..........2

42 U.S.C. § 1395y(a)(1)(A) ..........2, 8, 14

42 U.S.C. § 1395ff(c)(3)(B)(ii)(II) ..........3

42 U.S.C. § 1395ff(f)(2)(B) ..........2

42 U.S.C. § 1395hh(a)(2)..........7

42 U.S.C. § 1395ddd..........14, 26

42 U.S.C. § 1395ddd(a) ..........4

42 U.S.C. § 1395ddd(b) ..........4

42 U.S.C. § 1395ddd(b)(3) ..........4

42 U.S.C. § 1395ddd(f)(2)(A)..........4, 5

42 U.S.C. § 1395ddd(f)(3) ..........12

66 Fed. Reg. 5447 (Jan. 19, 2001) ..........5

Fed. R. Civ. P. 65(c) ..........29

## I. Introduction

Plaintiffs seek extraordinary relief. They ask this Court to enjoin the Secretary from applying Medicare's statutory coverage requirements to future reimbursement claims, including claims involving products and providers that are not before the Court. But their motion should be denied because they cannot satisfy the demanding standard for a preliminary injunction.

First, Plaintiffs cannot demonstrate a substantial likelihood of success on the merits because no jurisdiction exists for their claims. As explained in Defendants' motion to dismiss, the Medicare statute requires presentment and exhaustion before judicial review is available, and neither the Medicare statute nor the Administrative Procedure Act authorizes judicial review of hypothetical future reimbursement determinations. Plaintiffs concede that all but three of them have failed to exhaust their administrative remedies. Nor have Plaintiffs exhausted the alleged "Clawback Policy" issue they now ask this Court to adjudicate; instead, the administrative proceedings concerned individual reimbursement determinations, not the existence or legality of a supposed nationwide policy.

Second, even if the Court reaches the merits, Plaintiffs' claims fail. Plaintiffs' theory rests on a premise that CMS adopted an unwritten nationwide "Clawback Policy" without notice-and-comment rulemaking. But Plaintiffs identify no agency action establishing a new substantive legal standard governing Medicare payment. Instead, they challenge how Medicare contractors and administrative adjudicators, in individual claim adjudications, applied the longstanding statutory requirement that Medicare pay only for items and services that are "reasonable and necessary." Applying an existing statutory standard to individual claims is not rulemaking and does not trigger the notice-and-comment requirements of 42 U.S.C. § 1395hh(a)(2).

Finally, Plaintiffs seek sweeping injunctive relief extending far beyond the parties before

the Court. Even if some relief were warranted (and none is), any injunction should be limited to the named Plaintiffs and conditioned on an appropriate security bond under Rule 65(c).

Plaintiffs' motion for preliminary relief should be denied.

## II. Background

### A. The Medicare Program

Defendants incorporate by reference here the background provided in their motion to dismiss, ECF No. 29, and supplement with additional background to provide context for this response. The Medicare program provides federally funded health insurance for the elderly and disabled and is administered by the Centers for Medicare & Medicaid Services (CMS), a component of the U.S. Department of Health and Human Services (HHS).

Medicare pays only for services and products that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). If the Secretary, or his designee, determines that a product or service was not necessary and reasonable in the context of a particular claim, the statute mandates that "no payment may be made." *Id.* § 1395y(a).

### B. Medicare Post-Payment Review of Claims

Plaintiffs acknowledge that four Medicare contractors have adopted Local Coverage Determinations (LCDs) that set criteria for skin substitute claims. *See* ECF No. 36, PageID 5354. But adopting an LCD does not mean that every use of a skin substitute is covered. *See* 42 U.S.C. § 1395ff(f)(2)(B) (LCDs are determinations "respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis"); *see Erringer v. Thompson*, 371 F.3d 625, 628 (9th Cir. 2004) (contractors use LCDs "when the contractor identifies an item or service that is never covered in certain circumstances and wishes to establish automated review

or when widespread, significant risk to Medicare funds dictates"). LCDs specify under what clinical circumstance a service is considered to be reasonable and necessary, and serve as administrative and educational tools to assist providers in submitting correct claims for payment. *See id*. An LCD is binding only on the contractor that issued it, and only at the initial stages of the claim review process. *See* 42 U.S.C. § 1395ff(c)(3)(B)(ii)(II). LCDs are not binding on the qualified independent contractor, Administrative Law Judges (ALJs), or the Medicare Appeals Council ("Council"), but will be considered if applicable when making a decision. 42 C.F.R. § 405.1062(a). And, Medicare can and does make individual determinations as to whether, in a particular case, the services provided were reasonable and necessary, even where no regulation, National Coverage Determination (NCD), LCD, or other existing authority is directly relevant.

**B. Post-Payment Auditing Procedures**

"Today, Medicare stands as the largest federal program after Social Security," spending "about $700 billion annually to provide health insurance for nearly 60 million aged or disabled Americans." *Azar v. Allina Health Servs.*, 587 U.S. 566, 569 (2019). Because Medicare processes more than a billion claims a year, the program typically pays providers without conducting prior audits or reviewing supporting documentation. *Sahara Health Care, Inc. v. Azar*, 975 F.3d 523, 525 (5th Cir. 2020). That is, providers submit claims to a contractor, which pays the claims promptly unless there is some glaring "defect or impropriety" on the face of the claim. 42 U.S.C. § 1395u(c)(2)(B)(i); *see Gulfcoast Med. Supply, Inc. v. Sec'y, Dep't of Health & Hum. Servs.*, 468 F.3d 1347, 1349 (11th Cir. 2006) ("For reasons of administrative efficiency, [Medicare contractors] typically authorize payment on claims immediately upon receipt of the claims, so long as the claims do not contain glaring irregularities. Later, [contractors] conduct post-payment audits to verify that the payments were proper.").

**C. The Medicare Program Integrity Program**

Concerns over rising abuse of the Medicare Trust Fund prompted Congress to create the Medicare Program Integrity Program, under which "the Secretary shall promote the integrity of the Medicare program by entering into contracts . . . with eligible entities." 42 U.S.C. § 1395ddd(a). The Medicare statute expressly authorized the actions to be taken by these contractors (known as UPICs), which include reviewing the activities of providers and suppliers of services through medical and utilization review and fraud review; determining whether payment should not be or should not have been made; recovering Medicare payments that should not have been made; and educating providers, suppliers, and beneficiaries. *Id.* § 1395ddd(b).

The Medicare statute establishes post-payment safeguards against fraud, waste, and abuse. *See Sahara*, 975 F.3d at 525 (Medicare "generally pays facially valid claims, and conducts post-payment audits to detect overpayments."). The statute authorizes UPICs to audit payments for the recoupment of erroneous ones. 42 U.S.C. § 1395ddd(b)(3); *see Dominion Ambulance, L.L.C. v. Azar*, 968 F.3d 429, 431 (5th Cir. 2020) (discussing the ability of the UPICs' predecessors to "reopen otherwise final determinations" to identify overpayments).

The statute also authorizes recoupments of overpayments based on a contractor's initial determination made pursuant to the Medicare Integrity Program, unless the provider files a request for redetermination within 30 days. 42 U.S.C. § 1395ddd(f)(2)(A). If the contractor determines that an offset or recoupment should be put into effect, the provider is notified and may offer a rebuttal. *See* 42 C.F.R. § 405.374.

Additionally, if the provider files a request for reconsideration with the QIC within 60 days from the date of the redetermination decision, recoupment of the overpayment must cease until the QIC's decision is issued. 42 U.S.C. § 1395ddd(f)(2)(A); *see* 42 C.F.R. § 405.379(e). Once the QIC issues its decision, the recoupment process will resume for any overpayment

amount that has not been paid in full regardless of whether the provider requests further appeal. 42 C.F.R. § 405.379(d)(5).

### D. Section 361 of the Public Health Service Act

One final subject, raised by Plaintiffs but not actually germane to the issues here (as discussed below), relates to the role of the Food and Drug Administration (FDA) in regulating drugs, biological products, and medical devices. *See* 21 U.S.C. § 393(b). In 1998, FDA adopted a tiered, risk-based approach for regulating a rapidly growing category of biological products known as HCT/Ps (human cells, tissues, and cellular or tissue-based products). That approach was designed to provide only the degree of government oversight necessary to protect the public health, and it largely relies on manufacturers to accurately self-designate their products.[1]

Pursuant to its statutory authority under the Public Health Service Act (not the Medicare Act, which FDA does not administer), FDA subsequently issued several regulations governing HCT/Ps. *See, e.g.*, 66 Fed. Reg. 5447 (Jan. 19, 2001). HCT/Ps are "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." 21 C.F.R. § 1271.3(d). FDA determined that, in limited circumstances, certain HCT/Ps can be effectively regulated for FDA purposes solely by controlling the infectious-disease risks that they present. Such products are regulated under the Public Health Service Act and FDA's HCT/P regulations, even if they would otherwise meet the statutory definition of a "biological product." These products are sometimes referred to as "Section 361 HCT/Ps," after the communicable disease provision in § 361 of the statute. All other human and tissue-based products are regulated as drugs, devices, and/or biological drugs

---

[1] *See* FDA, Dkt. No. 97N-0068, http://www.fda.gov/downloads/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/Tissue/UCM062601.pdf.

because they may present a greater degree of risk. 21 C.F.R. § 1271.20. Those products are referred to as "Section 351 HCT/Ps" and are subject to adulteration, misbranding, and premarket approval requirements of the Federal Food, Drug, and Cosmetic Act. *Id.*

## III. Plaintiffs' Motion for Preliminary Relief and Legal Standard

Plaintiffs seek preliminary relief to enjoin or stay the agency from issuing unfavorable administrative decisions relating to skin substitute products. (ECF No. 36-28.) "Motions to stay agency action . . . are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Texas v. Biden*, 646 F. Supp. 3d 753, 771 (N.D. Tex. 2022) (internal quotation marks and citation omitted). Preliminary injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," a plaintiff must make "a clear showing" that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm without the requested injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Canal Auth. v. Callaway*, 489 F.2d 567, 572–73 (5th Cir. 1974). Failure to demonstrate any one of these elements requires denial of preliminary relief. *See Allied Mktg. Grp. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

## IV. Argument and Authorities

### A. Plaintiffs fail to establish subject-matter jurisdiction or proper venue for their claims (and thus cannot show any likelihood of success here).

As explained in the motion to dismiss, ECF No. 29, Plaintiffs fail to establish jurisdiction for their claims. Plaintiffs seek to bypass the Medicare statute's mandatory administrative review process based on their belief that the administrative process will not provide the relief they seek. But dissatisfaction with the likely outcome of administrative review does not excuse the Medicare statute's presentment and exhaustion requirements, and jurisdiction cannot exist

when these requirements are not satisfied. Plaintiffs concede that all but three of them failed to exhaust their administrative remedies and none of those three alleges that they first presented the "Clawback Policy" claim that they advance here. Furthermore, as the motion explained, venue in the Northern District of Texas is improper. Because Plaintiffs have not established that the Court has jurisdiction and because venue is improper, they cannot demonstrate a substantial likelihood of success on the merits, a prerequisite to obtaining preliminary injunctive relief.

**B. No likelihood of success is shown even if jurisdiction did exist.**

Aside from the jurisdictional bar, Plaintiffs also cannot demonstrate a substantial likelihood of success on their allegations that the Secretary created a "Clawback Policy" that changed the substantive standard for coverage of skin substitute products. ECF No. 36, PageID 5362. Plaintiffs generally argue that this alleged change required notice-and-comment rulemaking, cannot be applied retroactively, and contradicts currently applicable LCDs, but as explained below, these arguments fail, and the relevant authorities and case law instead show why Plaintiffs are not entitled to any relief here.

**1. Notice-and-comment rulemaking was not required because CMS did not establish or change a substantive legal standard.**

As an initial matter, Plaintiffs attempt to conjure into existence some new "Policy" that would then be subject to notice-and-comment rulemaking fails on its own terms. The Medicare statute requires notice-and-comment rulemaking only for a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility" of individuals or entities to furnish or receive Medicare services. 42 U.S.C. § 1395hh(a)(2). The question, then, is whether CMS changed the substantive legal standard governing payment for skin substitute claims. It did not, and Plaintiffs fail to show otherwise.

Instead, the governing statutory standard has remained unchanged. As relevant here, Medicare pays only for items and services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). The Medicare statute further authorizes payment only where the claimant furnishes the information necessary to determine that payment is due, and providers must submit sufficient documentation to establish Medicare coverage. *Id.* § 1395*l*(e); 42 C.F.R. § 424.5(a)(6). Together, these provisions place the burden on the provider to establish that the item or service satisfies coverage requirements.

Plaintiffs do not allege that CMS amended the statutory "reasonable and necessary" standard, promulgated a new coverage rule, or revised Medicare's eligibility criteria. Instead, they argue that CMS effectively changed Medicare policy by requiring additional evidence to support reimbursement for certain skin substitute claims. But that argument conflates the evidentiary showing necessary to establish entitlement to payment with the governing legal standard. They are not the same. The legal standard remains whether an administrative adjudicator (or later a court, upon judicial review after exhaustion) finds a claimed item or service is "reasonable and necessary" for the treatment of a beneficiary. A determination that the evidence submitted in support of a particular claim is insufficient to satisfy that longstanding statutory standard does not "establish[] or change[] a substantive legal standard" within the meaning of § 1395hh(a)(2). Rather, it reflects the application of an existing statutory standard to the facts of an individual claim.

Plaintiffs' reliance on *Azar v. Allina Health Services*, 587 U.S. 566 (2019), and *Texas v. Becerra*, 89 F.4th 529 (5th Cir. 2024), is unavailing. (ECF No. 36 at 14.) In *Allina*, the Supreme Court held that notice-and-comment rulemaking was required for subregulatory guidance that changed the methodology for calculating Medicare reimbursement. Likewise, *Texas* involved

agency action that altered a substantive legal standard requiring the provision of abortions to emergency-room patients. In both cases, the agency effectively adopted a new payment or eligibility standard applicable across the Medicare program.

No comparable agency action is alleged here. Plaintiffs do not identify any regulation, NCD, or other agency action changing the legal standard governing Medicare coverage and payment. Instead, they challenge the manner in which Medicare contractors and administrative adjudicators evaluated the evidence submitted in support of individual reimbursement claims. Applying an existing statutory standard through claim adjudication is fundamentally different from adopting a new substantive legal standard governing payment. Because Plaintiffs challenge only the former, neither *Allina* nor *Texas* requires notice-and-comment rulemaking.

Plaintiffs nonetheless argue that decisions by Medicare contractors and administrative adjudicators show that there is a new standard because in some cases it was found that particular skin substitutes were experimental and investigational and therefore not reasonable and necessary. But the concepts of "experimental" and "investigational" do not establish an independent Medicare coverage standard. Rather, they reflect an adjudicatory determination in any given case that the evidence presented was insufficient to establish that a particular item or service satisfied the statutory requirement that it be "reasonable and necessary" under 42 U.S.C. § 1395y(a)(1)(A). In that sense, the "experimental and investigational" discussion is derivative of the reasonable-and-necessary standard. It describes why the provider has not established entitlement to payment under the existing statutory framework—because the provider did not submit sufficient evidence that its product actually provides an established treatment for a beneficiary's disease or condition in the usage case presented. For this reason, the Secretary is clearly not applying a new standard retroactively.

Plaintiffs' objections to the contractors' application of LCDs, and the administrative adjudicators' application of the Medicare Program Integrity Manual, likewise do not show that Medicare has changed its longstanding coverage rules for skin substitutes or is otherwise acting unlawfully. Plaintiffs argue that the LCDs require that every product "cleared by Section 361 is automatically medically reasonable and necessary." ECF No. 36, PageID 5354. But the LCDs do no such thing. Rather, the LCDs identify the circumstances under which skin substitutes *may* be covered and also when they are never covered under the reasonable-and-necessary standard. *See, e.g.*, ECF No. 25-3, PageID 2332–2333 (LCD L36690 for Medicare contractor CGS Administrators, LLC, identifying the conditions under which a skin substitute may be covered).

Regardless of whether an applicable LCD exists, Medicare reimburses only those items and services that are reasonable and necessary for a particular beneficiary. An LCD cannot create an entitlement to payment independent of the statute. Properly understood, the LCDs identified by Plaintiffs set out circumstances in which coverage generally may be appropriate. They do not relieve providers or suppliers of demonstrating that any individual submitted claim satisfies Medicare's payment requirements. Plaintiffs' contrary interpretation would effectively elevate LCDs above the governing statute by treating them as binding guarantees of reimbursement. Nothing in the Medicare statute or case law supports such a conclusion.

Moreover, even where an LCD recognizes coverage, reimbursement still remains dependent on facts of the individual claim. Under the LCDs identified by Plaintiffs, coverage still depends on considerations of the beneficiary's clinical condition, prior treatment history, documented response to therapies, etc. ECF No. 25-3, PageID 2329–33. Accordingly, two claims involving the same product may properly receive different coverage determinations based on differences in the underlying factual record. Plaintiffs' theory would eliminate this statutorily

required individualized inquiry. Under Plaintiffs' approach, the inclusion of a product within an LCD would effectively require payment of every claim involving that product regardless of whether there is medical documentation supporting the particular item or service furnished, and a showing of an appropriate usage case. That is not how any LCD or Medicare operates.

Plaintiffs also argue that their products are HCT/Ps, ECF No. 25, ¶ 68, and that they are registered under § 361 of the Public Health Service Act. Plaintiffs suggest that this registration means that their products may not be considered experimental or investigational by Medicare.

But Plaintiffs' theory rests on a false premise and is entirely lacking in legal support. The regulation of an HCT/P under § 361 of the Public Health Service Act relates to FDA's communicable-disease authority; it does not establish that the product—much less any particular individualized use of the product—is "reasonable and necessary" under the Medicare statute. Medicare coverage and FDA regulation operate under separate statutory schemes with distinct purposes. A Medicare contractor's or administrative adjudicator's determination that a product is experimental or investigational is directed to the particular use or indication for which Medicare payment is sought, rather than to the product's regulatory status alone. Accordingly, the fact that a product is regulated under § 361 does not prevent CMS or its contractors from determining that a particular use is experimental or investigational for Medicare payment purposes. Recent case law affirms these distinctions. A manufacturer may register its product "as required by Section 361, but this does not amount to approval by the FDA, let alone establish its use as 'reasonable and necessary.'" *Greiner Orthopedics, LLC v. Kennedy*, No. 23-CV-1047, 2026 WL 63318, at *11 (D.D.C. Jan. 8, 2026). Put another way, "a product that satisfies the relevant requirements for use or sale under the FDA may nonetheless be ineligible for reimbursement by Medicare." *Id.* at *10; *see also Almy v. Sebelius*, 679 F.3d 297, 308 (4th Cir.

2012) ("while FDA approval has been adopted as a prerequisite to Medicare coverage, 'FDA approval/clearance alone does not generally entitle that device to coverage'"). Or as stated by yet another court, a provider "may have registered [its product] as required by Section 361, but that has little bearing on whether any instance of its use is covered by Medicare." *Macomb Foot, Ankle & Wound Care v. Kennedy*, No. 24-CV-869, 2026 WL 875235, at *8 (D.D.C. Mar. 31, 2026). In the end, "[p]roducts' potential FDA categorization under § 361 d[oes] not automatically entitle them to favorable coverage determinations under the separate reasonable and necessary scheme of Medicare." *Ctr. for Innovations in Evaluative Med., LLC v. Becerra*, No. 24-CV-362, 2026 WL 1676388, at *8 (M.D. La. May 22, 2026).

**2. The Medicare statute expressly authorizes post-payment review and recovery of improper payments.**

Despite Plaintiffs' characterization of their claims as a challenge to a changed payment policy, their complaint is, at bottom, an attack on CMS's longstanding statutory authority to review previously paid claims and recover overpayments. Congress has long recognized that Medicare's initial payment determinations occur on a massive scale involving millions of annual reimbursement requests and very limited information, and are therefore not infallible. Accordingly, it created an extensive program integrity system that authorizes and directs CMS to identify and recover overpayments. 42 U.S.C. § 1395ddd(f)(3). Consistent with that statutory framework, CMS issued regulations under which its contractors may reopen payment determinations under specified circumstances and recover overpayments when subsequent review demonstrates that payment was not authorized. 42 C.F.R. § 405.980 *et seq.*

Against this statutory backdrop, Plaintiffs' characterization of post-payment review as a novel "Clawback Policy" cannot be reconciled with the Medicare statute. Congress expressly contemplated that previously paid claims would remain subject to subsequent review and

correction where appropriate. The fact that CMS exercised those longstanding authorities with respect to some skin substitute claims therefore does not establish that it adopted a new payment policy or retroactively changed Medicare's coverage standards.

Plaintiffs' argument that contractors and administrative adjudicators improperly considered criteria from the Medicare Program Integrity Manual also fails. As another district court within this Circuit recently explained, the MPIM factors (which address commonsense issues like whether a service is safe, effective and appropriate[2]) are properly considered when determining whether a product meets the reasonable and necessary standard: "While these factors, which are set out in § 3.6.2.2 of the MPIM, are not binding on the Council, the applicable regulation, 42 C.F.R. § 405.1062(a), requires that they be given 'substantial deference.'" *Ctr. for Innovations*, 2026 WL 1676388, at *7. Additionally, at least one other court has addressed this exact claim in a case in which the plaintiffs argued that the "Council's reliance on Chapters 3 and 13 of the MPIM was error, because these chapters are 'interpretive rules that do not have the force of law.'" *Macomb Foot*, 2026 WL 875235, at *12. The court rejected this claim, first noting that "while 'ALJs . . . and the Council are not bound by . . . manual instructions,'" it was perfectly acceptable for an agency adjudicator to rely on the Manual "to inform its decisionmaking." *Id.* Because other courts have considered the same arguments Plaintiffs make here and found them unpersuasive, Plaintiffs are unlikely to succeed on the merits of these claims.

**3. The Secretary has not acted arbitrarily or capriciously.**

Plaintiffs argue that it is arbitrary and capricious for the Secretary to go from paying for skin substitute products to denying payment, and for the Secretary to consider costs to the

[2] *See Ctr. for Innovations*, 2026 WL 1676388, at *11, *13.

Medicare Trust Fund. Plaintiffs further argue that the Secretary lacks a reasoned basis for demanding evidence that each product is capable of providing the treatment for which it is billed. But Plaintiffs are not likely to succeed on any of these arguments.

*First*, even taking as true Plaintiffs' allegation that the Secretary reimbursed skin substitute products for years and has only now implemented post-payment review that found some of those products ineligible for payment, those actions do not establish that CMS has unlawfully changed a binding policy. Routine payment of claims, even over an extended period, does not itself establish a generally applicable substantive legal standard governing future reimbursement that locks Medicare into forevermore paying for a product or service. As discussed earlier in this brief, Medicare must pay claims quickly and it would be impossible for its contractors to gather all information necessary to fully investigate every one of the billions of claims before payment is made. Congress addressed this problem by requiring Medicare providers to keep evidence supporting their claims and by creating a system of post-payment review of claims. 42 U.S.C. §§ 1395ddd, 1395*l*(e). The Medicare statute requires more than submission of a claim to ultimately be *entitled* to payment—even if the payment was already made on the front end at the time of claim submission and before review. Medicare pays only for covered items and services that satisfy the statutory conditions of payment, including the requirement that the service be "reasonable and necessary." *Id.* § 1395y(a)(1)(A). To establish entitlement to payment, the claimant must furnish the information necessary to determine that payment is due, *id.* § 1395*l*(e), and the Secretary's regulations require providers to submit sufficient documentation supporting the claim, 42 C.F.R. § 424.5(a)(6). Providers also must maintain that documentation for seven years and make it available upon request by CMS or a Medicare contractor. 42 C.F.R. § 424.516(f). These provisions anticipate both pre-payment and

post-payment review and place the burden on providers to substantiate their claims throughout that process. They further show that Congress did not intend to create a system where initial payment creates a binding rule that the Secretary can only revisit by engaging in notice-and-comment rulemaking.

*Second*, Plaintiffs argue that it is unreasonable for the Secretary to require them to produce evidence of the efficacy of each skin substitute product because skin substitutes are all identical. Specifically, Plaintiffs argue that skin substitutes are regulated under § 361 and are therefore "at bottom, just human cells," and therefore should all be evaluated as if they are "functionally identical." ECF No. 36, PageID 5365–66. But with this argument Plaintiffs again conflate FDA regulatory classification with Medicare coverage. The fact that a skin substitute was self-registered as an FDA § 361 product does not mean that it is in all circumstances reasonable and necessary for treatment of a particular patient and thus payable by Medicare.

Even assuming that certain skin substitute products are regulated under the same framework or share biological characteristics, it also does not follow that evidence regarding one product necessarily establishes that another product, used for a particular beneficiary and indication, satisfies Medicare's reasonable-and-necessary standard. In these circumstances, the Medicare statute requires an individualized determination of entitlement to payment. Similarity among products may inform that analysis, but it does not eliminate the provider's burden to establish that the particular claim satisfies the statutory conditions for payment.

Much of Plaintiffs' own pleadings argue that scientific literature demonstrates the effectiveness of skin substitutes and that CMS failed to give sufficient weight to that evidence. But whether CMS assigned the proper weight to particular studies is not a question presented by Plaintiffs' facial APA challenge. Administrative adjudicators routinely evaluate competing

medical evidence in determining whether providers have demonstrated eligibility for Medicare payment. Disagreements regarding the persuasiveness of any particular clinical studies, and questions of how far such studies may be extended to non-studied products, cannot establish that the governing legal standard is arbitrary or otherwise unlawful.

At most, Plaintiffs contend that adjudicators should have reached different conclusions regarding the evidence submitted in support of individual reimbursement claims, but this concerns evidentiary sufficiency, not agency policymaking. Those contentions must first be raised in the administrative appeals process, not in a facial APA challenge alleging unlawful agency rulemaking. Plaintiffs have no likelihood of succeeding on the merits of this argument.

*Third*, Plaintiffs argue that the Secretary's "Clawback Policy" is contrary to law because it was allegedly premised on cost considerations, which Plaintiffs say is impermissible. ECF No. 36, PageID 5367. Plaintiffs repeatedly suggest that CMS undertook post-payment review of skin substitute claims because of the expense of such products. From this premise, they ask this Court to infer that the agency abandoned the statutory "reasonable and necessary" standard in favor of an impermissible cost-based coverage policy. But that inference is unwarranted.

Congress charged the Secretary with administering the Medicare program while safeguarding the Medicare Trust Fund. Program integrity activities, including medical review, reopening of claims, and recovery of identified overpayments, necessarily advance that statutory responsibility. But the fact that effective oversight conserves Medicare resources does not establish that cost replaced the governing legal standard. Virtually every Medicare payment determination has financial consequences. If concerns over ballooning spending or anticipated cost savings alone established an APA violation, then routine efforts to identify improper payments would become suspect whenever they reduced program expenditures. Nothing in the

Medicare statute supports that conclusion. The relevant inquiry remains whether CMS continued to apply the statutory reasonable and necessary standard. Plaintiffs have not plausibly alleged otherwise. Nor have Plaintiffs supplied evidence that they first presented this claim administratively. They have not established that they are likely to prevail on this claim.

Fourth, while Plaintiffs state that "[t]he Council has … reversed the ALJ on grounds that skin substitutes are 'experimental' or 'investigational' in *every* case of which Plaintiffs are aware," this is not correct. ECF No. 36 PageID 5357 (emphasis in original). There are final agency decisions issued by ALJs that have allowed coverage of skin substitute claims with dates of service after April 2022 (including one relating to Plaintiff Wound Management Specialists, LLC). *See, e.g.*, App. 006, 018, 031. This further shows Plaintiffs' allegations of an alleged "Clawback Policy" to be unsupported, because under Plaintiff's theory of a covert policy the Council would presumably have reversed these provider-favorable decisions.

**4. Other courts have rejected similar arguments.**

Earlier this year, another district court considered a challenge largely identical to Plaintiffs' allegation here that the Secretary utilizes a "Clawback Policy" to deny their claims, and held that that jurisdiction was absent "because Plaintiffs have failed to administratively exhaust it." *Greiner*, 2026 WL 63318, at *7; *see also StimLabs, LLC v. Becerra*, 636 F. Supp. 3d 165, 176 (D.D.C. 2022) (no jurisdiction because "when Plaintiffs filed this suit, none of them appear to have challenged CMS's purported unwritten policy on the grounds advanced here 'in the context of a specific administrative claim for payment'").[3] The same is true here.

Also illuminating is another lawsuit in which it was alleged that the Secretary

[3] On reconsideration, the district court held that one of the plaintiffs met the presentment requirement, but still found the court lacked jurisdiction over the lawsuit based on a failure to exhaust. *See StimLabs,* 651 F. Supp. 3d at 56.

"effectively adopt[ed] a 'blanket exclusion of certain HCT/Ps from Medicare coverage'" and "covertly appl[ied an] automatic-denial policy." *Macomb Foot*, 2026 WL 875235, at *5. These allegations, however, were not supported by specific facts that a covert policy actually existed, with the court explaining that "[e]ven if there were instances of reimbursing uses of HCT/Ps in the past, the fact that Plaintiffs' claims specifically were denied does not show that the denials were the result of a blanket policy." *Id.* Here, Plaintiffs rely on the same discredited types of legally insufficient allegations, and like the *Macomb Foot* plaintiffs, they merely allege that their claims were previously covered and that any other result must be an unlawful change in policy.

In yet another case, similar claims were rejected, with the court explaining that the plaintiffs "ha[d] not given the court any reason to believe there is such a covert policy beyond simply saying so," and instead were "infer[ring] the existence and effect of such a policy by characterizing every denial as" some finding "'that the products were experimental and not safe and effective.'" *Greiner*, 2026 WL 63318, at *6. But "this assertion [was] not borne out by the record evidence." *See id.* "[T]he ALJs did not rely on wholly inapplicable regulations to reach their decisions" in the exhibits that plaintiffs supplied. *See id.* "To the contrary, the ALJs denied the claims in detailed opinions for different reasons, specific to the uses and beneficiaries at issue and under the applicable Medicare standards and guidelines." *Id.* The same is true here, as shown in the exhibits submitted with Plaintiffs' pleadings. And because Plaintiffs have alleged no facts to support the existence of any "Clawback Policy," just like the suppliers in *Greiner*, they cannot prevail on this claim and their motion for preliminary relief must be denied, even if they had presented and exhausted that claim.

**5. The Medicare statute requires case-by-case coverage determinations, not the blanket relief Plaintiffs seek.**

Plaintiffs' appeal to this Court for a blanket coverage policy for "skin substitutes" runs

counter to the holdings of other courts that have reviewed individual appeals on full administrative records. For example, in one recent case in Florida, the court upheld the Secretary's final decision finding that the use of a skin substitute was not safe and effective in the specific context presented and that the provider failed to establish that the product was not experimental and investigational. *Family Foot & Leg Ctr., P.A. v. Kennedy*, No. 24-CV-547, 2025 WL 2538474, at *2 (M.D. Fla. Sept. 4, 2025). That is how the system of Medicare determinations is supposed to work, as opposed to Plaintiffs' blunderbuss approach that would effectively annul or preempt the decisions of other courts that painstakingly review specific claims on the basis of the relevant administrative record for that claim.

At the most basic level, Plaintiffs seek an order from this Court prospectively prohibiting the Secretary from making findings in individual cases that any skin substitute is experimental and/or investigational, regardless of the circumstances and specific usage case. But courts reviewing agency decisions sit as appellate tribunals and do not themselves weigh the evidence. *Elevance Health, Inc. v. Kennedy*, 795 F. Supp. 3d 861, 867 (N.D. Tex. 2025). The court determines whether the Secretary applied the correct law on a concrete claim and whether substantial evidence supports the agency's decision. "The Medicare statute unambiguously vests final authority in the Secretary, and no one else, to determine whether a service is reasonable and necessary." *New York ex rel. Bodnar v. Sec'y of Health & Hum. Servs.*, 903 F.2d 122, 125 (2d Cir. 1990). And courts lack authority to direct the Secretary how to handle future claims that are not before the court. *See Porzecanski v. Azar*, 943 F.3d 472, 483 (D.C. Cir. 2019).

Rather than proceeding through the legally required route to judicial review under the Medicare statute, which would allow for the creation of an appropriate administrative record, Plaintiffs attempt to avoid all the evidence that would be developed and assembled as part of

such a record by instead submitting stand-alone exhibits to be viewed without context. But that is inconsistent with the system that Congress created for courts to review agency action. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

Plaintiffs also overlook the inconvenient facts presented in their own exhibits that undermine their lawsuit. For example, one of Plaintiffs' own exhibits reflects Plaintiff Wound Management Specialists LLC's acknowledgment during the administrative process that the operative LCD specified that "there was scant peer-reviewed evidence on skin substitutes but allowed contractors to consider if they were reasonable and necessary in the care of a particular beneficiary." ECF No. 36-25, PageID 5951. This is not consistent with Plaintiffs' attempted characterization of the situation as one where the LCDs support all their claims unequivocally, but the Secretary has somehow created a "Clawback Policy" to override that result.

**6. Plaintiffs cannot prevail on their limitation on liability claim.**

Plaintiffs also argue that they are "faultless" and "'did not know, and could not reasonably have been expected to know' that the service was not covered." ECF No. 36, PageID 5367–5368. But other courts have addressed limitation on liability arguments for denied coverage and have found that those provisions do not provide payment as Plaintiffs suggest. *See Family Foot*, 2025 WL 2538474, at *5 ("the Secretary's silence on a particular service does not suggest coverage" and the supplier had no reason to believe that using a skin substitute "beyond the prescribed purpose . . . would be approved"). Whether a treatment is reasonable and necessary and whether a provider had reason to believe coverage would be denied is very case specific and depends on things like the conditions and ailments of a beneficiary, the level of

severity of the condition, whether an LCD applies and has criteria that must be met, how the product is being used, and what procedures were tried previously. And, the provider must make a claim administratively that the limitation of liability applies, otherwise that claim is waived. The fact that other courts have held that skin substitute providers had no reasonable expectation that their use of skin substitutes would be covered is sufficient evidence that Plaintiffs cannot meet their burden and is enough to deny Plaintiffs' request for a preliminary injunction. *See Family Foot*, 2025 WL 2538474, at *5. Additionally, it is not unusual for providers to fail to raise this issue administratively. *See Ctr. for Innovations*, 2026 WL 1676388, at *11 (Plaintiff "neglected to include any arguments concerning the issue of its financial liability."). Before a court can issue a decision on a limitation on liability claim, a provider must have raised it administratively, and once exhausted, a court would need to determine whether a final agency decision that denied payment based upon a limitation of liability provision was supported by substantial evidence, which is case-specific and not a general finding across an entire industry. Even if one court were to hold in a particular instance that a specific provider could not have anticipated their claims would not be covered, and therefore the limitation of liability applied, such holding would not apply to other claims.

### C. Plaintiffs fail to establish irreparable harm.

Plaintiffs claim irreparable harm as a result of CMS's efforts to recover Medicare reimbursements it previously issued to them. *See, e.g.*, ECF No. 25 ¶¶ 104, 142, 158, 185, 222, 237, 265, 279 (CMS "initially covered" treatments by plaintiffs). But no such harm is shown, as Plaintiffs by definition already received this money and if they obtain a favorable decision from an ALJ, the Medicare Appeals Council, or a federal court on an exhausted challenge, they will be

therefore be no worse off.[4] Plaintiffs' claims are unlike other claims under the APA in that they have already received the money at issue and are objecting to the government's effort to recoup it; a favorable litigation outcome will therefore make them economically whole. *See Dennis Melancon, Inc. v. New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("It is thus well-established that an injury is irreparable only 'if it cannot be undone through monetary remedies.'"). Plaintiffs' alleged economic loss is not irreparable because it would be fully remedied if they prevail in administrative proceedings or (proper) litigation after exhaustion.

Plaintiffs' arguments about alleged threats to the ongoing viability of their businesses also fail to show irreparable harm. *See* ECF No. 30, PageID 5369. This Court has already explained elsewhere that allegations of a Medicare provider "being forced to go out of business" do not justify emergency relief when a plaintiff has failed to channel its claims. *See Indeplus Grp. of Cos. v. Sebelieus*, No. 3:10-CV-0557-O, 2010 WL 1372488, at *3 (N.D. Tex. Apr. 7, 2010). As the Court summarized, "Plaintiff essentially complains that the suspension of payments is extremely damaging to Plaintiff and will result in Plaintiff's being forced to go out of business due to its dependence on Medicare payments for revenue. The Court is sympathetic to Plaintiff's situation . . . . but . . . is without the power to intervene in the agency's internal process for such disputes." *Id.*; *see also Griego v. Leavitt*, No. 3:07-CV-1708-D, 2008 WL 2200052, at *8 (N.D. Tex. May 16, 2008) ("Assuming *arguendo* that exhausting Dr. Griego's administrative remedies would force him to shut down his health clinic, this harm would not constitute irreparable injury. [E]ven if the Secretary's actions were to force a health care provider out of business, the injuries are not necessarily 'irreparable,' considering the risk known

[4] For those Plaintiffs who have partially refunded the payments via Extended Repayment Schedule agreements, they would receive a rebate of all amounts paid (including interest) in the event they prevail in this litigation. *See* Medicare Financial Management Manual, Ch. 3, § 200.5.

to the health care provider when it enters the Medicare program. Therefore, in the present case, the companies' allegations of financial doom, even if they were substantiated, which they are not, would not necessarily warrant judicial waiver of the exhaustion requirement." (internal quotation marks and citation omitted)). That all remains true today.

Additionally, those Plaintiffs who have channeled their claims—even if they can overcome their failure to establish venue in this Court, *see* ECF No. 29—cannot demonstrate imminent irreparable harm. Plaintiff April Lopez, for example, received a fully unfavorable ALJ decision on March 18, 2025—almost a year before filing suit. ECF No. 25-19. She appealed the adverse ALJ decision on May 8, 2025, ECF No. 25-20, but then did not seek escalation to federal court until March 2, 2026, despite being eligible to do beginning on August 6, 2025. *See* 42 C.F.R. §§ 405.1100, 405.1132. This unexplained delay of more than six months "militates against a finding of irreparable harm." *Golden Cheek Ventures, L.P. v. Brazos Elec. Power Coop.*, No. 4:15-CV-0821-O, 2015 WL 13469994, at *2 (N.D. Tex. Nov. 10, 2015).

Plaintiff Wound Management Specialists bases its claim for irreparable harm on a payment suspension issued April 21, 2026. Despite being aware of this suspension at the time it filed an amended complaint on May 8, 2026, it made no allegations about this suspension in that document. Even now, Wound Management Specialists does not provide this Court with any evidence of the payment suspension, even though it insists (through declarations) that the suspension is meritless. *See* ECF No. 36-16, ¶ 32. As Wound Management Specialists must acknowledge, however, CMS issued the payment suspension based in part on allegations that "Wound Management Specialists LLC improperly billed Medicare for services provided to 53 beneficiaries after their reported date of death, 11 of which had multiple dates of service after their reported date of death." (App. 041.) In other words, a key basis for the payment

suspension has *nothing* to do with any alleged "Clawback Policy." And Plaintiffs certainly do not seek an injunction forbidding CMS from using post-payment audits to determine whether suppliers are billing Medicare for services provided to dead people. Wound Management Specialists may try to rebut this serious allegation through the regulatory process described in its payment suspension letter, 42 C.F.R. § 405.273(b), but the suspension does not demonstrate that it is suffering irreparable harm caused by an alleged "Clawback Policy." By contrast, an injunction forbidding CMS from investigating wasteful Medicare spending (solely because the spending at issue involves skin substitutes) would irreparably harm the government and the public by preventing it from policing fraud, waste, and abuse in the Medicare program.

It is also notable that another Plaintiff, Wyoming Medical Associates, seems to acknowledge that it is not suffering irreparable harm. It has "not changed [its] protocols for when to provide advanced wound care." ECF No. 36-2, ¶ 18. And while it "fear[s] that [it] could be hit with another audit and/or demand at any moment," *id.* ¶ 22, it offers no evidence that such an audit will occur. "The party seeking a preliminary injunction must also show that the threatened harm is more than mere speculation." *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011). Wyoming Medical Associates has not changed its procedures and offers only speculation about the effects of a hypothetical future audit on its business, which does not show irreparable harm.

Plaintiffs' differing harm allegations further highlight the inappropriateness of class certification and class wide relief in this matter. *See* ECF No. 35. Some plaintiffs have entered into payment plans with CMS, others have not. *See, e.g.*, ECF No. 36-3, ¶ 12 (no repayment plan); ECF No. 36-4, ¶ 15 (same); ECF No. 36-5, ¶ 20 (repayment plan); ECF No. 36-8, ¶ 10 (same). Some Plaintiffs have altered their policy for when to apply skin substitutes, others have

not. *See* ECF No. 36-2, ¶ 18 ("we have not changed our protocols for when to provide advanced wound care"); ECF No. 36-3, ¶ 16 ("I have stopped using skin substitutes entirely."). Plaintiffs in Texas acknowledge that a CMS payment model known as the Wasteful and Inappropriate Service Reduction (WISeR) model, which is being tested in Texas and five other states and which they do not challenge, may affect their business. *See* ECF No. 36-5, ¶ 34 (Plaintiff Lopez acknowledging she has not trained her staff on the model); ECF No. 36-7, ¶ 26 (Plaintiff McGee acknowledging WISeR model and other unchallenged factors, including "lowered payments for skin substitutes," as a contributor to business difficulties). Given the absence of imminent irreparable harm, there is no basis for the "extraordinary remedy" of classwide preliminary injunctive relief. *Winter*, 555 U.S. at 24.[5]

**D. The public interest weighs against any preliminary relief.**

Plaintiffs propose two reasons that the public interest allegedly favors preliminary injunctive relief. Their first argument merely repeats the dubious allegation that some named class members face imminent irreparable harm. ECF No. 36, PageID 5370. Second, they allege that an injunction would "prevent amputations and even save lives." *Id.* Notably, in the one case Plaintiffs cite for this point, the court actually *denied* preliminary injunctive relief. *Baqer v. St. Tammany Par. Gov't*, No. 20-980, 2020 WL 1820040, at *14–*15 (E.D. La. Apr. 11, 2020). And the public interest there involved the unique circumstances of the COVID-19 pandemic and the risk of communicable disease. *Id.* at *14. By contrast, here, one Plaintiff affirmatively states that his organization has not altered its advanced-wound-care protocols. ECF No. 36-2 ¶ 18.

---

[5] To the extent that Plaintiffs attempt to assert irreparable harm on behalf of their patients, they cannot do so. *See Morice v. Hosp. Serv. Dist. #3*, No. 18-7945, 2019 WL 1517954, at *7 (E.D. La. Apr. 8, 2019) (physician "lacks standing to seek injunctive relief for harm that will occur to others, even to others who would allegedly benefit from such injunctive relief").

Even those Plaintiffs who state that they will no longer use skin substitutes offer no systematic evidence—only anecdotes—that fewer applications of skin substitutes will cause patient harm. Plaintiffs have failed to demonstrate that an injunction will result in a public benefit.

On the other hand, Plaintiffs' proposed injunction would cause substantial harm to the public interest in preventing fraud, waste, and abuse in the Medicare program. Plaintiffs' proposed injunction would undermine the government's ability to verify, via post-payment audits, whether Medicare suppliers used skin substitutes properly. Congress required the Secretary to contract with entities to conduct pre- and post-payment review to "promote the integrity of the medicare program." 42 U.S.C. § 1395ddd. The HHS Office of the Inspector General has noted that "Payment Trends for Skin Substitutes Raise Major Concerns About Fraud, Waste, and Abuse," and currently has an active review of "Medicare Part B claims for skin substitutes to identify payments that were at risk for noncompliance with Medicare requirements."[6] There is substantial public interest in preventing fraud, waste, and abuse in the Medicare program. Plaintiffs' broad injunction would undermine that public interest. Conversely, there is no harm to the public interest in requiring Medicare providers and suppliers seeking to challenge their reimbursements to present and exhaust their claims consistent with Congress's requirements. *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000).

The public interest concerns are further heightened here because Plaintiffs seek a mandatory injunction, which is particularly disfavored and "not granted unless extreme or very serious damage will result." *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*,

[6] *See* https://oig.hhs.gov/documents/evaluation/10939/OEI-BL-24-00420.pdf; https://oig.hhs.gov/reports/work-plan/browse-work-plan-projects/medicare-part-b-payments-for-skin-substitutes/.

636 F.3d 1150, 1160 (9th Cir. 2011). Plaintiffs fails to satisfy this heightened standard for the mandatory relief they seek—an order directing the Secretary to cease certain post-payment audits and decide every skin substitute claim submitted for Medicare coverage in favor of suppliers.

A mandatory preliminary injunction, as opposed to a prohibitory injunction, seeks to alter the status quo prior to litigation rather than maintain it. *Texas v. Ysleta del Sur Pueblo*, No. EP-17-CV-179-PRM, 2018 WL 1566866, at *9 (W.D. Tex. Mar. 29, 2018). That is, it mandates that defendants take some action inconsistent with the status quo rather than prohibiting them from altering the status quo. *Id*. This turns on "whether the non-moving party is being ordered to perform an act, or refrain from performing." *Schrier v Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005). Plaintiffs ask the Secretary to short-circuit Congress's established method for post-payment Medicare audits and supplier reimbursement appeals in favor of a blanket policy ordering the Secretary to issue payment without permitting post-payment review.

The Fifth Circuit has repeatedly held that mandatory injunctions require an even higher showing than prohibitory injunctions. *See Justin Indus., Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990) ("[B]ecause [the plaintiff] is seeking a mandatory injunction, it bears the burden of showing a clear entitlement to the relief under the facts and the law."); *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."). This Court should deny Plaintiffs' request for such a mandatory injunction.

### E. Plaintiffs' request for classwide preliminary relief amounts to an improper universal injunction.

Plaintiffs' request for "preliminary relief" for an entire industry of suppliers is an extraordinary request and obvious attempt to obtain a nationwide injunction. Part of their relief

request includes a request for vacatur. *See* ECF No. 36, PageID 5371 ("'a [Section 705] stay is the temporary form of vacatur'"). In *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), the Supreme Court held that the "more recent development" of "universal injunctions"—through which district courts "assert[] the power to prohibit enforcement of a law or policy against *anyone*"—"lacks a historical pedigree" and "falls outside the bounds of a federal court's equitable authority under the Judiciary Act" of 1789. *Id.* at 837, 847. A court sitting in equity must tailor relief to "'be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*.'" *Id.* at 852 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Plaintiffs seek an extraordinary remedy from this Court—to dictate to a coordinate branch of government how to decide individual future cases that are not even on review before the Court and for claims that have not been presented or exhausted. In particular, they ask to bar the Secretary, when reviewing claims for any skin substitute, even those not presently before the Court, from finding that the specific product is experimental and investigational on any basis. *See Porzecanski*, 943 F.3d at 482 (beneficiary "cannot satisfy 405(g)'s presentment requirement with respect to future claims because those claims have not yet arisen"). That is an extreme position and Plaintiffs have not identified instances where a court has instructed an administrative tribunal how to decide future cases or precluded a tribunal from making specific findings in future cases. Moreover, other decisions have already affirmed the denial of coverage of skin substitutes because they were determined to be experimental and/or investigational. *See, e.g.*, *Family Foot*, 2025 WL 2538474, at *2.

Because no jurisdiction exists over any claim that has not been administratively presented, the Court should not issue an injunction with regard to future claims. If the Court grants an injunction, however, it should do so only as to the named Plaintiffs, only as to past

claims, and not some purported class consisting of an entire industry. "[T]he APA only provide[s] authority to craft [an] equitable remedy" once the plaintiff's claims have "proceed[ed] through the special administrative review procedures set forth in the Medicare statute." *Porzecanski*, 943 F.3d at 485 (internal quotation marks and citations omitted). Allowing the Plaintiffs to obtain a universal remedy would allow other providers to circumvent not only the requirements of the Medicare statute, but the ordinary principles of Article III standing and equity that generally require that a court tailor remedies to the plaintiff's injury. *See, e.g.*, *Gill v. Whitford*, 585 U.S. 48, 73 (2018); *United States v. Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring in the judgment) (recognizing that courts should "ask[] whether party-specific relief can adequately protect the plaintiff's interests" and, if so, entering "broader relief is an abuse of discretion").

**F. If the Court orders injunctive relief, a substantial bond should be required.**

Rule 65(c) provides "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). This security requirement "assures the enjoined party that it may readily collect damages . . . in the event it was wrongfully enjoined." *Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990). "[F]ailure to require the posting of a bond or other security constitutes grounds for [an injunction's] reversal." *Id.*

A bond is appropriate security here because the Medicare program would lose millions of dollars if Defendants are wrongfully enjoined from denying reimbursement claims. Injunctive relief would require Medicare to reimburse claims for treatments that multiple reviewers have found do not meet the statute's "reasonable and necessary" requirements. *See* ECF No. 25,

¶¶ 13, 14, 20, 25, 148, 163, 187, 269, 280, 286. Some individual Plaintiffs are required to repay claims amounting to "millions" of dollars. *See* ECF No. 36, PageID 5358. Extending relief to a class of "hundreds" of similar providers would multiply the losses. *Id.*, PageID 5350. Given the program's scale, recoupment of those expenditures is highly unlikely at a later date.

Similarly, enjoining the agency's recoupment and calculation of interest would cause further damage by delaying repayment. Enjoining suspensions and audits would interfere with the Executive's administration of this complex program and restrain the federal statute's operation and its related regulatory scheme. If the Court grants injunctive relief, Defendants request the opportunity to propose an appropriate bond amount after having an opportunity to review the nature of any such relief granted.

## V. Conclusion

Plaintiffs' motion should be denied—and instead this case should be dismissed.

RYAN RAYBOULD
UNITED STATES ATTORNEY

/s/ Brian W. Stoltz
Brian Stoltz
Assistant United States Attorney
Texas Bar No.
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8626
Facsimile: 214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

Certificate of Service

On June 30, 2026, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Brian W. Stoltz
Brian Stoltz
Assistant United States Attorney